# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MENOMINEE INDIAN TRIBE** | ) | |
| **OF WISCONSIN,** | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | Case No.: 1:07cv00812 |
| v. | ) | |
| | ) | Hon. Rosemary M. Collyer |
| **UNITED STATES OF AMERICA,** | ) | |
| **MICHAEL O. LEAVITT**, Secretary of the | ) | |
| Department of Health & Human Services, and | ) | |
| **CHARLES W. GRIM**, Director of the | ) | |
| Indian Health Service, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**Table of Contents**

INTRODUCTION AND SUMMARY ...............................................................................1

BACKGROUND ........................................................................................................2

STANDARD OF REVIEW .............................................................................................9

RULE OF CONSTRUCTION ........................................................................................10

ARGUMENT ..........................................................................................................11

I.     Defendants Failed, in Each Year, to Pay the Tribe's Full Indirect
       Cost Need as Promised in the Contracts. ............................................................11

       A.     Defendants Promised to Pay in Accordance with Section 106
              of the ISDEAA. ...........................................................................12

       B.     Section 106 Requires Full Payment of Indirect Costs from Available
              Appropriations. ...........................................................................12

       C.     Defendants Were Bound to, and Did in Fact, Determine the Tribe's
              Indirect Cost Needs by the Rate-Times-Base Method..............................15

       D.     The IHS Failed to Pay the Tribe's Full Indirect Costs, as Calculated by
              Applying the Approved Rate, in any of the Years at Issue. ........................17

II.    The Tribe Did Not—and Could Not—Waive its Statutory and Contractual Right
       to Full Indirect Costs, and Is Not Estopped from Asserting that Right. ................18

       A.     The Text of the ISDEAA Precludes Tribal Waiver of Statutory Rights......18

       B.     Tribal Waiver Would Subvert the Purpose and Policies of the ISDEAA,
              and Is Thus Precluded ...............................................................20

       C.     The IHS's Cited Cases Do Not Support Waiver of Statutory Rights, and in
              Fact Recognize that Equitable Waiver Cannot Trump Public Policy
              Embodied in Statutes..................................................................23

       D.     The Tribe Did Not Waive Its Claim to Full Indirect Costs, Because
              that Claim Did Not Accrue Until (at the Earliest) the End of the
              Contract Year...........................................................................25

       E.     The Tribe Is Not Estopped from Claiming Additional Indirect Costs .......27

      F.      This Court Should Follow the Seldovia Case, in which the
              IBCA Rejected the IHS's "Waiver" Argument...........................................28

III.    The Tribe's Claims for 1996, 1997, and 1998 Meet the Applicable
      Statute of Limitations with the Benefit of Class-Action Tolling.........................30

      A.      The 1996-1998 Claims Were Timely Because the CDA Statute of
              Limitations Was Legally Tolled ................................................................30

            1.   The Shortfall Claims and Cherokee Nation Tolling ...........................32

            2.   The Miscalculation Claims and Zuni Tolling ......................................34

      B.      In the Alternative, the Statute of Limitations Was Equitably Tolled
              by the CSC Class Actions..........................................................................35

            1.   The Tolling Rule Would Apply in a Contract Dispute between
                Private Parties .....................................................................................36

            2.   There is No Evidence that Congress Did Not Intend the Tolling
                Rule to Apply to 41 U.S.C. § 605(a) ...................................................37

      C.      The Bowles Case Is Not to the Contrary ...................................................39

IV.    The Tribe's FY 1995 Claim Is Not Barred by Laches. ..........................................41

      A.      The Tribe's Delay in Bringing Its Claims Was Reasonable Given
              the CSC Class Actions. ............................................................................42

      B.      The IHS Was Not Prejudiced by the Tribe's Delay in Filing its Claims....43

V.    Defendants' Motion to Dismiss the Tribe's Breach of Trust Claim Should Be
    Denied. ......................................................................................................................44

CONCLUSION.............................................................................................................45

## Table of Authorities

<u>**Cases**</u>

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157
(Fed. Cir. 1993)..................................................................................................................42

*Aleutian Constructors v. United States*, 24 Cl. Ct. 372 (1991)...........................................26

*American Airlines, Inc. v. Austin*, 75 F.3d 1535 (Fed. Cir. 1996) ....................................18

*American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). .....................2, 31, 32, 34, 36

*Appeals of Cherokee Nation*, 99-2 BCA P 30462 (I.B.C.A. 1999), 1999 WL 440045)....22

*Appeals of Seldovia Village Tribe*, IBCA 3862-3863/97 (October 20, 2003) ...................14

*Application for Attorney Fees of Seldovia Village Tribe*, Interior Board of
Contract Appeals, Nos. IBCA 3862F/97 & 3863F/97 (July 26, 2005)..............................29

*Bailey v. West*, 160 F.3d 1360 (Fed. Cir. 1998)..........................................................36, 37

*Basch v. Ground Round, Inc.,* 139 F.3d 6 (1st Cir.1998) ...................................................34

*Beal Mortgage, Inc. v. F.D.I.C.*, 132 F.3d 85 (D.C. Cir. 1998)..........................................14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 125 S. Ct. 1955 (2007) ..............................10

*Board of Governors of the Univ. of N. Carolina v. United States*,
10 Cl. Ct. 27 (Cl. Ct. 1986)................................................................................................39

*Bowles v. Russell*, __ U.S. __, 127 S. Ct. 2360 (2007)........................................39, 40, 41

*Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119 (10th Cir. 1994)..........................................10

*Brice v. Secretary of Health & Human Servs.*, 240 F.3d 1367 (Fed. Cir. 2001) ..............38

*Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297(S.D.N.Y. 2001) ......................37

*Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697 (1945)........................................................20

*Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854
(Fed. Cir. 1997).........................................................................................18, 21, 22, 24

*C.I.T. Corp. v. Carl*, 85 F.2d 809 (D.C. Cir. 1936) ...........................................................26

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ......................................38

*Carter v. Exxon Co.*, 177 F.3d 197 (3d Cir. 1999) ............................................................21

*Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005)..............................................1, 5, 12, 23

*Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. 357
(E.D. Okla. 2001)...................................................................................................32, 42

*Christianson v. Harris County*, 529 U.S. 576 (2000) ........................................................19

*Coalition for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003) .............9

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988) .........................................41, 43

*Costello v. United States*, 365 U.S. 265 (1961) .................................................................42

*Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983) ...........30, 31, 32, 24, 36, 42

*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (Fed. Cl. 2004).........................42

*Day v. McDonough*, 547 U.S. 198 (2006) .........................................................................41

*Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637 (Fed. Cir. 1989).....................24

*E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978) .................................26, 28

*Gardner v. Panama R.R. Co.*, 342 U.S. 29 (1951) .......................................................42, 43

*Griffin v. Singletary,* 17 F.3d 356 (11th Cir.1994) ...........................................................34

*Empagren S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (D.C. Cir. 2003)....................9

*Haghighi v. Russian American Broadcasting Co.*, 173 F.3d 1086 (8th Cir. 1999) ............21

*Hartford Accident & Indem. Co.*, 130 Ct. Cl. 490 (1955) .................................................28

*Hermes Consolidated, Inc. v. United States*, 58 Fed. Cl. 409 (2003) ..........................24, 26

*In re Discovery Zone Securities Litigation*, 181 F.R.D. 582, 600, n.11 (N.D. Ill. 1998) ..31

*In re Fruehauf Trailer Corp.*, 250 B.R. 168 (D. Del. 2000)...............................................37

*Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147 (1883)........................................14

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990) .......................35, 36, 37, 38, 39, 41

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ...............................................10

*Joseph v. Wiles*, 223 F.3d 1155 (10th Cir. 2000)..............................................................31

*K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).........20

*Land Grantors in Henderson, Union & Webster Counties, Ky. v. United States,*
64 Fed. Cl. 661 (2005) ......................................................................................................37

*Manufacturers' Finance Co. v. McKey*, 294 U.S. 442 (1935) ...........................................28

*McCann v. Newman Irrevocable Trust*, 458 F.3d 281 (3d Cir. 2006)................................9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ...........18

*Mott v. R.G. Dickinson and Co.*, 1993 WL 63445 (D. Kan. 1993)....................................31

*NN&R v. One Beacon Ins. Group*, 2006 WL 1765077 (D. N.J. 2006)..............................37

*Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217 (1964) ...............................................33

*Oelberman v. Toyo Kisen Kabushiki Kaisha*, 3 F.2d 5 (9th Cir. 1925) .............................26

*Patton v. United States*, 64 Fed. Cl. 768 (2005) ...............................................................33

*Pueblo of Zuni v. United States*, 467 F. Supp.2d 1114 (D.N.M. 2006) ...........................13

*Pueblo of Zuni v. United States*, No. CV 01-1046 (D.N.M.)............................................34

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) .............................23, 36

*Reservation Ranch v. United States*, 39 Fed. Cl. 696 (1997).......................................24, 26

*Rough Diamond Co. v. United States*, 351 F.2d 636 (Ct. Cl. 1965)..................................24

*Salkind v. Wang,* 1995 WL 170122 (D. Mass. 1995) .......................................................31

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) .........................13

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ..........................................................................23

*Schimmer v. State Farm Mutual Automobile Ins. Co.*, 2006 WL 2361810
(D. Colo. 2006) ...........................................................................................................31, 35

*Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed. Cir. 1990).........................26

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) ......................... 41

*Stampco Construction Co. v. Guffey*, 572 N.E.2d 510 (Ind. Ct. App. 1st Dist. 1991) ....... 21

*Stone Container v. United States*, 229 F.3d 1345 (Fed. Cir. 2000) ...................... 31, 35, 36

*Terteling v. United States*, 334 F. 2d 250 (Ct. Cl. 1964) ................................................... 33

*Test Masters Educ. Servs. v. Singh*, 428 F.3d 559 (5th Cir. 2005) .................................... 10

*Tompkins v. United Healthcare*, 203 F.3d 90 (1st Cir. 2000) ........................................... 21

*Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075
(Fed. Cir. 2003) ........................................................................ 1, 8, 12, 13, 27, 29

*Thompson v. Seldovia Village Tribe*, No. 04-1230 (Fed. Cir. March 2004) ...................... 29

*Tunica-Biloxi Tribe of Louisiana v. United States*, No. 02-2413 (Dec. 9, 2003) ........ 40, 44

*Twombly*, 125 S. Ct. at 1974. (2007) ................................................... 10, 18, 44

*Union Pac. R.R. Co. v. United States*, 847 F.2d 1567 (Fed. Cir. 1988) ............................ 28

*United States v. Brockamp*, 519 U.S. 347 (1997) ....................................... 35, 37, 38, 39, 41

*United States v. Menasche*, 348 U.S. 528 (1955) ............................................................. 14

*United Tribe of Shawnee Indians v. United States*, 253 F.3d 543 (10th Cir. 2001) ............ 9

*Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) .................. 24, 26

*Young v. United States*, 535 U.S. 43 (2002) ....................................................... 35, 37, 41

## Statutes

11 U.S.C. § 507(a)(8)(A)(i) ............................................................................................ 41

11 U.S.C. § 523(a)(1)(A) ................................................................................................ 41

25 U.S.C. § 450(a)(1) ....................................................................................................... 2

25 U.S.C. § 450a(b) .................................................................................................. 21, 22

25 U.S.C. § 450b(g) .......................................................................................................... 5

25 U.S.C. § 450b(j) ......................................................................................................... 25

25 U.S.C. § 450j-1 ................................................................................................ *passim*

25 U.S.C. § 450j-1(a)(2), (3) .................................................................................4

25 U.S.C. § 450j-1(c) ...................................................................................8, 15, 16

25 U.S.C. § 450j-1(c)(2) .........................................................................................8

25 U.S.C. § 450j-1(c)(3)–(5) ..................................................................................5

25 U.S.C. § 450j-1(g) .........................................................................................4, 12

25 U.S.C. § 450k(e) .........................................................................................19, 20

25 U.S.C. § 450*l*(c), ...............................................................................7, 10, 13, 23

25 U.S.C. § 450m-1(a) ...........................................................................................45

25 U.S.C. § 450n .....................................................................................................25

25 U.S.C. § 458aaa-11(b)(2) ..................................................................................19

25 U.S.C. § 458aaa-16(e) .......................................................................................19

26 U.S.C. § 6511 .....................................................................................................41

28 U.S.C. § 2107(c) ................................................................................................40

31 U.S.C. § 7501 .......................................................................................................3

41 U.S.C. § 605(a) ......................................................................................37, 39, 40

41 U.S.C. § 606 .......................................................................................................39

41 U.S.C. § 609 .......................................................................................................40

42 U.S.C. § 2000e-16(c) .........................................................................................41

## **Regulations**

25 C.F.R. § 900.45(e) ........................................................................................5, 15

25 C.F.R. Part 900, Subpart K ...............................................................................19

## **Other**

15 Corbin on Contracts § 88.7 (rev. ed. 2003)...................................................21

Federal Acquisition Streamlining Act, Pub. L. No. 103-355 § 2351,
108 Stat. 3243 (Oct. 13, 1994) ........................................................................39

Federal Rules of Civil Procedure
     8.............................................................................................................10
     8(c) ........................................................................................................42
     12(b)(1) ...................................................................................................9
     12(b)(6) .................................................................................................10
     23..........................................................................................30, 31, 36, 42

Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205
(Oct. 5, 1988) .....................................................................................................3

H. R. Rep. No. 95-1556 (1978)..........................................................................39

Omnibus Consolidated Rescissions and Appropriations Act of 1996,
Pub. L. No. 104-134 (1996), 110 Stat. 1321 ..............................................7, 33

S. Rep. No. 95-1118 (1978) ...............................................................................39

S. Rep. No. 100-274, 1987 U.S.C.C.A.N. 2620, 2627 (Dec. 21, 1987) .......3, 4, 5, 22

U.S. Dep't of Health and Human Servs., ASMB C-10, *Cost Principles and
Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates
for Agreements with the Federal Government* (April 8, 1997).........................16

WILLISTON, CONTRACTS (4th ed. 2000) § 39:22.................................................26

## INTRODUCTION AND SUMMARY

The Menominee Indian Tribe of Wisconsin ("Tribe") presents a simple claim: Defendants breached the Tribe's contracts by failing to pay the full contract support costs ("CSC") promised by section 106 of the Indian Self-Determination and Education Assistance Act ("ISDEAA") and the contract provisions incorporating it.  Section 106 "require[s] that the Secretary provide funds for the full administrative costs to the tribes."[1]  In other words, the Government must pay 100% of the Tribe's CSC requirement, as calculated by procedures established by statute and regulation.  Defendants argue, in their Motion to Dismiss ("Def. MTD"), that they paid 100% of what they paid, and therefore could not be liable for breach.  This argument begs the question of how much the Government should have paid to comply with the contractual and statutory mandate of full payment.  Critically, Defendants do not (and cannot) show that the amount paid equaled the amount owed, so their motion to dismiss on grounds of full performance must fail.

Defendants also assert that the Tribe, by accepting the inadequate amount of CSC the Government paid, thereby waived its right to the full amount and is now estopped from claiming the difference.  The chronology of payments under the Tribe's contracts, which Defendants completely ignore, makes clear that the Tribe did not "waive" its claim to full payment, because neither that amount nor the lesser amount Defendants actually paid could have been known until the end of the contract year.  Moreover, the Tribe, as a member of the class uniquely benefited by the ISDEAA, cannot waive its statutory rights by contract.

Defendants also move to dismiss the Tribe's 1996, 1997 and 1998 claims based on the Tribe's alleged failure to comply with the statute of limitations in the Contract Disputes Act

---

[1] *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1081 (Fed. Cir. 2003) ("*Thompson*"), *aff'd Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) ("*Cherokee Nation*"); *Cherokee Nation*, 543 U.S. at 634 (citing section 106, 25 U.S.C. § 450j-1, for proposition that "[t]he [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses").

("CDA"). This argument ignores the well-established rule that the filing of a class action—such as the CSC class actions filed by the Cherokee Nation in 1999 and the Pueblo of Zuni in 2001— tolls the statute of limitations as to all members of the putative class, such as the Tribe.[2]

Finally, Defendants acknowledge that the Tribe's 1995 claims are not subject to the CDA statute of limitations, but contend those claims should be barred by laches. In fact, the Tribe's delay in bringing the claims was not unreasonable in light of the CSC class actions pending throughout most of the period, and involving claims identical to the Tribe's. In any event, the Defendants were not prejudiced by the delay.

## BACKGROUND

The ISDEAA and the Importance of Full CSC

The ISDEAA was enacted in 1975 to redress "the prolonged Federal domination of Indian service programs" by allowing tribes to exercise increased control over those programs. 25 U.S.C. § 450(a)(1). The mechanism for doing so relevant to this action is the self-determination contract under Title I of the ISDEAA. For many years the Tribe, under its Title I contracts and annual funding agreements ("AFAs"), has carried out programs, functions, services and activities ("PFSAs") for the benefit of its members and other beneficiaries that the Secretary would otherwise have administered directly. Throughout the period at issue, the Tribe operated a comprehensive health services program, including medical, dental, and community health services for eligible individuals within the service area.[3]

---

[2] *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974).

[3] *See, e.g.*, Def. Ex. A at 003 § C.3 (describing program in 1995 contract).

To enable the Tribe to provide these services, the ISDEAA requires that the contract include an amount "not less than the appropriate Secretary would have otherwise provided for the operation of the program or portions thereof for the period covered by the contract...." 25 U.S.C. § 450j-1(a)(1). This amount, often referred to as the "Secretarial" or "program" amount, does not reflect the full cost of carrying out programs in the contract. The Tribe must also carry out administrative activities that the Secretary does not need to carry out because they are done by other federal agencies, for example the Office of Personnel Management, the General Services Administration, the General Accountability Office, and the Department's Office of General Counsel. In addition, Tribes incur costs to carry out ISDEAA contracts that the Secretary does not incur when he carries out the activities directly, such as obtaining insurance, and completing annual audits under the Single Agency Audit Act, 31 U.S.C. § 7501 *et seq.*

To cover these additional costs, Tribes historically were compelled to either divert federal program funds, thus reducing services, or expend tribal funds, in effect subsidizing the federal program. Congress recognized this dilemma twenty years ago:

> [T]he single most serious problem with implementation of the Indian self-determination policy has been the failure of the Bureau of Indian Affairs and the Indian Health Service to provide funding for the indirect costs associated with self-determination contracts.

S. Rep. No. 100-274, at 8 (1987).

Responding to "the overwhelming administrative problems caused by indirect cost shortfalls," *id*. at 12, Congress amended the ISDEAA by adding a new section 106.[4] Section 106(a)(2) and (3) provide as follows:

> **(2)** There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure

---

[4] Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205 (Oct. 5, 1988), codified at 25 U.S.C. § 450j-1.

compliance with the terms of the contract and prudent management, but which --

    **(A)**  normally are not carried on by the respective Secretary in his direct operation of the program; or

    **(B)**  are provided by the Secretary in support of the contracted program from resources other than those under contract.

**(3)**    **(A)**  The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of-

    **(i)**  direct program expenses for the operation of the Federal program that is the subject of the contract, and

    **(ii)**  any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under section 106(a)(1).

25 U.S.C. § 450j-1(a)(2), (3).

Congress emphasized in section 106(g) that tribal contractors are to receive not just some CSC, but their full need: "Upon approval of a self-determination contract, the Secretary shall add to the contract the <u>full amount</u> of funds to which the contractor is entitled under section 106(a)...." *Id*. § 450j-1(g) (emphasis added).[5]

Thus, the statute could not be more clear: Tribes are entitled to be paid 100% of the CSC that they need. But how is that dollar amount to be determined?

<u>Determining Indirect Cost Requirements</u>

As noted in the Complaint, of the three types of CSC only indirect costs are at issue here. For the Tribe, as for the vast majority of tribal contractors, the indirect cost requirement was (and is) calculated under established federal procedures by multiplying a negotiated indirect cost rate

---

[5] The Senate Report emphasizes several times that these provisions are not half-way measures meant to <u>reduce</u> diversion of program and tribal funds, but to <u>eliminate</u> such diversion by mandating full funding. *E.g.*, S. Rep. No. 100-274, at 12 ("The most relevant issue is the need to fully fund indirect costs associated with self-determination contracts."); *id*. at 13 ("Full funding of tribal indirect costs associated with self-determination contracts is essential if the federal policy of Indian Self-Determination is to succeed.").

by the direct cost base.[6]  This is the Government's standard method, the method contemplated by

Congress when it enacted section 106, and the principal method ultimately adopted by the Indian

Health Service's ("IHS") own policies.[7]

Accordingly, in 1996 when the Secretary published the Department's regulations

implementing Title I of the ISDEAA, the rules specify that reasonableness, allowability, and

allocability of self-determination contract costs for tribal governments are to be determined

based on OMB Circular A-87, "Cost Principles for State, Local and Indian Tribal Governments."

25 C.F.R. § 900.45(e).  Circular A-87, in turn, requires tribes to recover indirect costs through

the rate method, with very limited exceptions.[8]

Even before the regulations were published in 1996, the IHS for many years had

calculated indirect cost requirements by multiplying a tribe's direct cost base by its negotiated

---

[6] The direct cost base, for the purpose of calculating indirect costs, is comprised of the "Secretarial" or program amount under section 106(a)(1), less capital expenditures and pass-through funds, plus direct contract support costs.  *See* Exhibit A at 4 (IHS CSC policy circular, ISDM 92-2, provision that direct contract support funds will be considered part of the recurring base); Exhibit B at 12 (IHS Circular No. 96-04 provision that direct contract support funds and section 106(a)(1) funds comprise recurring base); Exhibit C at 1 (providing, in indirect cost rate agreement, that applicable base excludes equipment and pass-through funds).

[7] *See, e.g.*, *Cherokee Nation v. Leavitt*, 543 U.S. 631, 635 (2005) (quoting Government's brief as saying that indirect costs are "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe"); 25 U.S.C. § 450j-1(c)(3)–(5) (requiring IHS, in its CSC shortfall report to Congress, to include information on indirect cost rates, direct cost bases, and the resulting indirect cost pool amounts); *id*. § 450b(g) (defining "indirect cost rate" as "the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency"); S. Rep. No. 100-274, at 17-18 (explaining Congress's expectation that indirect costs be calculated in accordance with Office of Management and Budget ("OMB") Circular A-87, which uses rate-times-base method); Exhibit A at 6 (IHS CSC policy circular ISDM 92-2 provision that indirect costs for recipients with indirect cost rates "will be determined by applying the negotiated rate(s) to the direct cost base amount for this purpose"); Exhibit B at 7 (IHS Circular 96-04 provision stating same rule).

[8] *See generally* OMB Circular A-87, Attachment E ("State and Local Indirect Cost Rate Proposals"); *id*. § D.1.c ("Each Indian tribal government desiring reimbursement of indirect costs must submit its indirect cost [rate] proposal to the Department of the Interior (its cognizant Federal agency).")  The Circular allows indirect cost allocations not using rates in certain limited situations.  Attachment E, § F.3 (allowing narrative cost allocation methodology where rate method inappropriate).

indirect cost rate to come up with a dollar amount owed for indirect costs.[9]  The IHS followed

that policy for the next fifteen years, and still does.[10]  What Congress did, and the 1996

regulations implemented, was to require that the full amount, so established, be paid.  For

recipients without indirect cost rates, the rate-times-base method cannot be used, and a lump-sum

for "indirect-type costs" is negotiated.  *See* Exhibit A at 6; Exhibit B at 7.  The Tribe, however,

did have a negotiated indirect cost rate in each of the years at issue in this case, so these lump-

sum payment provisions are not relevant to the issues in this case.[11]

> In summary, the IHS, like other federal agencies, and for all of the years at issue in this

case, calculated indirect cost needs by applying a negotiated rate to the program base, consistent

with the ISDEAA, its regulations, OMB Circular A-87, and the IHS's own CSC policy circulars.

The Incremental Process of Payment Under an ISDEAA Contract

> Each year the Tribe develops a budget and proposes an initial contract amount based on

historical and projected figures, with the understanding that additional funds will be added to the

contract by amendment during the year if, for example, the Tribe assumes new or expanded

PFSAs, its indirect cost rate changes, or the amount of formula funding for a particular PFSA is

---

[9] *See, e.g.*, Exhibit A at 6 (IHS CSC policy circular ISDM 92-2 provision that indirect costs for recipients with indirect cost rates "will be determined by applying the negotiated rate(s) to the direct cost base amount for this purpose").

[10] *See, e.g.*, Exhibit B at 7 (IHS Circular 96-04 provision stating same rule); IHS Circular No. 2000-01 § 5(A)(2)(c)(i) (same); IHS Circular No. 2001-05 § 5(A)(2)(c)(i) (same); IHS Circular No. 2004-03 § 5(A)(2)(c)(i) (same).

[11] *See* Exhibit C (containing rate agreements for each of the years at issue in this appeal).  As specified in the first paragraph of each agreement, "[t]he indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 [the ISDEAA] and Office of Management and Budget Circular A-87 apply...."  *E.g.*, Exhibit C at 1; *id.* at 5.  The Tribe's 1995 contract also specifies the rate-times-base method.  Def. Ex. A at 004, § G.1.e (providing that "indirect costs shall be reimbursed at the provisional fixed rate of 12.73% percent [sic] of the direct costs chargeable to this contract....").  The rate was later re-negotiated to 13.80%, as reflected in the rate agreement and the Complaint.  Exhibit A at 1; Complaint ¶ 25.  The rate was also changed from a "provisional" to a "fixed with carryforward" rate.

determined.[12]  The Tribe's contracts and AFAs were amended several times over the course of

each contract year to add funding and associated responsibilities.[13]

Because the Tribe's direct cost base could expand significantly during the course of a

contract year, and the Tribe's negotiated indirect cost rate could change as well, it was impossible

for the Tribe (or the IHS) to know the Tribe's full indirect cost need for the year at the time of

signing the initial contract and/or AFA in each year.  Nor could the Tribe know how much

indirect cost funding the IHS would provide by the end of each year, because modifications

could include indirect as well as direct program funding.[14]  Indeed, supplemental indirect cost

funding for a given contract year could arrive well after that year had ended, by way of a

modification to the following year's AFA.[15]

Unfortunately, in none of the years at issue in this case did the relatively small

installments of additional indirect cost funding provided by contract amendment bring the Tribe

up to 100% of its full requirement in any year, as documented by the Tribe's records and in the

IHS's own "shortfall reports."

---

[12] *See, e.g.*, Def. Ex. B at 025, § 6(1)(f) and (g) (FY 1996 AFA provisions stating that initial AFA does not include funding for Headquarters or Area Office tribal shares, but that such funds will be included later by amendment); *id.* at 014, § (e)(2)(B) (FY 1996 contract provision stating that modifications adding supplemental funds for PFSAs already included in initial AFA are not subject to written approval requirement).  The latter provision on contract modifications to supplement funding is part of the statutory Model Agreement in section 108 of the ISDEAA, and thus is contained in all of the Tribe's contracts from 1996-2004 as required by statute.  *See* 25 U.S.C. § 450*l*(c), § 1(e)(2)(B).

[13] *See, e.g.*, Def. Ex. A at 015-016 (Modification No. 9 to 1995 contract); Def. Ex. B at 028-029 (Modification No. 5 to 1996 AFA).

[14] *See, e.g.*, Def. Ex. A at 12-13 (modification to 1995 contract, dated September 13, 1995, adding $31,400 for indirect costs ("CSC IDC") in order "to supplement IDC FY '95 shortfall"); Def. Ex. B at 28 (modification to 1996 AFA, dated September 24, 1996, adding $30,000 for indirect costs).

[15] *See* Def. Ex. D at 016 (adding, in modification to FY 1998 AFA dated September 23, 1998, "$618 of FY '97 CSC IDC shortfall," along with "$498 of FY 98 CSC IDC shortfall").  Funds appropriated in each of the years in question could be obligated through the end of the succeeding fiscal year.  *See, e.g.*, Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134 (1996), 110 Stat. 1321, 1321-189 (providing that FY 1996 appropriations for IHS "shall remain available for obligation until September 30, 1997").

The IHS Shortfall Reports

While section 106, as enacted in the 1988 amendments, required full payment of CSC from available appropriations, the IHS continued to underpay tribal contractors considerably.  It did so based on the agency's interpretation of section 106(b), which makes funding "subject to the availability of appropriations."  25 U.S.C. § 450j-1(b).  From 1994 through 1997, the IHS maintained that the Secretary had the discretion to limit "available" funds to the amounts recommended in committee reports on the appropriations bills.[16]  From FY 1998 onward, the IHS believed that available funds were limited by the purported CSC spending "caps" Congress inserted in the appropriations acts.  *See* Complaint ¶ 35 and n.2.  Therefore, in every one of the claim years, the IHS severely underpaid the CSC of tribal contractors, including the Tribe, a fact documented in the agency's annual "shortfall reports."

Section 106(c) requires that the Secretary provide Congress an annual report that includes "an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted."  25 U.S.C. § 450j-1(c)(2).  These "shortfall reports" were to include detailed information for each tribal contractor on direct cost bases, indirect cost rates, and indirect cost shortfalls, if any.  *See id.* § 450j-1(c).  Like other IHS Area Offices, the Bemidji Area Office, in whose region the Tribe is located, created shortfall reports documenting CSC underpayments to tribal contractors in its region.  *See, e.g.*, Exhibit D at 3 (FY 2000 Bemidji Area shortfall report).  To calculate the shortfalls, consistent with the ISDEAA and the CSC circulars, the IHS multiplies the direct cost base, *id.* column K, by the most current approved indirect cost rate, *id.* column L, to determine indirect cost need, *id.* column N.  Applying this method to the Menominee Tribe, in FY 2000 the IHS applied the

---

[16]*See Thompson v. Cherokee Nation*, 334 F.3d 1075, 1087-88 (Fed. Cir. 2003) (summarizing and rejecting Secretary's interpretation, and holding that funds available for payment of CSC included agency's entire unrestricted lump-sum appropriation); *Cherokee Nation*, 543 U.S. at 644 (same).

Tribe's indirect cost rate of 10.88% to a direct cost base (after exclusions) of $4,441,470 to arrive at an indirect cost requirement of $483,232.  *Id*. column N; *cf*. Exhibit C at 21 (indirect cost rate agreement establishing rate of 10.88% for contract year 2000).  But the IHS paid only $338,147, Exhibit D at 3, column O, plus $63,829 in tribal shares counted as CSC, *id*. column D, leaving a shortfall of $81,256, *id*., column S.[17]

The Tribe has not been able to obtain Bemidji Area shortfall reports for every year at issue in this action, and does not know whether the Area Office in fact compiled reports for each year.  The reports represent the agency's best effort to inform Congress of the extent of the shortfalls, as calculated by the rate-times-base method.[18]

## STANDARD OF REVIEW

In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure ("FRCP"), the court assumes the truth of the allegations made and views all reasonable inferences in plaintiff's favor.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Empagren S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003).  The court may receive and consider extrinsic evidence.  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).  The court must permit the pleader to respond with supporting evidence and, where necessary, convene an evidentiary hearing when jurisdiction depends on findings of fact.  *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 546 (10th Cir. 2001).

---

[17] *Cf*. Complaint ¶ 25 (calculating 2000 shortfall as $152,030).

[18] The shortfall reports apply rates that are not adjusted to account for federal programs that pay little or no indirect costs, so the rates are diluted and result in exacerbated shortfalls, as the Tribe maintains in its "miscalculation claims."  Complaint ¶¶ 26-33.  The "shortfall claims" assert that the IHS failed to pay even the lesser amount yielded by applying the diluted rates, as documented in the shortfall reports and other records.

In considering Defendants' motion to dismiss under FRCP 12(b)(6), the court must presume that all well-pleaded allegations are true, resolve all doubts and inferences in the Tribe's favor, and view the Complaint in the light most favorable to the Tribe. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 170-71 (2005); *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 125 S. Ct. 1955, 1965 (2007) ("*Twombly*").  The Rules "erect a powerful presumption against dismissing pleadings for failure to state a claim." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1125 (10th Cir. 1994) (citations and internal quotation marks omitted).  Motions to dismiss are disfavored and rarely granted. *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005); *see also* FRCP 8 (requiring only short, plain statement showing entitlement to relief).  A claim will not be dismissed if it "nudge[s] ... across the line from conceivable to plausible." *Twombly*, 125 S. Ct. at 1974. (2007).  Once a claim is stated adequately, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1969.

## RULE OF CONSTRUCTION

The ISDEAA and the Tribe's contracts mandate that "[e]ach provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and ... related functions, services, activities, and programs ..., including all related administrative functions, from the Federal Government to the Contractor." Def. Ex. B at 005, § (a)(2) (1996 Contract); 25 U.S.C. § 450*l*(c) (§ 1(a)(2) of the Model Contract).  This statutory rule of construction applies to both the ISDEAA provisions at issue in this case and to all the terms of the Tribe's agreements with Defendants.

**ARGUMENT**

I.      **Defendants Failed, in Each Year, to Pay the Tribe's Full Indirect Cost Need as
        Promised in the Contracts.**

The Tribe's claims are straightforward: Defendants promised to pay the Tribe's full

indirect costs as required by section 106 and the contract provisions incorporating it.  Defendants

also agreed to indirect cost rates that determined what the full requirement would be in each

year.  Defendants failed in each year to pay 100% of the Tribe's indirect costs, as determined by

applying the negotiated rate to the applicable direct cost base, and Defendants do not argue

otherwise.  The IHS shortfall reports in the Tribe's possession confirm this to be so.[19]

To avoid liability, Defendants urge this court to focus solely on the amount they paid, and

ignore the amount they owed—along with the indirect cost rate agreements that the IHS itself

used to determine the amount owed.  Defendants point to accounting data in the final contract

modification for each year showing how much the IHS paid for indirect costs in that year.

Defendants then argue that because they paid every penny of the amount recorded as paid, they

did not breach the contracts.  This argument confuses the contractual promise to pay in full (in

accordance with section 106) with the accounting data tracking how much progress has been

made toward full payment.  Under Defendants' circular argument, the amount owed is the

amount indicated in the contract as paid, so whatever the IHS pays would be precisely what it

owes.  The IHS could pay the Tribe one dollar for indirect costs and still claim "full

performance" of this breach-proof contract.  This absurd result is not what Congress intended in

the ISDEAA and not what the parties' contracts say.

---

[19] In all of the claim years, the contracts, AFAs and modifications themselves provide ample evidence of
indirect cost shortfalls.  The presence or absence of an IHS shortfall report for any given year is not
necessary either to establish liability or to calculate damages.  The IHS shortfall reports are useful,
however, to underscore the disingenuousness of Defendants' newly minted litigation position that there
never has been one dollar of shortfall.  *See* Def. MTD at 10-15 (maintaining that government paid full
amount promised in each contract).

A.     *Defendants Promised to Pay in Accordance with Section 106 of the ISDEAA.*

Since 1988, the ISDEAA has required the Secretary to "add to the contract the full amount of funds to which the contractor is entitled under section 106(a)."  25 U.S.C. § 450j-1(g).  The Tribe's agreements for 1996-2004 explicitly reflect this requirement.  Def. Ex. B at 006-007 (providing, in contract governing 1996-1998, that funding amount in AFA "shall not be less than the applicable amount determined pursuant to section 106(a) of the [ISDEAA]"); Def. Ex. E at 006 (same provision in contract governing 1999-2001); Def. Ex. H at 005 (same provision in contract governing 2002-2004).

The 1995 contract does not contain an identical provision, but payment in accordance with section 106(a) was required by statute, as noted above.  In any event, the 1995 contract promises to pay indirect costs at 12.73% of the direct cost base, a figure later amended by the indirect cost agreement to 13.8%, both of which agreements the IHS breached.  The Motion to Dismiss does not assert, and the contract modifications do not indicate, that the IHS paid indirect costs at anything close to either percentage of the applicable direct cost base.  Def. Ex. A at 004, § G.1.e (promising payment of indirect costs at 12.73% of base); *id*. at 016 (documenting payment of $363,229 in indirect costs on a direct cost base of over $4 million).

B.     *Section 106 Requires Full Payment of Indirect Costs from Available*
       *Appropriations.*

Section 106 "require[s] that the Secretary provide funds for the <u>full administrative costs</u> to the tribes." *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1081 (Fed. Cir. 2003) ("*Thompson*") (emphasis added), *aff'd Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) ("*Cherokee Nation*"); *Cherokee Nation*, 543 U.S. at 634 (citing section 106, 25 U.S.C. § 450j-1, for proposition that "[t]he [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses").

Despite this clear language, Defendants argue that the ISDEAA does not require full payment, or indeed any payment. Def. MTD at 16. In Defendants' view, the ISDEAA requires only that the parties negotiate a contract, and "there is no 'independent' right under the ISD[EA]A to CSC." *Id.* at 17. In support of this proposition, which runs directly counter to the *Thompson* and *Cherokee Nation* decisions quoted above, Defendants cite *Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005). In that case, the Nation sought to collect funds for the contracts it could have had under the ISDEAA had the federal government not wrongly removed the Nation from its list of federally recognized tribes. The court declined to award "damages for contract support costs never incurred, on contracts never created." *Id.* at 1367. In contrast, the Tribe in this case had contracts with Defendants in each year at issue, fully performed in accordance with the terms of those contracts, and in doing so incurred large amounts of indirect costs for which the Tribe was not fully paid. Once a tribe does have an ISDEAA contract, as the Tribe did, the statute requires full payment.[20]

The contractual provision governing "Funding Amount" that incorporates section 106(a)—and the statutory Model Agreement provision it is based on—has two sentences. Defendants' Motion to Dismiss ignores the second of the two:

> Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than the applicable amount determined pursuant to section 106(a) of the [ISDEAA].

Def. Ex. B at 006-007; Def. Ex. E at 006; Def. Ex. H at 005; 25 U.S.C. § 450*l*(c), § 1(b)(4). Defendants focus on the first of these two sentences to argue that as long as the Secretary pays

---

[20] Defendants also cite *Pueblo of Zuni v. United States*, 467 F. Supp.2d 1114, 1116-17 (D.N.M. 2006) in support of the idea that the contracts, not the ISDEAA, create an entitlement to CSC. Def. MTD at 17-18. In that case, the court held that the Pueblo could not avoid the mandatory exhaustion requirement of the Contract Disputes Act ("CDA") by framing its contract claims as statutory rights. That holding is irrelevant to this case, because the Tribe has exhausted its administrative remedies under the CDA and seeks damages for the breach of contract terms required by statute.

the amount specified in the AFA—whether it be 100% of need, or one dollar—there is no breach.  That reading, however, renders the second sentence a nullity, violating canons of both statutory and contract interpretation.  The Supreme Court has often said that "effect must be given, if possible, to every clause and word of a statute."  *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883)).  The same is true of a contract: courts will interpret a contract in a manner that gives reasonable meaning to <u>all</u> of its provisions.  *E.g.*, *Beal Mortgage, Inc. v. F.D.I.C.*, 132 F.3d 85, 88 (D.C. Cir. 1998) (stating principle and adding that where possible courts should endeavor as well to render terms consistent with each other).

The two sentences are consistent with each other, and both can be given full effect.  The first sentence directs that the amount owed be made available to the Tribe by inclusion in the AFA.  The second sentence governs the amount—full funding under section 106(a).  In other words, the first sentence describes the mechanism for transferring the funds, while the second sentence explains the amount that must be paid.

Defendants argue that the contract provisions promising full payment in accordance with section 106 conflict with the specific dollar amounts identified in the "Appropriations and Accounting Data" in the amendments, and the specific term should govern over the general term.  Def. MTD at 17 n.5.  But there is no conflict between the promise of full payment and the documentation of a specific amount paid that represents less than full payment.  The contract or AFA simply must be amended (again) to increase the amount "available" to the Tribe—i.e., paid—to equal the amount that represents full payment.  If the IHS fails to do so, as was the case in the years at issue, the IHS has breached the contract.  *See, e.g.*, *Appeals of Seldovia Village Tribe*, IBCA 3862-3863/97 (October 20, 2003) (attached as Exhibit E) (holding IHS liable for

failure to amend the AFA to reflect higher indirect cost rate negotiated with Department of Interior, despite IHS payment of amount of CSC originally specified in AFA).

   C.   *Defendants Were Bound to, and Did in Fact, Determine the Tribe's Indirect Cost Needs by the Rate-Times-Base Method.*

While it is clear from section 106(g) that the "full amount" must be paid, some means for determining that amount must be employed. The calculation of indirect cost requirements for the Tribe, as for the vast majority of Tribes and indeed federal contractors generally, was made by applying a negotiated indirect cost rate to the direct cost base. IHS policy throughout the relevant years was clear: for contractors with established indirect cost rates, such as the Tribe, the IHS was required to award indirect costs "by applying the negotiated rate(s) to the direct cost base amount for this purpose." Exhibit A at 6 (ISDM 92-2); Exhibit B at 7 (IHS Circular No. 96-04). Moreover, the IHS was required by statute to include the base, rate, resulting need, amount paid, and shortfall (if any) in its annual shortfall report to Congress. 25 U.S.C. § 450j-1(c). And the IHS did just that, at least in some of the shortfall reports the Tribe has been able to obtain. *See* Exhibit D at 3 (2000 report); *id.* at 4 (2001).

Defendants' attempt to disclaim the rate method now, when application of that method has been agency policy and practice for over fifteen years, is disingenuous at best. Defendants assert that the ISDEAA does not require "a specific formula" to determine the indirect costs to be paid to a tribe, but the ISDEAA regulations require that tribal governments determine indirect costs in accordance with OMB Circular A-87, "Cost Principles for State, Local and Indian Tribal Governments." 25 C.F.R. § 900.45(e). The Circular, issued to the heads of all executive departments, "establishes principles and standards for determining costs for Federal awards, describes the indirect cost rate method and how to submit a proposal, and identifies the Department of the Interior ("DOI") as the cognizant federal agency for Indian tribes. OMB

Circular A-87, ¶ 1 and Attachment E.[21]  In accordance with the ISDEAA regulations and OMB

Circular A-87, the Tribe submitted indirect cost rate proposals each year to the DOI and received

an approved government-wide indirect cost rate for each year.  *See* Exhibit C.  The rate

agreements specifically apply to ISDEAA agreements.  As the first paragraph of each agreement

recites, "[t]he indirect cost rates contained herein are for use on grants and contracts with the

Federal Government [not just DOI] to which Public Law 93-638 [i.e., the ISDEAA] and Office

of Management and Budget Circular A-87 apply...."  *E.g.*, *id*. at 1.

By completely ignoring the indirect cost rate agreements, Defendants suggest that the

Secretary and IHS were not bound by those agreements, but that is incorrect.  Although

negotiated and executed by a DOI official,[22] that official was "the Responsible Agency for the

Federal Government," *id*. at 4, authorized to approve a government-wide indirect cost rate on

behalf of the Executive Branch.  The IHS has never challenged the Tribe's approved rates, and in

fact has referenced them in the shortfall reports.  *Compare* Exhibit C at 21 (rate agreement

establishing 10.88% indirect cost rate for Tribe for FY 2000) *with* Exhibit D at 3 (IHS shortfall

report for FY 2000 calculating Tribe's indirect cost requirement by applying 10.88% rate to

direct cost base).

Consistent with the ISDEAA, 25 U.S.C. § 450j-1(c), the ISDEAA regulations, OMB

Circular A-87, and the IHS's own CSC policy circulars, the IHS in fact calculated indirect cost

requirements for the Tribe by applying its approved rate to the direct cost base.  The IHS did not,

however, pay 100% of those requirements in any of the relevant years.

---

[21] *See also* U.S. Dep't of Health and Human Servs., ASMB C-10, *Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government* (April 8, 1997), which provides government-wide guidance for state, local and tribal governments on implementing OMB Circular A-87 and provides further detail on indirect cost rate proposals in Part 6.

[22] From 1995 through 2002, that official was in the Office of Inspector General; in 2003 the indirect cost rate negotiation function was transferred to the National Business Center within the DOI.

D.    *The IHS Failed to Pay the Tribe's Full Indirect Costs, as Calculated by Applying the Approved Rate, in any of the Years at Issue.*

Defendants do not argue that they paid the Tribe's full indirect costs, as calculated by the rate method described above, and appear to concede that they did not.  Instead, Defendants argue that their payment of lesser amounts was all the contracts required.  Def. MTD at 10-18.  As shown above, this argument violates elementary principles of statutory and contract interpretation by rendering the promise of full payment under section 106 a nullity.  It also confuses the contractual term governing "Funding Amount" with the "Accounting and Appropriation Data" documenting how much has actually been paid.  Because Defendants show only that they paid 100% of what they paid, not 100% of what they owed, their motion to dismiss on the basis of "full performance" should be denied.

The Tribe need not, in this Opposition, document the precise extent of the shortfalls it suffered; that can be done in the damages phase of these proceedings.  The IHS has acknowledged shortfalls, as calculated by the rate method, in all of the years for which the Tribe has obtained shortfall reports.  *See* Exhibit D at 1 (showing $61,458 shortfall for Tribe in FY 1997); *id*. at 2 (showing $17,249 shortfall for Tribe in FY 1999); *id*. at 3 (showing $81,256 shortfall for Tribe in FY 2000); *id*. at 4 (showing $87,518 shortfall for Tribe in FY 2001).  The Tribe expects to obtain through discovery shortfall reports for the other claim years as well.  In any event, the contracts, AFAs, and modifications themselves demonstrate clearly that the IHS did not pay the Tribe's full indirect cost requirement, as calculated by the rate method, in any of the claim years.  After acknowledging these shortfalls for years, Defendants have now adopted a post hoc litigation position that there never were any shortfalls, because the promise of full payment in accordance with section 106 was a nullity, and the amounts made available through

17

the AFAs and amendments were always necessarily exactly what was owed.  The court should

reject this novel, and wishful, notion of a breach-proof contract, and deny Defendants' motion.

 In sum, this is clearly not a case in which the Tribe has presented purely speculative and

implausible claims, as required to dismiss under Rule 12(b)(6).  *Twombly*, 127 S. Ct. at 1965,

1974.

## II. The Tribe Did Not—and Could Not—Waive its Statutory and Contractual Right to Full Indirect Costs, and Is Not Estopped from Asserting that Right.

 Defendants argue that the Tribe waived its right to claim additional indirect cost funding

by executing and performing the contracts rather than refusing to enter the contracts and

appealing the inadequate funding levels.  But the relevant funding level to justify an appeal is the

amount provided by the <u>end</u> of the contract year, not at the beginning.  The Tribe could not have

known at the beginning of the year whether it would suffer any indirect cost shortfall at all, let

alone the precise extent of that shortfall.  The Tribe could not waive its right to full payment by

accepting a first installment.  Moreover, the right to full CSC is a statutory right that cannot be

waived by contract.

### A. *The Text of the ISDEAA Precludes Tribal Waiver of Statutory Rights.*

 The equitable doctrine of waiver cannot trump statutory law.  "Generally, a provision in a

government contract that violates or conflicts with a federal statute is invalid or void."  *American*

*Airlines, Inc. v. Austin*, 75 F.3d 1535, 1538 (Fed. Cir. 1996).  When the text of a statute, or its

legislative policies, indicates that waiver was not intended, waiver cannot be applied.  *Mitsubishi*

*Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) (agreement to arbitrate

invalid if Congress has indicated intent to preclude waiver of judicial remedies); *Burnside-Ott*

*Aviation Training Center v. Dalton*, 107 F.3d 854, 858-59 (Fed. Cir. 1997) (waiver of right to

appeal invalid where it would subvert policies of statute).  The text and policies of the ISDEAA preclude waiver of tribal statutory rights such as the right to full CSC.

In its Motion to Dismiss, Defendants can point to no express waiver by the Tribe of its statutory rights.  Rather it maintains that the Tribe's failure to object to the AFA and its offer of less-than-full funding (as it turned out) implies a waiver of any claim to additional funding.  The ISDEAA does not permit such an implied waiver.

The ISDEAA contains a number of provisions authorizing, and providing a mechanism for, the Secretary to waive applicable regulations <u>when so requested in writing by a tribe</u>.  In 25 U.S.C. § 450k(e) Congress provided that "The Secretary may ... waive regulations if the Secretary finds that such exception or waiver is in the best interest of the Indians served by the contract or is consistent with the policies of this subchapter and is not contrary to statutory law.  In reviewing each request, the Secretary shall follow [declination procedures]."  Similarly in 25 U.S.C. § 458aaa-11(b)(2), the statute provides that "Not later than 90 days after receipt by the Secretary of a written request by an Indian tribe to waive application of a regulation...the Secretary shall either approve or deny the requested waiver in writing."  *See also* 25 C.F.R. Part 900, Subpart K ("Waiver Procedures").  There is even authority for tribes to agree to what would otherwise be inapplicable agency rules or policies, provided the tribe does so expressly in the compact or funding agreement.  25 U.S.C. § 458aaa-16(e).

But there is <u>no</u> ISDEAA provision for tribes to waive any <u>statutory</u> rights.  Because Congress has expressly and thoroughly considered waiver in the statute, and limited it to specific parties and subjects, the ISDEAA must be deemed to preclude its general application beyond these subjects.[23]

---

[23] *See, e.g.*, *Christianson v. Harris County*, 529 U.S. 576, 583 (2000) (noting canon of construction that "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other

In those few instances in the ISDEAA where Congress has allowed waiver of regulations, Congress created a procedure requiring that the waiver be expressed in writing from the tribe and that the Secretary expressly agree.  If Congress intended to protect tribes from any attempt by the Secretary to waive regulations unilaterally or by a tribe to waive regulations inadvertently, then certainly Congress did not intend to allow an implicit waiver of the statute itself.  Moreover, Congress set forth a clear test for waiver of regulations.  The Secretary may waive regulations only when the "waiver is in the best interest of the Indians served by the contract or is consistent with the policies of the Act, and is not contrary to statutory law."  25 U.S.C. § 450k(e).  In effect, Congress expressly banned a statutory waiver.  To imply a waiver of the statute here would go far beyond what is permitted in the statute and would violate the very test Congress set out for the waiver of regulations: it would subject the Tribe to a waiver that is inconsistent with the statute and its own best interest.

> B.     *Tribal Waiver Would Subvert the Purpose and Policies of the ISDEAA, and Is Thus Precluded.*

Not only the text, but the policy and purposes of the ISDEAA preclude tribal waivers of statutory rights.  The legislative policies underlying a statute may prohibit waiver even when the express language of the statute or contract does not.  *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 704-05 (1945) (employees' written waiver of right to liquidated damages under Fair Labor Standards Act ("FLSA") not enforceable).  In *O'Neill*, the court emphasized that the FLSA was designed to redress the unequal bargaining power between employers and employees, so to allow employees to waive its protections—even expressly and in writing—would thwart the legislative

---

mode"); *K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations and internal quotation marks omitted).

intent. *Id.* at 706.[24] Similarly, in *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997), a contract provision purported to make the "Award Fee" determination a unilateral Government decision that could not be reviewed under the CDA. The Federal Circuit found that this provision conflicted with the CDA's guarantee of appeal rights and subverted the statute's intent, to equalize the bargaining power of contractors and the Government.

> Permitting parties to contract away Board review entirely would subvert this purpose and return contractors to the position they occupied before the passage of the CDA. The government could insert jurisdiction defeating provisions in RFPs and contracts as desired, thus skewing the balance between it and contractors. As a result, contractors would lose the protections sought by Congress in enacting the CDA.

107 F.3d at 858. The specific Award Fee provision did not trump the general dispute resolution provision providing CDA review because there was no statutory warrant for the Award Fee exclusion. "Thus, the CDA trumps a contract provision inserted by the parties that purports to divest the Board of jurisdiction, unless the contract provision otherwise depriving jurisdiction is itself a matter of statute primacy." *Id.* at 859.

Like the FLSA and the CDA, the ISDEAA is legislation designed to redress unequal bargaining power: that between the Government and the tribes for whom it acts as trustee. *See* 25 U.S.C. § 450a(b) (declaring policy of ISDEAA to enable transition from "Federal domination" to tribal self-determination). Defendants argue that the specific term of the AFA documenting a dollar amount paid trumps the Tribe's right to full CSC guaranteed by sections 106(g) and 106(a) of the ISDEAA and the contract provisions incorporating these statutory

---

[24] *Accord, Tompkins v. United Healthcare*, 203 F.3d 90, 98 (1st Cir. 2000) (party cannot waive application of preemption provisions of Employee Retirement Income Security Act); *Carter v. Exxon Co.*, 177 F.3d 197, 210 (3d Cir. 1999) (gas station franchisees cannot waive protections granted by federal Petroleum Marketing Practices Act); *Haghighi v. Russian American Broadcasting Co.*, 173 F.3d 1086 (8th Cir. 1999) (inclusion of statutorily-required language in settlement agreement cannot be waived; applying Minnesota law); *Stampco Construction Co. v. Guffey*, 572 N.E.2d 510, 513 (Ind. Ct. App. 1st Dist. 1991) (employee in employment agreement cannot waive benefits of prevailing-wage statutes; "[a]llowing settlement or release of a claim would permit unscrupulous contractors to force employees to submit to economic pressures and accept lower wages"). *See* 15 Corbin on Contracts § 88.7, at 595 (rev. ed. 2003).

terms. Def. MTD at 17 n.5. Allowing the parties to contract away the statutory right to full CSC, however, would directly subvert both the general purpose of the ISDEAA and the specific purpose of section 106.

In the ISDEAA, "Congress declare[d] its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy...." 25 U.S.C. § 450a(b). Consistent with the federal trust responsibility, Congress sought to end "Federal domination" of services to Indians by transferring resources and responsibility to tribes. *Id*. Because those resources initially did not include full CSC, so that tribes were forced to cut services to pay overhead, Congress saw its self-determination policy undermined and the statute in need of revision.

In 1988 Congress amended section 106 to address "the consistent failure of federal agencies to fully fund tribal indirect costs." S. Rep. 100-274, 1987 U.S.C.C.A.N. 2620, 2627 (Dec. 21, 1987). The Senate committee emphasized the centrality of full CSC to the core policy of the ISDEAA: "Full funding of tribal indirect costs associated with self-determination contracts is essential if the federal policy of Indian Self-Determination is to succeed." *Id*. at 2632 (quoted in *Appeals of Cherokee Nation*, 99-2 BCA P 30462 (I.B.C.A. 1999), 1999 WL 440045 at 7). Just as the Government in *Burnside-Ott* could not subvert the policy of the CDA by inserting a contract provision giving it unilateral authority over the Award Fee, the Government here should not be allowed to subvert the ISDEAA with an inconsistent contract provision. If the Government could fix CSC funding at whatever level it wished, despite available appropriations to carry out the statutory mandate of full CSC, tribal contractors would be returned to the

position they occupied before passage of the 1988 ISDEAA amendments, rendering the statute pointless and skewing the Congressionally crafted balance of power.[25]

If the contracts' full-funding provision is at all ambiguous, the ISDEAA's legislative instructions for interpretation resolve that ambiguity. Each provision of the ISDEAA and the contracts "shall be liberally construed for the benefit of the Contractor." 25 U.S.C. § 450*l*(c) (Model Agreement § 1(a)(2)); Def. Ex. B at 005, § (a)(2) (contract provision incorporating same rule of interpretation). Congress adopted this interpretive principle in recognition that the ISDEAA is remedial legislation and that a longstanding canon of construction requires that laws for the benefit of Indians must be interpreted liberally in favor of Indians. *See Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed. Cir. 2005) (ISDEAA to be interpreted liberally in light of remedial purpose); (*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461 (10th Cir. 1997) (applying Indian canon of construction to resolve ambiguity in ISDEAA in favor of tribe). The Tribe could not waive its right to full CSC, even if the Government convinced it to agree to do so, without running afoul of the statutory full funding requirement.

C.    *The IHS's Cited Cases Do Not Support Waiver of Statutory Rights, and in Fact Recognize that Equitable Waiver Cannot Trump Public Policy Embodied in Statutes.*

None of the cases cited by Defendants in their "waiver" argument involves a contract provision at odds with a statute that specifically benefits the class of contractors of which the

---

[25] Defendants also suggest that the Tribe should have suspended performance if the IHS did not provide sufficient funds. Motion to Dismiss at 21 n. 7. First, the Government made this argument in *Cherokee Nation*, and the Supreme Court rejected it, finding that this boilerplate language does not excuse the agency's failure to fully fund a contract. *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 638-639 (2005). Second, faced with the choice of suspending health care services to its members altogether, or offsetting a lack of CSC with program funds and/or tribal funds, the Tribe chose the latter option. Defendants' suggestion that the Tribe's choice to use its own funds to continue serving its members should now be used against the Tribe illustrates the extent to which the Government, in developing its litigation position, has lost sight of the Secretary's trust responsibility to Indian tribes and their members.

other party is a member, as here and in *O'Neill* and *Burnside-Ott*.[26]  The centerpiece of

Defendants' argument is *Hermes Consolidated, Inc. v. United States*, 58 Fed. Cl. 409 (2003).  In

*Hermes*, the court held that the contractor waived the right to object to a contract provision

containing an economic price adjustment (EPA) clause arguably at odds with the Federal

Acquisition Regulation (FAR).  Significantly, though, the FAR provision was promulgated "for

the mutual benefit of both the government and the contractor."  *Id*. at 419.  The court specifically

recognized that equitable principles such as waiver cannot override statutory expressions of

public policy, and that the erroneous use of the EPA clause "did not rise to the level of ... being

contrary to the statutes of the United States or public policy."  *Id*.

Similarly, in *Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997), the

contract included an option provision arguably at odds with a Defense Acquisition Regulation

prohibiting option clauses that impose "undue risks" on the contractor.  The contractor

nonetheless accepted the contract term, presumably after weighing whether the risk was "undue,"

and performed the contract, thereby waiving the right to protest.  No statutory provision or public

policy was implicated.

The cases allowing waiver of statutory rights require that the contractor knowingly and

affirmatively waive the right by agreeing to a contrary contract term.[27]  An important distinction

between these cases and this is that the Tribe here did not accept any term contrary to the

---

[26] The principle that a contractor is not bound by contract terms in violation of a statute applies with special force when the contractor is part of the group the statute is designed to protect.  *Rough Diamond Co. v. United States*, 351 F.2d 636, 639–40 (Ct. Cl. 1965) (citing cases); *Burnside-Ott*, 107 F.3d at 859.

[27] *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 712 (1997) (waiver by agreement with contrary term); *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 641 (Fed. Cir. 1989) (same).

ISDEAA; on the contrary, the "Funding Amount" provisions cited above all promised full

payment in accordance with section 106.[28]

In summary, the waiver cases cited by the IHS do not support the application of the

waiver doctrine to a specific statutory right protecting the class of tribal contractors of which the

Tribe is a member.  The text and policy of the ISDEAA fully establish that the Tribe's statutory

right to full CSC, as incorporated in the contracts, is not waivable.

> *D. The Tribe Did Not Waive Its Claim to Full Indirect Costs, Because that Claim Did Not*
> *Accrue Until (at the Earliest) the End of the Contract Year.*

Defendants' waiver argument might also be less implausible if the Tribe had known,

when it entered the contract for each year, (1) what its direct cost base would be for the year; (2)

what its approved indirect cost rate would be for the year; (3) what its full indirect cost

requirement would be for the year; (4) how much the IHS would pay for indirect costs in that

year; and thus (5) whether the Tribe would suffer an indirect cost shortfall, and the extent of the

shortfall, in that year.  The Tribe could not have known any of these things, however, due to the

practice of contract modifications adding funds both to the base and the indirect cost account,

and IHS's concomitant incremental payment policy.  *Supra*, at 7-8.  The Tribe did not expressly

waive its right to recover damages for breach of its right to full payment, and Defendants do not

point to any express waiver.  Thus Defendants take the curious position that the Tribe implicitly

---

[28] Defendants' waiver cases also can be distinguished on the basis that none involves ISDEAA contracts. Section 4(j) of the ISDEAA makes clear that "no contract ... entered into pursuant to Title I of this Act shall be construed to be a procurement contract." 25 U.S.C. § 450b(j).  Thus the decisions interpreting government procurement contracts are of doubtful relevance here.  Although Defendants misread *Cherokee Nation* as "mandat[ing] that ISD[EA]A contracts be treated as any other procurement contract," Def. MTD at 16, the Supreme Court said nothing of the sort.  ISDEAA agreements are as <u>legally binding</u> as procurement contracts, the Court said, *Cherokee Nation*, 543 U.S. at 639, but the Court did not strike down section 4(j) or in any other way imply that Defendants shed their trust responsibility to the Tribe—a responsibility expressly reaffirmed by the Tribe's contracts with Defendants.  *E.g.*, Def. Ex. B at 013, § (d)(1) (reaffirming trust responsibility and stating that nothing in the contract is intended to "terminate, waive, modify, or reduce the trust responsibility of the United States to the tribes or individual Indians"); Def. Ex. E at 012-013 (same); Def. Ex. H at 013 (same); *see also* 25 U.S.C. § 450n (providing that nothing in the ISDEAA "shall be construed as ... authorizing or requiring the termination of any existing trust responsibility").

waived its right to recover for breach by accepting partial performance before it could have known that a breach would even occur.

Waiver requires the "intentional relinquishment of a known right." *C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C. Cir. 1936) (quoting *Oelberman v. Toyo Kisen Kabushiki Kaisha*, 3 F.2d 5, 6 (9th Cir. 1925), *cert. denied* 268 U.S. 693 (1925)); *see also* WILLISTON, CONTRACTS (4th ed. 2000) § 39:22 (citing cases).  The Tribe could not have known of its right to additional indirect cost funding, and thus could not have waived that right, until that right came into existence in the first place—at the end of the contract year, at the earliest.  Application of this principle distinguishes the cases on which Defendants rely, all of which involve contractors who see a problem (such as an illegal contract clause) prior to execution, yet sign and perform the contract anyway.[29]  These cases are fundamentally different from the Tribe's case because there was nothing facially objectionable in the contracts the Tribe entered with Defendants.  The contracts all promised to pay the amount of indirect funding in the AFA (the first sentence of the "Funding Amount" provision in section (b)(4) of the contracts), and they contained the promise to pay the full amount determined in accordance with section 106 (the second sentence).  As it turned out, the indirect cost funding added to the initial contract or AFA by the numerous modifications in each year failed to keep pace with the indirect cost requirements, as discussed above.  But the Tribe can hardly be charged with waiving its right to full payment by not filing unripe anticipatory challenges to funding levels that were at the time unknown.

---

[29] *Whittaker Elec. Sys. Dalton*, 124 F.3d 1433, 1446 (Fed. Cir. 1997) (invalid contract clause not challenged prior to execution); *Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed. Cir. 1990) (acceptance of contract provision at variance with statute); *Reservation Ranch v. United States*, 39 Fed. Cl. 696 (1997) (same); *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) (acceptance of contract clause later challenged as illegal); *E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978) (same); *Aleutian Constructors v. United States*, 24 Cl. Ct. 372 (1991) (same).

E.    *The Tribe Is Not Estopped from Claiming Additional Indirect Costs.*

Defendants assert that the Tribe's failure to object to the initial contract each year estops the Tribe from now claiming damages, because the Secretary has relied to his detriment on the funding amounts "negotiated" by the parties and included in the agreements. Def. MTD at 22. In fact, however, the Secretary relied to his detriment on a mistaken interpretation of section 106's "subject to availability" language as providing him with discretion to spend less of his unrestricted lump-sum appropriation than required to fully fund tribal contacts, an interpretation the Supreme Court rejected. *Cherokee Nation*, 543 U.S. at 643-44.

The estoppel argument relies on the same faulty premises as the waiver argument: namely, that the Tribe knew in advance of executing the contract how much indirect costs it would be paid and what its shortfall, if any, would be by the end of the contract year. "Had Plaintiffs raised their objections prior to contract execution, the Secretary would have had a full range of options," Defendants state, including litigation, re-negotiation, or simply providing the additional funds. This ignores not only the temporal element of contact funding discussed in detail above, but also the Secretary's policy to limit CSC levels to the amounts recommended in non-binding appropriations committee reports. *Cherokee Nation*, 543 U.S. at 646; *Thompson*, 334 F.3d at 1088. In theory the Secretary <u>could</u> have provided more indirect cost funding had the Tribe objected prior to signing the contract, but as a practical matter he would not have done so. More important, the Tribe simply had no grounds to object before execution to a funding level that was not then known to be inadequate.

Defendants' estoppel cases are no more relevant than its waiver cases, because they all involve acceptance of contract provisions that are clear and final upon execution.[30]  The Tribe's indirect cost funding amount, by contrast, could only be ascertained after six or nine contract modifications throughout the course of the contract year.

Finally, Defendants' claim of detrimental reliance – which is premised in part on their own unlawful actions - provides no basis for estoppel.[31]  Defendants argue that "if the Court permits Plaintiff to raise its claims now and if it is successful, the Secretary will be responsible for liquidation of all of the original obligations incurred by the Secretary (in reliance on the funding levels provided to Plaintiffs) as well as the obligations that Plaintiff maintains should now be considered part of Plaintiff's agreements."  Def. MTD at 23.  This is nonsense; the Secretary will simply be liable for damages.  Strip away the appropriations jargon, and Defendants' argument boils down to this: If a party pays less than the contract promised, then spends the difference on something else, the other party is estopped from claiming the difference because the first party relied to his detriment on his underpayment.  This is not the kind of detrimental reliance that entitles Defendants to invoke the equitable doctrine of estoppel.

     F.     *This Court Should Follow the* Seldovia *Case, in which the IBCA Rejected the IHS's "Waiver" Argument.*

Far more pertinent than the defense acquisition cases cited by Defendants is the *Seldovia* case, which is directly on point.  The Seldovia Village Tribe had executed an AFA with

---

[30] *E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978) (allegedly illegal option clause); *Union Pac. R.R. Co. v. United States*, 847 F.2d 1567 (Fed. Cir. 1988) (allegedly illegal contract term); *Hartford Accident & Indem. Co.*, 130 Ct. Cl. 490 (1955) (contract terms known at time of execution).

[31] The court in Cherokee made clear that the Defendants interpretation of their legal duty to pay CSC under section 106 of the ISDEAA was not consistent with the law.  Defendants' attempts to rely on their past illegal interpretation of the ISDEAA as a basis to invoke the equitable doctrine of estoppel is inappropriate: "[h]e who seeks equity must do equity."  *Manufacturers' Finance Co. v. McKey*, 294 U.S. 442, 449 (1935) (internal quotation marks omitted); *see also Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302, 1312 (D.C. Cir. 1980), *rev'd on other grounds*, 455 U.S. 72 (1982) (defendants' strategy of ignoring contractual obligations constitutes unclean hands weighing against permitting defendant to raise defense overlaid with equitable considerations).

Defendants, including a specified amount for indirect costs, an amount that was fully paid during the contract year.  During the year, however, Seldovia had negotiated a new indirect cost rate agreement with DOI that contained a higher indirect cost rate and thus required additional indirect cost funding from the IHS.  The IHS refused to amend Seldovia's AFA to reflect the higher rate, and the Tribe appealed to the Interior Board of Contract Appeals ("IBCA").

Just as in this case, the IHS sought to defend itself by saying it paid every dollar in the contracts and Seldovia acquiesced in accepting those amounts.  Judge Parrette of the IBCA rejected that argument, ruling that the IHS could not refuse to amend Seldovia's AFAs to reflect its higher indirect cost rate, then claim both full performance and waiver.  *Seldovia*, Exhibit E at 9-11.

The Government initially appealed the *Seldovia* case to the Federal Circuit, but later moved to stay the appeal pending the Supreme Court's ruling in *Cherokee Nation*, because *Cherokee* involved, in the Government's own words, "issues almost identical to the ones raised in this appeal."  *Thompson v. Seldovia Village Tribe*, No. 04-1230, Unopposed Motion to Stay Appellate Proceedings, at 1 (Fed. Cir. March 2004).  The Government abandoned the appeal once the Supreme Court decided *Cherokee Nation*, indicating that the Government understood that the *Seldovia* case, including Judge Parrette's conclusion that Seldovia could not waive its right to full CSC in its agreements with the IHS, to fall squarely within the scope of the *Cherokee Nation* decision.[32]

---

[32] It is worth noting that after Seldovia filed a petition for attorneys' fees under the Equal Access to Justice Act in the case, the IBCA awarded the fees, ruling that the IHS litigation position was not "substantially justified"—that is, not reasonable.  *Application for Attorney Fees of Seldovia Village Tribe*, Interior Board of Contract Appeals, Nos. IBCA 3862F/97 & 3863F/97, at 3-7 (July 26, 2005).  For example, even after the Federal Circuit had affirmed the IBCA's *Cherokee* decision in *Thompson v. Cherokee Nation*, 334 F.3d 1075 (Fed. Cir. 2003), and the IHS had admitted that the issues in *Seldovia* were "virtually identical with those in <u>Cherokee</u>," the IHS stubbornly persisted in appealing to the Federal Circuit.  "[A]pparently," Judge Parrette remarked, the "IHS simply was not prepared to take 'No' for an answer."  *Id*. at 4, 6.  As this case makes abundantly clear, to this day the IHS still is not prepared to take no for an answer.

**III.    The Tribe's Claims for 1996, 1997, and 1998 Meet the Applicable Statute of Limitations with the Benefit of Class-Action Tolling.**

Defendants' motion to dismiss the claims for contract years 1996, 1997, and 1998 should be denied, because Defendants ignore the well-established rule that class actions toll the statute of limitations as to members of the putative class, and do not provide the legal and factual analysis required to meet the stringent Rule 12(b)(1) standard.  *See supra*, at 9.

*A.      The 1996-1998 Claims Were Timely Because the CDA Statute of Limitations Was Legally Tolled.*

In *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  414 U.S. at 554.  The Court reasoned that without this rule, every potential class member would have to file its own action or motion to intervene in order to protect itself in case class certification were denied, "precisely the multiplicity of activity which Rule 23 was designed to avoid."  *Id.* at 551.  At the same time, the Court noted that "[t]his [tolling] rule is in no way inconsistent with the functional operation of a statute of limitations." *Id.* at 554.

As described by the Supreme Court in a later case affirming and extending the class-action tolling rule, statutes of limitations "are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights ... but these ends are met when a class action is commenced."  *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352 (1983) (citations omitted).

> Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights; Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims.  And a class complaint "notifies the defendants not only of the substantive claims being

brought against them, but also of the number and generic identities of the
potential plaintiffs who may participate in the judgment."

*Id.* at 352-53 (quoting *American Pipe*, 414 U.S. at 555).

In *Crown, Cork*, the Supreme Court clarified that tolling extends not only to plaintiffs
who intervene in the pending action, but also to would-be class members who file actions of their
own.  462 U.S. at 350.  The Court stated that "[o]nce the statute of limitations has been tolled, it
remains tolled for all members of the putative class until class certification is denied," at which
point "class members may choose to file their own suits or to intervene as plaintiffs in the
pending action."  *Id.* at 354.

Numerous courts have held that the tolling announced in *American Pipe* is legal, not
equitable tolling, and required by the FRCP.  *Stone Container v. United States*, 229 F.3d 1345,
1353-54 (Fed. Cir. 2000) (tolling mandated by statute); *Joseph v. Wiles*, 223 F.3d 1155, 1166-67
(10th Cir. 2000) (legal tolling occurs in class actions); *Schimmer v. State Farm Mutual
Automobile Ins. Co.*, 2006 WL 2361810 at *4 (D. Colo. 2006) (class action tolling is a form of
legal rather than equitable tolling); *In re Discovery Zone Securities Litigation*, 181 F.R.D. 582,
600, n.11 (N.D. Ill. 1998) (same); *Salkind v. Wang,* 1995 WL 170122, at *3 (D. Mass. 1995)
(same); *Mott v. R.G. Dickinson and Co.*, 1993 WL 63445 at *5 (D. Kan. 1993) (same).

In *Stone Container*, the Federal Circuit made it clear that class action tolling is not
equitable because it is "mandated by statute" (Rule 23).  229 F.3d at 1353.  As such it applies to
the Government.  "Having determined that Rule 23 tolling is statutory rather than equitable, it
follows that the rule of *American Pipe* applies to the government just as it does to private
parties...."  *Id.* at 1354.

For each of the Tribe's two sets of claims—shortfall and miscalculation—a separate CSC
class action tolled the claims.  First, a class action filed by the Cherokee Nation tolled the statute

as to the shortfall claims from 1999-2001, then a class action filed the Pueblo of Zuni tolled the statute as to the miscalculation claims from 2001 to 2007.

### 1. The Shortfall Claims and Cherokee Nation Tolling

The *Cherokee Nation* class action was filed on March 5, 1999, with the proposed class to include "[a]ll Indian tribes and tribal organizations operating Indian Health Service programs under contracts, compacts, or annual funding agreements authorized by the [ISDEAA] that were not fully paid their contract support cost needs, as determined by IHS, at any time between 1988 and the present." The Tribe fit squarely within this definition of the proposed class, and had the class been certified, the Tribe would have been bound by any judgment unless it opted out. Thus, under the rule of *American Pipe*, the statute of limitations for the Tribe's individual claims was tolled on March 5, 1999.[33] In a ruling dated February 9, 2001, the court denied the Cherokee motion for class certification. *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. 357 (E.D. Okla. 2001). The statute was tolled for one year and 341 days.

Defendants posit that the Tribe's claims accrued at the end of each contract year. Def. MTD at 7. Accepting for the moment that Defendants are correct, the Tribe's 1997 claim accrued on January 1, 1998, the day after the calendar-year contract expired. Ordinarily, then, the Tribe's claim for FY 1997 would have been due by January 1, 2004. Adding the *Cherokee Nation* tolling period, however, pushes the deadline back one year and 341 days, to December 8, 2005. The Tribe filed its claims for 1997 on September 7, 2005, well within the time period.

With the benefit of the tolling period, the Tribe's 1998 claims, also based on a calendar-year contract, could have been filed as late as December 8, 2006 (again, assuming Defendants

---

[33]*American Pipe*, 414 U.S. at 554 ("commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"); *Crown, Cork*, 462 U.S. at 354 ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.").

are correct about the accrual date). The Tribe filed the 1998 claims on September 7, 2005, some fifteen months before the deadline, even using Defendants' accrual date.

As for the 1996 claim, the Tribe challenges Defendants' assumption that it could not have accrued any later than the end of the contract (calendar) year. A common formulation is that "[a] claim accrues when damages are ascertainable." *Patton v. United States*, 64 Fed. Cl. 768, 774 (2005) (citations and internal quotations omitted); *Terteling v. United States*, 334 F. 2d 250, 255-56 (Ct. Cl. 1964). The Tribe's damages for breach of the 1996 contract were not ascertainable until the end of fiscal year 1997, so it was not until then that the claim accrued. The IHS's fiscal year 1996 appropriation remained available for obligation through the end of FY 1997. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134 (1996), 110 Stat. 1321, 1321-189 ("funding contained herein [for IHS] ... shall remain available for obligation until September 30, 1997"). Moreover, the IHS used this two-year obligation authority to pay CSC on previous years' contracts, including the Tribe's. *See* Def. Ex. D at 016 (adding, in modification to FY 1998 AFA dated September 23, 1998, "$618 of FY '97 CSC IDC shortfall," along with "$498 of FY 98 CSC IDC shortfall"). Because the IHS could have made up the 1996 shortfall at any time throughout the following fiscal year, the Tribe's damages were not ascertainable and its claim did not accrue until the end of FY 1997. The claim having accrued October 1, 1997, the Tribe's filing on September 7, 2005 was timely with the benefit of the *Cherokee Nation* tolling period.

Defendants cite *Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217, 225 (1964) (per curiam) to conclude that the Tribe's claims "accrued by the end of each contract year (which correspond with the calendar year)." Def. MTD at 7. In *Oceanic*, however, the contracts also

33

expired at the end of a calendar year, but the claims did not accrue until well after that time,

when a "final accounting" was completed and the extent of the damages ascertained.

In sum, the Tribe's shortfall claims for 1996-1998 were timely with the benefit of the

*Cherokee Nation* tolling period.

### 2.    *The Miscalculation Claims and* Zuni *Tolling*

The *Cherokee Nation* class action involved only shortfall claims, not miscalculation

claims, so *Cherokee Nation* did not toll the statute of limitations as to the latter claims.  The

statute of limitations on the Tribe's miscalculation claims continued to run until September 10,

2001, when the Pueblo of Zuni filed the first CSC class action against the IHS that asserted

miscalculation claims.  *See Pueblo of Zuni v. United States*, No. CV 01-1046 (D.N.M.) ("*Zuni*").

The proposed class included "all tribes and tribal organizations contracting with IHS under the

ISD[EA]A between fiscal years 1993 to the present."  *Zuni*, First Amended Complaint ¶ 53

(attached as Exhibit F).  The Tribe clearly would have been a member of this class, if certified.

The Pueblo's amended complaint also describes claims identical to the miscalculation claims

eventually brought by the Tribe.  *See id*. ¶¶ 66-73 (First and Second Causes of Action for

"Undercalculating 'Indirect' Contract Support Costs").[34]

Because the Tribe was a member of the putative *Zuni* class, and the Tribe's

miscalculation claims were subsumed in the class claims, the statute of limitations on the claims

was tolled as a matter of law under *American Pipe* and *Crown, Cork*.  When the Tribe filed its

---

[34] Because *Cherokee Nation* did not raise miscalculation claims and *Zuni* was the first class action to do so, the Tribe's reliance on *Zuni* as to those claims does not run afoul of the rule against "stacking" or "piggybacking" class action tolling periods.  *See, e.g.*, *Basch v. Ground Round, Inc.,* 139 F.3d 6, 11 (1st Cir.1998) ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely."), *cert. denied,* 525 U.S. 870 (1998); *Griffin v. Singletary,* 17 F.3d 356, 359 (11th Cir.1994) ("Plaintiffs may not piggyback one class action onto another and thus toll the statute of limitations indefinitely.").

own claims on September 7, 2005, the statute was still tolled, as the *Zuni* court did not decide the class certification issue until May 22, 2007.

As Defendants acknowledge, the Tribe could have filed its 1996 claims any time up until the end of calendar year 2002.  Def. MTD at 8.  Because the statute was tolled over a year before then, and the Tribe filed its claims before the statute began to run again, the Tribe's 1996 miscalculation claim was timely filed.  Of course, it follows that the FY 1997 and 1998 claims were also timely with the benefit of the tolling period.

B.    *In the Alternative, the Statute of Limitations Was Equitably Tolled by the CSC Class Actions.*

Generally, if a statute is legally tolled, a court need not address equitable tolling.  *Stone Container,* 229 F.3d at 1353; *Schimmer*, 2006 WL 2361810 at *4, n.4.  If this Court finds that the statute of limitations was not legally tolled, the Tribe argues in the alternative that the statute of limitations was equitably tolled by *Cherokee Nation* (for the shortfall claims) and by *Zuni* (for the miscalculation claims).

In *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990), the Supreme Court held that a "presumption" of equitable tolling applies to suits against the United States even though a waiver of sovereign immunity is to be strictly construed.  Once Congress has made a waiver of immunity, "making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any broadening of the congressional waiver....We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States.  Congress, of course, may provide otherwise if it wishes to do so."  *Id.* at 95-96.  The Supreme Court has confirmed this ruling in several subsequent cases.  *E.g.*, *Young v. United States*, 535 U.S. 43, 49 (2002); *United States v. Brockamp*, 519 U.S. 347, 350 (1997).

35

Under *Irwin*, the presumption in favor of tolling can be rebutted if either (1) tolling would not be applicable in a similar suit between private parties, or (2) Congress did not want tolling to apply.[35]    The CDA statute of limitations in § 605 may be tolled because under the *Irwin* test, (1) tolling would be available in a similar suit between private parties and (2) Congress did not state any clear intention that tolling not apply.

> 1.    *The Tolling Rule Would Apply in a Contract Dispute between Private Parties.*

Applying the first prong of the *Irwin* test, the question is whether tolling would apply in a private action when a class action is pending, and we have shown above that it would.  Class action tolling is, of course, available in disputes between private litigants, as *Crown, Cork* illustrates.[36]  The Federal Circuit, applying *Irwin*, has also made clear that class action tolling is available not only to private litigants against other private parties, but also against the Government.  *Stone Container Corp. v. United States*, 229 F.3d 1345, 1354 (Fed. Cir. 2000) ("Having determined that Rule 23 tolling is statutory rather than equitable, it follows that the rule of *American Pipe* applies to the Government just as it does to private parties, both generally and in this particular case.").

Class actions involving claims for breach of contract under the ISDEAA have also been established.  *See, e.g.*, *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) (class action alleging failure of Bureau of Indian Affairs to fully fund CSC under contracts in violation

---

[35] *Bailey v. West*, 160 F.3d 1360, 1364 (Fed. Cir. 1998) ("The rule we draw from *Irwin* is that the doctrine of equitable tolling, when available in comparable suits of private parties, is available in suits against the United States, unless Congress has expressed its intent to the contrary.").

[36] *See also Irwin*, 498 U.S. at 96 n.3 (citing *American Pipe* as example of cases in which Court has applied equitable tolling doctrine as between non-federal litigants).

of ISDEAA).  Courts routinely apply tolling doctrines to breach of contract actions both between

private parties and between private parties and the United States.[37]

Thus the first part of the *Irwin* test has been met.  Class action tolling is available to

private litigants in breach of contract actions and therefore may apply to the Government.

> 2. *There is No Evidence that Congress Did Not Intend the Tolling Rule to Apply to 41 U.S.C. § 605(a).*

Because it has become "hornbook law that limitations periods are customarily subject to

equitable tolling, ... Congress must be presumed to draft limitations periods in light of this

background principle."  *Young v. United States*, 535 U.S. 43, 49-50 (2002) (citations and internal

quotation marks omitted).  The Supreme Court has explained that analysis of a statute focuses on

"*Irwin*'s negatively phrased question: Is there good reason to believe that Congress did <u>not</u> want

the equitable tolling doctrine to apply?"  *United States v. Brockamp*, 519 U.S. 347, 350 (1997)

(Court's emphasis).  Rebutting the *Irwin* presumption in favor of tolling requires positive

evidence of Congressional intent otherwise with respect to the particular statute at issue.[38]

The text of the CDA reveals no indication that Congress intended to rebut the

presumption in favor of equitable tolling.  Section 605(a) simply says that, "Each claim by a

contractor against the government relating to a contract and each claim by the government

against a contractor relating to a contract shall be submitted within 6 years after the accrual of

the claim."  41 U.S.C. § 605(a).  This language does not preclude tolling or any other

---

[37] *See, e.g.*, *NN&R v. One Beacon Ins. Group*, 2006 WL 1765077 at *8 (D. N.J. 2006) (applying New Jersey law to toll statute as to breach of contract claim against insurer); *Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297, 304 (S.D.N.Y. 2001) (holding that "the statutes of limitations for plaintiff's claims of breach of contract ... are equitably tolled"); *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 194 (D. Del. 2000) (tolling Delaware statute of limitations on breach of contract and other claims); *Land Grantors in Henderson, Union & Webster Counties, Ky. v. United States*, 64 Fed. Cl. 661, 712 (2005) (applying *Irwin* to hold that "a breach of contract action brought under the Tucker Act is sufficiently similar to a similar private cause of action that consideration of the doctrine of equitable tolling is appropriate and necessary, particularly where 'harsh and unjust results' may occur if the statute is not tolled.").
[38] *Bailey v. West*, 160 F.3d 1360, 1368 (Fed. Cir. 1998) ("*Irwin* commands that tolling should be presumed absent a clear contrary intent of Congress....") (emphasis added).

background principle of the common law.  If anything, starting the running of the statute from "accrual" indicates that Congress intended the limitations period to be flexible under appropriate circumstances.  Rather than running from a hard-and-fast date, such as the contract termination date, the statute runs from accrual, which could be delayed if, for example, the contractor did not immediately discover the breach or the damage it caused.[39]  Tolling, like the discovery rule, must be read into the statute as well, and certainly cannot be read <u>out</u> of the statute absent clear congressional intent under the rule of *Irwin*.

In *United States v. Brockamp*, 519 U.S. 347 (1997), the Supreme Court confirmed the *Irwin* analytical framework and added more detail to the questions to be asked in examining Congressional intent.  *Brockamp* considered: (1) the statute's detail and technical language; (2) whether the limitations were reiterated substantively and procedurally; (3) whether explicit exceptions to limitations were included; and (4) the underlying subject matter of the statute. 519 U.S. at 352;  *see also Brice v. Secretary of Health & Human Servs.*, 240 F.3d 1367, 1372 (Fed. Cir. 2001).  Applying the *Brockamp* factors to the statute in this case, it is clear that the CDA is not "detailed" or "technical" as to the statute of limitations – certainly not to the same extent as the Internal Revenue Code scheme at issue in *Brockamp*.  Nor does the CDA reiterate the limitation "several times in several different ways" and in both substantive and procedural forms, as in *Brockamp*, or set forth exceptions for the contractor.  519 U.S. at 351.  In fact, the CDA's provision on statute of limitation is very straightforward: there is a single sentence in section 605 that states the six-year limitations period.

If anything, the general purposes of the CDA support the intent to allow tolling, and certainly do not provide any evidence to rebut the *Irwin* presumption.  The purposes were "to

---

[39] *See, e.g.*, *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990), *cert. denied* 501 U.S. 1261 (1991) (stating that "the 'discovery rule' of federal common law ... is read into statutes of limitations in federal-question cases ... in the absence of a contrary directive from Congress").

provide for a fair and balanced system of administrative and judicial procedures for the settlement of claims and disputes relating to government contracts,"[40] and to "equalize the bargaining power of the parties when a dispute exists."[41]  This emphasis on fairness supports the presumption that Congress intended tolling to be available to contractors' claims.  These purposes, combined with the lack of any express intent to preclude equitable tolling, provide no basis to rebut the *Irwin* presumption that tolling is available when warranted.[42]  Due to the lack of any Congressional intent to preclude tolling, under *Irwin/Brockamp* the doctrine of equitable tolling applies.

     C.     The *Bowles* Case Is Not to the Contrary.

Defendants cite the Supreme Court's recent ruling in *Bowles v. Russell*, __ U.S. __, 127 S. Ct. 2360 (2007) for the proposition that "[s]tatutory time limits are jurisdictional in nature, and courts do not have the power to create equitable exceptions to them."  Def. MTD at 7.  This simplistic statement does not reflect the case's actual holding, which does not impact the cases cited in the tolling arguments above.

---

[40] H. R. Rep. No. 95-1556, at 5 (1978).

[41] S. Rep. No. 95-1118, at 1 (1978).  This report briefly discusses the 90-day period for appealing the contracting officer's decision: "Section 7 [41 U.S.C. § 606] establishes the time limits available to the contractor to initiate an appeal to an agency board of contract appeals. This time frame (90 days) is considered adequate to insure the contractor the necessary time to review his position and to decide whether to appeal to an agency board."  *Id.* at 23.  Nothing in this description would appear to indicate any intent to preclude tolling when, for some good reason, 90 days is <u>not</u> adequate.

[42] The scant legislative history relevant to the six-year limitation period reveals no indication that Congress intended that tolling not apply.  As enacted in 1978, the CDA contained no statute of limitations period for presenting claims to the contracting officer (CO).[42]  *See, e.g., Board of Governors of the Univ. of N. Carolina v. United States*, 10 Cl. Ct. 27, 30 (Cl. Ct. 1986) (when first enacted, "the CDA provided no limitations period in which claims must be presented (or certified) to the CO").  In 1994, Congress enacted the Federal Acquisition Streamlining Act (FASA), which amended the CDA, 41 U.S.C. § 605(a), to include the six-year limitation.  Pub. L. No. 103-355 § 2351, 108 Stat. 3243, 3322 (Oct. 13, 1994).  Neither the FASA itself nor its legislative history discusses the reason for adding the six-year limitation to § 605(a).

*Bowles* addressed the question of whether the Federal Rule of Appellate Procedure 4(a) and 28 U.S.C. § 2107(c), which set forth the time within which to file an appeal, are jurisdictional and therefore not waivable by a court. The Supreme Court held that because the time frame for filing an appeal is set by statute, it is mandatory and jurisdictional and not subject to equitable waiver.

This ruling is notable for what it does not address. First, it is clearly limited to the issue of the filing of appeals in federal appellate court. Second, the ruling does not address a statute of limitations. The Court does not overrule any case relied upon by the Tribe in its tolling argument above, all of which address the tolling of a statute of limitations rather than an appeal period. The Court in *Bowles* states plainly that it is addressing a time frame set by statute which defines the jurisdiction of a court, not rules for claims processing. 127 S. Ct. at 2364.

The six-year CDA deadline at 41 U.S.C. § 605(a), however, is a garden-variety statute of limitations for presenting claims to the contracting officer.[43] The cases are clear—and the Supreme Court's ruling in *Bowles* does not change this clarity—that statutes of limitations, in certain circumstances, may be tolled. The six-year deadline at 41 U.S.C. § 605(a) is just such a statute of limitations. The more analogous section of the CDA to the statute at issue in *Bowles* is 41 U.S.C. § 609, which provides the time frame within which to appeal a contracting officer's decision in court. This section sets the jurisdiction of the district court to hear an appeal which is not an issue in this case.

---

[43] The additional requirement in section 605(a) that claims be presented to the contracting officer has been held jurisdictional, *e.g.*, *Tunica-Biloxi Tribe*, No. 02-2413, slip op. at 10 (D.D.C., Dec. 9, 2003). Although Defendants cite *Tunica-Biloxi* as supporting the jurisdictional nature of statutory time limits, Def. MTD at 7, time limits were not at issue in that case. Instead, this court held that presentment of claims to the contracting officer was jurisdictional. In the instant case, there is no dispute that the Tribe presented its claims; the only question is timeliness.

40

In his dissent in *Bowles*, Justice Souter makes the crucial distinction between statutes of limitations and statutes limiting jurisdiction of appeals, and the majority does not disagree that such a distinction exists. "The time limit at issue here...is much more like a statute of limitations, which provides an affirmative defense, see Fed. Rule Civ. Proc. 8(c), and is not jurisdictional. *Day v. McDonough*, 547 U.S. 198, 205 (2006). Statutes of limitations may be waived, *id.*, at 207-208, or excused by rules, such as equitable tolling, that alleviate hardship and unfairness, see *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95-96 (1990)." *Bowles*, 127 S. Ct. at 2369.

While Defendants may wish that *Bowles* stood for the proposition that any limitation period in a statute is jurisdictional and cannot be tolled, it plainly does not. *Irwin* involved a statute, 42 U.S.C. § 2000e-16(c); so did *Young* (11 U.S.C. §§ 523(a)(1)(A) and 507(a)(8)(A)(i)) and *Brockamp* (26 U.S.C. [Internal Revenue Code] § 6511). *Bowles* does not overrule *Irwin* or any other Supreme Court case on tolling statutes of limitations. The majority simply disagreed with Justice Souter over the nature of the time limitation at issue.

Finally, even if *Bowles* did overrule *Irwin*, *Young*, *Brockamp* et al. *sub silentio*—a dubious proposition[44]—and abolish equitable tolling for every statutory limitation period, that would not affect the Tribe's argument that the statute was legally tolled by the filing of the CSC class action(s).

## IV.    The Tribe's FY 1995 Claim Is Not Barred by Laches.

The defense of laches requires a showing of (a) unreasonable and unexcused delay by the claimant, and (b) prejudice to the defendant, either economic or in the ability to mount a defense. *Cornetta v. United States*, 851 F.2d 1372, 1377-78 (Fed. Cir. 1988) (en banc). The burden of

---

[44] *See, e.g.*, *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*...."). It is highly unlikely that the Court would overturn a "background principle" of "hornbook law," as the Court referred to the *Irwin* tolling doctrine in *Young*, 535 U.S. at 49-50, without so much as mentioning the rule or the cases in which it developed.

proof rests with the defendant.  *Id*. at 1380 (citing FRCP 8(c)).  Defendants must satisfy both

parts of the test.  *Costello v. United States*, 365 U.S. 265, 282 (1961).  Here, Defendants have not

met their burden on either prong.

> A.      *The Tribe's Delay in Bringing Its Claims Was Reasonable Given the CSC Class*
> *Actions.*

Mere passage of time does not constitute laches.  *Advanced Cardiovascular Sys., Inc. v.*

*Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993).   In fact, "where no prejudice to the

defendant has ensued from the mere passage of time, there should be no bar to relief."  *Gardner*

*v. Panama R.R. Co.*, 342 U.S. 29, 31 (1951).  Where, as here, Congress has chosen to impose no

statute of limitations, courts are reluctant to impose their own equitable limitation.  *E.g., CW*

*Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 569 (Fed. Cl. 2004) ("Because Congress did

not so limit the jurisdiction of this Court to hear such actions, we would be reluctant to invoke

laches except under extraordinary circumstances....").

Defendants state that the Tribe delayed "more than eleven years," Motion to Dismiss at 9,

but the Tribe actually submitted its claim to the contracting officer less than ten years from the

time Defendants claim it accrued (the end of calendar year 1995).  More important, the Tribe's

FY 1995 claim was only a little over three years old when the *Cherokee Nation* class action was

filed on March 5, 1999.  The class action aimed to recover CSC claims for all tribal contractors

from 1988 forward.  *Cherokee Nation*, 199 F.R.D. at 360.  As discussed in detail above, the

Tribe's reliance on the class action to vindicate its rights to unpaid CSC in FY 1995 (and the

other years) was reasonable as a matter of law.[45]

---

[45] *See Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352-53 (1983) ("Class members who do not
file suit while the class action is pending cannot be accused of sleeping on their rights; Rule 23 both
permits and encourages class members to rely on the named plaintiffs to press their claims.").

After class certification was denied by the *Cherokee Nation* court in 2001, a second CSC class action was filed by the Pueblo of Zuni, in which the class certification decision was not made until May 22, 2007. *Pueblo of Zuni v. United States*, CIV 01-1046LH (D.N.M.). Even so, the Tribe filed its FY 1995 claims in 2005 rather than rely on *Zuni*.

In sum, at <u>no</u> time during 1995-2005 did the Tribe sleep on its rights. The Tribe's "delay" was reasonable and justified.

B.      *The IHS Was Not Prejudiced by the Tribe's Delay in Filing its Claims.*

Even if the Tribe's delay had been unreasonable and unexplained, which it was not, the IHS would still have to show prejudice, or its laches argument fails. *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 31 (1951) ("[W]here no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief."). The burden of proving prejudice rests with the Defendants. *Cornetta*, 851 F.2d at 1380.

Defendants do not argue that the passage of time hampers their ability to defend against the Tribe's claims, as the written documents on which the FY 1995 claim is based—the contract, its modifications, and the relevant provisions of the ISDEAA—have been readily available to the parties and still say the same things now that they did in 1995. Instead, Defendants present perfunctory allegations of economic prejudice based on the lapse of FY 1995 appropriations at the end of that fiscal year. Def. MTD at 9-10. Under this reasoning, the Tribe's claim would have been just as "prejudicial" if filed in 1996 instead of 2005, since it would have sought to "revive a claim for appropriations that expired." *Id*. at 9. Therefore the delay of which

43

defendants complain made no difference even under their own logic.  Of course, the Tribe is not

seeking to "revive" expired appropriations, but only to recover damages.[46]

## V.      Defendants' Motion to Dismiss the Tribe's Breach of Trust Claim Should Be Denied.

Finally, Defendants' motion to dismiss the Tribe's breach of trust claims should also be

denied.  As Judge Walton from this court found a few years ago, the ISDEAA expressly

acknowledges and reflects the federal Government's trust responsibility.  *Tunica-Biloxi Tribe of

Louisiana v. United States*, No. 02-2413, slip op. at 37-38 (Dec. 9, 2003).  It is true that Judge

Walton declined, in *Tunica-Biloxi*, to hold the Secretary liable for breach of that trust by failing

to request additional appropriations for CSC from Congress.  *Id*. at 39-40.  The Tribe does not

limit its allegations of breach of trust to appropriations requests, however, alleging broadly that

"[t]he Secretary failed to take all steps necessary to fully fund the Tribe's contracts," Complaint ¶

48—for example, by reprogramming funds from the Department's unrestricted lump-sum

appropriation to cover the Tribe's shortfalls.  This allegation does not raise the issue of

redressability (and thus standing) that was central to Judge Walton's ruling in *Tunica-Biloxi*.

Accepting the Tribe's allegations as true, the Tribe's claim is plausible and should not be

dismissed under Rule 12(b)(6).  *Twombly*, 127 S. Ct. at 1965.

Defendants also argue that sovereign immunity bars the breach of trust claims, because

the ISDEAA's waiver of immunity is limited to claims for injunctive relief and money damages

arising under contracts.  Def. MTD at 25-26.  As alleged in the Complaint ¶ 49, however, the

Tribe's breach of trust claims arise from and relate to the contracts at issue, and thus fall within

the jurisdiction of this Court—and the waiver of sovereign immunity—afforded by section 110

---

[46] Defendants assert that their reliance on a limitation of cost provision in the 1995 contract supports their laches defense.  Def. MTD at 10 n.3.  In *Cherokee Nation*, however, the Supreme Court disagreed with a similar argument based on a boilerplate limitation of cost clause.  543 U.S. at 639-40.

of the ISDEAA.  *See* 25 U.S.C. § 450m-1(a).  Thus dismissal for lack of subject matter

jurisdiction would be inappropriate at this time.

## CONCLUSION

For the reasons above, the Tribe respectfully requests that this Court deny Defendants'

Motion to Dismiss in its entirety.

Pursuant to Local Civil Rules 7(f) and 78.1, the Tribe requests an oral hearing on

Defendants' Motion.

Respectfully Submitted,


_____/s/_____
F. Michael Willis (D.C. Bar No. 467462)
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Counsel for the Menominee Indian Tribe
of Wisconsin

DATED: September 10, 2007.

45

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Public Health Service
Indian Health Service                    Refer to:  OTA
Rockville, Maryland 20857

## INDIAN SELF-DETERMINATION MEMORANDUM NO. 92-2

### CONTRACT SUPPORT COST POLICY

Sec.

1. Background
2. Purpose
3. Definitions
4. New and Expanded Contracts
5. Procedure for Computing Amount of
   Contract Support Costs
6. Ongoing Contracts
7. Subsequent Years Considerations
8. Supersession

## 1. BACKGROUND

The development of this policy is in response to section 106(a) of Public Law 93-638, as amended, the Indian Self-Determination Act, which states:

Section 106. (a)(1) "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the program or portions thereof for the period covered by the contract.

(2) There shall be added to the amount required by paragraph (1) contract support costs which shall consist of the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which -

(A)  normally are not carried on by the respective Secretary in his direct operation of the program; or

(B)  are provided by the Secretary in support of the contracted program from resources other than those under contract."

Distribution:  PDS 557 Tab D, Tribes, Tribal Organizations
Date:  February 27, 1992

## 2. PURPOSE

To establish the Indian Health Service (IHS) policy for 1) identifying amounts required for direct and indirect contract support funds; and 2) allocating contract support funds for all Public Law (P.L.) 93-638 contracts. All funds for contract support costs are subject to the availability of funds made available for this purpose.

This policy outlines the procedures to be used to determine the need for contract support costs, and to guide the allocation of these funds.

## 3. DEFINITIONS

Contract Support Costs are:

A. Reasonable costs for activities which must be carried on by the Indian tribe or tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management but which normally are not carried on by the Secretary in his direct operation of the program, or are provided by the Secretary in support of the program from resources other than those under contract; and

B. Costs which are reasonable, necessary and allowable costs of the contractor, which are allocable to the contract based on applicable Federal cost principles; and

C. Costs which are not provided for under the allocation of program funds available for the contract as defined in P.L. 93-638, as amended, Section 106 (a)(1); and

D. Treated as either direct or indirect by the contractor based on applicable cost principles and the contractor's cost allocation policy.

## 4. NEW AND EXPANDED CONTRACTS

A. The Indian Self-Determination (ISD) Fund will cover certain costs of P.L. 93-638 awards when the award is:

(1) an initial transfer of a program previously operated by the IHS to the tribe or tribal organization, or

(2) to expand current tribal operations through the assumption of additional programs previously operated by IHS, or

(3) to provide initial contract support funding for all new and expanded 638 contracts, including the assumption of programs previously operated by other tribes, tribal organizations, Indian contractors, and for newly recognized tribes.

Distribution: PDS 557 Tab D, Tribes, Tribal Organizations

B. IHS will award funds for contract support costs for new and expanded contracts in the following two categories:

(1) Direct Contract Support Costs:

    a. Non-recurring direct contract support costs are costs which are of a non-recurring nature, are otherwise allowable direct contract support costs, and are required for the program to begin operations. These are also referred to as start up costs, but are not intended to be an additional cost category.

    b. Recurring direct contract support costs are costs which are of a recurring nature and associated directly with the operation of the program. These funds shall be awarded on a recurring basis.

(2) Indirect or Indirect Types of Costs:

Costs incurred for a common or joint purpose benefitting more than one contract objective, or which are not readily assignable to the contract objectives specifically benefitted without effort disproportionate to the results achieved, and which are not funded by other direct costs, and are incorporated in the Indian tribe's or tribal organization's indirect costs reimbursement procedure as negotiated annually with the cognizant Federal agency.

For contractors without negotiated indirect cost rates, indirect type costs consist of costs which are normally found in indirect cost pools of contractors with rates, and which are negotiated between the contractor and the Area Office using principles of reasonableness, allowability and allocability (see attachment A).

These funds shall be awarded "non-recurring" subject to negotiation in each subsequent year. Those contractors with a surplus of indirect cost support funds will not be allocated additional funds until the need is indicated by the most current negotiated indirect cost rate. (See page 7, Section 6, for special procedures for contracts that have received indirect cost funds as recurring funds). The following illustrations show: 1) total funding for the first year of the contract, and 2) contract costs for subsequent years.

Total funding for first year of the contract

| Program Funding Base (106(a)(1) amount) | |
| --- | --- |
| Direct Contract Support Costs (Recurring) | Contract support costs provided from ISD fund |
| Indirect Contract Support costs (non-recurring) | |

Contract Costs for Subsequent Years



(3) In subsequent years, direct contract support funds will be considered part of the recurring base of the contract, and will receive mandatory cost increases as do the direct program funds. Amount of indirect contract support funds must be justified each year based on negotiated amounts and any shortfalls are reported to IHS Headquarters for inclusion in the Annual Report to Congress on implementation of P.L. 93-638.

C. (1) Funds for new and expanded contracts will be allocated by IHS Headquarters from the ISD fund on a monthly basis until expended. If permitted by appropriations act, any funds that remain at the end of the fiscal year will be added to any ISD Funds available in the subsequent year. If funds are exhausted at any point in the fiscal year, requests received thereafter will be considered first for funding in the subsequent year from funds appropriated for this purpose.

(2) Area Offices will make requests after receiving proposals for new and expanded contracts. Areas are encouraged to begin discussions with the proposing tribe or tribal organization early to identify the amount of <u>need</u> for contract support costs according to procedures detailed in Section 5 of this policy.

Once the amount of need has been identified, and before the end of the 60-day proposal review period, a request for this amount will be submitted to the IHS Office of Tribal Activities, Division of Self-Determination Services to determine if funds are available for this purpose. The Office of Tribal Activities will respond immediately to advise if the funds are available.

While a CSC need may be requested which is greater than the amount determined to be available, the available amount will be the basis for consideration of approval or declination of proposals, and any subsequent award. Deficiencies for existing contracts will be included in the annual report to Congress required by Section 106(c) ot the Act.

(3) The requested amount will be the total of indirect and direct contract support costs for each project.

(4) If funds from the ISD Fund are inadequate to fully fund all requests, then requests to be funded that month will be selected based on the earliest receipt date.

## 5. PROCEDURE FOR COMPUTING AMOUNT OF CONTRACT SUPPORT COSTS

A. Direct Contract Support Costs

For new and expanded contracts, Area Offices will identify the amount needed for direct contract support costs in accordance with the following:

A detailed budget will be prepared for first-time contractors (new and expanded) detailing amounts to be considered as direct program funds, indirect and indirect type contract support costs, and direct contract support costs.

The amount of recurring direct contract support costs will be determined by negotiation between the recipient and the Area Office (see definitions section for direct contract support costs). **Only categories of cost which are not contained in either the indirect cost pool or the amount computed pursuant to Section 106(a)(1) can be considered as direct contract support costs.** The Area Offices and recipients must agree on the amount of direct contract support costs which will be recurring in future years.

"Recurring" direct contract support costs which may not be in a contractor's indirect cost pool are:

- Unemployment tax on direct program salaries.
- Workers compensation insurance on direct program salaries.
- Cost of retirement and other fringe benefits for direct program personnel in excess of amount funded within P.L. 93-638, as amended, Section 106 (a)(1).
- Long distance telephone charges.
- Postage allocable to direct programs.
- Discipline specific training for direct program personnel not funded in the 106 (a)(1) amount.

The Area Office will also work with the contractor to identify non-recurring direct contract support costs necessary as one time start up costs. These must be required to begin operations. They are not intended to be a program enhancement, and cannot be items of cost included in the 106(a)(1) amount. Examples may include the following:

Distribution:  PDS 557 Tab D, Tribes, Tribal Organizations

·Purchase of computer hardware and software.
·Required training and staff development.
·Systems development.
·Equipment and furniture.

Items listed above as examples of recurring and non-recurring direct contract support costs must be justified as such and negotiated with the Area Office. Items not included as examples above, but requested and justified by contractors shall be submitted by the Area Office to IHS Headquarters, Division of Self-Determination Services, for approval. This will contribute to greater consistency from Area to Area.

A single item of cost to be funded shall not be accounted for both in the computation of direct costs, and also in the computation of indirect or indirect-type costs. However, a type of cost may be either direct or indirect depending on the level or function of the organization to which it applies. The Area Office shall ensure that costs are reasonable, necessary, and not duplicative.

To the extent that the Area Office and the contractor cannot agree on an item(s) of cost, the disputed items shall be submitted to the Director, IHS, through the IHS Office of Tribal Activities, Division of Self-Determination Services.

The following is a description of the methodology to be used in computing the amount required for indirect contract support costs.

B. Indirect or Indirect Type Costs

For all contractors, Area Offices will identify the amount required for indirect costs of awards (12 months of operation) for each contract as follows:

(1) Recipients with Established Indirect Cost Rates

The amount of indirect costs expected to be incurred under awards by recipients with rates which have been negotiated or are being negotiated with the cognizant Federal agency will be determined by applying the negotiated rate(s) to the direct cost base amount for this purpose.

(2) Recipients without Established Indirect Cost Rates

Indirect types of costs may be computed by negotiating amounts for the following examples of "indirect-types of costs" listed on the following page. These examples are those most commonly found in the indirect cost pools of recipients with rates. The total amount negotiated for these items will be considered as the recipient's indirect cost for purposes of this allocation procedure.

Distribution: PDS 557 Tab D, Tribes, Tribal Organizations

| Management and Administration | Facilities and Equipment | General Services and Expenses |
|---|---|---|
| Governing Body | Building Rent/Lease/Cost Recovery | Insurance and Bonding |
| Management and Planning | Utilities | Legal Services |
| Financial Management | Housekeeping/Janitorial | Audit |
| Personnel Management | Building and Grounds | General Support Services |
| Procurement/Material Management | Repairs and Maintenance | |
| Human Resources Management | Equipment | |
| Property Management | | |
| Records Management | | |
| Data Processing | | |
| Office Services | | |

### Guidelines for the Principles Involved in Negotiating Indirect Costs

A plan for allocation of indirect costs will be required to support the distribution of any indirect costs related to the contracted program. All indirect costs included in the plan will be supported by accounting records which will substantiate the propriety of the indirect costs. The allocation plan should cover all indirect costs of the contractor, and contain, but not necessarily be limited to 1) the nature and extent of services provided and their relevance to the contracted program, 2) the items of expense to be included in the indirect cost pool, and 3) the methods to be used in distributing cost.

The Office of Management and Budget (OMB), Circular No. A-87, Cost Principles for State and Local Governments, establishes principles and standards for determining indirect costs applicable to contractors (local governments and federally recognized Indian tribal governments). Further, the circular discusses allowable and unallowable indirect costs.

## 6. ONGOING CONTRACTS

The amount of indirect contract support funds representing the previous year's base will be distributed to Areas "recurring" to fund each Area's indirect cost need. Each contractor's need for indirect contract support shall be determined by calculating changes, if any, in indirect cost rates, bases, and pools. If funds available in the Area's indirect cost base are not adequate to meet total requirements, then the amount available shall be distributed according to each contractor's proportion of total need. <u>These funds will be awarded to the contractor as non-recurring funds.</u> (See 4.A(3)for treatment of direct contract support costs.)

Each year, Areas are required to report additional needs for indirect contract support funds beyond the amount provided in their previous year's recurring base, or any surplus of funds provided in their recurring base based on current year needs.

## Transition Period

Some Areas have previously allocated indirect contract support funds as recurring funds to contractors. However, the purpose of this policy is to establish a uniform allocation process for indirect contract support funds, and will result in these funds being allocated as non-recurring funds to contractors. Agency wide.

**It is not intended for Areas to reduce contract amounts of indirect contract support funds previously allocated as recurring funds without the approval of the contractor.** Those contractors with a surplus of indirect contract support funds will not be allocated additional indirect contract support funds until their most current negotiated indirect cost rate indicates an additional requirement for these funds. Mandatory increases for self-determination contracts should be provided only on the recurring base amount (excluding indirect contract support) since actual needs will be negotiated each year for the indirect cost amounts.

7. **SUBSEQUENT YEARS CONSIDERATIONS**

A. Areas shall maintain a historical record of funds awarded in each of the following categories:

   a) direct program funds
   b) direct contract support funds
   c) indirect cost funding
   d) indirect-type cost funding

B. Federal indirect cost negotiators should be requested to highlight changes, if any, in the contractor's annual cost allocation plan (treatment of items of cost) as an exhibit to the negotiated indirect cost agreement.

C. Contractors and Area Offices must re-negotiate the contractors indirect type cost budget annually if the contractor does not have a formal negotiated indirect cost rate.

D. The same cost allocation rules applying to those contractors with formally negotiated indirect cost agreements will be applicable to those contractors without formally negotiated indirect cost rates.

8. **SUPERSESSION**

This issuance supercedes any policies or instructions previously issued regarding the allocation of Contract Support Funds.

Everett R. Rhoades, M.D.
Assistant Surgeon General
Director

Distribution: PDS 557 Tab D, Tribes, Tribal Organizations

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
INDIAN HEALTH SERVICE
ROCKVILLE, MARYLAND 20857          REFER TO: OAM

INDIAN HEALTH SERVICE CIRCULAR NO. 96-04

CONTRACT SUPPORT COSTS

Sec.
1. Purpose
2. Authorizing Legislation
3. Definitions
4. Process
5. Supersedure
6. Effective Date

Circular Exhibit 96-04-A: Section 106, Indian Self-
                         Determination and Education
                         Assistance Act, as Amended
Circular Exhibit 96-04-B: Contract Suppost Costs
                         Calculated Using the 80/20
                         Method
Circular Exhibit 96-04-C: Contract Support Costs
                         Calculation Based on a
                         Detailed Analysis

1.  PURPOSE.  The purpose of this circular is to provide
    instructional guidance on:

    •   Determining amounts of start-up, direct, and indirect
        contract support costs (CSC)
    •   Allocating pools of Indian Health Service (IHS) funding
        available for CSC
    •   Prioritizing tribal requests for funding of CSC
    •   Reporting by the IHS to all tribes and to the Congress

    These instructions are not regulations establishing program
    requirements and are not intended to bind agency personnel.
    These instructions are intended to provide guidance to IHS
    personnel to determine and allocate CSC, while allowing
    judgment and prudence in individual circumstances.

2.  AUTHORIZING LEGISLATION.  This circular is authorized
    pursuant to the Transfer Act, title 42 United States Code
    (USC) §2001 and implementing regulations in Title 42 of the
    Code of Federal Regulations §36.3.  The development of this

Distribution: PSD 557 (Indian Health Service Mailing Key)
Date: April 12, 1996

circular has involved the active participation of
representatives from Indian tribes. Since 1992, the
procedures discussed in this circular have been applied to
contracts awarded pursuant to Title I of the Indian Self-
Determination and Education Assistance Act, Public Law
(P.L.) 93-638, as amended. The CSC process has also been
applied to compacts awarded to tribes that have been
selected to participate in the Tribal Self-Governance
Demonstration Project (SGDP) pursuant to Title III of P.L.
93-638, as amended. Section 106 of P.L. 93-638, as amended,
authorizes funding for all Indian Self-Determination (ISD)
and Self-Governance agreements under the Act. Section 106
is provided as Exhibit 96-04-A to this circular, and is
cross-referenced to the pertinent sections where
instructions or examples have been provided.

3.  <u>DEFINITIONS</u>.

    A.  <u>Award</u>. An agreement authorized under Title I
        (contract) or Title III (compact) of P.L. 93-638, as
        amended.

    B.  <u>Awardee</u>. A recipient (tribe or tribal organization) of
        an award as defined above.

    C.  <u>Contract Proposal</u>. Refer to the regulations
        implementing P.L. 93-638, as amended, and Title 25,
        USC.

    D.  <u>Recurring Funds</u>. Contract or compact funds that do not
        require rejustification each year to the Secretary.
        Annual increases are provided through congressional
        mandatory increases or other resource allocation
        methodologies applicable to the respective funding
        category of the award.

    E.  <u>Non-Recurring Funds</u>. Funds that require a
        rejustification annually, and are awarded based upon an
        annual resource allocation methodology that considers
        or is dependent upon other factors (e.g., an indirect
        cost rate applied to a direct program base that may
        change the amount to be reimbursed from a single agency
        as the programs under contract continue to increase).

    F.  <u>Programs, Functions, Services, and Activities (PFSA)</u>.
        The PFSA including those administrative activities
        supportive of, but not included as part of, service
        delivery programs that are otherwise contractible,
        without regard to the organizational level within the

Case 1:07-cv-00812-RMC    Document 9-3    Filed 09/10/2007    Page 3 of 16

department that carries out such functions, as
authorized under P.L. 93-638, as amended.

G.    Tribal Shares.  A term that refers to a tribe's
equitable share of Area office and Headquarters
resources only.  This definition was originally adopted
and utilized in negotiating and awarding Annual Funding
Agreements (AFA) under Title III, P.L. 93-638, as
amended, and is being consistently applied to    Title
I contracts as authorized under P.L. 93-638, as
amended.  This term does not refer to a tribe's
equitable share of a service unit or program base,
which may also be included in a negotiated funding
agreement.

H.    Self-Governance Request.

(1)   Tribes entering the SGDP (Title III) the first
year:

The tribe's application to the IHS for a
Negotiation Grant, which is subsequently approved
for the tribe's participation in the SGDP.  The
application must include evidence of having
completed a sufficient planning activity as
described in the Negotiation Grant application
instruction.

(2)   Tribes joining an existing compact:

The tribe's written notice to the IHS, which is
subsequently approved, that it intends to join an
existing compact.

(3)   Tribes negotiating for new or expanded programs in
a subsequent year's AFA:

The tribe's written notice to the IHS that it
intends to negotiate for additional programs.

To be considered a valid request for purposes of
establishing placement on the ISD priority list, H1, 2,
or 3 above must include a clear description of the
programs to be negotiated, date that the program
operations are to be assumed, or estimate of the amount
of program funding required, and the amount of contract
support funding required.

4.    PROCESS.

    A.    Determining Amounts of Start-Up, Direct, and Indirect CSC.

        (1)    Determining the Amount of the Award.  Section 106 (a)(1) and 106 (a)(2) of the P.L. 93-638, as amended, provides for funding of contract and compact awards for program costs and CSC respectively.  Section 106(a)(1) provides the awardee the right to the funding the Secretary would have otherwise provided for the PFSA awarded.  In addition, section 106(a)(2) authorizes funding that represents costs associated with tribal expenses or PFSAs either not experienced by the Secretary or provided to the Secretary from resources not available to the awardee.

        (2)    Providing for Cost Reimbursement.  Throughout the operation of the program by the awardee, total contract costs, including CSC, are eligible to be reimbursed as either direct or indirect costs.  Since tribes often operate more than one program, many of the costs incurred by the awardee are reimbursed through an indirect cost allocation process, usually negotiated by the cognizant agency.  Section 106(a)(3) provides authority for tribes to recover costs in this manner, whether they are indirect in nature (benefiting multiple programs) or additional costs associated with operating a single program.

        Since some, but not all, of the funds provided in section 106(a)(2) represent costs that are eligible to be reimbursed through this indirect cost recovery method, the procedures below are intended to ensure that needs are accurately identified but avoid a duplication of funding.

        For service unit assumptions, or partial service unit assumptions, the costs historically incurred by the IHS will be reviewed to identify types of costs that are similar in nature to those costs that are included in the awardee's indirect cost pool.  Those costs that are in the awardee's indirect cost pool that are similar in nature to the costs incurred by the IHS will be considered as duplicative for purposes of funding for administrative "overhead" purposes (section

106(a)(3)(A)(ii)). In determining whether such costs are similar in nature, the review will consider both the cost category label (travel, supplies, etc.) and how the funds were spent by the IHS.

a.   <u>Start Up Costs</u>.  Section 106(a)(5) states, "Subject to paragraph (6), during the initial year that a self-determination contract is in effect, the amount required to be paid under paragraph (2) shall include startup costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary:

  (i)  To plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and

  (ii) To ensure compliance with the terms of the contract and prudent management."

       Examples include:

       •   Purchase of computer hardware and software
       •   Required training and staff development
       •   Systems development (establishing required administrative and other health management systems)
       •   Equipment and furniture to support the administrative unit

b.   <u>Direct CSC</u>.  Requirements for these costs will be determined by negotiation between the awardee and the Secretary.  Costs for activities that are not contained in either the indirect cost pool (or indirect cost type budget) or the amount computed pursuant to section 106(a)(1) can be funded as a direct CSC. These funds shall be awarded on a recurring basis.

     Examples include, but are not restricted to:

     •   Unemployment taxes on direct program salaries

- Workers compensation insurance on direct program salaries
- Cost of retirement for direct program salaries
- Long distance telephone charges
- Postage
- Training required to maintain certification of direct program personnel

Items listed above as examples of startup costs and direct CSC must be justified as such and negotiated with the Area office. Items not included as examples above, but requested and justified by awardees shall be submitted by the Area office to IHS Headquarters, Office of Administration and Management (OAM), for approval. This will contribute to greater consistency from Area-to-Area.

c.  Indirect or Indirect Types of Costs.  Guide-lines for the Principles Involved in Negotiating Indirect Costs:

A plan for allocation of indirect costs will be required to support the distribution of any indirect costs related to the awardee's program. All indirect costs included in the plan will be supported by accounting records that will substantiate the propriety of the indirect costs. The allocation plan should cover all indirect costs of the awardee, and contain, but not necessarily be limited to: (1) the nature and extent of services provided and their relevance to the awardee's program; (2) the item of expenses to be included in the indirect cost pool, and (3) the methods to be used in distributing cost.

The Office of Management and Budget (OMB) circulars establish principles and standards for determining indirect costs applicable to the awardee. Public Law 103-413 has made modifications to the OMB cost principles otherwise applicable to tribes and tribal organizations.

(i) <u>Awardee with Negotiated Indirect Cost Rates</u>. The amount of indirect costs expected to be incurred under awards by tribes or tribal organizations with rates that have been negotiated or are being negotiated with the cognizant Federal agency, will be determined by applying the negotiated rate(s) to the direct cost base amount for this purpose. The amount to be reimbursed will be consistent with the individual awardee rate agreement, reflecting any exclusions required by the agreement.

(ii) <u>Awardee without Negotiated Indirect Cost Rates (Guidelines for Agency Negotiators)</u>. A lump sum amount for "indirect types of costs" may be computed for awardees who do not have formally negotiated agreements with their cognizant agency for reimbursement under an indirect cost rate. This annual lump sum amount may be calculated by negotiating a fixed amount for "indirect types of costs." Categories of costs often considered "overhead" or "indirect-type" are generally in the categories of Management and Administration, Facilities and Equipment, General Services, and Expenses. Examples of indirect costs are:

Examples of "Overhead" or
"Indirect-type" Costs

| <u>Management & Administration</u> | <u>Facilities & Equipment</u> | <u>General Services & Expenses</u> |
|---|---|---|
| Governing Body | Building | Insurance & |
| Management & Planning | Utilities | Legal Services |
| Financial Management | Housekeeping/Janitorial | Audit |
| Personnel Management | Building & Grounds | General |
| Procurement/Materiel | Repairs & Maintenance | Interest |
| Human Resources | Equipment | Depreciation/U |
| Property Management | | |
| Records Management | | |
| Data Processing | | |
| Office Services | | |

(3)     <u>Alternative Methods for Calculating Amount of
        Section 106(a)(1) Funds in Area Office and
        Headquarters "Tribal Shares"</u>.  With respect to
        amounts to be considered as the direct program
        base (for the purpose of calculating indirect or
        indirect-type costs) from amounts of PFSAs
        transferred from Areas and Headquarters "Tribal
        Shares," at the option of the awardee, the IHS and
        the awardee will either:

        a.     Conduct a case-by-case detailed analysis of
               the "purpose for which the funds were
               utilized by the Secretary" in order to avoid
               a duplication in amounts funded.

               In cases where a detailed analysis is
               performed, it will be conducted in the
               following manner:

               Area/Headquarters tribal shares will be
               reviewed to identify types of costs that are
               similar in nature to those costs that are
               included in the awardee's indirect cost pool.
               Those costs that are in the awardee's
               indirect cost pool that are similar in nature
               to Area/Headquarters tribal shares will be
               considered as duplicative for purposes of
               funding for administrative or "overhead"
               purposes (Section 106(a)(3)(A)(ii)).

               In determining whether such costs are similar
               in nature, the review will consider both the
               cost category label (travel, supplies, etc.)
               and how the funds were spent by the IHS.

        b.     Apply the following "split" of total Area and
               Headquarters tribal shares as specified
               below:

               In the absence of a detailed analysis by the
               awardee and the IHS, 80 percent of
               Area/Headquarters tribal shares will be
               considered as direct program funds (section
               106(a)(3)(A)(I)) and 20 percent of such
               tribal shares will be considered as funding
               for administrative or "overhead" purposes
               (section 106(a)(3)(A)(ii)).

               Once an amount is computed for a direct
               program or an indirect or overhead purpose

under method a. or b. above, it will be used in accordance with the terms of the rate agreement or alternative method provided herein, for calculating the amount required for indirect or indirect type costs.  The balance of the tribal shares not considered as direct program expenses (and therefore not used to calculate indirect cost funding requirements) will be considered as available for CSC for the respective awardee.  Any such balance, if in excess of the CSC requirement, shall also remain with the awardee.  Any excess CSC requirements not funded by the portion of the Area or Headquarters tribal shares to be considered as available for CSC, will be eligible for payment from the ISD fund, and the processes specified in this circular for allocation of funding in this pool will apply.

Exhibit 96-04-B illustrates how the 80/20 method would be calculated, and Exhibit 96-04-C illustrates how a detailed analysis would be calculated.

(4) <u>Allocating Funding Available for CSC</u>.  Essentially three pools of funding are contained in the single IHS budget activity for CSC.  The first pool represents an increase in the IHS appropriation for CSC for new and expanded awards.  The second pool represents amounts awarded in the prior year that are made available to the IHS on a recurring  basis. The third pool represents amounts provided for mandatory increases on the prior year "base" and shortfall funds, if appropriated.  Each one has funding priorities and eligibility requirements for costs to be reimbursed.

a. <u>Pool No. 1 - The Indian Self-Determination Fund</u>.  The ISD Fund will cover CSC when an award is:

(i) (1) An initial transfer of a program previously operated by the IHS to the tribe or tribal organization; or (2) to expand current tribal operations through the assumption of additional shares of PFSAs previously operated by the IHS, regardless of the organizational level

at which it was operated; or (3) assumption of programs previously operated under awards to other tribes, tribal organizations, contractors, and for newly recognized tribes; or (4) new or expanded programs available because of new appropriations, excluding mandatory increases.

(ii) <u>Initial Funding Period - First Come First Served</u>. Funds for new and expanded programs will be allocated by IHS Headquarters as expeditiously as possible. Approved requests for CSC for new and expanded programs will be funded at 100 percent of the approved amount on a first come first served basis. Allocation will be based on a priority list until funding for the ISD funds is exhausted. If permitted by appropriations act, any funds that remain in the ISDF at the end of the year will be added to funds to be made available in the subsequent year. If funds are exhausted in any fiscal year (FY), tribes on the priority list will remain on the priority list and be considered in priority order when funding is made available by appropriation or reprogramming.

```
Indirect CSC (non-
recurring)
Start-up Costs Direct CSC

Program Base
(106(a)(1) amount)
```

*The ISD fund is the source of funds in the initial funding period.*

(iii) <u>Priority Determined by Date of Request</u>. A priority list for each FY will be developed for every tribe with a requested start date in the proposal (Title I) or request (Title III) in that FY. Tribes will be placed on the priority list within the FY based on:

(a) The date of receipt by the IHS Area office of a Title I contract proposal.

Case 1:07-cv-00812-RMC    Document 9-3    Filed 09/10/2007    Page 11 of 16

   (b)  The date of receipt by the IHS Area office of a request to negotiate a Title III award.

(iv)  <u>Roles and Responsibilities</u>. Tribes will provide either (a) or (b) above to the Area office. The Area office will provide a copy to OAM, and in the case of Title III, an additional copy will be provided to the Office of Tribal Self-Governance (OTSG). In providing either (a) or (b) above, the tribe will include a clear estimate of the amount of CSC required.

The Area office will be responsible for negotiating the CSC and forwarding the recommendation to OAM. In the case of Title III, an additional copy will be forwarded to the OTSG. The Area office shall ensure that costs are reasonable, necessary, and not duplicative. To the extent that the Area office and the awardee cannot agree on an item(s) of cost, the disputed item(s) shall be submitted to the Director, IHS, through the Headquarters OAM.

(v)  <u>Information and Documentation by IHS</u>. The priority list will be maintained by OAM and distributed quarterly to Area offices. The list will include tribe or tribal organization, proposed start date, date of request or proposal, estimated amount of the program costs to be awarded, estimated amount of CSC approved and awarded, and remaining funds available. The OAM will revise estimated amounts of CSCs as additional data becomes available through negotiations.

(vi)  <u>Changes in Start Date</u>. While awaiting award of ISD funding, tribes or tribal organizations may choose to delay their starting date, if necessary, because of the delay in the award of contract support funding. Such choice shall not change the placement of the tribe or

tribal organization on the priority list. The priority list shall be maintained by OAM and reviewed periodically to ensure the validity of start dates and the amounts needed.

If a tribe changes the FY start date for any reason other than solely the lack of CSC funding, it will be placed in the new FY by its original date.

(vii)    <u>Subsequent Funding Periods</u>. Beginning in year 2, direct contract support and section 106(a)(1) funds will be considered part of the recurring base of the award. Mandatory funding increases will be provided based on congressional appropriation. The amount of direct contract support funds may be renegotiated annually at the option of the awardee. The amount of indirect contract support funds must be justified each year based on the awardee's indirect cost agreement or mutually negotiated amounts. Any shortfalls in funding are reported to the Headquarters OAM by Area offices and the OTSG for inclusion in required reports to the Congress, and other reporting to tribes.

Indirect CSC*
*(Non-recurring to awardee, recurring to Area)*

Direct CSC**
*(Recurring to awardee and Area)*

Program Base **
*(Section 106(a)(1) amount)*
*(Recurring to awardee and Area)*

*\* Indirect CSC base amount in subsequent years is described below, Pool No. 2. Increases/decreases to indirect CSC base amount are governed by Pool No. 3, also described below.*

*\*\* Treated as recurring i.e., not adjusted unless tribe requests to renegotiate in subsequent years).*

b.  <u>Pool No. 2   Prior Year CSC Base (Ongoing Awards)</u>.  The amount of indirect contract support funds representing the previous year's base will be distributed to Areas as "recurring" to fund each Area's indirect cost need.  Each awardee's need for indirect CSC shall be determined by calculating changes, if any, in indirect cost rates, bases, and pools.  If the funds available in the Area's indirect cost base are not adequate to meet all awardee's requirements, then the amount available shall be distributed according to each awardee's proportion of total need, except that prior year funds should not be reduced if justified as described below.  These funds will be awarded to the contractor as non-recurring funds.

c.  <u>Pool No. 3   Mandatory Increases/ Shortfall Funds</u>.  Mandatory increases that represent a percentage of the Area's prior year recurring indirect cost base are distributed annually as available.  Additional shortfall funds may also be made available to the IHS and allocated to Area offices for this purpose.  Since awardees are required to rejustify their needs for indirect CSC each year, amounts required for indirect CSC may exceed the amount available for this purpose.  Mandatories should be allocated in such a manner as to provide increases to awards based on each awardee's proportion of total additional need.  If additional need is proportionately greater for some awardee's, they will receive a greater percentage of CSC mandatories and shortfall funds.

Prior year funds provided for indirect CSC to each awardee, if justified in subsequent years, shall not be reduced by the IHS, except as authorized in section 106(b) of the ISDA.  Awardee should expect to receive these funds continuously, only if they continue to be justified for at least the same amount or greater annual need.  They are awarded as non-recurring funds to enable the Area to adjust amounts previously awarded if the amount of costs allocated to the IHS for reimbursement should decrease.  If amounts previously awarded for indirect CSC are not

justified by an awardee in a subsequent year, they will be made available for distribution to other awardees in the Area with unfunded CSC needs for this purpose.

*Note: It is not intended for Areas to reduce contract amounts of indirect contract support funds allocated prior to FY 1992 (original date of ISDM No. 92-2, Contract Support Cost Policy was February 27, 1992) as recurring funds without approval of the contractor.*

B.    <u>Requirements for Reporting and Documenting Amounts of CSC Funds Available, Needed, and Requested</u>.  Areas shall maintain an historical record of funds negotiated and awarded in each of the categories:

- Direct program funds
- Start-up costs
- Direct contract support funds
- Indirect cost funding
- Indirect-type cost funding
- Indirect cost rates
- Types of rates
- Types of bases
- Pass through/exclusions

5.    <u>SUPERSEDURE</u>.  Indian Self-Determination Memorandum No. 92-2, "Contract Support Costs Policy," dated February 27, 1992, and any policies or instructions previously issued regarding the allocation of contract support funds.

6.    <u>EFFECTIVE DATE</u>.  The policy and procedures contained in this circular are retroactive to April 1, 1996, upon signature by the Director, IHS.

Michael H. Trujillo, M.D., M.P.H.
Assistant Surgeon General
Director, Indian Health Service

Circular Exhibit 96-04-A
Page 1
(4/12/96)

## Indian Self-Determination and Education and Assistance Act
## Public Law 93-638, As Amended

Section 106: [Contract Funding] [25 USC Sec. 450j-1]

[CONTRACT FUNDING]
SEC. 106 [25 USC 450j-1]. (a)(1) The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractible, is operated.

(2)  There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which -

(A)  normally are not carried on by the respective Secretary in his direct operation of the program; or

(B)  are provided by the Secretary in support of the contracted program from resources other than those under contract.

(3)(A)  The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of--

(i)  direct program expenses for the operation of the Federal program that is the subject of the contract, and

(ii)  any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under section 106(a)(1).

(B) On an annual basis, during such period as a tribe or tribal organization operates a Federal program, function, service, or activity pursuant to a contract entered into under this Act, the tribe or tribal organization shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph.

(4) For each fiscal year during which a self-determination contract is in effect, any savings attributable to the operation of a Federal program,

Circular Exhibit 96-04-A
Page 2
(4/12/96)

function, service, or activity under a self-determination contract by a tribe or tribal organization (including a cost reimbursement construction contract) shall--

    (A)  be used to provide additional services or benefits under the contract; OR

    (B)  be expended by the tribe or tribal organization in the succeeding fiscal year, as provided in section 8.

    (5)  Subject to paragraph (6), during the initial year that a self-determination contract is in effect, the amount required to be paid under paragraph (2) shall include startup costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary--

    (A)  to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and

    (B)  to ensure compliance with the terms of the contract and prudent management.

    (6)  Costs incurred before the initial year that a self- determination contract is in effect may not be included in the amount required to be paid under paragraph (2) if the Secretary does not receive a written notification of the nature and extent of the costs prior to the date on which such costs are incurred.

    (b) .The amount of funds required by subsection (a)--

    (1)  shall not be reduced to make funding available for contract monitoring or administration by the Secretary;

    (2)  shall not be reduced by the Secretary in subsequent years except pursuant to--

    (A)  a reduction in appropriations from the previous fiscal year for the program or function to be contracted;

    (B)  a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;

    (C)  a tribal authorization;

    (D) a change in the amount of pass-through funds needed under a contract; or

    (E) completion of a contracted project, activity, or program;

    (3)  shall not be reduced by the Secretary to pay for Federal functions, including, but not limited to, Federal pay costs, Federal employee retirement benefits, automated data processing, contract technical assistance or contract monitoring;

*1995*
*Indirect*
*Cost*

## TRIBAL ORGANIZATION
## INDIRECT COST NEGOTIATION AGREEMENT
95-P-327

ORGANIZATION:                    DATE:    DEC 2 7 1994

Menominee Indian Tribe of Wisconsin      FILING REF.: This replaces the
Post Office Box 910                      Negotiation Agreement dated
Keshena, Wisconsin 54135-0910            March 2, 1994.

The indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in Title 25 of the Code of Federal Regulations, Chapter I, subchapter M, and in Section II A below. The rates were negotiated by the U.S. Department of the Interior Office of Inspector General (External Audits) and the subject organization in accordance with the authority contained in the Circular.

---

### SECTION I:  RATES

|  | Effective Period | | | | |
|---|---|---|---|---|---|
| Type | From | To | Rate | Locations | Applicable to |
| Fixed with Carryforward | 10/1/94 | 9/30/95 | 13.8%[1] | All | All Programs |

[1] The base is total direct costs and applies to all programs administered by the Tribe but excludes capital expenditures and pass-through funds.

Fringe benefits related to indirect salaries and wages are treated as indirect costs. Fringe benefits applicable to direct salaries and wages are treated as direct costs.

RECEIVED

JAN 1 6 1997

MENOMINEE
TRIBAL CLINIC

## SECTION II:  GENERAL

A.  LIMITATIONS:  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon the conditions that  (1) no costs other than those incurred by the grantee/contractor were included in its indirect cost rate proposal and that such costs are legal obligations of the grantee/contractor, (2) the same costs that have been treated as indirect costs have not been claimed as direct costs, and (3) similar types of costs have been accorded consistent treatment.

B.  AUDIT:  All costs, direct and indirect, Federal and non-Federal, are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C.   CHANGES:   Rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted.   Changes in the organizational structure or in the method of accounting for costs that affect the amount of reimbursement resulting from the use of the rates in this agreement require the prior approval of the authorized representative of the responsible negotiation agency.  Failure to obtain such approval may result in subsequent audit disallowances.

D.  PROVISIONAL/FINAL RATES:  Within 6 months after year end, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and funds are not available to cover the additional indirect costs, the Tribe may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the Tribe will be required to pay the difference to the funding agency.

E.  FIXED CARRYFORWARD RATES:  Fixed carryforward rates are based on an estimate of the costs that will be incurred during the period for which the rates apply.  When the actual costs for the period have been determined, an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F.  NOTIFICATION TO FEDERAL AGENCIES:  Copies of this document may be provided to other Federal offices as a means of notifying them of the agreement contained herein.

---

SECTION II:  GENERAL

---

G. RECORD KEEPING: Organizations must maintain accounting records that demonstrate that each item of cost has been treated consistently either as a direct or an indirect cost.  Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.  If an organization is unable to document the program allocation of a Tribal government, only 50 percent of Tribal government costs will be included in the indirect cost pool.

H.  OTHER:

1.  The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs.  Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.  Costs treated and claimed as direct costs of a program or activity cannot also be treated as indirect costs.  For example:  Supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the pool for central administration.

2.  Federal programs currently reimbursing indirect costs to this grantee/contractor by means other than the rates cited in the agreement should be credited for such costs and the applicable rates cited herein be applied to the appropriated base to identify the proper amount of indirect costs allocable to the programs.

3.  Contracts/grants that provide for a ceiling on the indirect cost rates or the amounts indicated in Section I above will be subject to the ceilings stipulated in the contract or grant agreements.  In the event the ceiling rate cited is higher than the negotiated rate, the negotiated rate will be used to determine the maximum allowable indirect cost.

4.  Programs received by the Tribe or initiated subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool.  It should be noted that this may result in an adjustment to a future rate.

5.  A new indirect cost proposal is necessary to obtain an approved indirect cost rate for the next fiscal year.  The proposal is due in our office within 6 months after the close of the fiscal year and may be based on actual costs or budgetary data or on a combination thereof.

---

## SECTION III: ACCEPTANCE

Listed below are the signatures of acceptance of this agreement:

By the Organization

/s/

Signature

Glen Miller

Typed or Printed Name

Chairman

Title

Menominee Indian Tribe of
Wisconsin

Organization

12/21/94

Date

By the Responsible Agency for the
Federal Government

/s/

Signature

Charles Moses

Typed Name

Assistant Director, External Audits

Title

Office of Inspector General
U.S. Department of the Interior

Agency

DEC 27 1994

Date

Negotiated by Greg Raile
Telephone (703) 235-3061

*1996*
*Indirect*
*Cost.*

Page 1 of 4

## TRIBAL ORGANIZATION
## INDIRECT COST NEGOTIATION AGREEMENT
### 96-P-718

ORGANIZATION:                    DATE:    APR 1 6 1996

Menominee Indian Tribe of Wisconsin          FILING REF.: This replaces the
Post Office Box 910                          Negotiation   Agreement   dated
Keshena, Wisconsin 54135-0910                December 27, 1994.

The indirect cost rates contained herein are for use on grants and contracts with the
Federal Government to which Public Law 93-638 and Office of Management and
Budget Circular A-87 apply, subject to the limitations contained in Title 25 of the
Code of Federal Regulations, Chapter I, subchapter M, and in Section II A below.
The rates were negotiated by the U.S. Department of the Interior Office of Inspector
General (External Audits) and the subject organization in accordance with the
authority contained in the Circular.

---

## SECTION I: RATES

### Effective Period

| Type | From | To | Rate | Locations | Applicable to |
|------|------|-----|------|-----------|---------------|
| Fixed with Carryforward | 10/1/95 | 9/30/96 | 14.99%[1] | All | All Programs |

[1] The base is total direct costs and applies to all programs administered by the Tribe
but excludes capital expenditures and pass-through funds.

Fringe benefits related to indirect salaries and wages are treated as indirect costs.
Fringe benefits applicable to direct salaries and wages are treated as direct costs.

---

## SECTION II:  GENERAL

A. LIMITATIONS:  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon the conditions that (1) no costs other than those incurred by the grantee/contractor were included in its indirect cost rate proposal and that such costs are legal obligations of the grantee/contractor, (2) the same costs that have been treated as indirect costs have not been claimed as direct costs, and (3) similar types of costs have been accorded consistent treatment.

B. AUDIT:  All costs, direct and indirect, Federal and non-Federal, are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C. CHANGES:  Rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted.  Changes in the organizational structure or in the method of accounting for costs that affect the amount of reimbursement resulting from the use of the rates in this agreement require the prior approval of the authorized representative of the responsible negotiation agency.  Failure to obtain such approval may result in subsequent audit disallowances.

D. PROVISIONAL/FINAL RATES:  Within 6 months after year end, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and funds are not available to cover the additional indirect costs, the Tribe may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the Tribe will be required to pay the difference to the funding agency.

E. FIXED CARRYFORWARD RATES:  Fixed carryforward rates are based on an estimate of the costs that will be incurred during the period for which the rates apply.  When the actual costs for the period have been determined, an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F. NOTIFICATION TO FEDERAL AGENCIES:  Copies of this document may be provided to other Federal offices as a means of notifying them of the agreement contained herein.

## SECTION II:  GENERAL

G. RECORD KEEPING: Organizations must maintain accounting records that demonstrate that each item of cost has been treated consistently either as a direct or an indirect cost. Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis. If an organization is unable to document the program allocation of a Tribal government, only 50 percent of Tribal government costs will be included in the indirect cost pool.

H. OTHER:

1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs. Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity. Costs treated and claimed as direct costs of a program or activity cannot also be treated as indirect costs. For example: Supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the pool for central administration.

2. Federal programs currently reimbursing indirect costs to this grantee/contractor by means other than the rates cited in the agreement should be credited for such costs and the applicable rates cited herein be applied to the appropriated base to identify the proper amount of indirect costs allocable to the programs.

3. Contracts/grants that provide for a ceiling on the indirect cost rates or the amounts indicated in Section I above will be subject to the ceilings stipulated in the contract or grant agreements. In the event the ceiling rate cited is higher than the negotiated rate, the negotiated rate will be used to determine the maximum allowable indirect cost.

4. Programs received by the Tribe or initiated subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool. It should be noted that this may result in an adjustment to a future rate.

5. A new indirect cost proposal is necessary to obtain an approved indirect cost rate for the next fiscal year. The proposal is due in our office within 6 months after the close of the fiscal year and may be based on actual costs or budgetary data or on a combination thereof.

## SECTION III: ACCEPTANCE

Listed below are the signatures of acceptance of this agreement:

| | |
|---|---|
| By the Organization | By the Responsible Agency for the Federal Government |

*Louis J. Dixon* /s/

Signature

Louis Dixon

Typed or Printed Name

Vice Chairman

Title

Menominee Indian Tribe of Wisconsin

Organization

4/12/96

Date

*Charles Moses* /s/

Signature

Charles Moses

Typed Name

Assistant Director, External Audits

Title

Office of Inspector General
U.S. Department of the Interior

Agency        APR 16 1996

Date

Negotiated by Deborah Jones
Telephone (703) 235-3061



# United States Department of the Interior

OFFICE OF THE INSPECTOR GENERAL
Washington, D.C. 20240

APR 18 1996

Ms. Betty Jo Wozniak, Tribal Administrator
Menominee Indian Tribe of Wisconsin
P. O. Box 910
Keshena, Wisconsin 54135-0910

Dear Ms. Wozniak:

We have enclosed an original and a copy of the Indirect Cost Negotiation Agreement
for the Menominee Indian Tribe of Wisconsin. The Agreement provides for an
indirect cost rate of 14.99 percent for the fiscal year ending September 30, 1996. A
copy of the Agreement will be transmitted to the Department of Health and Human
Services for reproduction and distribution in accordance with Office of Management
and Budget Circular A-87. We will distribute a copy of the report to the Bureau of
Indian Affairs.

In order to facilitate the review process, please submit the following information with
your next proposal:

  1. Certification that the proposal has been prepared in accordance with Office
of Management and Budget Circular A-87.

  2. A current organizational chart of the agency.

  3. Certification that the accounting system and controls are in compliance with
the Code of Federal Regulations (25 CFR 276.7).

  4. A schedule of salaries included in the indirect cost pool, including functional
statements of the duties and responsibilities of all positions in sufficient detail to
justify their classification as administrative positions.

  5. A schedule of direct costs, indirect costs incurred, and indirect cost recoveries
by funding agency and program title, including the identity of all programs that are
Public Law 93-638 contracts.

  6. Audited financial statements.

# RECEIVED

APR 22 1996

# TRIBAL
# ADMINISTRATOR

7. Reconciliation of actual costs (direct, indirect, and exclusions) reported in the indirect cost proposal with the audited costs reported in the financial statements. The reported actual costs should be indexed to the audited costs. We have enclosed a form that may be used to complete the reconciliation.

If further information is needed regarding this matter, please contact Ms. Deborah Jones at (703) 235-3061.

Sincerely,

*Charles Moses*

Charles Moses
Assistant Director, External Audits

Enclosures (3)

cc:  Director, Division of Cost Allocation and Liaison,
       Department of Health and Human Services
     Division of Self-Determination Services, Office of Tribal Activities,
       Indian Health Services, Department of Health and Human Services
     Chief, Division of Self-Determination Services, Bureau of Indian Affairs
     Contract Officer, Minneapolis Area Office, Bureau of Indian Affairs

1997

## TRIBAL ORGANIZATION
## INDIRECT COST NEGOTIATION AGREEMENT

97- P- 857

ORGANIZATION:                    DATE:    MAY 2 0 1997

Menominee Indian Tribe of Wisconsin    FILING REF.: This replaces the
Post Office Box 910                    Negotiation Agreement dated April 16,
Keshena, Wisconsin 54135-0910          1996.

The indirect cost rates contained herein are for use on grants and contracts with the
Federal Government to which Public Law 93-638 and Office of Management and Budget
Circular A-87 apply, subject to the limitations contained in Title 25 of the Code of Federal
Regulations, Chapter I, subchapter M, and in Section II A below.  The rates were
negotiated by the U.S. Department of the Interior Office of Inspector General (External
Audits) and the subject organization in accordance with the authority contained in the
Circular.

---

SECTION I:  RATES

| | Effective Period | | | | |
|---|---|---|---|---|---|
| Type | From | To | Rate | Locations | Applicable to |
| Fixed with Carryforward | 10/1/96 | 9/30/97 | 13.94% | All | All Programs |

[1] The base is total direct costs and applies to all programs administered by the Tribe but excludes capital
expenditures and pass-through funds.

Fringe benefits related to indirect salaries and wages are treated as indirect costs.  Fringe
benefits applicable to direct salaries and wages are treated as direct costs.

## SECTION II:  GENERAL

A.  LIMITATIONS:  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon the conditions that  (1) no costs other than those incurred by the grantee/contractor were included in its indirect cost rate proposal and that such costs are legal obligations of the grantee/contractor, (2) the same costs that have been treated as indirect costs have not been claimed as direct costs, and (3) similar types of costs have been accorded consistent treatment.

B.  AUDIT:  All costs, direct and indirect, Federal and non-Federal, are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C.  CHANGES:  Rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted. Changes in the organizational structure or in the method of accounting for costs that affect the amount of reimbursement resulting from the use of the rates in this agreement require the prior approval of the authorized representative of the responsible negotiation agency. Failure to obtain such approval may result in subsequent audit disallowances.

D.  PROVISIONAL/FINAL RATES:  Within 6 months after year end, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and funds are not available to cover the additional indirect costs, the Tribe may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the Tribe will be required to pay the difference to the funding agency.

E.  FIXED CARRYFORWARD RATES:  Fixed carryforward rates are based on an estimate of the costs that will be incurred during the period for which the rates apply. When the actual costs for the period have been determined, an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F.  NOTIFICATION TO FEDERAL AGENCIES:  Copies of this document may be provided to other Federal offices as a means of notifying them of the agreement contained herein.

---

SECTION II:  GENERAL

G.  RECORD KEEPING:  Organizations must maintain accounting records that demonstrate that each item of cost has been treated consistently either as a direct or an indirect cost.  Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.  If an organization is unable to document the program allocation of a Tribal government, only 50 percent of Tribal government costs will be included in the indirect cost pool.

H.  OTHER:

1.  The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs.  Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.  Costs treated and claimed as direct costs of a program or activity cannot also be treated as indirect costs.  For example:  Supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the pool for central administration.

2.  Federal programs currently reimbursing indirect costs to this grantee/contractor by means other than the rates cited in the agreement should be credited for such costs and the applicable rates cited herein be applied to the appropriated base to identify the proper amount of indirect costs allocable to the programs.

3.  Contracts/grants that provide for a ceiling on the indirect cost rates or the amounts indicated in Section I above will be subject to the ceilings stipulated in the contract or grant agreements.  In the event the ceiling rate cited is higher than the negotiated rate, the negotiated rate will be used to determine the maximum allowable indirect cost.

4.  Programs received by the Tribe or initiated subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool.  It should be noted that this may result in an adjustment to a future rate.

5.  A new indirect cost proposal is necessary to obtain an approved indirect cost rate for the next fiscal year.  The proposal is due in our office within 6 months after the close of the fiscal year and may be based on actual costs or budgetary data or on a combination thereof.

SECTION III: ACCEPTANCE

Listed below are the signatures of acceptance of this agreement:

By the Organization

_____ /s/
Signature

Apesanahkwat
_____
Typed or Printed Name

Chairman
_____
Title

Menominee Indian Tribe of Wisconsin
_____
Organization

5/6/97
_____
Date

By the Responsible Agency for the
Federal Government

*Charles Moses*                    /s/
_____
Signature

Charles Moses
_____
Typed Name

Assistant Director, External Audits
_____
Title

Office of Inspector General
U.S. Department of the Interior
_____
Agency

MAY 20 1997
_____
Date

Negotiated by John Kruse
Telephone (202) 208-5384

1908

## TRIBAL ORGANIZATION
## INDIRECT COST NEGOTIATION AGREEMENT

ORGANIZATION:                    DATE:    AUG  4 1998

Menominee Indian Tribe of Wisconsin      FILING REF.: This replaces the
Post Office Box 910                      Negotiation Agreement dated May 20,
Keshena, Wisconsin 54135-0910            1997.    98-P-607

The indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in Title 25 of the Code of Federal Regulations, Chapter I, subchapter M, and in Section II A below.  The rates were negotiated by the U.S. Department of the Interior Office of Inspector General (External Audits) and the subject organization in accordance with the authority contained in the Circular.

## SECTION I:  RATES

|  | Effective Period | | | | |
| Type | From | To | Rate | Locations | Applicable to |
| Fixed with Carryforward | 10/1/97 | 9/30/98 | 9.66% | All | All Programs |

[1] The base is total direct costs and applies to all programs administered by the Tribe but excludes capital expenditures and pass-through funds.

Fringe benefits related to indirect salaries and wages are treated as indirect costs.  Fringe benefits applicable to direct salaries and wages are treated as direct costs.

## SECTION II: GENERAL

A. LIMITATIONS: Use of the rates contained in this agreement is subject to any applicable statutory limitations. Acceptance of the rates agreed to herein is predicated upon the conditions that (1) no costs other than those incurred by the grantee/contractor were included in its indirect cost rate proposal and that such costs are legal obligations of the grantee/contractor, (2) the same costs that have been treated as indirect costs have not been claimed as direct costs, and (3) similar types of costs have been accorded consistent treatment.

B. AUDIT: All costs, direct and indirect, Federal and non-Federal, are subject to audit. Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C. CHANGES: Rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted. Changes in the organizational structure or in the method of accounting for costs that affect the amount of reimbursement resulting from the use of the rates in this agreement require the prior approval of the authorized representative of the responsible negotiation agency. Failure to obtain such approval may result in subsequent audit disallowances.

D. PROVISIONAL/FINAL RATES: Within 6 months after year end, a final rate must be submitted based on actual costs. Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate. If the final rate is greater than the provisional rate and funds are not available to cover the additional indirect costs, the Tribe may not recover all indirect costs. Conversely, if the final rate is less than the provisional rate, the Tribe will be required to pay the difference to the funding agency.

E. FIXED CARRYFORWARD RATES: Fixed carryforward rates are based on an estimate of the costs that will be incurred during the period for which the rates apply. When the actual costs for the period have been determined, an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F. NOTIFICATION TO FEDERAL AGENCIES: Copies of this document may be provided to other Federal offices as a means of notifying them of the agreement contained herein.

SECTION II: GENERAL

G. RECORD KEEPING: Organizations must maintain accounting records that demonstrate that each item of cost has been treated consistently either as a direct or an indirect cost. Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis. If an organization is unable to document the program allocation of a Tribal government, only 50 percent of Tribal government costs will be included in the indirect cost pool.

H. OTHER:

1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs. Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity. Costs treated and claimed as direct costs of a program or activity cannot also be treated as indirect costs. For example: Supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the pool for central administration.

2. Federal programs currently reimbursing indirect costs to this grantee/contractor by means other than the rates cited in the agreement should be credited for such costs and the applicable rates cited herein be applied to the appropriated base to identify the proper amount of indirect costs allocable to the programs.

3. Contracts/grants that provide for a ceiling on the indirect cost rates or the amounts indicated in Section I above will be subject to the ceilings stipulated in the contract or grant agreements. In the event the ceiling rate cited is higher than the negotiated rate, the negotiated rate will be used to determine the maximum allowable indirect cost.

4. Programs received by the Tribe or initiated subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool. It should be noted that this may result in an adjustment to a future rate.

5. A new indirect cost proposal is necessary to obtain an approved indirect cost rate for the next fiscal year. The proposal is due in our office within 6 months after the close of the fiscal year and may be based on actual costs or budgetary data or on a combination thereof.

## SECTION III: ACCEPTANCE

Listed below are the signatures of acceptance of this agreement:

By the Organization

_/s/_

Signature

Apesanahkwat

Typed or Printed Name

Chairman

Title

Menominee Indian Tribe of Wisconsin

Organization

7/31/98

Date

By the Responsible Agency for the
Federal Government

_Charles Moses_                    _/s/_

Signature

Charles Moses

Typed Name

Assistant Director, External Audits

Title

Office of Inspector General
U.S. Department of the Interior

Agency

AUG  4 1998

Date

Negotiated by John Kruse
Telephone (703) 235-9231

## TRIBAL ORGANIZATION
## INDIRECT COST NEGOTIATION AGREEMENT

# 99-P-871

**ORGANIZATION:**

Menominee Indian Tribe of Wisconsin
Post Office Box 910
Keshena, Wisconsin 54135-0910

**DATE:** SEP 7 1999

**FILING REF.:** This replaces the Negotiation Agreement dated August 4, 1999.

The indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in Title 25 of the Code of Federal Regulations, Chapter I, subchapter M, and in Section II A below. The rates were negotiated by the U.S. Department of the Interior Office of Inspector General (External Audits) and the subject organization in accordance with the authority contained in the Circular.

## SECTION I: RATES

|  | Effective Period | | | | |
| Type | From | To | Rate | Locations | Applicable to |
| --- | --- | --- | --- | --- | --- |
| Fixed with Carryforward | 10/1/98 | 9/30/99 | 9.80% | All | All Programs |

[1] The base is total direct costs and applies to all programs administered by the Tribe but excludes capital expenditures and pass-through funds. Consequently, to determine the amount of indirect cost to be billed under this agreement, capital expenditures and pass-through funds should be subtracted from total expenditures and the balance multiplied by the approved rate.

Fringe benefits related to indirect salaries and wages are treated as indirect costs. Fringe benefits applicable to direct salaries and wages are treated as direct costs.

---

SECTION II:  GENERAL

---

A.  LIMITATIONS:  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon the conditions that  (1) no costs other than those incurred by the grantee/contractor were included in its indirect cost rate proposal and that such costs are legal obligations of the grantee/contractor, (2) the same costs that have been treated as indirect costs have not been claimed as direct costs, and (3) similar types of costs have been accorded consistent treatment.

B.  AUDIT:  All costs, direct and indirect, Federal and non-Federal, are subject to audit. Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C.  CHANGES:  Rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted. Changes in the organizational structure or in the method of accounting for costs that affect the amount of reimbursement resulting from the use of the rates in this agreement require the prior approval of the authorized representative of the responsible negotiation agency. Failure to obtain such approval may result in subsequent audit disallowances.

D.  PROVISIONAL/FINAL RATES:  Within 6 months after year end, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and funds are not available to cover the additional indirect costs, the Tribe may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the Tribe will be required to pay the difference to the funding agency.

E.  FIXED CARRYFORWARD RATES:  Fixed carryforward rates are based on an estimate of the costs that will be incurred during the period for which the rates apply.  When the actual costs for the period have been determined, an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F.  NOTIFICATION TO FEDERAL AGENCIES:  Copies of this document may be provided to other Federal offices as a means of notifying them of the agreement contained herein.

)

---
## SECTION II:  GENERAL
---

G.  RECORD KEEPING:  Organizations must maintain accounting records that demonstrate that each item of cost has been treated consistently either as a direct or an indirect cost.  Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.  If an organization is unable to document the program allocation of a Tribal government, only 50 percent of Tribal government costs will be included in the indirect cost pool.

H.  OTHER:

1.  The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs.  Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.  Costs treated and claimed as direct costs of a program or activity cannot also be treated as indirect costs.  For example: Supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the pool for central administration.

2.  Federal programs currently reimbursing indirect costs to this grantee/contractor by means other than the rates cited in the agreement should be credited for such costs and the applicable rates cited herein be applied to the appropriated base to identify the proper amount of indirect costs allocable to the programs.

3.  Contracts/grants that provide for a ceiling on the indirect cost rates or the amounts indicated in Section I above will be subject to the ceilings stipulated in the contract or grant agreements.  In the event the ceiling rate cited is higher than the negotiated rate, the negotiated rate will be used to determine the maximum allowable indirect cost.

4.  Programs received by the Tribe or initiated subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool.  It should be noted that this may result in an adjustment to a future rate.

5.  A new indirect cost proposal is necessary to obtain an approved indirect cost rate for the next fiscal year.  The proposal is due in our office within 6 months after the close of the fiscal year and may be based on actual costs or budgetary data or on a combination thereof.

SECTION III: ACCEPTANCE

Listed below are the signatures of acceptance of this agreement:

By the Organization

_____ /s/
Signature

_____
Typed or Printed Name

_____
Title

Menominee Indian Tribe of Wisconsin
Organization

_____
Date

By the Responsible Agency for the
Federal Government

_____ /s/
Signature

Charles Moses
_____
Typed Name

Assistant Director, External Audits
_____
Title

Office of Inspector General
U.S. Department of the Interior
Agency

SEP   7  1999
_____
Date

Negotiated by John Kruse
Telephone (703) 235-9231

Page 1 of 4

# INDIAN ORGANIZATIONS
## INDIRECT COST NEGOTIATION AGREEMENT

### ORGANIZATION:

Menominee Indian Tribe of Wisconsin
Post Office Box 910
Keshena, Wisconsin 54135-0910

DATE:  AUG 2 4 2000   Report Number:  # OO- P - 642

FILING REF: This Agreement replaces the Negotiation Agreement dated September 3, 1999.

The indirect cost rate contained herein is for use on grants and contracts with the Federal Government to which the Office of Management and Budget Circular A-87 applies, subject to the limitations in Section II A of this agreement.  The rate was negotiated by the U.S. Department of the Interior Office of Inspector General (External Audits) and the subject organization in accordance with the authority contained in the Circular.

| Type | Period | Applicable To | Rate |
|------|--------|---------------|------|
| Fixed with Carryforward | 10/1/99 to 9/30/00 | All Programs | 10.88 %[1] |

[1] Base: Total direct costs less capital expenditures and pass through funds.  The rate applies to all programs administered by the Tribe.  To determine the amount of indirect cost to be billed under this agreement, capital expenditures and pass through funds should be deducted from total direct costs and the remainder multiplied by the rate.

Fringe benefits related to indirect salaries and wages are treated as indirect costs.  Fringe benefits related to direct salaries and wages are treated as direct costs.

---

SECTION II:  GENERAL

---

A. LIMITATIONS:  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon these conditions: (1) no costs other than those incurred by the subject organization were included in its indirect cost rate proposal, (2) all such costs are the legal obligations of the grantee/contractor, (3) similar types of costs have been accorded consistent treatment and, (4) the same costs that have been treated as indirect costs have not been claimed as direct costs (For example, supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the indirect cost pool for central administration).

B. AUDIT:  All costs, direct and indirect, Federal and non-Federal, are subject to audit. Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C. CHANGES:  Rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted.  Changes in the organizational structure or in the method of accounting for costs that affect the amount of reimbursement resulting from the use of the rates in this agreement require the prior approval of the authorized representative of the responsible negotiation agency.  Failure to obtain such approval may result in subsequent audit disallowance.

D. PROVISIONAL/FINAL RATES:  Within 6 months after year end, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and funds are not available to cover the additional indirect costs, the Organization may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the Organization will be required to pay the difference to the funding agency.

E. FIXED CARRYFORWARD RATES:  Fixed carryforward rates are based on an estimate of the costs that will be incurred during the period for which the rates apply.  When the actual costs for the period have been determined, an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F. NOTIFICATION TO FEDERAL AGENCIES:  Copies of this document may be provided to other Federal offices as a means of notifying them of the agreement contained herein.

---

## SECTION II:  GENERAL

**G. RECORD KEEPING:** Organizations must maintain accounting records that demonstrate that each item of cost has been treated consistently either as a direct or an indirect cost. Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.

**H. REIMBURSEMENT CEILINGS:** Grantee/contractor program agreements providing for ceilings on indirect cost rates or reimbursement amounts are subject to the ceilings stipulated in the contract or grant agreements.  If the ceiling rate is higher than the negotiated rate in Section I of this agreement, the negotiated rate will be used to determine the maximum allowable indirect cost.

**I. USE OF OTHER RATES:** If any Federal programs are reimbursing indirect costs to this grantee/contractor by a measure other than the approved rates in this agreement, the grantee/contractor should credit such costs to the affected programs and the approved rates should be used to identify the maximum amount of indirect cost allocable to these programs.

**J. CENTRAL SERVICE COSTS:**  Where central service costs are estimated for the calculation of indirect cost rates, adjustments will be made to reflect the difference between provisional and final amounts.

**K. OTHER:**

1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs. Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.

2. Programs received or initiated by the organization subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool.  It should be noted that this may result in an adjustment to a future rate.

3. New indirect cost proposals are necessary to obtain approved indirect cost rates for future fiscal or calendar years.  Such proposals are due in our office 6 months prior to the beginning of the year to which the proposed rates will apply.

SECTION III: ACCEPTANCE

Listed below are the signatures of acceptance of this agreement:

By the Organization

Signature _(s)_

 Apesanahkwat
Typed or Printed Name

Tribal Chairman
Title

Menominee Indian Tribe of Wisconsin
Organization

 8/22/2000
Date

By the Responsible Agency for the
Federal Government

*Charles Moses*     /s/
Signature

Charles Moses
Typed Name

Assistant Director, External Audits
Title

Office of Inspector General
U.S. Department of the Interior
Agency

AUG 2 4 2000

Date

Negotiated by John Kruse
Telephone (703) 235-9231

# Indian Organizations
## Indirect Cost Negotiation Agreement

### EIN: 39-1205576

Organization:

Menominee Indian Tribe of Wisconsin
P.O. Box 910
Keshena, Wisconsin  54135-0910

Date: March 7, 2002

Report No(S).: 02-P-340

Filing Ref.:
Last Negotiation Agreement
Dated August 24, 2000

The indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in 25 CFR, Chapter 1, subchapter M, and in Section II.A. of this agreement.  The rates were negotiated by the U.S. Department of the Interior, Office of Inspector General, and the subject organization in accordance with the authority contained in the Circular.

## Section I:  Rates

| Type | Effective Period From | To | Rate* | Locations | Applicable To |
|------|------|------|------|------|------|
| Fixed Carryforward | 10/01/00 | 09/30/01 | 9.7% | All | All Programs |

*Base:  Total direct costs, less capital expenditures and passthrough funds. Passthrough funds are normally defined as major subcontracts, payments to participants, stipends to eligible recipients, and subgrants, which normally require minimal administrative effort.

Treatment of fringe benefits:    Fringe benefits applicable to direct salaries and wages are treated as direct costs; fringe benefits applicable to indirect salaries and wages are treated as indirect costs.

## Section II:  General                                              Page 1 of 3

A. **Limitations:**  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein are predicated upon these conditions: (1) no costs other than those incurred by the subject organization were included in its indirect cost rate proposal, (2) all such costs are the legal obligations of the grantee/contractor, (3) similar types of costs have been accorded consistent treatment, and (4) the same costs that have been treated as indirect costs have not been claimed as direct costs (For example, supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the indirect cost pool for central administration).

B. **Audit:** All costs (direct and indirect, federal and non-federal) are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C. **Changes:** The rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted.  Changes in organizational structure, or changes in the method of

accounting for costs that affect the amount of reimbursement resulting from use of the rates in this agreement, require the prior approval of the responsible negotiation agency. Failure to obtain such approval may result in subsequent audit disallowance.

D. **Provisional/Final Rates:** Within 6 months after yearend, a final rate must be submitted based on actual costs. Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate. If the final rate is greater than the provisional rate and there are no funds available to cover the additional indirect costs, the organization may not recover all indirect costs. Conversely, if the final rate is less than the provisional rate, the organization will be required to pay back the difference to the funding agency.

E. **Fixed Carryforward Rate:** The fixed carryforward rate is based on an estimate of costs that will be incurred during the period for which the rate applies. When the actual costs for such period has been determined, an adjustment will be made to the rate for a future period, if necessary, to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F. **Agency Notification:** Copies of this document may be provided to other federal offices as a means of notifying them of the agreement contained herein.

G. **Record Keeping:** Organizations must maintain accounting records that demonstrate that each type of cost has been treated consistently either as a direct cost or an indirect cost. Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.

H. **Reimbursement Ceilings:** Grantee/contractor program agreements providing for ceilings on indirect cost rates or reimbursement amounts are subject to the ceilings stipulated in the contract or grant agreements. If the ceiling rate is higher than the negotiated rate in Section I of this agreement, the negotiated rate will be used to determine the maximum allowable indirect cost.

I. **Use Of Other Rates:** If any federal programs are reimbursing indirect costs to this grantee/contractor by a measure other than the approved rates in this agreement, the grantee/contractor should credit such costs to the affected programs, and the approved rates should be used to identify the maximum amount of indirect cost allocable to these programs.

J. **Central Service Costs:** Where central service costs are estimated for the calculation of indirect cost rates, adjustments will be made to reflect the difference between provisional and final amounts.

K. **Other:**
1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs. Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.

2. Programs received or initiated by the organization subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool. It should be noted that this could result in an adjustment to a future rate.

**Section II:  General** (continued)                                    Page 3 of 3

3. New indirect cost proposals are necessary to obtain approved indirect cost rates for future fiscal or calendar years.  The proposals are due in our office 6 months prior to the beginning of the year to which the proposed rates will apply.


**Section III:  Acceptance**

Listed below are the signatures of acceptance for this agreement:

By the Indian Organization:

_____ /s/

Lisa Waukau
Name

Chairperson
Title

3/4/02
Date

By the Cognizant Federal Government Agency:

_____ /s/

Inge Montich
Name
Indirect Cost Coordinator
Western Region
Title
U.S. Department of the Interior
Office of Inspector General
Agency
Date  March 7, 2002
Negotiated by Elena Chan
Telephone (916) 978-5638

## Indian Organizations
## Indirect Cost Negotiation Agreement

EIN: 39-1205576

**Organization:**

Menominee Indian Tribe of Wisconsin
Post Office Box 910
Keshena, Wisconsin  54135-0910

**Date:** October 3, 2002

**Report No(S).:** 03-P-020

**Filing Ref.:**
Last Negotiation Agreement
dated March 7, 2002

The indirect cost rate contained herein is for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in 25 CFR, Chapter 1, subchapter M, and in Section II.A. of this agreement.  The rate was negotiated by the U.S. Department of the Interior, Office of Inspector General, and the subject organization in accordance with the authority contained in the Circular.

**Section I:  Rate**

| Type | Effective Period | | Rate* | Locations | Applicable To |
|------|------|------|------|------|------|
| | From | To | | | |
| Fixed Carryforward | 10/01/01 | 09/30/02 | 9.5% | All | All Programs |

*Base:  Total direct costs, less capital expenditures and passthrough funds. Passthrough funds are normally defined as major subcontracts, payments to participants, stipends to eligible recipients, and subgrants, all of which normally require minimal administrative effort.

Treatment of fringe benefits:    Fringe benefits applicable to direct salaries and wages are treated as direct costs; fringe benefits applicable to indirect salaries and wages are treated as indirect costs.

**Section II:  General**

A. **Limitations:**  Use of the rate contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rate agreed to herein is predicated upon these conditions: (1) no costs other than those incurred by the subject organization were included in its indirect cost rate proposal, (2) all such costs are the legal obligations of the grantee/contractor, (3) similar types of costs have been accorded consistent treatment, and (4) the same costs that have been treated as indirect costs have not been claimed as direct costs (For example, supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the indirect cost pool for central administration).

B. **Audit:**  All costs (direct and indirect, federal and non-federal) are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation agreement.

C. **Changes:** The rate contained in this agreement is based on the organizational structure and the accounting system in effect at the time the proposal was

submitted. Changes in organizational structure, or changes in the method of accounting for costs that affect the amount of reimbursement resulting from use of the rate in this agreement, require the prior approval of the responsible negotiation agency. Failure to obtain such approval may result in subsequent audit disallowance.

D. **Provisional/Final Rates:** Within 6 months after yearend, a final rate must be submitted based on actual costs. Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate. If the final rate is greater than the provisional rate and there are no funds available to cover the additional indirect costs, the organization may not recover all indirect costs. Conversely, if the final rate is less than the provisional rate, the organization will be required to pay back the difference to the funding agency.

E. **Fixed Carryforward Rate:** The fixed carryforward rate is based on an estimate of costs that will be incurred during the period for which the rate applies. When the actual costs for such period has been determined, an adjustment will be made to the rate for a future period, if necessary, to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F. **Agency Notification:** Copies of this document may be provided to other federal offices as a means of notifying them of the agreement contained herein.

G. **Record Keeping:** Organizations must maintain accounting records that demonstrate that each type of cost has been treated consistently either as a direct cost or an indirect cost. Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.

H. **Reimbursement Ceilings:** Grantee/contractor program agreements providing for ceilings on indirect cost rates or reimbursement amounts are subject to the ceilings stipulated in the contract or grant agreements. If the ceiling rate is higher than the negotiated rate in Section I of this agreement, the negotiated rate will be used to determine the maximum allowable indirect cost.

I. **Use Of Other Rates:** If any federal programs are reimbursing indirect costs to this grantee/contractor by a measure other than the approved rate in this agreement, the grantee/contractor should credit such costs to the affected programs, and the approved rate should be used to identify the maximum amount of indirect cost allocable to these programs.

J. **Central Service Costs:** Where central service costs are estimated for the calculation of indirect cost rates, adjustments will be made to reflect the difference between provisional and final amounts.

K. **Other:**
1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs. Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.

2. Programs received or initiated by the organization subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool. It should be noted that this could result in an adjustment to a future rate.

**Section II:  General** (continued)                                    Page 3 of 3

3. New indirect cost proposals are necessary to obtain approved indirect cost
rates for future fiscal or calendar years.  The proposals are due in our office 6
months prior to the beginning of the year to which the proposed rates will apply.

**Section III:  Acceptance**

Listed below are the signatures of acceptance for this agreement:

By the Indian Organization:                 By the Cognizant Federal Government
                                            Agency:

Lisa Waukau, Tribal Chairperson  /s/        *Inge Montich*  /s/

Name  Lisa Waukau                           Inge Montich
                                            Name
Title  Tribal Chairperson                   Indirect Cost Coordinator
                                            Western Region
Date  9-26-02                               Title
                                            U.S. Department of the Interior
                                            Office of Inspector General
                                            Agency
                                            Date October 3, 2002
                                            Negotiated by Te Lam-Vi
                                            Telephone (916) 978-5638



# United States Department of the Interior

### OFFICE OF INSPECTOR GENERAL
#### Western Region Audits
#### 2800 Cottage Way, Suite E-2712
#### Sacramento, California 95825

7530

October 3, 2002



Ms. Lisa Waukau, Chairperson
Menominee Indian Tribe of Wisconsin
Post Office Box 910
Keshena, Wisconsin 54135-0910

Dear Ms. Waukau:

Enclosed is an original copy of the Indirect Cost Negotiation Agreement for the 12-month period
ending September 30, 2002, between the Federal Government and the Menominee Indian Tribe
of Wisconsin.

If you have any questions regarding this agreement, please write or call Ms. Maria Nua, Program
Analyst, at (916) 978-5638.

You can find us on the Internet at http://www.oig.doi.gov/icps/icphome.html.  We hope that the
information provided on this site will assist you in preparing and submitting your indirect cost
proposals.

Sincerely,

Inge Montich

Inge Montich
Indirect Cost Coordinator

Enclosure

cc:    Contracting Officer, Midwest Regional Office, BIA

Ref:    F:/Wrextdoc/Midwest/MITWh209/Issue.ltr

*Aug. File
all Depts
10/15/02*

# Indian Organizations
# Indirect Cost Negotiation Agreement

EIN: 39-1205576

| | |
|---|---|
| **Organization:** | **Date:** |
| Menominee Indian Tribe of Wisconsin | **Report No(S).:** |
| Post Office Box 910 | |
| Keshena, Wisconsin  54135-0910 | **Filing Ref.:** |
| | Last Negotiation Agreement |
| | dated October 3, 2002 |

The indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in 25 CFR, Chapter 1, subchapter M, and in Section II.A. of this agreement.  The rates were negotiated by the U.S. Department of the Interior, National Business Center, and the subject organization in accordance with the authority contained in the Circular.

## Section I:  Rates

| | Effective Period | | | | Applicable |
|---|---|---|---|---|---|
| Type | From | To | Rate* | Locations | To |
| Fixed Carryforward | 10/01/02 | 09/30/03 | 10.87%** | All | BIA Programs |
| Fixed Carryforward | 10/01/02 | 09/30/03 | 10.66% | All | All Other |

* Base:  Total direct costs, less capital expenditures and passthrough funds.  Passthrough funds are normally defined as major subcontracts, payments to participants, stipends to eligible recipients, and subgrants, all of which normally require minimal administrative effort.

**The rate for BIA programs was calculated using the Benchmarking Methodology stipulated in the Equitable Relief Orders filed by the U. S. District Court of New Mexico on June 1, 2001, August 5, 2002, and June 11, 2003.

Treatment of fringe benefits:    Fringe benefits applicable to direct salaries and wages are treated as direct costs; fringe benefits applicable to indirect salaries and wages are treated as indirect costs.

## Section II:  General                                                    Page 1 of 3

A. **Limitations:**  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon these conditions: (1) no costs other than those incurred by the subject organization were included in its indirect cost rate proposal, (2) all such costs are the legal obligations of the grantee/contractor, (3) similar types of costs have been accorded consistent treatment, and (4) the same costs that have been treated as indirect costs have not been claimed as direct costs (For example, supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the indirect cost pool for central administration).

B. **Audit:** All costs (direct and indirect, federal and non-federal) are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation agreement.

C. **Changes:** The rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted.  Changes in organizational structure, or changes in the method of accounting for costs that affect the amount of reimbursement resulting from use of the rate in this agreement, require the prior approval of the responsible negotiation agency. Failure to obtain such approval may result in subsequent audit disallowance.

D. **Provisional/Final Rates:**  Within 6 months after yearend, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and there are no funds available to cover the additional indirect costs, the organization may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the organization will be required to pay back the difference to the funding agency.

E. **Fixed Carryforward Rate:**  The fixed carryforward rate is based on an estimate of costs that will be incurred during the period for which the rate applies. When the actual costs for such period have been determined, an adjustment will be made to the rate for a future period, if necessary, to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F. **Agency Notification:**  Copies of this document may be provided to other federal offices as a means of notifying them of the agreement contained herein.

G. **Record Keeping:**   Organizations must maintain accounting records that demonstrate that each type of cost has been treated consistently either as a direct cost or an indirect cost.  Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.

H. **Reimbursement Ceilings:**  Grantee/contractor program agreements providing for ceilings on indirect cost rates or reimbursement amounts are subject to the ceilings stipulated in the contract or grant agreements.  If the ceiling rate is higher than the negotiated rate in Section I of this agreement, the negotiated rate will be used to determine the maximum allowable indirect cost.

I. **Use Of Other Rates:**  If any federal programs are reimbursing indirect costs to this grantee/contractor by a measure other than the approved rates in this agreement, the grantee/contractor should credit such costs to the affected programs, and the approved rate should be used to identify the maximum amount of indirect cost allocable to these programs.

J. **Central Service Costs:**  Where central service costs are estimated for the calculation of indirect cost rates, adjustments will be made to reflect the difference between provisional and final amounts.

K. **Other:**
1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs.  Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.

2. Programs received or initiated by the organization subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool.  It should be noted that this could result in an adjustment to a future rate.

3. New indirect cost proposals are necessary to obtain approved indirect cost rates for future fiscal or calendar years.  The proposals are due in our office 6 months prior to the beginning of the year to which the proposed rates will apply.

**Section III:  Acceptance**

Listed below are the signatures of acceptance for this agreement:

By the Indian Organization:                By the Cognizant Federal Government
                                                Agency:

_Joan R. Delabreau_ /s/                    _____ /s/

Joan R. Delabreau                          Inge Montich
Name                                       Name
                                           Indirect Cost Coordinator
Tribal Chairperson                         Indirect Cost Section
Title                                      Title
10/15/03                                   U.S. Department of the Interior
Date                                       National Business Center
                                           Agency
                                           Date
                                           Negotiated by Te Lam-Vi
                                           Telephone (916) 566-7111



# United States Department of the Interior
## National Business Center
### Indirect Cost Section
2180 Harvard Street, Suite 430
Sacramento, CA 95815



**NBC**
National
Business
Center



October 6, 2003

Ms. Joan Delabreau, Chairperson
Menominee Indian Tribe of Wisconsin
Post Office Box 910
Keshena, Wisconsin 54135-0910

Dear Ms. Delabreau:

On the basis of our review of the indirect cost rate proposal submitted by the Menominee Indian Tribe of Wisconsin for fiscal year (FY) ended September 30, 2003, and subject to the conditions contained in the enclosed negotiation agreement, we are prepared to approve a fixed carryforward rate of 10.66 percent for all programs, except programs funded by the Bureau of Indian Affairs under Public Law 93-638. For Bureau of Indian Affairs Programs, we calculated a fixed carryforward rate of 10.87 percent for FY 2003.

Both rates are based on total direct costs, less capital expenditures and passthrough funds. For Bureau of Indian Affairs programs, we based our calculation on the benchmarking methodology approved by the U. S. District Court of New Mexico in the following Orders:

- "Stipulated Order Regarding Equitable Relief to Implement Benchmarking Methodology," filed June 1, 2001,
- "Second Stipulated Order to Implement Benchmarking Methodology," filed August 5, 2002, and
- "Third Stipulated Order to Implement Benchmarking Methodology," filed June 11, 2003.

The results of our review are summarized in the enclosed Exhibits 1 and 2.

You must submit a new indirect cost rate proposal to obtain an approved rate for FY 2004. This proposal, which was due in our office on April 1, 2003, may be based on costs or budgetary data or a combination of these data. Your proposal requesting a rate for FY 2004 must include a carryforward computation for FY 2002 based on, and reconcilable to, financial statements that meet the requirements of the Single Audit Act of 1984, Public Law 98-502, as amended. In addition, the data used in the "Indirect Cost Collections" column must also be reconcilable to the financial statements.

---

Enclosed are two copies of the Indirect Cost Negotiation Agreement.  If you agree with the contents, please sign and return both copies to us.  I will then sign and return one copy to you.  If you have any questions concerning the agreement or this letter, please write or call Ms. Maria Nua, Program Analyst, at (916) 566-7111.

Sincerely,

Inge Montich
Indirect Cost Coordinator

Enclosures: Exhibits and Negotiation Agreement

cc:    Contracting Officer, Midwest Regional Office, Bureau of Indian Affairs

Ref:    F:\Wrextdoc\Midwest\Mitwh209\Mitw-Na.03

**Menominee Indian Tribe of Wisconsin**
**FY 2001 Carryforward And FY 2003 Rate Computation**
**All Other Programs Except BIA Programs**

**Exhibit 1**
**Page 1 of 2**

| Programs | FY 2001 Actual Direct Cost Base | % of Total | FY 2001 Indirect Cost Pool | Indirect Rate @ 10.00% | Indirect Cost Collections | Shortfall | Carryforward |
|---|---|---|---|---|---|---|---|
| BIA (638) | $7,164,679 | 21.6% | $706,452 | $716,468 | $698,608 | $7,844 | $0 |
| IHS (638) | 7,786,680 | 23.5% | 768,594 | 778,668 | 699,973 | 68,621 | 0 |
| HHS (Non-638) | 1,903,688 | 5.7% | 186,425 | 190,369 | 184,322 | 2,103 | 0 |
| Interior (Non-638) | 474,990 | 1.4% | 45,789 | 47,499 | 45,884 | 0 | -95 |
| Agriculture | 174,534 | 0.5% | 16,353 | 17,453 | 16,826 | 0 | -473 |
| EPA | 260,760 | 0.8% | 26,165 | 26,076 | 17,862 | 8,214 | 89 |
| Education | 45,999 | 0.1% | 3,271 | 4,600 | 4,513 | 0 | -1,242 |
| Justice | 269,175 | 0.8% | 26,165 | 26,918 | 9,839 | 16,326 | 0 |
| Transportation | 11,889 | 0.0% | 0 | 1,189 | 1,149 | 0 | -1,149 |
| Treasury | 5,816 | 0.0% | 0 | 582 | 0 | 0 | 0 |
| FWS | 0 | 0.0% | 0 | 0 | 0 | 0 | 0 |
| HUD | 2,633,580 | 7.9% | 258,378 | 263,358 | 246,999 | 11,379 | 0 |
| Institute of ML | 8,500 | 0.0% | 0 | 850 | 0 | 0 | 0 |
| FEMA | 6,207 | 0.0% | 0 | 621 | 600 | 0 | -600 |
| State | 2,268,272 | 6.8% | 222,402 | 226,827 | 212,902 | 9,500 | 0 |
| Other | 276,932 | 0.8% | 26,165 | 27,693 | 24,084 | 2,081 | 0 |
| Tribal | 9,902,520 | 30.1% | 984,454 | 990,252 | 1/ | | |
| Total | $33,194,221 | 100.0% | $3,270,613 | $3,319,423 | $2,163,561 | $126,068 | -$3,470 |

2/

| | |
|---|---|
| Accepted FY 2003 Indirect Costs | $3,700,825 |
| FY 2001 Overrecovery Carryforward to FY 2003 | -3,470 3/ |
| Accepted FY 2003 Indirect Cost Pool | $3,697,355 |
| Accepted FY 2003 Direct Cost Base | $34,680,534 |
| Accepted FY 2003 Standard Indirect Cost Rate | 10.66% |

**Menominee Indian Tribe of Wisconsin**
**FY 2001 Carryforward And FY 2003 Rate Computation**
**All Other Programs Except BIA Programs**

**Exhibit 1**
**Page 2 of 2**

1/ Over or underrecovery from Tribal accounts is internal and therefore not included in the carryforward computation.

2/ We decreased the reported FY 2001 direct cost base of $36,349,382 by $3,155,161 to equal to the revised amount provided by the Tribe in an email dated September 11, 2003.

3/ Program shortfalls should be reported to the respective granting agencies.

4/ We included $3,470 of FY 2001 overrecovery carryforward to FY 2003 that was computed based on actual recoveries of indirect costs. Although the Orders for Equitable Relief from the U.S. District Court for the District of New Mexico, filed September 21, 1999, October 5, 2000, June 1, 2001, and August 5, 2002, permitted the Office of Inspector General to correct internal inconsistencies as discussed in the General Accounting Office Report of June 1999, the Court Orders did not approve the carryforward methodology reflected in this schedule. By entering into an indirect cost rate agreement calculated by using this schedule, neither a Tribal contractor nor the government waives its respective claims or defenses regarding the contractor's indirect costs or contract support.

5/ We increased the revised FY 2003 direct cost base of $34,503,278 by $177,256 to include enterprise funds which was inadvertently left out from the total base computation.

Note: The amounts shown as Indirect Cost Collections are based on the Tribe's audited financial statements and supplemental information provided by the Tribe.

**Menominee Indian Tribe of Wisconsin**                                    **Exhibit 2**

## Benchmarking Methodology Summary For Finalizing Fiscal Year 2001
(Based on Equitable Relief Orders from the United States District Court of New Mexico,
 filed June 1, 2001, August 5, 2002, and June 11, 2003)

**Data Entered into Court Ordered Benchmarking Spreadsheet:**

| | |
|---|---|
| Actual indirect cost (IDC) pool reconcilable to audited Financial Statements | $3,270,613 |
| Actual BIA IDC base reconcilable to audited Financial Statements | 7,164,679 |
| Actual non-federal funds in IDC base (tribal, state, private) reconcilable to audited Financial Statements | 12,447,724 |
| Actual other federal funds in IDC base (excludes BIA and IHS) reconcilable to audited Financial Statements | 5,795,138 |
| Actual IHS funds in IDC base reconcilable to audited Financial Statements | 7,786,680 |
| Actual IDC collections from other federal agencies, which must be credited to prevent double recovery | 527,994 |

**Results of Court-Ordered Benchmarking Spreadsheet:**

| | |
|---|---|
| Net increase in BIA IDC rate under benchmarking | 0.21% |
| **Accepted Standard IDC Rate** | 10.66% |
| **Accepted BIA IDC Rate Under Benchmarking** | **10.87%** |

## Indian Organizations
## Indirect Cost Negotiation Agreement

EIN: 39-1205576

**Organization:**

Menominee Indian Tribe of Wisconsin
P.O. Box 910
Keshena, Wisconsin 54135-0910

**Date:** June 14, 2004

**Report No(S).:** 04-A-483

**Filing Ref.:**
Last Negotiation Agreement
dated October 20, 2003

The indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in 25 CFR, Part 900, and in Section II.A. of this agreement. The rates were negotiated by the U.S. Department of the Interior, National Business Center, and the subject organization in accordance with the authority contained in the Circular.

## Section I:  Rates

| Type | Effective Period | | Rate* | Locations | Applicable To |
| | From | To | | | |
| --- | --- | --- | --- | --- | --- |
| Fixed Carryforward | 10/01/03 | 09/30/04 | 11.32%** | All | BIA Programs |
| Fixed Carryforward | 10/01/03 | 09/30/04 | 11.27% | All | All Other |

* Base:  Total direct costs, less capital expenditures and passthrough funds. Passthrough funds are normally defined as major subcontracts, payments to participants, stipends to eligible recipients, and subgrants, all of which normally require minimal administrative effort.

**The rate for BIA programs was calculated using the Benchmarking Methodology stipulated in the Equitable Relief Orders filed by the U. S. District Court of New Mexico on June 1, 2001, August 5, 2002, and June 11, 2003.

Treatment of fringe benefits:      Fringe benefits applicable to direct salaries and wages are treated as direct costs; fringe benefits applicable to indirect salaries and wages are treated as indirect costs.

## Section II:  General

Page 1 of 3

A. **Limitations:**  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon these conditions: (1) no costs other than those incurred by the subject organization were included in its indirect cost rate proposal, (2) all such costs are the legal obligations of the grantee/contractor, (3) similar types of costs have been accorded consistent treatment, and (4) the same costs that have been treated as indirect costs have not been claimed as direct costs (for example, supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the indirect cost pool for central administration).

B. **Audit:**  All costs (direct and indirect, federal and non-federal) are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation agreement.

alm

C. **Changes:** The rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted.  Changes in organizational structure, or changes in the method of accounting for costs that affect the amount of reimbursement resulting from use of the rate in this agreement, require the prior approval of the responsible negotiation agency. Failure to obtain such approval may result in subsequent audit disallowance.

D. **Provisional/Final Rates:** Within 6 months after yearend, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and there are no funds available to cover the additional indirect costs, the organization may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the organization will be required to pay back the difference to the funding agency.

E. **Fixed Carryforward Rate:** The fixed carryforward rate is based on an estimate of costs that will be incurred during the period for which the rate applies. When the actual costs for such period have been determined, an adjustment will be made to the rate for a future period, if necessary, to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F. **Agency Notification:** Copies of this document may be provided to other federal offices as a means of notifying them of the agreement contained herein.

G. **Record Keeping:** Organizations must maintain accounting records that demonstrate that each type of cost has been treated consistently either as a direct cost or an indirect cost.  Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis.

H. **Reimbursement Ceilings:** Grantee/contractor program agreements providing for ceilings on indirect cost rates or reimbursement amounts are subject to the ceilings stipulated in the contract or grant agreements.  If the ceiling rate is higher than the negotiated rate in Section I of this agreement, the negotiated rate will be used to determine the maximum allowable indirect cost.

I. **Use of Other Rates:** If any federal programs are reimbursing indirect costs to this grantee/contractor by a measure other than the approved rates in this agreement, the grantee/contractor should credit such costs to the affected programs, and the approved rate should be used to identify the maximum amount of indirect cost allocable to these programs.

J. **Central Service Costs:** Where central service costs are estimated for the calculation of indirect cost rates, adjustments will be made to reflect the difference between provisional and final amounts.

K. **Other:**
1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs.  Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity.

2. Programs received or initiated by the organization subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool.  It should be noted that this could result in an adjustment to a future rate.

---

**Section II:  General** (continued)                                 Page 3 of 3

---

3. New indirect cost proposals are necessary to obtain approved indirect cost rates for future fiscal or calendar years.  The proposals are due in our office 6 months prior to the beginning of the year to which the proposed rates will apply.

---

**Section III:  Acceptance**

---

Listed below are the signatures of acceptance for this agreement:

By the Indian Organization:

*Joan R. Delabreau*                    /s/

 Joan R. Delabreau
Name

 Chairperson
Title

 6/7/04
Date

By the Cognizant Federal Government
   Agency:

*Inge Montich*                    /s/

Inge Montich
Name
Indirect Cost Coordinator
Indirect Cost Services
Title
U.S. Department of the Interior
National Business Center
Agency
Date  June 14, 2004
Negotiated by Steve Dallosta
Telephone (916) 566-7111

elm



# United States Department of the Interior
### National Business Center
Indirect Cost Section
2180 Harvard Street, Suite 430
Sacramento, CA 95815



NBC
National
Business
Center

RECEIVED

**JUN 2 8 2004**

MITW
ADMINISTRATION

June 14, 2004



Ms. Joan Delabreau, Chairperson
Menominee Indian Tribe of Wisconsin
P.O. Box 910
Keshena, Wisconsin 54135-0910

Dear Ms. Delabreau:

Enclosed is an original copy of the Indirect Cost Negotiation Agreement for the 12-month period ending September 30, 2004, between the Federal Government and the Menominee Indian Tribe of Wisconsin.

If you have any questions regarding this agreement, please write or call Ms. Maria Nua, Program Analyst, at (916) 566-7111.

Sincerely,

*Inge Montich*

Inge Montich
Indirect Cost Coordinator

Enclosure

cc:    Self-Determination Specialist, Midwest Regional Office, BIA
        Director of External Audits, Office of Inspector General, Department of Interior

Ref:    J:/Wrextdoc/Midwest/MITWh209/Issue.ltr

Dug. Fill
all Depts
Finance  6/29/04 RB

Phone (916) 566-7111    Fax (916) 566-7110    E-mail ICS@nbc.gov    Internet http://www.nbc.gov/icshome.cfm

BEMIDJI AREA INDIAN HEALTH SERVICE
RECOMMEND DISTRIBUTION OF NON-RECURRING FY97 INDIRECT COST SHORTFALL FUNDS

| # | Tribal AFA | Indirect Cost Need | Indr. Cost Shortfall FY97 | Percent Shortfall Begin FY97 | Less 15.7% Shortfall Average | Shortfall Above Average | Percent Of Col. G Total | Share Of $165,000 Non-Recur. IDC | Adjusted Shortfall Col. D-I | Adjusted Shortfall Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PRAIRIE ISLAND | 69,919 | 69,919 | 100.0% | 10,977 | 58,942 | 12.7% | 20,975 | 48,944 | 70.0% |
| 2 | SOKAOGON | 87,003 | 43,203 | 49.7% | 13,659 | 29,544 | 6.4% | 10,513 | 32,690 | 37.6% |
| 3 | LAC VIEUX DESERT | 172,477 | 78,077 | 45.3% | 27,079 | 50,998 | 11.0% | 18,148 | 59,929 | 34.7% |
| 4 | LAC COURTE OREILLES | 394,455 | 169,855 | 43.1% | 61,929 | 107,926 | 23.3% | 38,406 | 131,449 | 33.3% |
| 5 | ONEIDA ALCO | 34,688 | 12,588 | 36.3% | 5,446 | 7,142 | 1.5% | 2,542 | 10,046 | 29.0% |
| 6 | ONEIDA HC | 404,390 | 145,790 | 36.1% | 63,489 | 82,301 | 17.8% | 29,288 | 116,502 | 28.8% |
| 7 | RED CLIFF | 632,327 | 216,927 | 34.3% | 99,275 | 117,652 | 25.4% | 41,867 | 175,060 | 27.7% |
| 8 | MENOMINEE ALCO | 25,690 | 5,390 | 21.0% | 4,033 | 1,357 | 0.3% | 483 | 4,907 | 19.1% |
| 9 | KEWEENAW BAY ALCO | 108,260 | 22,259 | 20.6% | 16,997 | 5,262 | 1.1% | 1,873 | 20,386 | 18.8% |
| 10 | ONEIDA SANITATION | 5,502 | 987 | 17.9% | 864 | 123 | 0.0% | 44 | 943 | 17.1% |
| 11 | MENOMINEE HC | 381,519 | 62,319 | 16.3% | 59,898 | 2,421 | 0.5% | 861 | 61,458 | 16.1% |
| 12 | BAY MILLS | 206,031 | 30,531 | 14.8% | 0 | 0 | 0.0% | 0 | 30,531 | 14.8% |
| 13 | LEECH LAKE | 189,654 | 26,031 | 13.7% | 0 | 0 | 0.0% | 0 | 26,031 | 13.7% |
| 14 | GRAND PORTAGE | 42,536 | 4,636 | 10.9% | 0 | 0 | 0.0% | 0 | 4,636 | 10.9% |
| 15 | SAGINAW | 293,475 | 29,175 | 9.9% | 0 | 0 | 0.0% | 0 | 29,175 | 9.9% |
| 16 | RED LAKE ALC | 27,969 | 2,269 | 8.1% | 0 | 0 | 0.0% | 0 | 2,269 | 8.1% |
| 17 | ST CROIX | 158,327 | 12,126 | 7.6% | 0 | 0 | 0.0% | 0 | 12,126 | 7.6% |
| 18 | BOIS FORTE | 284,441 | 18,942 | 6.7% | 0 | 0 | 0.0% | 0 | 18,942 | 6.7% |
| 19 | HANNAHVILLE | 183,760 | 10,460 | 5.7% | 0 | 0 | 0.0% | 0 | 10,460 | 5.7% |
| 20 | HO CHUNK | 332,620 | 7,320 | 2.2% | 0 | 0 | 0.0% | 0 | 7,320 | 2.2% |
| 21 | RED LAKE COMP HLTH | 424,173 | 6,184 | 1.5% | 0 | 0 | 0.0% | 0 | 6,184 | 1.5% |
| 22 | ITC OF MICHIGAN | 39,293 | 293 | 0.7% | 0 | 0 | 0.0% | 0 | 293 | 0.7% |
| 23 | GLITC | 73,857 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 24 | KEWEENAW BAY HC | 126,796 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 25 | UPPER SIOUX | 16,300 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 26 | LOWER SIOUX | -0- | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 27 | SHAKOPEE | -0- | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 28 | WHITE EARTH | 128,389 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 29 | STOCKBRIDGE MUNSEE | 182,300 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 30 | BAD RIVER | 115,327 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 31 | FOREST COUNTY | 34,763 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| 32 | LAC DU FLAMBEAU | 191,412 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| | TOTAL | 5,368,653 | 975,281 | 502.3% | 363,648 | 463,666 | 100.0% | 165,000 | 610,281 | 414.1% |
| | AVG % BY NUMBER TRIBES | | | 15.7% | 15.7% | | | | | 12.9% |

NOTES:
(1) New tribes were not included in distribution of FY97 IDC Shortfall funds. New tribes' IDC needs were requested from IHS ISD Fund (queue).
(2) It was recommended that only tribes above the Area shortfall average of 15.7% should share in the distribution of $165,000 FY97 IDC shortfall funds.

IDCSF1.WK4  08/20/97

**Fiscal Year 99 CSC Shortfall Report**
**CSC SHORTFALL REPORT**
**BEMIDJI Area**

Date Updated: 01/06/00

CSC SHORTFALL REPORT
BEMIDJI Area

FINAL

| Title I or III | No. | Area | Annuities | (A) Total FY _ Program (non-recurring) | (B) Total FY _ Program (non-recurring) | (C) LESS (-) Program amounts in the BIO Grants or of CSC | (D) FY _ Prior Rates Included in BIO Grants or of CSC | (E) FY _ DCSC Funding (non-recurring) Need | (F) FY _ DCSC Funding Need | (G) FY _ DCSC Base (Recurring) | (H) FY _ DCSC Shortfall (Memo: medium Only) | (I) FY _ DCSC Program Base (Memo: Ongoing Awards Only) | LESS (-) Other Estimated tied Pass-thrus | 98 Object Cost Base | Meet current approved IDC Rate | Fiscal Year & Type of IDC Rate | (N) IDC _ Need (recurring) | (O) FY _ IDC Funding Paid | (P) FY _ IDC Shortfall (Memo: medium Only) | (Q) FY _ IDC Shortfall (Memo: medium Only) | TOTAL CSC Need for | TOTAL Available for CSC | Total Funding CSC Shortfall | % of Ongoing CSC Need Funded |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 1 | BAO | LITTLE TRAVERSE | | | | | | | | | | | | | | | | | | | | | |
| I | 2 | BAO | LITTLE RIVER BAND | | | | | | | | | | | | | | | | | | | | | |
| I | 3 | BAO | KEWEENAW BAY | | | | | | | | | | | | | | | | | | | | | |
| I | 4 | BAO | POKAGON | | | | | | | | | | | | | | | | | | | | | |
| I | 5 | BAO | LAC COURTE OREILLES | | | | | | | | | | | | | | | | | | | | | |
| I | 6 | BAO | GRAND PORTAGE | | | | | | | | | | | | | | | | | | | | | |
| I | 7 | BAO | NEW DAY | | | | | | | | | | | | | | | | | | | | | |
| I | 8 | BAO | WHITE EARTH | | | | | | | | | | | | | | | | | | | | | |
| I | 9 | BAO | UPPER SIOUX | | | | | | | | | | | | | | | | | | | | | |
| I | 10 | BAO | HURON POTAWATOMI | | | | | | | | | | | | | | | | | | | | | |
| I | 11 | BAO | RED LAKE BAY | | | | | | | | | | | | | | | | | | | | | |
| I | 12 | BAO | RED LAKE | | | | | | | | | | | | | | | | | | | | | |
| I | 13 | BAO | RED CLIFF | | | | | | | | | | | | | | | | | | | | | |
| I | 14 | BAO | LAC DU FLAMBEAU | | | | | | | | | | | | | | | | | | | | | |
| I | 15 | BAO | SHAKOPEE | | | | | | | | | | | | | | | | | | | | | |
| I | 16 | BAO | MENOMINEE | | | | | | | | | | | | | | | | | | | | | |
| I | 17 | BAO | LEECH LAKE | | | | | | | | | | | | | | | | | | | | | |
| I | 18 | BAO | BAY MILLS | | | | | | | | | | | | | | | | | | | | | |
| I | 19 | BAO | OLETC INC | | | | | | | | | | | | | | | | | | | | | |
| I | 20 | BAO | STOCKBRIDGE | | | | | | | | | | | | | | | | | | | | | |
| I | 21 | BAO | HANNAHVILLE | | | | | | | | | | | | | | | | | | | | | |
| I | 22 | BAO | PRAIRIE ISLAND | | | | | | | | | | | | | | | | | | | | | |
| I | 23 | BAO | ST CROIX | | | | | | | | | | | | | | | | | | | | | |
| I | 24 | BAO | MENOMINEE BAY | | | | | | | | | | | | | | | | | | | | | |
| I | 25 | BAO | BAD RIVER | | | | | | | | | | | | | | | | | | | | | |
| I | 26 | BAO | HO-CHUNK | | | | | | | | | | | | | | | | | | | | | |
| I | 27 | BAO | FOREST COUNTY | | | | | | | | | | | | | | | | | | | | | |
| I | 28 | BAO | SOKAOGON | | | | | | | | | | | | | | | | | | | | | |
| I | 29 | BAO | SAGINAW | | | | | | | | | | | | | | | | | | | | | |
| I | 30 | BAO | LOWER SIOUX | | | | | | | | | | | | | | | | | | | | | |
| I | 31 | BAO | LAC VIEUX DESERT | | | | | | | | | | | | | | | | | | | | | |
| I | 32 | BAO | ITCOF MICHIGAN | | | | | | | | | | | | | | | | | | | | | |
| TITLE I | | | Sub-Totals | | | | | | | | | | | | | | | | | | | | | |
| III | | | GRAND TRAVERSE | | | | | | | | | | | | | | | | | | | | | |
| III | | | ONEIDA | | | | | | | | | | | | | | | | | | | | | |
| III | | | BOIS FORTE | | | | | | | | | | | | | | | | | | | | | |
| III | | | MILLE LACS | | | | | | | | | | | | | | | | | | | | | |
| III | | | SAULT STE MARIE | | | | | | | | | | | | | | | | | | | | | |
| III | | | FOND DU LAC | | | | | | | | | | | | | | | | | | | | | |
| TITLE III | | | Sub-Totals | | | | | | | | | | | | | | | | | | | | | |
| | | | AREA TOTALS | | | | | | | | | | | | | | | | | | | | | |

DEF022917

Fiscal Year 00 — Shortfall Report
CSC SHORTFALL REPORT
BEMIDJI Area

Data Open as entered 12/15/10

CSC SHORTFALL REPORT
BEMIDJI Area

| | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) | (L) | (M) | (N) | (O) | (P) | (Q) | (R) | (S) | (T) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title No. III Agency | Area | Total FY 00 Program Base (Running) | Total FY 00 Program Base (Running) | LESS (-) Program Amounts of ICSC | LESS (-) FY 00 Total Base Reserved Payments from ICSC | FY 00 DCSC Funding (Non-Reserved Item Only) | FY 00 DCSC Funding Need | FY 00 DCSC Shortfall (Increase/Returning Only) | FY 00 Program Base (Ongoing Arena) Only | LESS (-) Other Increases thru | Direct Cost Base | Most Current IDC Base | Total Years & Type of IDC Base | FY 00 IDC Need (mot recurring) | FY 00 IDC Need FY 00 IDC Funding (Non Recurring) | FY 00 IDC Shortfall (Non Recurring Item Only) | TOTAL (FY 00 DCSC Need) | TOTAL Funding for CSC | Total CSC Shortfall | N of Ongoing CSC Need Funded |

**BEMIDJI AREA**

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(Table rows list agencies including LITTLE TRAVERSE, LITTLE RIVER BAND, KEWEENAW BAY, POKAGON, LAC COURTE OREILLES, GRAND PORTAGE, MILLE LACS, WHITE EARTH, UPPER SIOUX, SOKAON MAFUANTON, RED LAKE, BAD RIVER, LAC DU FLAMBEAU, SHAKOPEE, MENOMINEE, MOLE LAKE, BAY MILLS, ONEIDA, STOCKBRIDGE, MENOMINEE, PRAIRIE ISLAND, ST. CROIX, MENOMINEE BAY, RED CLIFF, HO-CHUNK, MENOMINEE, FOREST COUNTY, POKAGON, LOWER SIOUX, LAC VIEUX DESERT, FOND DU LAC — with numeric data columns, followed by TITLE III and Sub-Total rows: GRAND TRAVERSE, ONEIDA, BOIS FORTE, MILLE LACS, SAULT STE MARIE, FOND DU LAC, Sub-Total, and AREA TOTALS.)*

Bob Cullen - Finance Superior department the total allocation of $11,493,995 has not been over-obligated for FY 00. Explanations from Lisa Escobedo
12/5/00

DEF022918

# Fiscal Year 2001 CSC Shortfall Report

Bemidji Area

DEF022919



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Contract Appeals
801 N. Quincy St.  Suite 300
Arlington, VA  22203

703 235 3813                              703 235 1281 (fax)

### APPEALS OF SELDOVIA VILLAGE TRIBE

IBCA 3862 & 3863/97               :         Decided: October 20, 2003

Compact No. 58G950029-01-2        Appellant's Motion for Summary
FY 1996 and 1997 Funding Agreements   Judgment Granted; Government's
Indian Health Service, HHS        Motions for Summary Judgment
                                  and to Dismiss Denied

APPEARANCE FOR APPELLANT:         Geoffrey D. Strommer, Esq.
                                  Hobbs, Straus, Dean & Walker, LLP
                                  Portland, Oregon 97204

                                  Joseph H. Webster, Esq.
                                  Hobbs, Straus, Dean & Walker, LLP
                                  Washington, DC 20006

APPEARANCE FOR GOVERNMENT:        Duke McCloud, Esq.
                                  Chief, IHS Branch, HHS
                                  Rockville, Maryland 20857

### OPINION BY ADMINISTRATIVE JUDGE PARRETTE

Seldovia Village Tribe (Appellant or the Tribe) of Alaska has appealed two reductions in payments by the Indian Health Service (IHS) under the Tribe's FY 1996 and FY 1997 Annual Funding Agreements (AFA's) . Appellant alleges that IHS failed to pay the Tribe its full contract support costs (CSC's) of $126,439 in each of those years, amounts not in dispute.  IHS contends that the CSC reductions were the result of inadequate appropriations by the Congress, and avers that the Tribe's CSC reductions were both proper and proportionately the same as those experienced by other CSC recipients.

The appeals were filed in June 1997 and assigned to Judge Cheryl Rome, who is no longer with the Board.  They were deferred for Board consideration because the issue of the propriety of CSC reductions was already before the Board in similar case, Cherokee Nation, which was ultimately reviewed by Court of Appeals for the Federal

Circuit. <u>See</u> Appeals of <u>Cherokee Nation of Oklahoma</u>, IBCA 3877-79, 99-2 BCA 30,462; reconsideration granted at 01-1 BCA 31,158; decision unchanged at 01-1 BCA 31,349 (hereafter "Cherokee"). The Board's decision was affirmed in <u>Thompson v. Cherokee Nation of Oklahoma</u>, 334 F. 3d 1075, 2003 U.S. App., LEXIS 13483. Familiarity with <u>Thompson</u> is presumed for the purposes of this opinion.

Further information on IHS's Title III Self-Determination program can be found in <u>Shoshone-Bannock Tribes v. HHS</u>, 279 F. 3d 660 (9th Circuit 2002) and in <u>Cherokee Nation v. Thompson</u>, 311 F. 3d 1054 (10th Circuit 2002). Both Circuits have decided appeals similar to this one in favor of the Government rather than the appellant. This Board, however, agrees with the decision of the Federal Circuit in <u>Thompson</u>, which is binding for us in any event.

Appeal Background

The present Appeals were filed pursuant to the Indian Self-Determination and Education Assistance Act (ISDA or the Act), which authorizes IHS to award to tribal organizations the same amounts that IHS would have spent in providing services to them, in order to enable the tribes to administer the programs themselves. Under Title III of the Act, the Secretary of HHS enters into Compacts with tribes to provide these funds, known as Secretarial funds, to enable them to provide health services to eligible Indians pursuant to Annual Funding Agreements. In addition, the tribes are entitled to funds to cover the administrative costs of the programs, called contract support costs, based on a rate arrived at through negotiation between the tribe and the cognizant Federal agency. The only limitation on the resulting CSC funding is that the funds must come out of, and may not exceed, available appropriations.

During the years in question, IHS experienced shortfalls in the amounts recommended by the Congressional Appropriations Committees for CSC use, even though total ISDA appropriations were increasing each year. These reductions were not incorporated into the legislation itself but were only Committee recommendations. Nevertheless, IHS treated them as mandatory directives and apportioned the funds as recommended, despite the fact that the entitlement to full CSC funds was arguably required under 25 U.S.C. sec. 450j-1(a) and that adequate funds for CSC purposes were available under the ISDA general appropriation.

2

Although the present Appeals predated <u>Thompson</u> and involve the same issues, IHS argues here that because the tribe's AFA's expressly provided that funding was to be in accordance with IHS's existing policy memorandum, which called for the allocation of funds only within the limits of the Appropriation Committee's recommendation, full CSC payments were not required. Thus, IHS believes that the facts in this case differ from those in <u>Thompson</u>, and that <u>Thompson</u> is inapplicable. Appellant challenges this view, and both parties have moved for summary judgment.

These issues have been briefed at great length. Despite the Government's extensive arguments to the contrary, we hold that these appeals are within the ambit of <u>Thompson</u> and grant summary judgment for the reasons set forth in that decision. However, because they involve issues of first impression with respect to the Alaska tribes, it may be useful to set forth the general background of the Appeals as provided by Appellant in its Summary Judgment Motion. We will then address IHS' contention that Seldovia legally contracted away its entitlement to full CSC payments when it signed its Annual Funding Agreements.

<u>Contract Background</u>

A. History of Title III Compacting

The Indian Self-Determination and Education Assistance Act (ISDA), Pub.L. 93-638, 88 Stat. 2206 (Jan. 4, 1975), 25 U.S.C. § 450 <u>et seq.</u>, was enacted by Congress in 1975, and has since been amended on a number of occasions. The ISDA allows tribes or tribal organizations to enter into agreements with the IHS to administer programs, functions, services or activities (PFSAs) which the IHS has operated for Indian tribes and their members. As originally enacted, the only mechanism for tribes to assume such PFSAs was through Title I contracts, which limited the flexibility of tribes to administer programs to accommodate unique local circumstances.

Thus, in 1988 Congress enacted Public Law 100-472, which formally established the Tribal Self-Governance Demonstration Project (Title III), 25 U.S.C. § 450f note. Title III directed the Secretary of the Interior to initiate the Project as a five-year experiment involving up to 20 tribes. Under this Project, participating tribes were given the option of negotiating compacts and annual funding agreements (AFA's) with the Secretary of the Interior for the operation of DOI programs for

3

Indians.  In accordance with such compacts, tribes are authorized to administer such PFSA's and receive funds from all levels of the agency to perform these responsibilities -- funds that the Secretary otherwise would have spent to perform the PFSAs.  In addition to these "Secretarial funds," tribes are also entitled to CSC funds to cover the administrative costs of operating the programs.

The AFA, which is to be negotiated as part of a compact and re-negotiated each year, establishes the funding levels for operating the programs in the compact.  With certain limitations, tribes are authorized to redesign and reallocate program funds on the basis of tribal priorities.

On December 4, 1991, President Bush signed the Tribal Self-Governance Demonstration Project Act, Public Law 102-184, into law.  Among other things, this Act amended Public Law 100-472 to establish an Indian Health Service Self-Governance Demonstration Project and directed IHS to study the feasibility of expanding the Project to IHS programs and services.  In 1992 Congress again amended Title III by enacting Section 314 of the Indian Health Amendments of 1992.[1] The 1992 amendments authorized the Secretary of the Department of Health and Human Services (HHS) to negotiate Self-Governance compacts and AFAs with tribes that had completed the required planning activities.

B.    The Alaska Tribal Health Compact

In 1994, 13 tribes and tribal organizations in Alaska negotiated and signed the Alaska Tribal Health Compact (ATHC) and AFAs authorizing them to operate health care programs under Title III in fiscal year 1995.  The ATHC was subsequently signed by the Director of IHS on behalf of the Secretary of HHS.  The ATHC and AFAs went into effect on October 1, 1994, after having been filed with the Congress for review by the Senate Committee on Indian Affairs and the House Committee on Natural Resources, and other affected tribes, as required by law.

Since 1994, a number of other tribes and tribal organizations in Alaska have become co-signers of the ATHC and have negotiated AFAs thereunder, including the

---

[1]    Public Law 102-573.

4

Appellant Seldovia Village Tribe.  To date, 18 tribes and tribal organizations from throughout Alaska are signatories to the ATHC.  As a result, the vast majority of the IHS programs in Alaska are currently operated under tribal administration in accordance with the provisions of Title III and the ATHC.

C.    Calculation of Contract Support Costs

The Indian Self-Determination Act requires the Secretary to pay full contract support cost funding to a contracting or compacting tribe in addition to the Secretarial amount for direct program funding.  25 U.S.C. 450j-1(a)(2);  CSC funds "cover the full administrative costs the Tribe will incur -- and which, absent the self-determination contract, the Federal government would incur -- in connection with the operation of [direct Indian] programs."  Ramah Navajo School Board v. Babbitt, 87 F.3d 1338, 1341 (D.C. Cir. 1996); see also 25 U.S.C. 450b(f).

One aspect of CSC is "indirect costs."  The ISDA defines these as "costs incurred for a common or joint purpose benefitting more than one contract objective, or which are not readily assignable to the contract objectives specifically benefitted without effort disproportionate to the results achieved;" 25 U.S.C. § 450b(f).  The amount of indirect costs to which a tribal contractor is entitled is based upon a rate which is "arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency."  25 U.S.C. § 450b(g).  The ISDA provides that funds for all such CSC "shall be added" to the tribe's contract.  25 U.S.C. § 450j-1(a)(2)(emphasis added).   The only limitation is that all funding is "subject to the availability of appropriations."  25 U.S.C. § 450j-1(b). [2]

---

[2]    As noted by the court in Shoshone-Bannock Tribes v. Shalala, 988 F. Supp. 1306, 1329 (D. Or. 1997), "CSC are automatically awarded as a percentage of the tribe's Secretarial Amount, but funding is 'subject to the availability of appropriations' and the Secretary's need to serve non-contracting tribes."

D.    Use of ISDM 92-2 to Distribute Contract Support Funds

IHS utilizes ISDM 92-2,[3] an unpromulgated, internal agency guideline, to determine and allocate "contract support funds for all Public Law (P.L.) 93-638 contracts." ISDM 92-2 at 2 (Appt. Exh. H). Through this mechanism, the IHS limits the  availability of CSC funding for ongoing contracts and compacts to a predetermined amount based on the level of prior year CSC funding to each Area Office.  In the case of ongoing contracts, ISDM 92-2 (pg. 7) provides:

> The amount of indirect contract support funds representing the previous year's base will be distributed to Areas "recurring"[[4]] to fund each Area's indirect cost need.  Each contractors' need for indirect contract support shall be determined by calculating changes, if any, in indirect cost rates, bases, and pools.  If funds **available** in the Area's indirect cost base are not adequate to meet total requirements, then the amount **available** shall be distributed according to each contractor's proportion of total need.  These funds will be awarded to the contractor as non-recurring funds.  (underline in original, bold added).

The term "available" is not defined by ISDM 92-2.  However, historically IHS has only increased the funds "available" for CSC to the extent that such an increase is recommended in the Conference Committee Report that accompanies the IHS' annual appropriation.  Thus, this limitation on the funds available for CSC is not based upon any statutory mandate, but is only based upon Committee recommendations.

E.    Congressional Appropriations for the IHS

The Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996) appropriated the following lump-sums for the Indian Health Service for FY 1996:

---

[3]    In 1996, ISDM 92-2 was superseded by ISDM 96-04, which is consistent in relevant parts with its predecessor. However, for purposes of this appeal, ISDM 92-2 was the applicable guideline at the time that the Tribe entered into both its FY 1996 and FY 1997 AFAs.

[4]    ISDM 96-04 (pg. 2) defines "recurring funds" as "Contract or compact funds that do not require rejustification each year to the Secretary.  Annual increases are provided through congressional mandatory increases or other resource allocation methodologies applicable to the respective funding category of the award."

> For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,747,842,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 300aaa-2 for services furnished by the Indian Health Service." (emphasis added).

Of the IHS' lump-sum appropriation of $1,722,842,000 for FY 1996, non-earmarked funds totaled $1,364,937,000. Similarly, the FY 1997 Appropriations Act provided:

> For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,806,269,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 238(b) for services furnished by the Indian Health Service (emphasis added).

Omnibus Consolidated Appropriations Act for FY 1997, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996). Thus, the FY 1997 Act is nearly identical to the FY 1996 Act except that Congress increased the Indian Health Service's lump-sum appropriation by nearly 60 million dollars to $1,809,269,000. Of this total, non-earmarked funds totaled $1,408,736,000.

Nowhere is there any suggestion in the plain language of the FY 1996 and FY 1997 Appropriations Acts that Congress intended to impose a spending cap on CSC funds.[5] Only in the Committee reports is the issue of total funding for CSC addressed and there the Committee simply makes a recommendation. Neither the report nor the recommendation rises to a binding duty. The FY 1996 Report states:

> *Contract Support Costs*.--The Committee recommends
> $153,040,000 for contract support costs including decreases of

---

[5]    The plain language of the Appropriation Acts must control. See Idaho First Nat'l Bank v. Commissioner of Internal Revenue, 997 F.2d 1285, 1289 (9th Cir. 1993) ("[I]f the [statutory] language ... is unambiguous, and its literal application does not conflict with the intentions of its drafters, the plain meaning should prevail."); Environmental Defense Fund v. Reilly, 909 F.2d 1497, 1502 (D.C. Cir. 1990) (the starting point of statutory construction is "the language of the statute itself and absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive").

$11,864,000 for pay and fixed costs and $3,770,000 for support cost shortfalls." H. R. Rep. 104-173, at 97 (1995)(emphasis added); see also S. Rep. 104-125, at 94 (1995).

The FY 1997 Report states:

> *Contract support costs*.--The Committee recommends $160,660,000 for contract support. This amount includes increases over the fiscal year 1996 enacted level of $120,000 for the staffing of new facilities and $7,500,000 for the Indian self-determination fund." S. Rep. 104-319, at 90 (1996)(emphasis added); see also H. R. Rep. 104-625 (1996).

F.    IHS Budget Requests for CSC

In both FY 1996 and FY 1997, the IHS failed to request adequate CSC to cover the existing shortfall. For FY 1996, the IHS requested $161,174,000, an increase of $15,714,000 over the previous year. However, as of the end of FY 1995, the CSC shortfall was approximately $43 million. As of March 30, 1996, the CSC shortfall just for new and expanded contracts was over $25 million. Shoshone-Bannock, 988 F. Supp. at 1329.

For FY 1997, the IHS requested significantly more for CSC -- $200,955,000, an increase of $46,115,000 -- but still far short of the then existing CSC need. As of the end of FY 1996, the IHS had a CSC shortfall of approximately $62 million. Further, the IHS separately reported to Congress that its total CSC shortfall for FY 1997 was $81,956,000. See IHS CSC Annual Shortfall Report to Congress for FY 1997 (Sep. 24, 1997), at 3. Thus, the IHS requested almost $36 million less than it acknowledged was necessary to fully fund its CSC need for FY 1997.

G.    Background of the Seldovia Village's Claim

In 1995, the Tribe and the Office of Cost Allocation, Department of Health and Human Services, negotiated an indirect cost rate of 47.3 percent for FY 1996 and FY 1997. Proposed Amendments 2 & 3 to FY 1996 AFA (with attached IDC Agreement). Based upon this rate, the Tribe's CSC need for both years was $247,696.

8

On January 24, 1996, the Tribe submitted to the IHS proposed amendments 2 and 3 to the FY 1996 AFA. Among other things, these amendments would have adjusted the funding in the FY 1996 AFA to provide for the payment of indirect costs under the negotiated indirect cost rate of 47.3 percent in accordance with the terms of the AFA. Section 4(B) of the FY 1996 AFA provides for the payment of contract support funds for indirect costs under section 106(a)(2) of the Act and Indian Self-Determination Memorandum No. 92-2.[6] The amount requested by the Tribe was determined based on the policies in ISDM 92-2.

At a meeting between tribal and IHS representatives held on December 3, 1996, the IHS tentatively responded that no action had been taken by the IHS on the amendments submitted almost a year earlier and that consequently these amendments were not incorporated into the FY 1996 AFA. On December 10, 1996 the Area Office, after further file review, confirmed that "we find that neither the Area [Office] nor IHS Headquarters processed the proposed amendments when received."

While the IHS agreed that $247,696 was the Tribe's CSC need, it stated that only $121,257 was available for CSC. Based upon this lack of "available" funds, the IHS did not incorporate the amendment into the Tribe's FY 1996 or FY 1997 AFA's. Instead, the IHS simply noted that it "did not have contract support cost shortfall funding available to meet [the Tribe's] needs at the time the amendment was first proposed, nor does it have those funds now." Similarly, the Final Contracting Officer's Decision seeks to justify the failure of the IHS to pay the Tribe's CSC requirement by stating that "the Alaska Area IHS did not have any new funds to award for the IDC rate change." As a result, the Tribe suffered a CSC funding shortfall of $126,439 in both FY 1996 and FY 1997.

Although not clearly stated, the IHS's position that no funds were available was apparently based upon its process for determining available funds for CSC under ISDM 92-2, through which the IHS generally only increases its allocation of funds for CSC if the Conference Committee recommends such an increase in report language. Thus, although Congress increased the IHS' budgets for FY 1996 and FY 1997 by tens

---

[6]       The AFA provides that ISDM No. 92-2 shall apply if no revisions of this memorandum is in effect by October 1, 1995, which was the case.

of millions of dollars in non-earmarked funds each year, the position of the IHS seems to be that these and other non-mandatory funds were not "available" for CSC.

Positions of the Parties

The Government argues that even if it accepts the <u>Thompson</u> decision, IHS is entitled to summary judgment because the funding provisions of the ISDA are not self-executing but require annual funding agreements to identify the programs, services, functions, and activities to be performed or administered, the funds to be provided, the general budget category assigned, the time and method of payment, and any other provisions to which the parties agree. Appellant agrees that how the Board rules depends upon interpretation of the relevant provisions in Appellant's AFA's for FY's 1996 and 1997, and IHS's policies ISDM 92-2 and IHS Circular 96-04.

At the time Seldovia's FY 1996 AFA was entered into, IHS was in the process of revising ISDM 92-2, so the AFA provided as follows:

> <u>The parties have not agreed on the amounts to be paid or the method and process for calculation and payment of contract support costs under the AFA.</u> The IHS has proposed a new policy, which will be the successor to ISDM 92-2. This proposal is currently being circulated for tribal comment. It is anticipated that a new policy will be adopted by the IHS Director on or before October 1, 1995. <u>It is the position of the IHS</u> that any payment of or calculation of contract support costs shall be made in accordance with the new IHS policy referred to herein, except that if such a new policy is not in effect by October 1, 1995, contract support negotiations shall be based on ISDM 92-2  (emphasis added).

IHS's Circular 96-04, the successor policy to ISDM 92-2, was not issued until April 1, 1996. Thus, the Government asserts that Appellant's FY 1996 AFA was governed by ISDM 92-2, and that the amount of CSC paid for that year was in accordance with this policy. According to IHS, the only question before the Board is whether IHS met its obligations under ISDM 92-2, which it argues it did.

Seldovia requested an amendment to its 1996 AFA on January 24, 1996, approximately four months into the term of the FY 1996 AFA, because it had negotiated a new indirect cost rate with HHS's Office of Cost Allocation. IHS applied the new cost rate in determining the CSC payments the Tribe was entitled to but

10

allegedly could not pay the entire amount because of its shortfall in appropriations. Although the Tribe subsequently sought the full amount to which it was otherwise entitled, IHS maintains that Seldovia was bound by the funding scheme it had agreed to in its AFA, which limited total CSC payments to the amounts recommended by the Appropriations Committee despite an increase in the total ISDA appropriation.  But Appellant cites <u>MAPCO Alaska Petroleum, Inc., v. United States</u>, 27 Fed. Cl. 405 (1992), for the proposition that the Government cannot contractually force the Tribe to accept less than full CSC's when the Tribe is entitled to full CSC's by law.  It also asserts that the Government cannot lawfully benefit from a contract provision contrary to law, citing <u>Beta Systems, Inc., v. United States</u>, 838 F.2d at 1185.  We agree.

IHS also renews in this Appeal its argument that Sec. 314 in the Omnibus Consolidated and Emergency Supplemental Appropriations Act for FY 1999, Pub. L. 105-277, restated the Congress's intention that the obligation to fund contract support costs is limited to the amount specifically appropriated for that purpose each year.  Sec. 314 states in part:

> Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service by Public Laws 103-138, 103-332, 104-134, 104-208 and 105-83 for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes.

By contrast, Appellant's position is that (1) IHS had a mandatory obligation to fully fund the Tribe's CSC requirement to the extent that funds were legally available, and (2) adequate funds were legally available in both FY 1996 and FY 1997 to fully fund the Tribe's CSC requirement.  Appellant also disputes IHS' contention that it was bound by the wording of its AFA to accept a lesser amount, noting that the 1996 AFA specifically stated that Seldovia would receive CSC payments "as defined in section 106(a)(2) and (3)" of the Act (i.e., 25 U.S.C. sec. 450j-1(a)(2) and (3).  According to Appellant:

> This mandatory contract language obligated the IHS to pay the Tribe's contract support requirement to the extent that funds were available in FY 1996 and FY 1997.  Since more than adequate funds were available in those years, the

contract and statute required the IHS to pay 100 percent of the Tribe's contract support requirement. Because the IHS failed to do so, it breached its contract with the Tribe and the Tribe is entitled to a judgment for damages.

The Board is unable to conclude that the Tribe ever agreed in the FY 1996 AFA that the policies set forth in ISDM 92-2 were controlling. If anything, the relevant language indicates a lack of agreement by the parties as to the amounts to be funded and the method of funding.

As for Sec. 314, Appellant contends that IHS' position that it "extinguishes" the Tribe's claims for more contract support costs must mean that the Tribe previously had a valid claim. It further argues that giving Sec. 314 retroactive effect would be inconsistent with the plain language of that provision and in clear violation of the three-part test for retroactivity enunciated in Madrid v. Gomez, 150 F. 3d 1030 (9th Cir. 1998), citing Landgraph v. USI Film Products, 511 U.S. 244 (1994). The tests are (1) whether Congress has expressly prescribed the statute's proper reach: a statute can operate retroactively only with a clear statement to that effect; (2) whether the statute is retroactive under the ordinary rules of statutory construction, including its legislative history; but (3) if neither of the previous steps sheds light on the scope of the statute, then the court must apply the judicial default rule that statutes are not to be applied so as to create a "retroactive effect."

Appellant asserts that the terms of Sec. 314 are on their face prospective ("are the total amounts available" and "may use"). It cites the language of Landgraph that: "The largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." 511 U.S. 244 at 271. The Landgraph court adds a footnote as follows:

> While the great majority of our decisions relying upon the antiretroactivity presumption have involved intervening statute burdening private parties, we have applied the presumption in cases involving new monetary obligations that fell only on the government [Ibid., case citations omitted].

However, we need not discuss the effect of Sec. 314 at greater length because the Board's position on that issue has already been made clear in Cherokee and been

affirmed by the Federal Circuit in <u>Thompson</u>.  Briefly, as Appellant urges, we did not find it contains the necessary requisites for retroactive application.  Thus, Section 314 does not preclude summary judgment for Appellant.

<u>Decision</u>

Having thoroughly reviewed the parties' voluminous submissions in this matter, we find that this Appeal has no significant differences from <u>Cherokee</u>, and that the precedent in <u>Thompson</u> is controlling.

Accordingly, we grant Appellant's Motion for Summary Judgment and hold that, in the circumstances of this case, (1) the Tribe's mandatory and agreed-upon contract support costs should have been fully funded out of IHS's more than adequate lump-sum appropriations for the years in question, rather than being limited to amounts informally recommended by the Appropriations Committee; (2) IHS had an obligation to reprogram funds, if necessary, to fulfill that statutory obligation; and (3) Seldovia is entitled to an additional $252,878 in CSC to cover IHS's underpayment in FY's 1996 and 1997, together with interest calculated in accordance with the Contract Disputes Act.   The Government's motions are hereby denied.

Bernard V. Parrette
Administrative Judge

I concur:

Candida S. Steel
Chief Administrative Judge

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF ZUNI, on behalf of itself         )
and all others similarly situated,          )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )     Case No. CIV 01-1046 LH/LEG
                                            )
UNITED STATES OF AMERICA;                   )
TOMMY THOMPSON, Secretary of the            )
United States Department of Health and      )
Human Services; and                         )
MICHAEL H. TRUJILLO, Director of the        )
Indian Health Service, United States        )
Department of Health and Human Services,    )
                                            )
            Defendants.                     )
_____ )

## FIRST AMENDED COMPLAINT

Plaintiff, for itself and all other members of the class described below,

complains and alleges as follows:

## I.
## INTRODUCTION

1. This class action for money damages is brought under the Indian Self-

Determination and Education Assistance Act of 1975 (ISDA), as amended, 25 U.S.C.

§ 450 *et seq.* and the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* (CDA).  During the

period covered by this First Amended Complaint the ISDA required the defendants

through the Indian Health Service, to enter into certain annual contracts with the plaintiff and other Indian Tribes represented by the class, and further required that the contract price include "contract support costs." Despite the command of the ISDA, the defendants (1) failed to properly calculate the Tribes' "contract support cost" requirements, (2) failed to pay the properly calculated amounts required to be paid, and (3) failed to fully pay even the Tribes' undercalculated "contract support cost" requirements. This class action is brought to recover money damages for defendants' failure to pay the plaintiff and the class the full contract support costs required to be paid: (1) under the ISDA and (2) under contracts between the Indian Health Service and the plaintiff entered into pursuant to the ISDA.

The damages claims asserted herein arise out of the defendants' breach of the plaintiff's and the class's statutory rights under the ISDA, and the defendants breach of the plaintiff's and the class's contractual rights under their annual contracts. The period covered by the First Amended Complaint is federal fiscal years 1993 to the present.

## II.
## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 25 U.S.C. § 450m-1 (actions or claims for money damages arising under contracts authorized by the ISDA), 28 U.S.C. § 1362 (actions brought by Indian Tribes) and 28 U.S.C. § 1331 (actions arising under

federal law).

3.  Venue in this civil action against officers and employees of the United

States acting in their official capacity is proper in this District under 28 U.S.C. § 1391(e)

because the plaintiff resides in this District.

## III.
## PARTIES

4.  Plaintiff Pueblo of Zuni is a federally recognized Indian Tribe with tribal

headquarters situated in Zuni, New Mexico.  Pursuant to the terms of the ISDA, the

Pueblo of Zuni has at all times relevant to this First Amended Complaint operated tribal

health programs under various self-determination contracts and annual funding

agreements entered into with the Indian Health Service.

5.  Defendant United States is sued because the claims asserted herein

involve statutory and contractual obligations of the United States and seek damages

against the United States for breach of those obligations.  Defendant Tommy Thompson

is the Secretary of the United States Department of Health and Human Services (DHHS).

Under the Indian Self-Determination Act, Congress has imposed upon the Secretary

various statutory and contractual obligations that are the subject of this action.  Defendant

Michael H. Trujillo is the Director of the Indian Health Service, the Department's agency

that exercises primary responsibility for administering the United States' trust programs

serving Indian Tribes.  The Secretary has delegated most of his responsibilities under the

Indian Self-Determination Act to the Director.  Secretary Thompson and Director Trujillo

are officers or employees of the United States, and they are sued here in their official

capacities and collectively referred to herein interchangeably as "the Secretary" or "IHS."

**IV.**
**GENERAL ALLEGATIONS**

**The Indian Self-Determination Act**

6.  Pursuant to the ISDA, IHS enters into "self-determination contracts,"

"self-governance compacts," and annual funding agreements (also referred to collectively

herein as "ISDA contracts") with tribes and tribal organizations.  Self-determination

contracts are entered into by the parties thereto under the authority of Title I of the ISDA,

Pub. L. 93-638, as amended, 25 U.S.C. § 450 *et seq.* (hereinafter referred to as "Title I").

Self-governance compacts have been entered into by the parties thereto either under the

authority of Title III of the ISDA, Pub. L. 101-472, as amended, reproduced at 25

U.S.C.A. § 450f note (2000 Supp.) (hereafter "Title III"), or since August 2000 under

Title V of the ISDA, 25 U.S.C. § 458aaa *et seq.*  A self-determination contract, a self-

governance compact or an annual funding agreement is a binding contractual agreement

between the Government and an Indian Tribe under which the Tribe undertakes the daily

administration of one or more designated federal programs serving the Tribe, such as an

IHS hospital, an IHS clinic or an IHS community health program.  Each year IHS enters

into hundreds of ISDA contracts.  The same Act also applies to the Bureau of Indian

4

Affairs (BIA).

7. The ISDA requires that the contract price of any ISDA contract shall include an amount "not less than the appropriate Secretary would have otherwise provided for the operation of the program or portions thereof for the period covered by the contract. . . ." 25 U.S.C. § 450j-1(a)(1). *See also* 25 U.S.C. § 458aaa-7(c) (requiring Secretary to pay amounts specified in 25 U.S.C. § 450j-1(a)(1)-(5); Title III, § 303(a)(6). This amount is commonly referred to as the "Secretarial amount."

8. This "Secretarial amount," however, does not reflect the full cost of administering the contracted IHS programs. This is partly so because many of the administrative resources drawn upon by IHS in support of its operations are located in entirely different departments or agencies of the federal government. These include various functions carried out by the Office of Personnel Management, the Merit Systems Protection Board, the General Services Administration, the General Accounting Office, the various Inspectors General, the Treasury Department, and various other DHHS agencies. This is also partly so because applicable law or prudent management impose upon Tribes administering ISDA contracts certain requirements not borne by IHS in its administration of its own operations (such as the duty to complete annual audits under the Single Agency Audit Act, 31 U.S.C. § 7501, *et seq.*, and the need to carry certain forms of insurance).

9. Tribes with ISDA contracts also incur more costs than the Secretary

because the agencies historically imposed upon Tribes additional overhead burdens "more stringent than the requirements that are imposed on the Federal agencies themselves," S. Rep. No. 100-274 at 9 (1987), such as requirements for program reporting.

10.  Due to the facts noted in paragraphs 8-9 of this First Amended Complaint, without additional funding a Tribe administering an ISDA contract cannot deliver the same level of services to IHS beneficiaries that IHS could deliver when operating the same program that is the subject of the ISDA contract.  Absent additional funding, such Tribes are compelled to divert federal program funds to pay for these administrative functions, effectively penalizing the beneficiaries of a Tribe that operates an IHS program under an ISDA contract.  *See* United States General Accounting Office, REPORT TO CONGRESSIONAL COMMITTEES: INDIAN SELF-DETERMINATION ACT, SHORTFALLS IN INDIAN CONTRACT SUPPORT COST NEED TO BE ADDRESSED at 40 (June 1999).

11.  Most of the additional costs incurred by Tribes under the ISDA are known as "indirect costs."  Historically, neither the Indian Health Service nor the Bureau of Indian Affairs has fully paid all tribal indirect cost requirements associated with ISDA contracts.  Congress recognized the difficulties caused by the underfunding of contract support costs in 1988 and amended the ISDA that year to address these problems.  In doing so the Senate Committee on Indian Affairs declared that:

> Full funding of tribal indirect costs associated with self-
> determination contracts is essential if the federal policy of
> Indian Self-Determination is to succeed.

S. Rep. No. 100-274 (1987), at 13.  It observed that:

> [T]he single most serious problem with implementation of the
> Indian self-determination policy has been the failure of the
> Bureau of Indian Affairs and the Indian Health Service to
> provide funding for the indirect costs associated with self-
> determination contracts.

*Id*. at 8.  To address this problem, Congress added to the Act detailed provisions requiring

that contracts include a carefully defined amount for "contract support costs" over and

above the "Secretarial amount."

**Contract Support Costs.**

12.  In addition to the Secretarial amount, and to address the matters noted

in paragraphs 8-11 of this First Amended Complaint, the ISDA requires that the contract

price include "contract support costs." The ISDA directs that:

> There shall be added to the amount required by paragraph
> (1) contract support costs which shall consist of an amount for
> the reasonable costs for activities which must be carried on by
> a tribal organization as a contractor to ensure compliance with
> the terms of the contract and prudent management, but which
> –
>
> (A)  normally are not carried on by the respective
> Secretary in his direct operation of the program; or
>
> (B)  are provided by the Secretary in support of the
> contracted program from resources other than those under
> contract.

7

25 U.S.C. § 450j-1(a)(2). The ISDA directs that contract support costs "shall be added" to the Secretarial amount as part of the contract price. *Id.* The ISDA further provides that:

> The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of –
>
>> (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and
>>
>> (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under [25 U.S.C. § 450j-1(a)(1)].

25 U.S.C. § 450j-1(a)(3)(A). The ISDA further requires that:

> During the initial year that a self-determination contract is in effect, the amount required to be paid under [25 U.S.C. § 450j-1(a)(2)] shall include startup costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary –
>
>> (A) to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and
>>
>> (B) to ensure compliance with the terms of the contract and prudent management.

25 U.S.C. § 450j-1(a)(5).

13.   The ISDA provides that a contractor's right to full contract support costs as part of the contract price is a statutory right:

> Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [25 U.S.C. § 450j-1(a)], subject to adjustments for each subsequent year that such tribe or tribal organization administers a Federal program, function, service, or activity under such contract.

25 U.S.C. § 450j-1(g).

14.   Contract support cost needs are specified in Section 106(a)(2) and are defined in Section 106(a)(3) of the ISDA.  25 U.S.C. § 450j-1(a)(2), (a)(3).  They are also further defined in various IHS circulars describing how such costs are calculated, including ISDM 94-02, IHS Circular 96-04, IHS Circular 2000-01, and IHS Circular 2001-05.

15.   The Indian Self-Determination Act Amendments of 1994, Pub. L. 103-413, amended the ISDA to require that "[e]ach self-determination contract entered into under [the ISDA] shall – (1) contain, or incorporate by reference, the provisions of the model agreement described in subsection (c). . . ." 25 U.S.C. § 450*l*(a).  The terms of the model agreement, set forth in 25 U.S.C. § 450*l*(c), are commonly known as "the model contract."  These terms were incorporated into all of the Pueblo of Zuni's self-determination contracts that are the subject of this action.

9

16. Section 1(b)(4) of the model contract, set forth at 25 U.S.C. § 450*l*(c),
restates in contractual terms the statutory right of all self-determination contractors to the
full "contract support costs" specified in 25 U.S.C. § 450j-1(a):

> Subject to the availability of appropriations, the Secretary
> shall make available to the Contractor the total amount
> specified in the annual funding agreement incorporated by
> reference in subsection (f)(2). Such amount shall not be less
> than the applicable amount determined pursuant to section
> 106(a) of the Indian Self-Determination and Education
> Assistance Act (25 U.S.C. 450j-1).

### IHS Calculation of Contract Support Cost Requirements

17. From fiscal years 1993 to the present, IHS has calculated the contract
support cost requirements of tribes and tribal organizations contracting under Title I or
compacting under Titles III or V under several successive sets of agency guidelines
known as Indian Self-Determination Memorandum (ISDM) 92-2, and IHS Circulars
96-04, 2001-01 and 2001-05. These guidelines provide agency personnel with
"instructional guidance on determining amounts of required contract support costs," and
they "detail[ ] procedures for calculating CSC requirements." *See* IHS Circular 2001-05
at 1.

### Indirect Contract Support Costs

18. Contract support costs are comprised of "indirect costs" and "direct"
contract support costs. *See, e.g.*, IHS Circular 96-04, at 2, 5-8. Indirect costs, on average
comprise 80% of the total contract support cost requirements calculated by IHS. *See*,

*e.g.*, President's Budget Request Fiscal Year 1997, Indian Health Service Justification of

Estimates for Appropriations Committees at IHS-80 (1996).

19.  Most tribes and tribal organizations carrying out ISDA contracts

negotiate an annual "indirect cost rate" with the Tribe's "cognizant agency," which is the

Department of the Interior's Office of Inspector General for "virtually all" ISDA

contracts.  President's Budget Request Fiscal Year 1999, Indian Health Service

Justification of Estimates for Appropriations Committees, at IHS-118).  With rare

exception these negotiations occur under OMB Circular A-87.  IHS then calculates each

Tribe or tribal organizations' annual indirect contract support cost requirement associated

with an IHS ISDA contract by multiplying the contractor's indirect cost rate by the

Secretarial amount included in the contract (subject to appropriate adjustments reflected

in the indirect cost rate agreement).

20.  IHS's reliance on the unadjusted indirect cost rate negotiated with the

Department of the Interior's Office of Inspector General, or on any other unadjusted

indirect cost rate issued by any other cognizant federal agency of a tribal contractor,

understates the full indirect cost requirement Congress directed the Secretary to pay in the

ISDA.  In 1997 the Tenth Circuit held that reliance by the federal government on such

rates to calculate indirect contract support cost requirements, without further adjustment

to account for agencies that by law pay no indirect costs (or pay less than the full amount

dictated by such unadjusted rate), is contrary to the ISDA's command that:

> Nothing in this subsection shall be construed to authorize the
> Secretary to fund less than the full amount of need for indirect
> costs associated with a self-determination contract.

*Id*. *See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997). The IHS has at

all times relevant to this First Amended Complaint engaged in the same practice in

calculating ISDA indirect contract support cost requirements as was struck down by the

Tenth Circuit in *Ramah*.

### Direct Contract Support Costs

21. "Direct" contract support costs, unlike "indirect costs," are contract

support costs which are directly and readily attributable to a single IHS ISDA contracted

program (or group of such programs). Direct contract support costs include the additional

"direct program expenses for the operation of the Federal program that is the subject of

the contract," 25 U.S.C. § 450j-1(a)(3)(A)(i), and may include such costs as workers'

compensation payments, unemployment taxes, and insurance. IHS calculates direct

contract support cost requirements under the IHS guidelines identified in paragraph 17 of

this First Amended Complaint.

### General Shortfalls in IHS Contract Support Cost Payments

22. The defendants have during the 1990s and through fiscal year 2001:

(a) undercalculated, and thus failed to fully pay, all tribal indirect

contract support cost requirements associated with tribal ISDA contracts, by employing

an erroneous and illegal methodology for calculating such requirements (as described in

Paragraph 20 of this First Amended Complaint);

      (b)  failed to fully pay most tribal contractors' undercalculated

contract support cost requirements associated with both "ongoing" contracts and "new or

expanded" contracts.

    23.  Throughout the 1990s IHS generally told Tribes that they had no right

to additional contract support costs over and above those sums that IHS actually paid in a

given year.

    24.  At no time during the period FY 1993 to the present has the President

ever requested from Congress the full amount of the contract support cost requirements

associated with all tribal contracts between Tribes and the Indian Health Service.  At no

time during the period FY 1993 to the present has the Secretary reported to Congress the

full contract support cost requirement associated with all tribal contracts.  The Secretary's

failure was contrary to the directive set forth in 25 U.S.C. § 450j-1(c) of the ISDA.

**The Lump-Sum Years.**

    25.  During the period FY 1993 through FY 1997, Congress funded IHS

through a lump-sum appropriation that was legally available to carry out the ISDA,

including to pay contract support costs.  In each such year, an expenditure out of the

lump-sum appropriation to pay full contract support costs associated with ISDA contracts

in effect that year was within the purpose of the appropriation, the amount of the

appropriation and the timing of the appropriation's availability.  IHS, in fact, used a

portion of each such year's appropriations to pay such costs.  At no time covering the

period FY 1993 through FY 1997 did any appropriations Act of Congress limit the

amount IHS could spend for contract support cost purposes.  *E.g.*, Omnibus Consolidated

Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321-189

(1996); Omnibus Consolidated Appropriations Act for FY 1997.  Although throughout

this period various Congressional appropriations committees recommended that IHS

spend various amounts of its lump-sum appropriations for contract support cost purposes;

*see*, *e.g.*, H.R. Rep. No. 104-173 at 97 (1995); at 3; *see also* S. Rep. No. 104-125, at 94

(1995), at 4; S. Rep. No. 104-319 at 90 (1996), at 3; *see also* H.R. Rep. No. 104-625

(1996); none of these recommendations was ever enacted into law.  None of these

recommendations constituted an earmark or cap on the amount of appropriations legally

available in the covered year to pay contract support costs.  Throughout this period, IHS

lump-sum appropriations were legally available to pay in full all contract support cost

requirements associated with tribal contracts.

      26.  "Availability," a term of art in appropriations law, refers to the legality

of an agency's expenditure of its appropriated funds.  *See* I U.S. General Accounting

Office, Office of the General Counsel, *Principles of Federal Appropriations Law* 2-4

(1991), (explaining that the statement "whether appropriated funds are or are not 'legally

available' for a given obligation or expenditure . . . is simply another way of saying that a given item is or is not a legal expenditure").

27. In fiscal years 1993 through 1997 the Secretary had ample lump-sum appropriations from which to pay the Tribes their contract support cost entitlements. And if appropriated funds were legally "available" to pay the Tribes their contract support cost requirements, the Secretary had no delegated authority or discretion under the ISDA to refuse payment on ISDA contracts.

28. The last, unnumbered sentence of 25 U.S.C. § 450j-1(b) (hereinafter the "§ 106(b) availability clause") provides as follows:

> Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

The § 106(b) availability clause specifically limits the Secretary's authority to disburse funds to those funds that are legally available to pay amounts specified in ISDA contracts and required to be paid under the ISDA.

29. At the close of each of fiscal years 1993 through 1997 IHS had multi-million dollar unobligated balances and multi-million dollar obligated but unliquidated balances. This was still the case during FY 1997 for each of these fiscal years. During FY 1997 IHS shared with the IHS Contract Support Cost Work Group a document

entitled "'Procedures for Allocating Prior Year Unobligated Balances to Satisfy CSC Shortfalls." In this document IHS outlined the procedures by which such balances could be applied to pay prior year contract support shortfalls. IHS subsequently declined to carry out these procedures.

30. In allocating contract support costs during the period FY1993 through FY1997, IHS considered two separate categories of tribal contracts: (a) "ongoing" (also called "existing") contracts, and (b) "new or expanded" (also called "initial or expanded") contracts.

(a)     "Ongoing" (or "existing") contracts were contracts that a tribe had been operating in a previous year. For example, if a tribe was operating an IHS clinic and had been receiving its IHS funding (including contract support costs) since 1990, IHS deemed that contract in 1996 an "ongoing" contract.

(b)     "New or expanded" contracts addressed IHS programs that were never operated by a tribe in prior years. For instance, if a tribe previously had nothing to do with running an IHS clinic, but submitted a contract to run the clinic for the first time in 1996, IHS deemed that contract a "new" (or "initial") contract in 1996. Likewise, if a tribe had run some IHS medical programs in the clinic since 1990, and submitted a contract modification for 1996 to also run, for the first time, an IHS dental program, IHS deemed the dental portion of the contract an "expanded" contract in 1996.

16

31.  Despite the legal availability of its entire lump-sum appropriations in the period FY1993 through FY1997 to pay tribal contract support costs, during that period IHS each year limited contract support cost payments to "ongoing" contracts and to "new or expanded" contracts, though in different ways.  IHS did so even though Congress did not earmark or cap the amounts IHS could pay for such costs.

(a)    During the period FY1993 through FY1997, IHS annually limited its total contract support cost payments to "ongoing" contracts to the total amount recommended in appropriations committee reports for that purpose.  In each of fiscal years 1993 through 1997, IHS failed to pay scores of tribal contractors tens of millions of dollars in their full contract support cost requirements (even as miscalculated by IHS, *see* paragraph 20 of this First Amended Complaint).

(b)    Congress established the "Indian Self-Determination Fund" (hereafter "ISD Fund") in each of fiscal years 1993 through 1997 to pay "the transitional costs of initial or expanded" tribal ISDA contracts.  *E.g.*, Pub. L. 104-208, 110 Stat. 3009, 3009-213 (1996).  The only effect of the designation of the ISD Fund was to authorize IHS to spend the Fund over the course of two or more fiscal years; it did not limit the total amount IHS could spend for contract support costs associated with new or expanded ISDA contracts.  Nonetheless, during the period FY1993 through FY1997, IHS, in general, only used the ISD Fund to pay contract support costs associated with "new or expanded" contracts.  IHS distributed the ISD Fund among "new or expanded" contracts

17

on a first come-first served basis. To do this IHS used its "ISD Queue" or "Priority List," which collected and then ranked tribally-contracted IHS programs by the year in which a tribe first contracted to carry out the program. IHS distributed the ISD Fund to pay that year's contract support costs associated with contracts at the top of the Queue, continuing down until IHS exhausted the ISD Fund. IHS then removed those contracts from the Queue and advanced the rest. In any given year a tribe operating a contracted IHS program listed on the Queue would be paid contract support costs associated with that contract only if the contract advanced high enough to be covered by that year's ISD Fund. If not, that year the tribe got nothing in connection with such costs. IHS Circular 96-04, at 10-11; ISDM 92-2, at 5. In each of fiscal years 1993 through 1997, IHS failed to pay scores of tribal contractors tens of millions of dollars in their full contract support cost requirements (even as miscalculated by IHS, *see* paragraph 20 of this First Amended Complaint) associated with their contracts listed on the IHS "Queue."

32. Up through FY1997, Congress never capped the amount of funds that were legally available to IHS to pay contract support costs for "ongoing" tribal contracts or for "new or expanded" tribal contracts. In other litigation the defendants in this Action have conceded the preceding sentence.

33. In 1998 the House Appropriations Committee criticized the "basic 'fairness'" of IHS's system for paying contract support costs to tribal contractors. *See*

18

H.R. Rep. 105-609, at 126 (1998). Beginning in FY1999, IHS abandoned the "Queue"

Policy described in Paragraph 30(b) of this First Amended Complaint.

     34. The defendants' actions in funding less than the full contract support

cost requirements of tribal contractors over a period of many years is documented in

(1) the 1999 report of the General Accounting Office identified in paragraph 10 of this

First Amended Complaint; (2) IHS annual contract support cost shortfall reports prepared

pursuant to section 106(c) of the ISDA (25 U.S.C. 450j-1(c)) but never forwarded to

Congress as required by the ISDA; (3) IHS's budget justifications submitted to Congress

as part of the President's annual budget request; (4) various additional reports prepared by

IHS including special reports requested by committees of Congress; and (5) individual

documentation IHS annually provides to tribal contractors stating each tribal contractor's

calculated annual contract support cost requirements and each tribal contractor's annual

payment.

     35. The IHS annual contract support cost shortfall report is an annual report

prepared each spring. In this annual report, IHS summarizes how much IHS has

calculated as each Tribe's requirement to meet its full contract support cost requirements

in the prior year, how much IHS paid against that requirement, and the resulting shortfall,

if any. In this report IHS also summarizes the full contract support cost requirement IHS

has calculated for each Tribe in the current year, the amounts it has paid or expects to pay

in the current year against those needs, and the shortfall (if any) it expects in the current

year.  Further, the annual contract support shortfall report projects any similar shortfall

IHS anticipates in the next fiscal year.

   36.  The IHS shortfall reports compiled each year are prepared by each of

the twelve IHS Area Offices individually for each Tribe situated within each Area Office.

The IHS Area Offices then forward their determinations of final contract support cost

requirements to the IHS Headquarters, where the information is reviewed and compiled

by the Office of Tribal Self-Governance, the Office of Tribal Programs, the Office of

Management Support and the Division of Financial Management.  The purpose of these

reports is to meet the Secretary's duty under Section 106(c) of the ISDA to furnish to

Congress an annual accounting of the full contract support cost requirements of

contracting Tribes, as determined by IHS, and to provide an accounting of the amount of

contract support cost funds that were paid according to IHS in that year.  25 U.S.C. §

450j-1(a)(1).  In preparing each report IHS (either centrally or through its various Area

Offices) calculates on an individual contract basis the amount of contract support costs

required to fully fund tribal contract support cost requirements in the covered year,

according to the instructions set forth in IHS's circulars regarding contract support costs.

Each IHS shortfall report is accompanied by detailed appendices which include tribal-

specific information relevant to the determination of contract support cost requirements

for every tribal contractor in the United States.

37.  In each of fiscal years 1993 through 1997 IHS determined the total amount it would make available for contract support cost payments that year shortly after the enactment of each year's annual appropriation for IHS.  At no time contemporaneous with these determinations did IHS ever undertake a detailed analysis of the balance of its appropriation for purposes of determining how much in additional contract support cost funding could be paid to tribes with ISDA contracts that year.

### The "Cap" or Earmark Years.

38.  In each of fiscal years 1998 to the present Congress has limited the availability of appropriations IHS may spend to pay contract support costs due on ISDA contracts, by limiting such payments in the relevant appropriations acts to "not to exceed" a certain sum.  The sums so appropriated have been insufficient to meet the full contract support cost requirements of all tribal ISDA contractors even at the understated amounts IHS calculated as specified in paragraph 20 of this First Amended Complaint.

39.  The insufficient appropriations made to IHS to pay contract support costs in fiscal years 1998 to the present do not limit or excuse the federal government's continuing liability for the full contract price specified in the ISDA and in the plaintiff's contracts and funding agreements.  The ISDA's § 106(b) availability clause limits the Secretary's ability to liquidate and pay the government's contractual and statutory obligations under the ISDA, but it does not limit the United States's liability for the contract price specified in the ISDA and in the plaintiff's contracts.

40.  Even in years when sufficient appropriations were not available to the Secretary to pay all contracted amounts for contract support costs, the United States remained liable for the full amount specified in the ISDA and the ISDA contracts.  The ISDA requires the Secretary to enter into binding contracts in advance of appropriations acts for specified amounts, including amounts for contract support costs.  The duty and authority of the Secretary to enter into ISDA contracts is not limited to available appropriations.

41.  Under the ISDA, a tribal contractor has a contractual right to a specific amount of contract support costs as part of the contract price.  Both the Secretary's authority, and his mandatory duty, to award a tribal contract at this price, including full contract support costs, is not conditional on the availability of appropriations.  While an insufficiency of appropriations to IHS may excuse IHS from providing full contract support cost payments on tribal contracts, it does not eliminate the obligation of the United States for the full contract price.

42.  The mandatory funding provisions of § 450j-1(a), by providing the Secretary with legislative authorization to create obligations in advance of an appropriation, create what is referred to in the jargon of federal appropriations law as "contract authority."  Failure by Congress to appropriate sufficient funds to meet those obligations does not limit the United States's liability to pay the specified amount of the obligation.  The ISDA unconditionally mandates that the full amount of funding for

22

contract support costs must be added to the contract as a part of the contract price and specifically requires the Secretary to bind the United States to that amount through contract.

43. This action seeks an award of money damages arising out of the defendants' failure to pay full contract support costs. This action does not seek specific performance, and it does not seek the payment of contract support costs not previously paid. The court's authority to award "money damages" under 25 U.S.C. § 450m-1 of the ISDA is independent of the continuing availability (or lack thereof) of older appropriations to pay additional contract support costs. Money damages will be awarded from the Permanent Judgment Fund created by 31 U.S.C. § 1304. The Fund is not controlled by IHS and it is not dependent on appropriations to IHS. Rather, the Fund establishes a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlement may order payments without being constrained by concerns of whether adequate funds exist at the agency level to satisfy any judgment.

44. IHS has no authority to pay a judgment entered in this case. Such damages may by law only be paid from the Judgment Fund.

## V.
## SPECIFIC FACTS CONCERNING THE PUEBLO OF ZUNI

45. The Zuni Reservation encompasses about 450,000 acres, located in the

west-central part of New Mexico.  The Pueblo of Zuni is one of the largest and most

remote of the nineteen New Mexico Indian Pueblos.  The Village of Zuni contains the

Pueblo's population center and is the site of all governmental, educational, health and

social service organizations.  Veronica E. Velarde Tiller, *Tiller's Guide to Indian Country*

at 470 (1996) (*Tiller's Guide*).

46.  The Pueblo of Zuni's principal town was founded in about 1350 and its

Reservation was established by Executive Order in 1877.  Additional lands were added to

the Reservation in 1917, 1935, and 1949.  The Pueblo adopted a Constitution under

section 16 of the Indian Reorganization Act, 25 U.S.C. § 476.  The governing body of the

Pueblo of Zuni is the Tribal Council, made-up of the Governor, the Lieutenant Governor,

and Six Tribal Council members, all of whom are elected to four-year terms.  *Tiller's*

*Guide*.

47.  The Pueblo of Zuni currently employs 504 people, including 54

individuals in positions serving the health program.

48.  Since before 1993, the Pueblo of Zuni has operated various federal IHS

programs benefitting the Zuni people, through self-determination contracts authorized

under Title I of the ISDA.  The contracted programs have been operated for the benefit of

the approximately 10,000 members of the Pueblo, most of whom live on the Zuni

Reservation.  At all times relevant to this First Amended Complaint, these contracted

programs included, among others: the Otitis Media (Audiology) program (Contract Nos.

24

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 and 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); the Community Health Representative program
(Contract Nos. 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 and 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); the Emergency Medical Service (EMS)
program (Contract Nos. 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); the Model Diabetes Project (Wellness Program)
(Contract Nos. 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 and 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); the Teen Health Program (Contract Nos.
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 and 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); and the Zuni Recovery Center (substance abuse services)
program (Contract Nos. 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, 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 and 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).  Since at least
FY 1995 to the present, each of these contracts has been in the form of a Model Contract
and Annual Funding Agreement.

49.  The Pueblo of Zuni's self-determination contracts and annual funding
agreements with the United States, together with the ISDA, entitled the Pueblo to all
contract support costs described in 25 U.S.C. § 450j-1(a) for the Pueblo's contracts from
fiscal years 1993 through 1998.

50.  Under the Pueblo of Zuni's self-determination contracts and annual
funding agreements for the period fiscal years 1993 through 1998; 25 U.S.C. § 450j-1(a);
and other applicable law, the Pueblo of Zuni had a contractual and legal right to be paid,
collectively, on all its ISDA contracts indirect and direct contract support costs in an
amount totaling at least $1,256,968; plus the additional sum of $339,934 (representing the
difference between the amount due for indirect costs as calculated by IHS and the amount
due for indirect contract support costs as properly calculated pursuant to the ISDA and the
Tenth Circuit's holding in the *Ramah* litigation (as described in Paragraph 20 of this First

25

Amended Complaint)); for a total amount of no less than $1,596,902. Of this amount, IHS paid no more than $932,773, leaving a total amount of unpaid contract support costs of at least $664,129.

51. By multiple letters dated April 16, 2001, as supplemented by multiple letters dated September 28, 2001 covering each annual funding agreement, the Pueblo of Zuni submitted timely claims with IHS for damages for the contract support costs not paid to the Pueblo under its various contracts and funding agreements. Each claim was filed pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq.* and 25 U.S.C. § 450m-1(c) of the ISDA. Each claim made by the Pueblo of Zuni was under $100,000. As to each claim the agency contracting officer had sixty days from receipt to issue a decision. 41 U.S.C. § 605(c)(1). As of the date of the filing of this First Amended Complaint, more than the statutory 60 days had passed since the submission of the claims, as so supplemented. Since the IHS contracting officer has to date not issued a decision on any of the claims, the claims have now been denied by operation of law. 41 U.S.C. § 605(c)(5). This First Amended Complaint is therefore timely insofar as it arises under the CDA. 41 U.S.C. § 609(a)(3); 25 U.S.C. § 450m-1(a), (c).

## VI.
## CLASS ACTION ALLEGATIONS

52. This action is brought by plaintiff as a class action, on its own behalf and on behalf of all others similarly situated, under the provisions of Rules 23(a) and

23(b)(3) of the Federal Rules of Civil Procedure for money damages and other relief as the Court deems appropriate, including costs and attorneys' fees.

53.  The class so represented by plaintiff in this action, and of which plaintiff is itself a member, consists of "all tribes and tribal organizations contracting with IHS under the ISDA between fiscal years 1993 to the present."  The class so represented, and of which plaintiff is itself a member, may, at the Court's direction, be subdivided into subclasses comprised of (1) tribal contractors whose indirect contract support cost requirements were undercalculated and thus not fully paid, as alleged in Paragraph 20 of this First Amended Complaint; (2) tribal contractors whose contract support costs associated with their "ongoing" contracts were not fully paid (even as undercalculated); and (3) tribal contractors whose contract support costs associated with their "new or expanded" contracts were not fully paid (again, even as undercalculated).

54.  According to IHS's contract support cost shortfall report covering fiscal year 1999 ("IHS 1999 Report"), 329 Tribes situated in 35 states then operated ISDA contracts for the administration of various IHS hospitals, clinics and other federal health care programs.

55.  Of these 329 tribal contractors, all 329 tribal contractors suffered shortfalls in the payment of their indirect contract support costs associated with their ISDA contracts, due to IHS's failure to properly calculate such indirect contract support cost requirements (as alleged in Paragraph 20 of this First Amended Complaint).  Further,

27

of these 329 tribal contractors, at least 296 Tribes experienced shortfalls in the payment

of their contract support cost requirements as undercalculated by IHS, including (1) at

least 142 Tribes that according to the IHS 1999 Report experienced shortfalls in contract

support costs associated with their "ongoing" contracts; (2) at least 131 Tribes that were

at the time of the IHS 1999 Report listed on the IHS Queue and that were underpaid in

FY 1999 in connection with their "new or expanded" contracts; and (3) at least 23 Tribes

that did not experience shortfalls in FY 1999 but did experience shortfalls in one or more

earlier years associated with their "new or expanded" contracts.

      56.  The class is so numerous that joinder of individual members in this

action is impracticable.

      57.  There are common questions of law and fact involved in this action that

affect the rights of each member of the class in the same way, and the relief sought is

common to the entire class.  Each ISDA contract has an identical clause regarding the

availability of appropriations.  Each class member suffered one or more contract support

cost shortfalls in the same way, for the same reason, and under the same IHS policies.

Further, each class member's claim raises the same legal issue:  whether the Indian Self-

Determination Act, and the ISDA contracts that implement the Act, required the federal

government to pay the Tribes at the time the full contract price, including the full amount

of the "shortfalls" they experienced in the designated years (including, but not limited to,

the amounts acknowledged in IHS's own reports).  The class satisfies Rule 23(a)'s

commonality requirement.

58.  The claims of the plaintiff Pueblo of Zuni, are typical of the claims of

the class in that the claims of all members of the class, including plaintiff, are based on

the same statutes, legal theories, basic contract terms, and course of conduct.  Like all

other class members, the Pueblo of Zuni's claim is that the ISDA requires the government

to calculate and pay full contract support costs associated with ISDA contracts, once a

contract is executed and performance has commenced.  The Pueblo of Zuni's claimed

injuries arise out of the same precise course of conduct and events that led to the

underpayments experienced by all other class members over the full class period.

Further, there is no antagonism among class members, for any judgment awarded for

damages (if any) will be payable from the Permanent Judgment Fund established in 31

U.S.C. § 1304, just as was the case in *Ramah v. Babbitt*, 50 F. Supp.2d 1091 (D.N.M.

1999).  The class satisfies Rule 23(a)'s typicality requirement.

59.  The named plaintiff is the representative party for the class, and is able

to, and will, fairly and adequately, protect the interests of the class.  The named plaintiff

Tribes have no antagonistic or conflicting interests with those of the class, and class

counsel is qualified, experienced and able to conduct the proposed litigation.  The

attorneys for plaintiff are experienced and capable in litigation in the field of contract

support costs under the ISDA, having *inter alia* represented, or continuing to represent,

the Tribes in *Ramah Navajo School Board & Puyallup Tribe v. Babbitt*, 87 F.3d 1338

(D.C. Cir. 1996); *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988

F. Supp. 1306 (D. Or. 1997)*, on reconsideration,* 999 F. Supp. 1395 (D. Or. 1998), on

remand, 58 F. Supp.2d 1191 (D. Or. 1999), reversed __ F.3d __ (9th Cir. Oct. 16, 2001)

(pending on rehearing petition filed Nov. 30, 2001); and *Shalala v. Cherokee Nation of*

*Oklahoma*, __ F.3d __ (Fed. Cir., Feb. 25, 2000) (unpublished order dismissing

government's appeal from a determination of liability for unpaid contract support costs).

In addition, plaintiff's counsel represents the Tribes in *Cherokee Nation of Oklahoma and*

*Shoshone-Paiute Tribes of Nevada v. United States*, No. 01-7106 (10th Cir.) (appeal

docketed June __, 2001); certain DHHS Division of Cost Allocation class members in

*Ramah Navajo Chapter v. Babbitt*, No. 90-0957 (D.N.M.); and a putative class of Tribes

contracting with the BIA that were never paid "direct" contract support costs in *Pueblo of*

*Zuni v. United States*, No. 00-365 LH/WWD (D.N.M.)  All of these cases involved or

currently involve similar legal issues pertaining to contract support costs.  Neither the

Pueblo of Zuni nor its counsel herein have any interests that might cause them not to

vigorously pursue all the claims stated herein.

        60.  This action is properly maintained as a class action inasmuch as the

questions of law and fact common to all members of the class predominate over any

questions affecting individual members.  Here, the claims stem from a common course of

conduct.  The basic claim for unpaid contract support cost is the same for all class

members: they all claim that the ISDA and their annual contracts entitled them to full

contract support cost funding.  So, too, is the government's central defense the same:  that

appropriations have allegedly not been available to fully pay all Tribes their contract

support cost needs, and that any such unavailability relieves the government of liability.

The common issues thus "dominate this litigation," and are both determinative and

dispositive.  The class satisfies rule 23(b)(3)'s "predominance" requirement.

      61.  A class action is superior to other available methods for the fair and

efficient adjudication of the controversy.  This case involves a course of conduct that was

identical with regard to all members of the class.  In addition, (1) the members of the

class do not have a strong interest in controlling the prosecution of their separate claims,

(2) there is relatively little litigation concerning the controversy already commenced by

members of the class, (3) it is desirable to concentrate this litigation in the interests of

judicial economy, and (4) the class is manageable.  If individual actions were commenced

in this Court by members of the class, the Court would ultimately be called upon to

address the precise same legal issues as are presented in this action.  The same would be

true of other individual actions commenced in other districts.  Therefore, a class action is

a superior means for the fair and efficient resolution of the controversy.

      62.  The class meets the requirements of Rule 23(b)(1).  Separate actions by

tribes and tribal organizations against the defendants asserting the claims set forth herein

(1) would create a risk of establishing incompatible standards of conduct for the

defendants, and (2) would also create a risk of individual adjudications which would, as a

practical matter, be dispositive of the interests of other tribes and tribal organizations, and

would substantially impair or impede the ability of such other tribes and tribal

organizations to protect their interests.

63.    The class meets the requirements of Rule 23(b)(2).  The defendants

have both acted and refused to act on grounds generally applicable to the class, making

appropriate final injunctive relief and declaratory relief with respect to the class as a

whole.

64.    Each class member's damages can accurately be calculated by

reviewing an extensive array of government documents, including, *inter alia*, internal IHS

shortfall reports; IHS's ISD Queue reports; IHS's comprehensive fiscal year 1999 final

determination regarding the contract support costs needs of all Tribes then remaining on

the Queue from prior years; IHS's similar comprehensive reports for fiscal years 2000

and 2001; IHS field data supporting said reports; and indirect cost data maintained, in

part, by the Department of Interior Office of Inspector General, and, in part, by the DHHS

Division of Cost Allocation.  Quantifying damages can be accomplished efficiently and

accurately in this class action, both globally for the class and individually for each class

member, given extensive existing agency data and analyses concerning annual tribal

contract support cost requirements.

32

65.   The claims asserted by the class do not include claims for the failure of the defendants to pay contract support costs for reasons specific to an individual tribe, such as (but not limited to) disagreements concerning the proper method for determining a particular tribe's contract support cost entitlements due to a dispute over particular items of cost.

### FIRST CAUSE OF ACTION
### (VIOLATION OF THE ISDA FOR UNDERCALCULATING "INDIRECT" CONTRACT SUPPORT COSTS)

66.   Plaintiff realleges paragraphs 1 through 65 as if fully set forth herein.

67.   As alleged in Paragraph 20 of this First Amended Complaint, IHS failed to adjust the indirect cost rate issued by the Department of the Interior Office of Inspector General to account for the dilution in IHS's responsibility for indirect costs under the ISDA caused by the OIG's erroneous assumption, reflected in its rate calculations, that all agencies funding the Pueblo of Zuni contribute to the Pueblo's indirect cost pool at the full OIG-determined rate.  This failure resulted in an undercalculation of the "amount" the Pueblo of Zuni was entitled to under the ISDA for contract support costs.  Specifically, in order to calculate the Pueblo of Zuni's "indirect" contract support costs, IHS used or incorporated a method, based upon OASC-10 and OMB Circular A-87, for determining indirect cost rates which in each year: (a) included funding provided by certain agencies other than IHS and the BIA in the direct cost base, resulting in (b) a lower indirect cost rate which was then (c) applied to the IHS's portion

33

of the direct cost base, resulting in (d) a determination of an IHS indirect contract support

cost requirement which was lower in amount than required by the ISDA because (e) the

agencies that were wrongfully included in the direct cost base did not fully pay, and were

known not to fully pay, supplemental indirect costs.

68.  By failing to adjust the OIG rate to properly calculate the full amount

of indirect contract support costs associated with the IHS programs operated by the

Pueblo of Zuni under the ISDA, and those programs operated by other members of the

plaintiff class under the ISDA, the defendants violated their statutory obligations to the

Pueblo of Zuni and to the plaintiff class under: 25 U.S.C. §§ 450j-1(a)(2), (3) & (5), 450j-

1(b), 450j-1(c)(2), 450j-1(d) and 450j-1(g), and other applicable federal law.

## SECOND CAUSE OF ACTION
## (BREACH OF CONTRACT FOR UNDERCALCULATING "INDIRECT" CONTRACT SUPPORT COSTS)

69.  Plaintiff realleges paragraphs 1 through 68 as if fully set forth herein.

70.  The Pueblo of Zuni entered into multiple ISDA contracts with the

United States covering FY1993 through 1998.  These ISDA contracts required the IHS to

pay the Pueblo of Zuni full indirect contract support costs associated with all IHS

programs transferred to tribal operation under those contracts.

71.  The defendants failed to meet their contractual obligations to pay all

indirect contract support costs required to be paid under the Pueblo of Zuni's ISDA

contracts for fiscal years 1993 through 1998, by failing to adjust the OIG rate to properly

34

calculate the full amount of indirect contract support costs associated with the IHS programs operated by the Pueblo of Zuni under the ISDA, and those programs operated by other members of the plaintiff class under the ISDA.

72.  The multiple failures of the defendants to pay to the Pueblo of Zuni its full indirect contract support costs by undercalculating those costs, as alleged in this First Amended Complaint, constitute multiple breaches of the Pueblo's ISDA contracts for fiscal years 1993 through 1998.

73.  The plaintiff class provided the defendants with IHS-funded services under ISDA contracts.  These agreements and the law under which they were executed required the defendants to pay the plaintiff class members their full statutory entitlements to indirect contract support costs associated with all health programs transferred to tribal operation under those contracts.  The defendants have failed to meet their contractual obligations by failing to pay all indirect contract support costs required to be paid under the plaintiff class members' contracts with IHS.  The failure of the defendants to pay the plaintiff class full contract support costs as alleged in this First Amended Complaint constitutes multiple breaches of those ISDA contracts.

### THIRD CAUSE OF ACTION
### (VIOLATION OF THE ISDA FOR FAILING TO PAY FULL CONTRACT SUPPORT COSTS ASSOCIATED WITH "ONGOING" CONTRACTS)

74.  Plaintiff realleges paragraphs 1 through 73 as if fully set forth herein.

35

75. The amount of contract support costs the ISDA required the defendants to pay included the full amount of contract support costs associated with the Pueblo of Zuni's "ongoing" contracts in FY1993 through FY1998, and the full amount of contract support costs associated with the "ongoing" contracts of all other members of the Plaintiff class. The defendants failed to fully pay these amounts. In failing to fully pay these amounts, the defendants violated their statutory obligations to the Pueblo of Zuni and to the plaintiff class under: 25 U.S.C. §§ 450j-1(a)(2), (3) & (5), 450j-1(b), 450j-1(c)(2), 450j-1(d) and 450j-1(g), and other applicable federal law.

## FOURTH CAUSE OF ACTION
## (BREACH OF CONTRACT FOR FAILING TO PAY FULL CONTRACT SUPPORT COSTS ASSOCIATED WITH "ONGOING" CONTRACTS)

76. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

77. The Pueblo of Zuni entered into multiple ISDA contracts with the United States covering FY1993 through 1998. These ISDA contracts required the IHS to pay the Pueblo of Zuni full contract support costs associated with all portions of the Pueblo's contracts, including all "ongoing" portions of those contracts.

78. The defendants failed to meet their contractual obligations to pay full contract support costs associated with the "ongoing" portions of the Pueblo of Zuni's ISDA contracts for fiscal years 1993 through 1998, and the "ongoing" portions of the contracts of other members of the class.

79. The multiple failures of the defendants to pay to the Pueblo of Zuni its full contract support costs associated with its ongoing contracts, as alleged in this First Amended Complaint, constitute multiple breaches of the Pueblo's ISDA contracts for fiscal years 1993 through 1998.

80. The plaintiff class provided the defendants with IHS-funded services under ISDA contracts. These agreements and the law under which they were executed required the defendants to pay the plaintiff class members their full statutory entitlements to contract support costs associated with all health programs transferred to tribal operation under those contracts, including the "ongoing" portions of those contracts. The defendants have failed to meet their contractual obligations by failing to pay all contract support costs associated with "ongoing" contracts required to be paid, under the plaintiff class members' contracts with IHS. The failure of the defendants to pay the plaintiff class full contract support costs as alleged in this First Amended Complaint constitutes multiple breaches of those ISDA contracts.

**FIFTH CAUSE OF ACTION**
**(VIOLATION OF THE ISDA FOR FAILING TO PAY**
**FULL CONTRACT SUPPORT COSTS ASSOCIATED WITH**
**"NEW OR EXPANDED" CONTRACTS)**

81. Plaintiff realleges paragraphs 1 through 80 as if fully set forth herein.

82. The amount of contract support costs the ISDA required the defendants to pay included the full amount of contract support costs associated with the Pueblo of

Zuni's "new or expanded" contracts in FY1993 through FY1998, and the full amount of

contract support costs associated with the "new or expanded" contracts of all other

members of the Plaintiff class.  The defendants failed to fully pay these amounts.  In

failing to fully pay these amounts, the defendants violated their statutory obligations to

the Pueblo of Zuni and to the plaintiff class under: 25 U.S.C. §§ 450j-1(a)(2), (3) & (5),

450j-1(b), 450j-1(c)(2), 450j-1(d) and 450j-1(g), and other applicable federal law.

**SIXTH CAUSE OF ACTION**
**(BREACH OF CONTRACT FOR FAILING TO PAY**
**FULL CONTRACT SUPPORT COSTS ASSOCIATED WITH**
**"NEW OR EXPANDED" CONTRACTS)**

83.  Plaintiff realleges paragraphs 1 through 82 as if fully set forth herein.

84.  The Pueblo of Zuni entered into multiple ISDA contracts with the

United States covering FY1993 through 1998.  These ISDA contracts required the IHS to

pay the Pueblo of Zuni full contract support costs associated with all portions of the

Pueblo's contracts, including all "new or expanded" portions of those contracts.

85.  The defendants failed to meet their contractual obligations to pay full

contract support costs associated with the "new or expanded" portions of the Pueblo of

Zuni's ISDA contracts for fiscal years 1993 through 1998, and the "new or expanded"

portions of the contracts of other members of the class.

86.  The multiple failures of the defendants to pay to the Pueblo of Zuni its

full contract support costs associated with its "new or expanded" contracts, as alleged in

38

this First Amended Complaint, constitute multiple breaches of the Pueblo's ISDA

contracts for fiscal years 1993 through 1998.

87.  The plaintiff class provided the defendants with IHS-funded services

under ISDA contracts.  These agreements and the law under which they were executed

required the defendants to pay the plaintiff class members their full statutory entitlements

to contract support costs associated with all health programs transferred to tribal operation

under those contracts, including the "new or expanded" portions of those contracts.  The

defendants have failed to meet their contractual obligations by failing to pay all contract

support costs associated with "new or expanded" contracts, required to be paid under the

plaintiff class members' contracts with IHS.  The failure of the defendants to pay the

plaintiff class full contract support costs as alleged in this First Amended Complaint

constitutes multiple breaches of those ISDA contracts.

## SEVENTH CAUSE OF ACTION
## (DECLARATORY JUDGMENT)

88.  Plaintiff realleges paragraphs 1 through 87 as if fully set forth herein.

89.  Section 314 of the Omnibus Consolidated and Emergency

Supplemental Appropriations Act for Fiscal Year 1999, Pub. L. 105-277 (§ 314), provides

in full:

> Notwithstanding any other provision of law, amounts
> appropriated to or earmarked in committee reports for the
> Bureau of Indian Affairs and the Indian Health Service by
> Public Laws 103-138, 103-332, 104-134, 104-208, and 105-83

39

for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes, except that, for the Bureau of Indian Affairs, tribes and tribal organizations may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants, self-governance compacts or annual funding agreements.

90.  Defendants assert that § 314 bars some or all of the claims alleged by the plaintiff in this First Amended Complaint, rendering the defendants' contractual and statutory obligations described in this First Amended Complaint void and unenforceable.

91.  Plaintiff contends that § 314 is wholly inapplicable to its rights and the rights of the Class to money damages as alleged in this First Amended Complaint. Plaintiff further contends that to the extent these enactments are directed at rendering the defendants' contractual and statutory obligations to the plaintiff and the Class void and unenforceable, they are not sovereign acts but mere actionable repudiations of vested contracts and vested statutory rights by a contracting party – the United States – which is bound to honor its contracts and just debts the same as any other contracting party.

92.  The claim of defendants that § 314 bars the plaintiff's claims and those of the Class, rendering the defendants' contractual and statutory obligations void and unenforceable, presents a matter of actual controversy between the parties.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that this Court grant the following relief for itself and all other members of the class:

1.  Monetary damages under the ISDA, 25 U.S.C. §§ 450m-1(a) and 450m-1(d) and the Contract Disputes Act, 41 U.S.C. § 601, *et seq.*, in an amount to be proven at trial.

2.  Interest under the Prompt Payment Act, 31 U.S.C. § 3901 *et seq.*, the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, and other applicable law;

3.  Costs of suit under the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable law, including full reasonable attorneys' fees and expert witness fees.

4.  A declaratory judgment that § 314 does not impair the rights of the plaintiff and of the class to money damages as alleged in this First Amended Complaint.

5.  Such other and further relief including declaratory, injunctive and

equitable relief, as the Court deems just.

DATED this 12th day of December 2001.

Attorneys for Plaintiff

SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & MIELKE


By:_____
        Lloyd Benton Miller
        David C. Mielke

I hereby certify that I mailed and faxed,
or caused to be mailed and faxed, a true
and correct copy of the foregoing document to
the following attorney of record this 12th day of
December 2001:

Rachel J. Hines, Trial Attorney
Federal Programs Branch, Civil Division
U.S. Department of Justice
Room 914
P.O. Box 883
Washington, D.C.  20044

Facsimile: 202-616-8202


_____
        David C. Mielke


F:\Docs\ZUNI\IHSCSC\Pldgs\Finals\Amend-Comp.wpd

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MENOMINEE INDIAN TRIBE**<br>**OF WISCONSIN,** | ) ) ) | |
| PLAINTIFF, | ) ) | Case No.: 1:07cv00812 |
| v. | ) ) | Hon. Rosemary M. Collyer |
| **UNITED STATES OF AMERICA,**<br>**MICHAEL O. LEAVITT**, Secretary of the<br>Department of Health & Human Services, and<br>**CHARLES W. GRIM**, Director of the<br>Indian Health Service, | ) ) ) ) ) | |
| DEFENDANTS. | ) ) | |

## ORDER DENYING
## DEFENDANTS' MOTION TO DISMISS

THIS MATTER having come before the court on Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and the court having considered the submissions of the parties and being otherwise sufficiently advised in this matter, now therefore it is

ORDERED, ADJUDGED AND DECREED, that Defendants' Motion is DENIED; and it is further

ORDERED, that Defendants answer the Plaintiff's Complaint within fourteen (14) days of the entering of this order.

Dated: _____          _____
                               Rosemary M. Collyer
                               UNITED STATES DISTRICT JUDGE