IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MENOMINEE INDIAN TRIBE          )
OF WISCONSIN,                   )
                                )
          Plaintiff,            )
                                )
          v.                    )          Case Number: 1:07cv00812
                                )
UNITED STATES OF AMERICA,       )          Hon. Rosemary M. Collyer
MICHAEL O. LEAVITT, Secretary   )
of the Department of Health and )
Human Services, and CHARLES W.  )
GRIM, Director of the Indian Health )
Service                         )
                                )
          Defendants.           )
_____ )

## REPLY MEMORANDUM IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

Plaintiff entered into contracts with the government pursuant to the Indian Self-

Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* ("ISDA"). These contracts

specified the funding levels to be paid by the government for certain costs, including indirect

Contract Support Costs ("CSC"). After performing under these contracts for many years,

Plaintiff has sued to recover additional money, arguing that the ISDA provides for payment

beyond that specified in the contracts. The ISDA, however, does not provide for *any* set amount

of money, nor does it require that any particular method be used to determine payment under

contracts. Rather, it contemplates a contract negotiation between the parties which, if

unsuccessful and resulting in a declination, can immediately be challenged in court by a

contractor.  Plaintiff negotiated the contracts at issue, and the government has fully performed under those contracts.  Therefore, Plaintiff's breach of contract claims should be dismissed.

In addition, Plaintiff's contract claims for several years are barred by applicable statutes of limitations and laches.  Plaintiff, in its Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss ("Pl.'s Mem."), argues that legal and equitable tolling should apply to its claims for 1996 through 1998.  However, in its argument in support of legal tolling, Plaintiff cites to no case that has tolled the jurisdictional administrative deadline contained in the Contract Disputes Act, 41 U.S.C. § 601 *et seq*. ("CDA").  Additionally, Plaintiff has not demonstrated that equitable tolling under *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990), could apply to the CDA; even if it could, the factors to allow equitable tolling are not present to warrant it.  Likewise, Plaintiff's claim for breach of trust fails to state a cognizable claim. Therefore, this case should be dismissed in its entirety.

In this memorandum, Defendants will address the statute of limitations, laches, and finally, arguments supporting Defendants' motion for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

## I.    THE STATUTE OF LIMITATIONS IS NOT TOLLED FOR PLAINTIFF'S CLAIMS TO FUNDS FROM CONTRACT YEARS 1996, 1997 AND 1998

Plaintiff acknowledges that the CDA, 41 U.S.C. § 605(a), requires it to present its claims to the agency's contracting officer within 6 years after the accrual of a claim.  In an effort to litigate claims that were presented to the Indian Health Services' ("IHS") contracting officer after six years of accrual, Plaintiff argues that legal and equitable tolling should apply.  In fact, neither

legal nor equitable tolling applies to Plaintiff's claims.

> **A.    Legal Tolling Is Inapplicable to the Jurisdictional Deadline for Administrative Filing Contained in the Contract Disputes Act**

Plaintiff asserts that the Rule 23 tolling principles set forth in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) and its progeny require tolling of Plaintiff's claims for 1996 through 1998.  Pl.'s Mem. at 30.  Under *American Pipe*, the commencement of a class action suspends a statute of limitations to all potential class members, until class certification is denied. *Id.* at 554; *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354 (1983).  Plaintiff alleges that two cases filed as class actions – *Cherokee Nation v. United States*, No. Civ. 99-92-S (E.D. Okla.) and *Pueblo of Zuni v. United States*, No. Civ. 01-1046 (D.N.M.) – toll Plaintiff's claims for years 1996 through 1998.  Plaintiff cannot rely on the *American Pipe* line of cases to support its request for tolling administrative presentment.

Plaintiff's claims for 1996 through 1998 must de dismissed for lack of jurisdiction because Plaintiff failed to present a timely claim to the contracting officer in accordance with the CDA's jurisdictional administrative presentment requirement.[1]  *See James M. Ellet Constr. Co. v. United States*, 93 F.3d 1537, 1542 (Fed. Cir. 1996) ("Congress granted the court jurisdiction only over an appeal from a contracting officer's decision on a valid claim."); *Pueblo of Zuni v. United States,* 467 F. Supp. 2d 1099, 1106 (D.N.M. 2006) ("exhaustion under the CDA is a mandatory requirement before federal court jurisdiction can exist").  Plaintiff can cite no case in

---

[1]  The Supreme Court, ruling on a claim for disability benefits under the Social Security Act, discussed in detail the distinction between (1) the presentment of a claim to the agency, and (2) the necessity of having obtained a final decision to be appealed; only the latter of which was waivable under the Social Security Act.  *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). Applying the same reasoning to the CDA, presentment of claims is non-waivable.

which *American Pipe* was applied to the CDA's jurisdictional administrative filing requirement, and it is questionable whether it would apply.

Plaintiff's class action tolling analysis ignores that the CDA is a two-step process. The first step in the CDA process is that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision . . . within 6 years after the accrual of the claim." 41 U.S.C. § 605(a). The second step is the appeal of the contracting officer's decision within one year. *Id.* § 609(a); 25 U.S.C. § 450m-1(a), (d). Class action tolling, if it were to apply to the CDA, could only affect the second step – tolling the statute of limitations for filing a lawsuit after the exhaustion of administrative requirements. Class action tolling would not toll the administrative six year deadline to present a claim to the agency.

The cases relied on by Plaintiff stand for the proposition that putative class actions can toll the time requirements of filing a complaint in court. *See American Pipe*, 414 U.S. at 552-53; *Crown, Cork*, 462 U.S. at 351. The rationale for permitting tolling under Rule 23 is judicial economy – preventing a flood of lawsuits in the courts from potential class members while class certification is pending. *See e.g., American Pipe*, 414 U.S. at 550-51. The Supreme Court was worried that potential class members attempting to intervene or filing separate lawsuits in order to preserve their legal rights would unnecessarily strain courts through "needless multiplicity of actions." *Crown, Cork*, 462 U.S. at 351. Plaintiff does not seek to toll the CDA's 12-month time limit for filing claims in federal court after receiving a decision from the contracting officer. *See* 41 U.S.C. § 609(a). Instead, Plaintiff seeks tolling of the CDA's requirement to present claims administratively to the agency within six years of accrual. 41 U.S.C. § 605(a). Rule 23 tolling is

not applicable to the requirement of timely *administrative* presentment and exhaustion under the CDA, and for good reason; tolling mandatory administrative presentment requirements does nothing to promote judicial economy.  To the contrary, allowing parties to toll administrative presentment requirements could unnecessarily delay class actions while courts would have to wait until potential class members exhausted administrative remedies with the contracting officer.  Moreover, Plaintiff cannot argue that it relied on the pendency of a proposed *judicial* class action as a basis for failing to pursue the requisite *administrative* remedies, as required for each and every contract claim.  *See Zuni*, 467 F. Supp. 2d at 1107; *James M. Ellet*, 93 F.3d at 1542.  Because courts lack subject matter jurisdiction over claims not presented administratively, *see id.*, requiring potential class members to proceed with mandatory administrative exhaustion during the pendency of the class certification promotes judicial economy; provides notice to the defendant; and does not harm a potential class member's legal rights.

While some cases have applied the reasoning of *American Pipe* to toll certain deadlines for administrative filing, they have not involved a failure to meet a mandatory presentment requirement, as exists under the CDA.[2]  *See Zuni*, 467 F. Supp. 2d at 1106 ("exhaustion under the CDA is a mandatory requirement before federal court jurisdiction can exist.").  Because federal court jurisdiction cannot attach until there has been administrative presentment, Rule 23 tolling doesn't apply.  *See NuFarm America's, Inc. v. United States*, 398 F. Supp. 2d 1338, 1353

---

[2]  *See, e.g.*, *McDonald v. Secretary of HHS*, 834 F.2d 1085, 1092 n.4 (1st Cir. 1987) (noting that all class members had met the "non-waivable jurisdictional requirement of having presented a claim of benefits . . . to the Secretary"). *Compare Sharpe v. American Express Co.*, 689 F. Supp. 294, 300 (S.D.N.Y. 1988) (holding that 90-day requirement for a federal action under Title VII is not jurisdictional); *Griffin v. Singletary*, 17 F.3d 356, 360-61 (11th Cir. 1994) (applying the rulings of *McDonald* and *Sharpe* to toll EEOC filing deadline).

(Ct. Int'l Trade 2005) (holding Rule 23 tolling is unavailable to potential class members who "have failed to meet the jurisdictional requirement of exhausting their administrative remedies").

### 1.    Plaintiff Cannot Pursue Tolling on the Basis of *Cherokee Nation*

Plaintiff does not even fall within the putative classes in *Cherokee Nation*.  In that case, the Cherokee Tribe sought additional funding for contract support costs.  *Cherokee Nation* was filed on March 5, 1999 and class certification was denied on February 9, 2001. *See* Civil Docket for Case No. 6:99-cv-00092-FHS (E.D. Okla); 199 F.R.D. 357, 366 (E.D. Okla. 2001).  Because administrative presentment of claims is a mandatory pre-requisite to raising claims in federal court, *see Zuni*, 467 F. Supp. 2d at 1106, the *Cherokee Nation* putative class could not include Tribes that had not presented their administrative claims; the jurisdiction of the court was limited to claims by only those entities that had already presented their CDA claims administratively. *See NuFarm America's Inc. v. United States*, 398 F. Supp.2d at 1353-54 (finding no jurisdiction over class members who had failed to exhaust administrative remedies); *see also Founding Church of Scientology v. Director, FBI*, 459 F. Supp. 748, 756 (D.D.C. 1978) (when administrative presentment is jurisdictional, "each member of the plaintiff class must exhaust his or her administrative remedies").  Plaintiff exhausted its administrative remedies in 2005, well after the filing of *Cherokee* in 1999, and even after the class certification motion was denied. Because Plaintiff did not meet the jurisdictional requirements to be in federal court, it could not have been a member of the *Cherokee Nation* putative class, and it cannot take advantage of any tolling based on *Cherokee Nation*.

### 2.    Plaintiff Cannot Pursue Tolling Based on *Zuni*

There are three reasons why, even if Rule 23 tolling could theoretically apply, Plaintiff

cannot take advantage of such tolling for the *Zuni* case. First, as with *Cherokee Nation*, the *Zuni* court had no jurisdiction over Plaintiff as a putative class member. Second, tolling only applies to the first class action filed, not to subsequent actions on the same issue. Third, Rule 23 tolling is unavailable to litigants that choose to bring an action before a determination of class certification, which Plaintiff did with respect to *Zuni*.

Plaintiff had not exhausted administrative pre-requisites prior to the filing of the *Zuni* class action complaint. The *Zuni* class action complaint was filed in 2001, and class certification was denied on May 22, 2007. As with *Cherokee Nation* , Plaintiff is not within the scope of the *Zuni* class because its lack of administrative exhaustion rendered it outside of the class of Tribes able to seek federal court relief. *See supra* p. 6. This alone renders Rule 23 tolling unavailable for *Zuni*.

In addition, Plaintiff cannot take advantage of the putative class action of *Zuni* because tolling applies only for the first class action addressing a claim; it does not apply to subsequent class actions where new plaintiffs seek to reargue the question of class certification. *See In re Vioxx Products Liability Litigation*, 478 F. Supp. 2d 897, 907 (E.D. La. 2007) ("Federal courts have uniformly held that the *American Pipe* rule operates only with respect to the first class action filed for a specific controversy."). *See also Yang v. Odom*, 392 F.3d 97, 104 (3d Cir. 2004); *Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998). *Cherokee Nation* was the first purported class action seeking recovery of additional indirect CSC under ISDA contracts. Plaintiff tries to avoid this rule by asserting that the litigants in *Cherokee* did not seek recovery of additional CSC based on a "miscalculation" theory and that *Zuni* was the first case to do so. Pl.'s Mem. at 34 n.34. This is a distinction without a difference. The *Cherokee* and *Zuni* cases dealt

with exactly the same claims as Plaintiff raises here: that Tribes did not receive the full amount

of CSC to which they were entitled.  Therefore, if any tolling could possibly apply, it would be

solely under *Cherokee*.[3]

Finally, numerous courts have ruled that class action tolling is not available for litigants

who choose to file their own individual action during the pendency of class certification.  *See*

*e.g., Wyser-Pratte Mgmt. Co. v. Telxon Corp*. 413 F.3d 553, 559 (6th Cir. 2005) ("The purposes

of *American Pipe* tolling are not furthered when plaintiffs file independent actions before

decision on the issue of class certification, but are when plaintiffs delay until the certification

issue has been decided."); *Glater v. Eli Lilly & Co.*, 512 F.2d 735, 739 (1st Cir. 1983) ("The

policies behind Rule 23 and *American Pipe* would not be served, and in fact would be disserved,

by guaranteeing a separate suit at the same time that a class action is ongoing."); *Kozlowski v.

Sheahan*, No. Civ. A. 055593, 2005 WL 343494 at *3 (N.D. Ill. Dec. 12, 2005) (finding a "clear

majority of federal courts" have followed rule that tolling does not apply to a plaintiff filing suit

prior to class determination); *Chinn v. Giant Food, Inc.,* 100 F. Supp. 2d 331, 335 (D. Md. 2000)

(tolling does not apply when individual suit filed prior to class certification decision); *Rahr v.

Grant Thornton LLP*, 142 F. Supp.2d 793, 800 (N.D. Tex. 2000) (same); *Stutz v. Minn. Mining

Mfg. Co.*, 947 F. Supp. 399, 403-04 (S.D. Ind. 1996) (rejecting tolling argument by plaintiff filing

---

[3]  In an effort to show that their claims involving 1996 are timely as a result of tolling due
to *Cherokee Nation*, Plaintiff argues that its damages were not ascertainable until the end of
fiscal year 1997. *See* Pl.'s Mem. at 33.  This is not true.  The appropriations for fiscal year 1996
were to be obligated within the year. *See Omnibus Consol. Rescissions and Appropriations Act of
1996*, Pub. L. No. 104-134, 110 Stat. 1321, 1321-189, 1321-196 (1996).  Plaintiffs misleadingly
quote from this public law, omitting the key language from its quote that "funding contained
herein, and in any earlier appropriations Acts *for scholarship programs* under the Indian Health
Care Improvement Act (25 U.S.C. 1613) shall remain available for obligation until September
30, 1997." *Id.*, 110 Stat. at 1321-189.  Scholarship money is not at issue in this case.

prior to resolution of class issue and noting "[j]udicial recognition of a proposed class, whether it is ultimately certified or decertified, is needed to trigger class tolling.").[4]  Here, Plaintiff filed its Complaint on May 3, 2007, prior to the *Zuni* court's ruling on class certification.  Therefore, Plaintiff cannot take advantage of tolling based on the *Zuni* putative class action.

###### B.    Equitable Tolling Does Not Apply to Plaintiff's Claims

Plaintiff argues that its claims, if not legally tolled, should be equitably tolled.  Plaintiff asserts that the rule of *Irwin*, 498 U.S. at 89, which allowed equitable tolling to apply in suits against the government in certain circumstances, should apply here.  Pl.'s Mem. at 35.  Plaintiff argues that equitable tolling should apply because the tolling rule would apply in a contract dispute between private parties, and because there is no evidence that Congress limited the rule of equitable tolling for claims brought pursuant to 41 U.S.C. § 605(a).  *Id.* at 36-39.  Plaintiff ignores the fact that federal courts extend this equitable relief "only sparingly," *Irwin*, 498 U.S. at 457, and that the factual circumstances of Plaintiff's case do not warrant such extraordinary relief.

Plaintiff's argument that equitable tolling is available under *Irwin* because such tolling would apply in a private action misconstrues the deadline which plaintiff seeks to toll.  Plaintiff does not seek to toll the deadline for filing a breach of contract action in court – a deadline faced by litigants against both private and governmental entities.  Rather, Plaintiff seeks to toll a statutory deadline for filing administrative claims, which is unique to those seeking relief against

---

[4]  There are a few courts that have not followed this line of cases.  *See, e.g., In re Worldcom Securities Litig.*, _ F.3d _, 2007 WL 212874 (2d Cir. 2007); *Lehman v. United Parcel Serv. Inc.*, 443 F. Supp. 2d 1146, 1151 (W.D. Mo. 2006) (though the court rejected the majority view of courts on this issue, it noted that "it might be a good idea to have a rule that prohibits individual cases until after class certification is resolved").

the government.  In addition to the one-year statute of limitations found in Section 609 of the

CDA, the CDA contains an deadline to appeal to an agency's contracting officer.  41 U.S.C.

§ 605(a).  This statutory deadline for filing administrative claims is unique to cases against the

federal government, and is jurisdictional in nature.[5]  *See Zuni*, 467 F. Supp.2d at 1107; *Tunica-*

*Biloxi Tribe of Louisiana v. United States*, No. 02-2413, slip op. at 10 (D.D.C. Dec. 9, 2003).

Because Section 605 is a deadline unique to litigation against the government, a litigant against a

private party would not be able to equitably toll this deadline.  Therefore, the rule of *Irwin*

(which addressed equitable tolling for a statutory deadline for filing in court) is inapplicable.

Even if Plaintiff could overcome the first hurdle in applying *Irwin* for equitable tolling,

Plaintiff would not be able to meet the further requirement of showing that Congress intended to

allow tolling.  Several factors indicate Congressional intent: time limitations set forth in

emphatic terms; time limitations explained in a highly technical manner (that "cannot be easily

read as containing implicit exceptions"); limitations reiterated several different ways; and

exceptions provided in the statute.  *United States v. Brockcamp*, 519 U.S. 347, 350-52 (1997).

These factors indicate a Congressional intent to preclude equitable tolling, although a statute

need not contain all of these factors to render equitable tolling inapplicable.  *Brice v. Sec'y of*

*Health and Human Services*, 240 F.3d 1367, 1372-73 (Fed. Cir. 2001).  Several of these factors

---

[5]  Plaintiff concedes that the administrative presentment requirement of 41 U.S.C. § 605 is jurisdictional in nature (although, without support, Plaintiff argues that the time limit can be parsed out of this jurisdictional presentment requirement as non-jurisdictional).  *See* Pl.'s Mem. at 40 n. 43.  Therefore, it is unclear why Plaintiff goes to great lengths to try and distinguish *Bowles v. Russell*, __ U.S. __, 127 S. Ct. 2360 (2007).  As Plaintiff states, "The Court in *Bowles* states plainly that it is addressing a time frame set by statute which defines the jurisdiction of a court. . ."  Pl.'s Mem. at 40, citing 127 S. Ct. at 2364.  Similarly, the administrative presentment requirement of 41 U.S.C. § 605 – the very deadline that Plaintiff seeks to extend – is a time frame set by Congress that limits the jurisdiction of federal courts.

10

are present here.  "[T]he statutory scheme of the CDA is extremely complex and internal

deadlines for filing and appeals are time-sensitive."  *Zuni*, 467 F. Supp. 2d at 1107.   In addition,

Congress included a specific exception to the limitation period in § 605(a), which supports the

position that it did not want equitable tolling to apply to this requirement. *See* 41 U.S.C. § 605(a)

(providing that six-year limitation "does not apply to a claim by the government against a

contractor that is based on a claim by the contractor involving fraud.")  Moreover, there is a

generous six-year administrative exhaustion deadline, which further indicates the deadline should

not be expanded.  *See United States v. Beggerly*, 524 U.S. 38, 49 (1998) ("Equitable tolling of an

already generous statute of limitations incorporated into the [Quiet Title Act] would throw a

cloud of uncertainty over these rights, and we hold that it is incompatible with the Act.").

  Plaintiff points to no case where the administrative exhaustion deadline of the CDA has

been equitably tolled.[6]  In fact, several *post-Irwin* decisions have found that CDA statutory

deadlines cannot be extended "in the interest of equity."  *Renda Marine, Inc. v. United States*, 71

Fed. Cl. 782, 789 (2006) (internal quotation marks and citation omitted); *see also Hamza v.

United States*, 36 Fed. Cl. 10, 15 (1996) (finding courts cannot waive CDA statute of limitations

on equitable grounds).  This is unsurprising, given the Supreme Court's limitations on equitable

---

  [6]  Since *Irwin*, Courts have barred the application of equitable tolling for several other
statutes.  *See, e.g., Brockamp*, 509 U.S. at 354 (section 6511 of the Internal Revenue Code);
*Beggerly*, 524 U.S. at 49 (Quiet Title Act); *Brice*, 240 F.3d at 1374 (National Childhood Vaccine
Injury Act).  The Federal Circuit, which handles most contract cases against the government, has
not definitively resolved the issue of whether equitable tolling could apply to CDA claims.  *See
Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238-39 (Fed. Cir. 2002)
(noting duress might equitably toll filing of CDA suit, although not resolving issue because there
was no duress); *Bonneville Associates Ltd. P'ship v. Barram*, 165 F.3d 1360, 1365 (Fed. Cir.
1999) (noting that Federal Circuit had not decided whether equitable tolling applies to CDA, and
finding it unnecessary to do so because the fact of the case did not warrant it).

tolling:

> We have allowed equitable tolling in situations where the claimant has actively
> pursued its judicial remedies by filing a defective pleading during the statutory
> period, or where the complainant has been induced or tricked by his adversary's
> misconduct into allowing the filing deadline to pass. We have generally been
> much less forgiving in receiving late filings where the claimant failed to exercise
> due diligence in preserving his legal rights.

*Irwin*, 498 U.S. at 457-58. Here, Plaintiff did not file any defective administrative appeals, nor

was it "induced or tricked" by any misconduct of the government. This is a case of a litigant

merely sitting on its rights, which does not warrant the extraordinary relief of equitable tolling.

*See id.* at 458 ("the principles of equitable tolling . . . do not extend to what is at best a garden

variety claim of excusable neglect").

## II.    PLAINTIFF'S CLAIM FOR THE 1995 CONTRACT IS BARRED BY LACHES

Plaintiff's claim under the 1995 contract, which is even older than those barred by the

statute of limitations, should likewise be barred. Plaintiff alleges that its delay since the end of

1995 in bringing its claims was reasonable, due to tolling that should apply based on *Cherokee*

*Nation* and *Zuni*. As discussed above, Plaintiff could not have been in those putative classes, as

it had not met the jurisdictional administrative presentment requirements to be in front of federal

courts. Therefore, any reliance on those class actions was unwarranted. While Plaintiff alleges

that, at no time did it sleep on its rights, the nearly 10-year delay in exhausting administrative

remedies and over 11-year delay in filing suit belie this assertion.

Moreover, the government has demonstrated prejudice to reviving such an old claim.

Congress appropriated money to IHS to spend within that year. *See Dep't of Interior & Related*

*Agencies Appropriations Act, 1995*, Pub. L. No. 103-332, 108 Stat. 2499, 2527-28, 2536, 2537-

38 (1994).  In accordance with this directive, IHS obligated funds and this appropriation has long since expired.  Plaintiff asserts that IHS can simply pay any judgment out of the Judgment Fund. However, "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages."  *America's Community Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).  As such, Plaintiff in this case is not truly seeking compensatory damages from the Judgment Fund.  Even if it were, Plaintiff's assertion ignores the fact that the CDA requires IHS to repay those amounts.[7]  41 U.S.C. § 612.  Therefore, it is not a simple matter of recovering damages from the Judgment Fund.

## III.    THE GOVERNMENT FULLY PERFORMED UNDER ALL CONTRACTS AT ISSUE

Plaintiff does not even attempt to dispute that its contracts contained specific funding figures and that the government paid in full on those figures.  While Plaintiff tries to pass this off as a tautology it is, in fact, full performance.  Plaintiff accuses the government of focusing "solely on the amount they paid."  Pl.'s Mem. at 11.  This is untrue – the government directs the Court's attention to the *agreements between the parties*, which specified, in detail, the money that would be paid under the contracts.  At this point, Plaintiff distances itself from those contracts, calling the agreed-upon figures "the amount specified in the AFA" and "documentation of a specific amount paid that represents less than full payment."  Pl.'s Mem. at 14.  Plaintiff cannot escape the reality that it entered into contracts that set forth numerical

---

[7] Plaintiff also argues that the Court in *Cherokee Nation* rejected the government's reliance on a limitation of cost provision.  Pl.'s Mem. at 44 n. 46.  However, unlike the limitation of cost provision in *Cherokee Nation* which contained no specific figure as a cap on payment, *see* 543 U.S. at 639-40, the 1995 contract limited payment on the contract to $4,623,969.  *See* Def.'s Mem. in Support of Mot. to Dismiss ("Defs.' Mem.") at 10 n.3; Ex. A at 004, 016.

indirect CSC amounts to be paid under the contract. This was not a one-sided agreement; Plaintiff was fully aware of the indirect CSC funds specified in the contract, and it agreed to perform the contract under the explicit terms contained therein, including the funding amounts. It was also agreed to contract modifications, with full awareness of how payment was altered. The funding amounts could not have been clearer. Plaintiff's belated disagreement with the benefit of the bargain it made does not negate the original bargain.

### A.     The ISDA Does Not Alter the Contract Analysis

Plaintiff argues that, notwithstanding these specific figures contained in the contracts, the ISDA, which is incorporated into the contracts, requires that a different amount be paid as the "full amount" under the ISDA, which is represented through a "base times rate" analysis. Pl.'s Mem. at 12-16. Nowhere does Section 106 of the ISDA explain what a "full amount" of payment would be, nor does it dictate that payment under a "base times rate" calculation is necessary. Instead, the ISDA requires that the amount of funding be set through a negotiation between the parties. *See* 25 U.S.C. §§ 450f(a)(1), (2), 450j-1(a)(3)(B), 450*l*(c)(b)(4); 25 C.F.R. § 900.12, 900.8(h).

Plaintiff cannot rely on Section 106(a) of the ISDA, 25 U.S.C. § 450j-1(a), to receive what it characterizes as "full funding" under the statute. Section 106(a) does not resolve the question of what constitutes "full funding" under the statute. Instead, this provision contemplates negotiation between the parties, *id.* § 450j-1(a)(3)(B), and it allows contractors to receive immediate court review when the Secretary decision to decline to fund a proposed contract at the level proposed by the Tribe. 25 U.S.C. §§ 450m-1(a), 450f(a)(2), 450f(b). It also requires that CSC amounts be "reasonable," *id.* §§ 450j-1(a)(2), 450j-1(a)(3)(A), and not

duplicate other funding.  *Id.* § 450j-1(a)(3).  The contracts at issue include this negotiated

amount and, by paying this agreed-upon amount, IHS has not breached the contracts based on

any statutory requirements.   Notably, Plaintiff's "full funding" argument is not predicated on the

actual amount spent by the Tribe for indirect CSC (much less any statutorily-specified amount).

Rather, Plaintiff states that "full funding" under the statute is whatever the amount of rate times

base would yield, notwithstanding the fact that the statute contains no such provision.  Moreover,

payment predicated on rate times base could very well run contrary to the mandate of not

providing Tribes with a windfall recovery (i.e., providing Plaintiff with more funding that its

actual, reasonable costs).  *See Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed.

Cir. 2005); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1464 (10th Cir. 1997).

Plaintiff does not, and cannot, cite the ISDA as providing for the "rate times base"

calculation to determine payment under contracts.[8]  Instead, it relies on government circulars as

providing such detail.   IHS Circulars are internal guidance for IHS personnel and, do not, by

their terms, create any obligation to pay indirect costs. *See* Indian Self-Determination

Memorandum No. 92-2 at 2 (Pl.'s Ex. A) ("All funds for contract support costs are subject to the

availability of funds made available for this purpose.  This policy outlines the procedures to be

used to determine the need for contract support costs, and to guide the allocation of those

funds."); IHS Circular No. 06-04 at 1 (Pl.'s Ex. B) ("These instructions are not regulations

establishing program requirements and are not intended to bind agency personnel.  These

instructions are intended to provide guidance to IHS personnel to determine and allocate CSC,

---

[8]  The only statutory citation Plaintiff provides referencing cost bases and cost rates is 25
U.S.C. § 450j-1(c), which references annual reports that HHS is to provide to Congress.  *See*
Pl.'s Mem. at 15.

while allowing judgment and prudence in individual circumstances."). Nor can Plaintiff rely on

an expectation of payment based on OMB Circular A-87, as OMB Circulars, by their very terms,

do not create any obligation to pay indirect costs. See 2 C.F.R. § 225.20 ("[The principles in this

Circular] are not intended to identify the circumstances or to dictate the extent of Federal and

governmental unit participation in the financing of a particular Federal award"); 2 C.F.R. § 225

App. A, § A.1 (same).

Nor is Plaintiff assisted by its reliance of *Thompson v. Cherokee Nation*, 334 F.3d 1075

(Fed. Cir. 2003), *aff'd sub nom Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005), for recovery of

additional money. In that case, the contract "provided that the appellee and the Secretary would

negotiate annual funding agreements," which is consistent with ISDA requirements. *Thompson*,

334 F.3d at 1082. Rather than contract for a numerical amount of indirect CSC, which was done

here, in *Thompson*, "[i]ndirect costs were negotiated pursuant to Office of Management and

Budget Circular A-87 as a predetermined fixed percentage of the base funding for the health

programs." *Id.* This case does not stand for the general proposition that IHS is statutorily bound

to follow OMB Circular A-87; it stands only for the proposition that IHS must abide by the terms

of its contract and, when it explicitly contracts to follow OMB Circular A-87, it must do so.[9]

---

[9] In further support of its argument in support of its breach of contract claim, Plaintiff has attached to its opposition "some of the shortfall reports that the Tribe has been able to obtain." Pl.'s Mem. at 15. Defendant's motion to dismiss Plaintiff's breach of contract claim based on full performance is brought under Fed. R. Civ. P. 12(b)(6). While the contracts are incorporated into the Complaint and properly before the Court, *see Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004), reliance on other extrinsic evidence is not allowed without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(b)(6); *Thomas v. District of Columbia*, 887 F. Supp. 1, 5 n.1 (D.D.C. 1995) ("The Court has discretion not to accept matters outside the pleadings presented by any party in conjunction with a 12(b)(6) motion, particularly where the proffered material and the conversion from a motion to dismiss to one for summary judgment will not facilitate disposition of the action.")

In fact, the Supreme Court's determination of *Cherokee Nation*, which affirmed *Thompson*, supports the government's position in this case. In *Cherokee Nation*, the Supreme Court rejected the government's argument that ISDA contracts were unique, government-to-government agreements to which general contract law did not apply. 543 U.S. at 638. The Court found nothing in the language of ISDA that warranted such special treatment of contracts and determined that "Congress, in respect to the binding nature of a promise, meant to treat alike promises made under the Act and ordinary contractual promises (say, those made in procurement contracts)." *Id.* at 639. The Court rejected the argument that the contracts could not be interpreted as ordinary procurement contracts, as it found that the Act's prohibition of treating ISDA contracts like procurement contracts was "designed to relieve tribes and the Government of the technical burdens that often accompany procurement, not to weaken a contract's binding nature." *Id.* at 640. In *Cherokee*, the government was held to its binding contractual promises. The Court stated that, had the government wished to pay less money than that negotiated in the contracts, it should "refrain[] from making less essential contractual commitments." *Id.* at 642. Here, IHS did so by numerically delineating the amount of indirect CSC that it agreed to pay. IHS's intent could not have been more clear.[10]

---

[10]   The 1995 contract is the only one that Plaintiff points to as referencing a negotiated rate, in addition to setting forth numerical amounts for indirect CSC. *See* Pl.'s Mem. at 12; Ex. A at 0004. The provision cited by Plaintiff, however, is not a promise to pay rate times base. It states, "The allowable indirect costs under this contract shall be established in accordance with the procedures set forth in General Provision Clause 5, Negotiated Overhead Rates," and notes that the 12.73% rate is a "provisional fixed rate." Ex. A at 0004. The Indirect Cost Negotiation Agreement is how the referenced negotiated rates are determined, and is attached hereto as Exhibit K. It contains several caveats. Section B states that indirect costs are subject to audit; Section D provides for adjustments in the rates; Section E states that, when actual costs for the period have been determined, "an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs;" and Section H(3) states

17

In essence, Plaintiff argues that, even though the contracts stated how much money was to be paid for various items (such as indirect CSC) this specified amount was not the agreed-upon payment amount, at least for indirect CSC.  Instead, a different amount (unknown to the parties at the time of contracting) was the true amount agreed upon, based on the statute.  This is simply wrong.  If Plaintiff's argument were accepted, the indirect CSC amount could never be determined pursuant to a contract negotiation.  Under this theory, if the amounts the parties agreed upon were less than the amount the contractor later claimed in a lawsuit, the Secretary would still be liable, notwithstanding the fact that he might have agreed to every element of the contractor's proposal.  It would be almost impossible for the Secretary to administer the ISDA and distribute each year's appropriations consistent with appropriations limits.

## IV.   THE DOCTRINES OF WAIVER AND ESTOPPEL APPLY TO PLAINTIFF'S CLAIMS

 Even if the statute could be read to include a right to payment (which Defendants dispute), Plaintiff cannot pursue its claims at this late date because waiver and estoppel apply.

### A.     Waiver Applies to Plaintiff's Claims

Plaintiff alleges that it has not waived any rights because the ISDA does not allow for waiver; that waiver would run contrary to ISDA purposes and policies; that it could not have waived its claim because its claim did not accrue until the end of the contract year; and that this Court should follow a case decided by the Interior Board of Contract Appeals ("IBCA").  None of these arguments has merit.

---

that contracts providing a ceiling on indirect CSC will be subject to that ceiling.  *See* Ex. K. These provisions demonstrate that the contract did not contemplate a straight-forward application of base times rate for payment of indirect CSC.

Plaintiff asserts that the ISDA does not "permit" waiver.  Pl.'s Mem. at 19.  However, a statute need not specifically provide for waiver.  Instead, "unless Congress itself has evinced an intention to preclude a waiver," the principle of waiver can apply.  *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 641 (Fed. Cir. 1989).  There is nothing in the ISDA that indicates the general rules of waiver are inapplicable to it.  To the contrary, the ISDA contemplates that issues regarding contracting are to be resolved immediately.  The ISDA provides for immediate federal court review of the Secretary's decision to decline or fund a contract at the level or under the terms proffered by a Tribe.  25 U.S.C. §§ 450m-1(a); 450f(a)(2), 450f(b).  Under these provisions, a court can immediately compel the Secretary to enter into a contract in conformity with a Tribe's proposal.[11]  Affording tribal contractors an opportunity for prompt judicial review indicates a Congressional intent to resolve disputes promptly, and that waiver principles are not foreclosed.

Plaintiff also errs in concluding that waiver would subvert the policy of the ISDA.  The purpose of the ISDA is to allow Tribes to provide services directly to their members by entering into contracts with the government, if they so choose.[12]  25 U.S.C. § 450f, 450j-1.  The ISDA is

---

[11]  Plaintiff's citation to the ISDA's language regarding waiver of *regulations*, Pl.'s Mem. at 19-20, is inapposite to the issue of waiver of *statutory* rights.  To make this point, Plaintiff cites cases applying *expressio unius est exclusio alterius*, which is a "canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative."  Black's Law Dictionary, 8th ed. (2004); *see* Pl.'s Mem. at 19 n.23.  The canon's force "depends entirely on context, whether or not the draftsmen's mention of one thing . . . does really necessarily, or at least reasonably, imply the preclusion of alternatives." *Martini v. Fed. Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1343 (D.C. Cir. 1999) (internal quotations and citation omitted).  One provision in the ISDA setting forth a mechanism for a tribe to seek waiver of regulations does not contain the context necessary to infer that Congress intended to foreclose the waiver that is generally present with respect to contracts.

[12] They may also choose to have IHS provide health care to their members directly.

not a money-mandating statute; it contains no policy of payment of a sum certain, or a policy favoring the "rate times base" calculation that Plaintiff argues is necessary for "full payment." Instead, it promotes a policy of negotiating and entering contracts, from which entitlements will flow.[13]  Nor is Plaintiff correct in asserting that the contractual provisions specifying the amount to be paid run contrary to the statute, as such an argument presupposes that the statute sets forth a different amount.  It does not.  Therefore, the cases Plaintiff cites holding that litigants cannot waive rights that run contrary to statutes are inapposite.  *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 710 (1945) (when statute provided for payment of "liquidated damages," to be paid by employer, employer could not force employees to waive right to receive such damages); *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 859 (Fed. Cir. 1997) (when Contract Disputes Act provides for *de novo* appeal of contract disputes, parties could not contract away review).  Instead, because the ISDA's policy is for the parties to negotiate contracts (rather than conferring a right to receive payment of a sum certain), the cases involving waiver under general contract principles apply.  *See* Def.'s Mem. at 19-22.

Plaintiff asserts that it could not have knowingly waived statutory rights by agreeing to a contract term, because it did not know how much it would receive under the contract.  Pl.'s Mem. at 25-26.  In fact, Plaintiff knew how much money it was entitled to for indirect CSC under the contract when it signed the contracts, as the amount was set forth in the contract.  To the extent funding levels changed over the year, it was done through contract modifications.

---

[13]  Even Plaintiff's assertions that the ISDA is "designed redress unequal bargaining power," Pl.'s Mem. at 21, and that "contracts shall be liberally construed for the benefit of the contractor" *id.* at 23, demonstrate that – at bottom – Plaintiff understands that the statute's policy as one to promote contracting.

Inclusion of the clause to determine funding in accordance with Section 106 of the Act did not

change this, as Section 106 does not provide for any other amount of funding, nor does it provide

for the rate times base calculation to which Plaintiff now claims it is entitled.  Had Plaintiff

wanted to be assured of payment derived from specific calculations in its contracts, instead of the

figures that were included, it could have asked to do so at the time of contract formation.[14]

> ### B.    Estoppel Applies to Plaintiff's Claims

Plaintiff has likewise not rebutted the application of estoppel.  Defendants explained that

all pertinent appropriations that might have been available for obligation in Plaintiff's 1995-2004

contracts have been either spent or obligated, or they have lapsed as a matter of law.  Def.'s

Mem. at 22-25.  In response, Plaintiff reiterates that it did not know the amount of indirect CSC

it would receive under the contract.  This argument runs contrary to the contract language, which

sets forth indirect CSC amount.  Plaintiff also asserts the availability of the Judgment Fund to

---

[14] The administrative decision, *Appeals of Seldovia Village Tribe*, No. 3862 & 3863/97 (IBCA Oct. 20, 2003), cited by Plaintiff for the proposition that waiver should not apply is neither authoritative nor binding here.  First, *Seldovia* was decided before *Cherokee Nation*, the case in which the Supreme Court indicated that ISDA contracts should be treated like ordinary government contracts.  Second, the decision in *Seldovia* is not persuasive because the administrative judge did not discuss authoritative Federal Circuit decisions such as *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) and *E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978). Here, IHS has not benefitted from the CSC contract terms which Plaintiff claims violate the ISDA.  To hold that a party to a government contract may agree to the contract, accept its benefits, and then claim that it is entitled to a better deal, would make it virtually impossible for the government to contract within its appropriation limits and would render such limits meaningless. Plaintiff also cites to a second *Seldovia* decision, in which the Board awarded attorney's fees to the plaintiffs, but fails to tell the Court that this decision has been vacated.  *See* Pl.'s Mem. at 29 n.32.  A copy of the decision vacating this decision is attached as Exhibit L.

pay damages.[15]  Pl.'s Mem. at 28.  But the Judgment Fund requires that funds awarded under the

CDA be reimbursed by the defendant-agency.  41 U.S.C. § 612(c).  Therefore, if IHS is found

liable and is required to repay the Judgment Fund, IHS's other programs, including those

programs for tribes without ISDA contracts and other ISDA contractors, will be harmed.  *See*

U.S.C. § 450j-1(b).  The declination process available to contractors at the outset ensures that if a

contractor is not satisfied with the funding levels offered by the Secretary, the dispute will be

resolved before any promises are made and generally before all relevant appropriations are

exhausted.  Once contracts are executed, the Secretary has every reason to rely on their terms and

not to expect additional funds would be required.  Estoppel applies to bar Plaintiff's claims.

## V.    PLAINTIFF CANNOT MAINTAIN A BREACH OF TRUST CLAIM

Plaintiff's breach of trust claim should be dismissed on two grounds: first, there is no

cognizable trust duty that has been breached by the government's actions; and second, the

government has not waived sovereign immunity for this claim.  Nothing in Plaintiff's opposition

refutes these principles.

Plaintiff acknowledges that Judge Walton dismissed a breach of trust claim brought by a

Tribe, finding that an agency has no duty to seek additional appropriations to pay additional

indirect CSC costs.  Pl.'s Mem. at 44.  Plaintiff distinguishes this holding by asserting that its

---

[15]  In a footnote, Plaintiff accuses Defendants of relying on their "past illegal interpretation of section 106 of the ISDA," citing *Cherokee Nation* as concluding that Defendant's interpretation of Section 106 was not consistent with the law.  Pl.'s Mem. at 28 n.31. In *Cherokee Nation*, the government conceded that it had breached the terms of the contract, but asserted that such a breach was excusable because it was consistent with ISDA provisions.  543 U.S. at 638.  The Court rejected this argument, holding the government to the explicit contractual obligations.  *Id.* at 639.  Defendants here do not concede breach, nor are they relying on anything but the explicit language of the contract – not on any alleged "past illegal interpretation" of statutory provisions.

breach of trust claim is broader – it also encompasses a duty to reprogram funds from IHS's lump-sum appropriation "to cover the Tribe's shortfalls." *Id.* This cannot state a cognizable breach of trust. Any trust owed by the government is to all Indian Tribes as a class. *See Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir. 1986) ("No trust relation exists which can be discharged to the plaintiff here at the expense of other Indians."). If IHS were to reprogram its funds (received for the benefit of *all* Tribes) in order to pay Plaintiff more money, IHS would necessarily be taking away money that would otherwise be spent in the support of other Tribes. No trust duty could be read to dictate that *certain* Indian Tribes receive more money at the cost of others.

More fundamentally, the government has not waived sovereign immunity for such a claim. The waiver of sovereign immunity for money damages is limited to contract claims under the CDA. *See* 25 U.S.C. § 450m-1(a), (d). Plaintiff alleges that its breach of trust claims "arise from and relate to the contracts at issue." Pl.'s Mem. at 44. However, Plaintiff has pled its breach of trust claim separately in its complaint, and seeks to separately recover damages for this claim. Plaintiff's independent breach of trust claim is not a contract claim. Therefore, there has been no waiver of sovereign immunity and this claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be granted.

Dated: September 25, 2007                    Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             JEFFREY A. TAYLOR
                                             United States Attorney

                                             SHEILA M. LIEBER
Of Counsel:                                  Deputy Branch Director

MARIAN C. NEALON                                 /s/ Tamara Ulrich
CLAIRE D. DE CHAZAL                          TAMARA ULRICH (NY Bar)
Assistant Regional Counsel                   Trial Attorney
U.S. Department of Health and                U.S. Department of Justice, Civil Division
     Human Services                          Federal Programs Branch
Office of General Counsel, Region V          20 Massachusetts Ave., N.W.
233 North Michigan Avenue - Suite 700        P.O. Box 883
Chicago, IL 60601                            Washington, D.C.  20044
voice: (312) 886-1693                        voice: (202) 305-1432
fax: (312) 886-1718                          fax: (202) 616-8470

                                             Attorneys for Defendants

# EXHIBIT K

*1995
Indirect
Cost*

Page 1 of 4

## TRIBAL ORGANIZATION
## INDIRECT COST NEGOTIATION AGREEMENT
### 95–P–327

**ORGANIZATION:**

**DATE:**  DEC 2 7 1994

Menominee Indian Tribe of Wisconsin
Post Office Box 910
Keshena, Wisconsin 54135-0910

**FILING REF.:** This replaces the Negotiation Agreement dated March 2, 1994.

The indirect cost rates contained herein are for use on grants and contracts with the Federal Government to which Public Law 93-638 and Office of Management and Budget Circular A-87 apply, subject to the limitations contained in Title 25 of the Code of Federal Regulations, Chapter I, subchapter M, and in Section II A below. The rates were negotiated by the U.S. Department of the Interior Office of Inspector General (External Audits) and the subject organization in accordance with the authority contained in the Circular.

---

### SECTION I: RATES

| | Effective Period | | | | |
|---|---|---|---|---|---|
| Type | From | To | Rate | Locations | Applicable to |
| Fixed with Carryforward | 10/1/94 | 9/30/95 | 13.8%[1] | All | All Programs |

[1] The base is total direct costs and applies to all programs administered by the Tribe but excludes capital expenditures and pass-through funds.

Fringe benefits related to indirect salaries and wages are treated as indirect costs. Fringe benefits applicable to direct salaries and wages are treated as direct costs.

**RECEIVED**

**JAN 1 6 1997**

MENOMINEE
TRIBAL CLINIC

---

## SECTION II:  GENERAL

A.  LIMITATIONS:  Use of the rates contained in this agreement is subject to any applicable statutory limitations.  Acceptance of the rates agreed to herein is predicated upon the conditions that  (1) no costs other than those incurred by the grantee/contractor were included in its indirect cost rate proposal and that such costs are legal obligations of the grantee/contractor, (2) the same costs that have been treated as indirect costs have not been claimed as direct costs, and (3) similar types of costs have been accorded consistent treatment.

B.  AUDIT:  All costs, direct and indirect, Federal and non-Federal, are subject to audit.  Adjustments to amounts resulting from audit of the cost allocation plan or indirect cost rate proposal upon which the negotiation of this agreement was based will be compensated for in a subsequent negotiation.

C.   CHANGES:   Rates contained in this agreement are based on the organizational structure and the accounting system in effect at the time the proposal was submitted.   Changes in the organizational structure or in the method of accounting for costs that affect the amount of reimbursement resulting from the use of the rates in this agreement require the prior approval of the authorized representative of the responsible negotiation agency.  Failure to obtain such approval may result in subsequent audit disallowances.

D.  PROVISIONAL/FINAL RATES:  Within 6 months after year end, a final rate must be submitted based on actual costs.  Billings and charges to contracts and grants must be adjusted if the final rate varies from the provisional rate.  If the final rate is greater than the provisional rate and funds are not available to cover the additional indirect costs, the Tribe may not recover all indirect costs.  Conversely, if the final rate is less than the provisional rate, the Tribe will be required to pay the difference to the funding agency.

E.  FIXED CARRYFORWARD RATES:  Fixed carryforward rates are based on an estimate of the costs that will be incurred during the period for which the rates apply.  When the actual costs for the period have been determined, an adjustment will be made to compensate for the difference between the costs used to establish the fixed rate and the actual costs.

F.  NOTIFICATION TO FEDERAL AGENCIES:  Copies of this document may be provided to other Federal offices as a means of notifying them of the agreement contained herein.

JUN 16 '05  10:13AM MENOMINEE TRIBAL CLINIC                              P.11/34

---

## SECTION II:  GENERAL

G. RECORD KEEPING: Organizations must maintain accounting records that demonstrate that each item of cost has been treated consistently either as a direct or an indirect cost. Records pertaining to the costs of program administration, such as salaries, travel, and related costs, should be kept on an annual basis. If an organization is unable to document the program allocation of a Tribal government, only 50 percent of Tribal government costs will be included in the indirect cost pool.

H. OTHER:

1. The purpose of an indirect cost rate is to facilitate the allocation and billing of indirect costs. Approval of the indirect cost rate does not mean that an organization can recover more than the actual costs of a particular program or activity. Costs treated and claimed as direct costs of a program or activity cannot also be treated as indirect costs. For example: Supplies can be charged directly to a program or activity as long as these costs are not part of the supply costs included in the pool for central administration.

2. Federal programs currently reimbursing indirect costs to this grantee/contractor by means other than the rates cited in the agreement should be credited for such costs and the applicable rates cited herein be applied to the appropriated base to identify the proper amount of indirect costs allocable to the programs.

3. Contracts/grants that provide for a ceiling on the indirect cost rates or the amounts indicated in Section I above will be subject to the ceilings stipulated in the contract or grant agreements. In the event the ceiling rate cited is higher than the negotiated rate, the negotiated rate will be used to determine the maximum allowable indirect cost.

4. Programs received by the Tribe or initiated subsequent to the negotiation of this agreement are subject to the approved indirect cost rate if the programs receive administrative support from the indirect cost pool. It should be noted that this may result in an adjustment to a future rate.

5. A new indirect cost proposal is necessary to obtain an approved indirect cost rate for the next fiscal year. The proposal is due in our office within 6 months after the close of the fiscal year and may be based on actual costs or budgetary data or on a combination thereof.

Page 4 of 4

---

## SECTION III: ACCEPTANCE

Listed below are the signatures of acceptance of this agreement:

| By the Organization | By the Responsible Agency for the Federal Government |
|---|---|

_(signature)_ /s/       _Charles Moses_ /s/

Signature                           Signature

Glen Miller                             Charles Moses

Typed or Printed Name               Typed Name

Chairman                          Assistant Director, External Audits

Title                                   Title

                                         Office of Inspector General

Menominee Indian Tribe of Wisconsin        U.S. Department of the Interior

Organization                           Agency

12/21/94                             DEC 27 1994

Date                                    Date

Negotiated by Greg Raile
Telephone (703) 235-3061

# EXHIBIT L



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Contract Appeals
801 N. Quincy St. Suite 300
Arlington, VA 22203

### APPEALS OF SELDOVIA VILLAGE TRIBE

| | |
|---|---|
| IBCA 3862F & 3863F | Case Decided: October 20, 2003 |
| Compact No. 58G950029-01-2<br>FY 1996 and 1997 Funding Agreements<br>Indian Health Service, HHS | Attorney Fee Application: attorney hourly<br>rate appealed to Court of Appeals for the<br>Federal Circuit; dismissed April 4, 2006. |
| APPEARANCE FOR APPELLANT: | Geoffrey D. Strommer, Esq.<br>Hobbs, Straus, Dean & Walker, LLP<br>Portland, Oregon 97205 |
| APPEARANCE FOR GOVERNMENT: | Michael E. Robinson, Esq.<br>Attorney, Civil Division<br>Department of Justice<br>Washington, D.C. 20530 |

### ORDER BY ADMINISTRATIVE JUDGE PARRETTE

Seldovia Village Tribe of Alaska appealed two reductions in payments by the Indian Health Service (IHS) under the Tribe's FY 1996 and FY 1997 Annual Funding Agreements (AFA's). Appellant alleged that IHS failed to pay the Tribe its full contract support costs (CSC's) of each of those years, amounts not in dispute, but IHS contended that the CSC reductions were the result of inadequate appropriations by the Congress and that the Tribe's CSC reductions were both proper and proportionately the same as those experienced by other CSC recipients. The Board disagreed and awarded the full amount of CSC's for each year. Appellant then applied for attorney fees and costs. The Board awarded attorney fees at the rate of $75.00 per hour and the Tribe appealed to the Federal Circuit court for higher fees. The Court subsequently dismissed the Appeal pursuant to an agreement by the parties. This Board will do so as well. The decision in IBCA 3862F/03 and 3863F/03 is hereby vacated and the case dismissed from the docket.

Bernard V. Parrette
Administrative Judge

I concur:

Candida S. Steel, Chief Administrative Judge