# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MENOMINEE INDIAN TRIBE**<br>**OF WISCONSIN,** | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | Case No.: 1:07cv00812 |
| v. | ) | |
| | ) | Hon. Rosemary M. Collyer |
| **UNITED STATES OF AMERICA,** | ) | |
| **MICHAEL O. LEAVITT**, Secretary of the | ) | |
| Department of Health & Human Services, and | ) | |
| **CHARLES W. GRIM**, Director of the | ) | |
| Indian Health Service, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## MENOMINEE INDIAN TRIBE OF WISCONSIN'S
## NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff Menominee Indian Tribe of Wisconsin (the "Tribe") hereby gives notice of pertinent additional authorities that have come to the Tribe's attention since the close of briefing in the above-captioned matter.

1.      Both *Solow v. United States*, 78 Fed. Cl. 86 (2007) and *Athey v. United States*, 78 Fed. Cl. 157 (2007) support the Tribe's argument that a class action may serve to equitably toll the statute of limitations. *Solow*, 78 Fed. Cl. at 89; *Athey*, 78 Fed. Cl. at 160; *see also* Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss ("Pl. Opp.") at 35-39. Moreover, the cases hold, a plaintiff cannot be said to have unreasonably delayed under the doctrine of laches while awaiting the outcome of a class action. *Solow*, 78 Fed. Cl. at 89-90; *Athey*, 78 Fed. Cl. at 160-61; *see also* Pl. Opp. at 42-43.

2.      *GHS Health Maintenance Org., Inc. v. United States*, 76 Fed. Cl. 339 (2007)

supports the Tribe's argument that a contractor cannot waive by contract rights provided by a

statute enacted for the protection of a class of which the contractor is a member.  *GHS*, 76 Fed.

Cl. at 372; *see also* Pl. Opp. at 18-25.  Moreover, the case suggests that the failure of a contractor

to object to the contract provision at odds with the statute, even if the contractor performs, does

not result in a waiver of statutory rights.

For the court's convenience, we attach a copy of each of these cases.

Respectfully Submitted,


/s/
F. Michael Willis
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, OR  97205
503-242-1745 (Tel.)
503-242-1072 (Fax)
Attorneys for the Menominee Indian Tribe
of Wisconsin

DATED: January 22, 2008

Westlaw.

78 Fed.Cl. 157                                                                                                           Page 1
78 Fed.Cl. 157
**(Cite as: 78 Fed.Cl. 157)**

United States Court of Federal Claims.
ATHEY, Robert M., et al., Plaintiffs,
v.
The UNITED STATES, Defendant.
**No. 99-2051C.**

Aug. 23, 2007.

**Background:** Former employees of the Veterans Administration (VA) brought suit against the United States challenged the government's computation of lump-sum payments of accrued annual leave to which they were entitled upon retirement or separation. Defendant filed motion to dismiss.

 **Holdings:** The United States Court of Federal Claims, Smith, Senior Judge, held that:

 (1) statute of limitations was tolled during pendency of class action of which plaintiffs were a part until their claims were severed in class action settlement;

 (2) suit was not barred by laches; and

 (3) plaintiffs were not entitled to the inclusion of premium pay in calculating lump-sum payments of accrued annual leave.

 Motion granted in part and denied in part.

West Headnotes

**[1] Federal Courts** 🗝1106

170Bk1106 Most Cited Cases
Statute of limitations on claims of former employees of the Veterans Administration (VA) challenging government's computation of lump-sum payments of accrued annual leave to which they were entitled upon retirement or separation was tolled during pendency of class action of which plaintiffs were a part until their claims were severed in class action settlement. 28 U.S.C.A. § 2501; RCFC, Rule 23, 28 U.S.C.A.

**[2] Equity** 🗝84

150k84 Most Cited Cases
To prevail on a claim of laches, the burden lies with the defendant to show an unreasonable delay in filing suit which causes prejudice or injury to the defendant.

**[3] United States** 🗝39(12)

393k39(12) Most Cited Cases
Suit against the United States in which former

employees of the Veterans Administration (VA) challenged government's computation of lump-sum payments of accrued annual leave to which they were entitled upon retirement or separation was not barred by laches, where plaintiffs were part of an earlier class action suit which was timely filed.

**[4] United States** 🗝39(8)

393k39(8) Most Cited Cases
Pursuant to statute, former employees of the Veterans Administration (VA) were not entitled to the inclusion of premium pay in calculating lump-sum payments of accrued annual leave to which they were entitled upon retirement or separation. 38 U.S.C.A. § 7453(i).

**[5] United States** 🗝39(8)

393k39(8) Most Cited Cases
Pursuant to the Treasury and General Government Appropriations Act for fiscal year 1998, former federal employees were precluded from seeking relief for the inclusion of Sunday premium pay received after October 1, 1997 as part of their accrued annual leave lump-sum payment upon separation or retirement if they did not actually perform the work. Treasury, Postal Service, and General Government Appropriations, 1998, § 636, 5 U.S.C.A. § 5546 note.
***158** Ira M. Lechner, Escondido, California, for the Plaintiffs.

 Sharon A. Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice with whom were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Acting Director, and Kathryn A. Bleecker, Assistant Director, and Kate M. Ryan, General Attorney, Department of Veterans Affairs, for the Defendant.

*OPINION and ORDER*

 SMITH, Senior Judge.

 This case arises from a separate class action suit brought before this Court in *Archuleta v. United States,* Case No. 99-205C. The previous case involved the claims of federal employees that challenged the government's computation of lump-sum payments of accrued annual leave to which they were entitled upon retirement, separation, or death under 5 U.S.C. § 5551. That litigation concluded in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

a settlement agreement that, *inter alia,* severed without prejudice the claims of the Plaintiffs consisting of former employees of the Veterans Administration (VA) [FN1]. Plaintiffs claim that the government miscalculated their lump-sum payment of accrued annual leave after separation from federal service and bring this action for relief.

> FN1. The Veterans Administration has since been renamed the Department of Veterans Affairs.

The present case is before the Court on the Government's Motion to Dismiss claiming that pursuant to RCFC 12(b)(1), this Court lacks jurisdiction because Plaintiffs' claims are time barred by the statute of limitations imposed by 28 U.S.C. § 2501, and/or the doctrine of laches. In the alternative, the Government argues that the case must be dismissed for failure to state a claim pursuant RCFC 12(b)(6). After oral argument and careful consideration, and for the reasons set forth below, the Court **DENIES IN PART** and **GRANTS IN PART** Defendant's Motion to Dismiss.

### BACKGROUND

In 1946, Congress created what is now the Veterans Health Administration to meet the medical needs of returning World War II veterans. *D. Br. at 3.* At the time, there was a need to quickly hire personnel who could provide care for returning service members as the existing federal civilian personnel system was inadequate for the task. *Id.* As a result, Congress enacted a separate and unique personnel system to increase recruitment and retention of VA medical employees. *See* 38 U.S.C. § § 7401-7474. Title 38 gives the Secretary of Veterans Affairs the authority over hiring and other personnel related **\*159** matters. *Id.* Certain categories of health practitioners are governed under title 38, including registered nurses (RNs), physician assistants (PAs), and expanded-function dental auxiliaries (EFDA). *Id.* However, not all VA employees are governed by title 38; some are governed entirely under the general civil service personnel system of title 5. *P. Br. at 16.* Moreover, there is a remaining group of VA employees referred to as "hybrids" because they are governed under both titles 5 and 38. *Id.*

Federal employees, whether under title 5 or title 38, who leave federal service are entitled to a lump-sum payment of their accrued annual leave. VA employees are eligible to certain forms of premium pay, in addition to their basic pay, based on certain eligibility requirements as well as possibly being entitled to scheduled pay increases during the course of their employment. According to the statute, the amount of lump-sum payment is to be "equal to the pay ... the employee or individual would have received had he remained in the service until expiration" of the annual leave period. 5 U.S.C. § 5551(a). The Office of Personnel Management (OPM) exercises regulatory authority over the lump-sum statute. 5 U.S.C. § 5553.

### FACTS

In this case, Plaintiffs are all former employees of the VA that left federal service on or after April 7, 1993. *3d Am. Compl. at ¶ 1.* At the time Plaintiffs separated from the agency, the VA paid out a lump-sum payment of accrued annual leave to the employees. *D. Br. at 9.* The Plaintiffs claim the VA did not include certain categories of premium pay or scheduled pay increases that the employees would have received had they stayed at the agency through their leave period when they calculated the lump-sum amount. *3d Am. Compl at ¶ ¶ 2, 3.*

The claims of Plaintiffs were originally part of a larger class action lawsuit involving the calculation of lump-sum payments to federal employees heard by this Court in *Archuleta v. United States,* Case No. 99-205C that was filed on April 7, 1999. *P. Br. at 9.* That case ultimately reached a settlement agreement after several years of settlement negotiations on this complex issue, and pursuant to its terms this Court severed employees of the VA from the suit without prejudice. *Severance order,* Filed June 1, 2006. Promptly, the Plaintiffs filed their third amended complaint on June 21, 2006 and it was docketed as 99-2051C, as an offshoot case of 99-205C. In response, the Government filed a Motion to Dismiss for lack of subject matter jurisdiction and/or for failure to state a claim under which relief may be granted. The Plaintiffs answered and oral argument was held. For the reasons set forth below, the Court hereby **DENIES IN PART** and **GRANTS IN PART** Defendant's Motion to Dismiss.

### DISCUSSION

**I. Motion to Dismiss**

**A. The Suit is Timely**

[1] In order for a case to be brought in this Court, the claim must be brought within six years after the first claim accrues. 28 U.S.C. § 2501. It is well settled that a "claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." *Creppel v.*

*United States, 41 F.3d 627, 631 (Fed.Cir.1994)* (quoting *Japanese War Notes Claimants Ass'n v. United States, 178 Ct.Cl. 630, 373 F.2d 356, 358 (1967)*).

 Defendant argues that the six year statute of limitations requires the Court to dismiss its claims because the claims accrued almost 14 years ago. *D. Br. at 11-12.* Defendant arrives at this 14 year calculation arguing that the present suit was filed in June of 2006 and that the claims first arose when they separated from the government beginning in April of 1993. *Id. at 11.* Therefore, because the Plaintiffs waited more than six years from the time the claims first accrued before filing suit, the Defendant argues that based on the statute of limitations the case must be dismissed. On the other hand, Plaintiffs argue that this case was part of the earlier *Archuleta* class action filed in 1999. *P. Br. at 8-9.* Plaintiffs argue that the instant case is a continuation of the earlier suit because the claims were in the earlier suit **\*160** and the VA Plaintiffs were only severed on June 1, 2006. *Id. at 8.* Thus, the Plaintiffs allege the suit is timely.

 At oral argument, Plaintiffs supplemented their brief by arguing that RCFC 23 tolled the statute of limitations and, therefore, their claims are timely. In *Christian v. United States, 46 Fed.Cl. 793, 818 (2000)* and *Barbieri v. United States, 15 Cl.Ct. 747 (1988)* this Court has held "that filing of a class action under Rule 23 of the Court of Federal Claims tolls the statute of limitations just as it does under the Federal Rule of Civil Procedure 23." *Christian, 46 Fed.Cl. at 818.* Plaintiffs argued that because they were part of an earlier class action under RCFC 23, that action tolled the statute of limitations when it was filed in 1999. In June 2006, the *Archuleta* case was settled. In settling the matter, the current Plaintiffs' claims were severed and were to "continue as a separate action." *Order Approving Settlement.* It is clear to the Court that like *Barbieri* and *Christian,* the VA Plaintiffs' claims were tolled in 1999 when the *Archuleta* suit was filed. Further evidence of that fact is found in the docket number, which is 99-2051 C. The "99" refers to the year in which the case was filed. Accordingly, this Court finds that the statute of limitations governing the Plaintiffs' claims was tolled by the *Archuleta* suit and that the instant suit is timely. [FN2]

> FN2. In addition, at oral argument Defendant argued that this Court is without authority to waive a jurisdictional limitation according to the recent Supreme Court holding in *Bowles v. Russell, 551 U.S. ----,*

*127 S.Ct. 2360, 168 L.Ed.2d 96 (2007).* This argument is simply misplaced. The statute of limitations need not be waived in order for the present suit to proceed. *Id.*

**B. Case is Not Precluded by Laches**

 [2] In the alternative, the Defendant argues that this Court lacks jurisdiction to hear this case under RCFC 12(b)(1) because the Plaintiffs' claims are barred under the doctrine of laches. *D. Br. at 12.* The defense of laches "is based upon considerations of public policy, which require for the peace of society the discouragement of stale demands." *Alligood v. United States, 14 Cl.Ct. 11, 15 (1987).* The doctrine recognizes the need for the "speedy vindication or enforcement of rights." *Id.* To prevail on a claim of laches, the burden lies with the defendant to show an "unreasonable" delay in filing suit which causes "prejudice or injury to the defendant." *Poett v. Merit Sys. Prot. Bd., 360 F.3d 1377, 1384 (Fed.Cir.2004).*

 [3] The Defendant argues that the doctrine of laches applies because the Plaintiffs were aware of their claims since 1991 but waited until 2006 to file their complaint and hence unreasonably delayed in asserting their claims. *D. Br. at 13.* It is further argued that delay resulted in prejudice against the Defendant by impeding its ability to mount a defense since evidence would be difficult and costly to obtain because the facts at issue arose so long ago. *Id.* The Defendant bases its assertion that the Plaintiffs were aware of their claims since 1991 on the fact that the Plaintiffs' counsel filed a similar suit in *Gaffney v. United States, 834 F.Supp. 1 (D.D.C.1993)* that involved the lump-sum calculation for a separate group of federal employees. In articulating its reasoning during oral argument, Defendant argued that it is the responsibility of the attorney to identify all potential claimants who may be entitled to assert legal claims at the time any class of plaintiffs file suit. This argument is absurd. Were this Court to make a determination on whether a plaintiff delayed in filing suit based retroactively on the knowledge of their attorney that a claim has accrued, it would unfairly prevent a substantial number of legitimate suits from moving forward. It would also impose an impossible duty upon an attorney to tell every potential client every claim they "might" possibly have. Instead, in class action cases, the Court must look to the time when each individual plaintiff became aware of his or her claims in deciding whether there was unreasonable delay. Here, it cannot be argued that the Plaintiffs knew of their claims when *Gaffney* was filed in 1991 because they

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

had not yet separated from federal service at that time. Further, the Plaintiffs could not have been aware of their claims until after they separated from service.

The Court finds that the procedural history of this case makes the doctrine of laches inapplicable. It is clear from the background **\*161** of the case that the Plaintiffs were part of an earlier class action suit that was timely filed. Specifically, the Plaintiffs first asserted their claims in 1999 by the filing of the *Archuleta* lawsuit. For that reason, the Plaintiffs did not unreasonably delay in pursuing their claims. The Court agrees with the Plaintiffs that their claims "have been pending in this court for eight (8) years." *P. Br. 14.*

For the foregoing reasons, this Court finds that the Plaintiffs' claims are not time barred by the statute of limitations or under the doctrine of laches. Therefore, the Defendant's Motion to Dismiss for lack of subject matter jurisdiction is **DENIED.**

## II. Failure to State a Claim for Relief

### A. Standard of Review

In the alternative, Defendant has filed a Motion to Dismiss under RCFC 12(b)(6) for failure to state a claim. Dismissal is only appropriate when the accepted pleading standard set forth in RCFC 8(a)(2) is not met: "once a claim for relief has been stated adequately, it may be supported by showing any set of facts consistent with the allegation in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Moreover, "once a claim for relief has been stated, a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* at 1969 (citation and internal quotation marks omitted).

### B. The Statute is Clear that Plaintiffs are not entitled to Premium Pay

[4] Defendant argues that title 38 employees are excluded from having premium pay calculated into their lump-sum payment. *D. Br. at 15.* The Defendant contends that title 38 created a unique personnel system to meet the needs of veterans and that the compensation of these employees is not necessarily the same as general civil service employees under title 5. *D. Br. at 15.* According to the Defendant, the VA Secretary exercises discretion with respect to personnel matters involving title 38

employees and "hybrid" employees. *D. Br. at 3, 7.* Defendant contends that this discretion includes authority over employee pay. *Id.* As a result, title 38 employees may be compensated differently than employees under the title 5 system. *Id. at 5.*

The Defendant identifies three categories of employees among class members who are under the title 38 system. *Id. at 15-16.* Specifically, registered nurses and nurse anesthetists under 38 U.S.C. § 7401(1), physicians assistants and expanded-function dental auxiliaries (EFDA) under 38 U.S.C. § 7401(3), and "hybrid" employees under 38 U.S.C. § 7401(3) and 38 U.S.C. § 7403(f)(1)(a). *Id.* With respect to these categories of federal workers, the Defendant asserts that title 38 entitles them to a lump-sum payment of accrued annual leave calculated based on the basic rate of pay they were earning prior to separation and that the statute prohibits the inclusion of additional pay, i.e., premium pay, in the payout amount. *Id.* The Defendant relies on 38 U.S.C. § 7453(i) which states:

Any additional pay paid pursuant to this section shall not be considered as basic pay for the purposes of the following provisions of title 5 (and any other provision of law relating to benefits based on basic pay):
(1) Subchapter VI of chapter 55
(2) Section 5595
(3) Chapters 81, 83, 84, and 87.
38 U.S.C. § 7453(i). The referenced portions relate to accumulated and accrued leave upon separation.

On the other hand, the Plaintiffs argue that all VA employees are federal workers entitled to the lump-sum payment of 5 U.S.C. § § 5551-5553 whether they are "hybrids" or governed under title 5 or title 38. *P. Br. at 16- 17.* In arguing for the proper way to calculate the lump-sum payment, the Plaintiffs cite 5 U.S.C. § 5551 which reads that the amount "shall equal the pay (excluding any differential under section 5925 and any allowance under section 5928) the employee or individual would have received had he remained in service until expiration of the period of annual or vacation leave." *Id. at 17 (quoting 5 U.S.C. § 5551).* The Plaintiffs contend that the term "pay" in the statute is not limited to "basic pay" but also includes premium pay. *Id. at 18.* The Plaintiffs make **\*162** several arguments in support of their reading of the term "pay" for purposes of the lump-sum payment including the argument that the OPM, in its 1999 regulations, defined the term "pay" in the statute "as including premium pay." In addition, Plaintiffs assert that the VA Secretary has not

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

construed the term "pay" as limited to "basic pay" by allowing certain forms of premium pay to be included as an employee's "pay" for the purposes of the lump-sum payment. [FN3] *P. Br. at 19.* The Plaintiffs argue that 38 U.S.C. § 7453(i) is properly understood to mean that additional pay is not part of "basic pay" rather than as excluding it from the calculation of "pay" for purposes of the lump-sum payment. *Id.* In support of their contention, the Plaintiffs point to the separate use of the terms "additional pay" and "basic pay" in 38 U.S.C. 7453(a). *Id. at 20.* The statute reads, "[i]n addition to the rate of basic pay provided for nurses, a nurse shall receive additional pay as provided by this section." 38 U.S.C. § 7453(a). Therefore, it is argued that the prohibition on including additional pay as part of "basic pay" does not exclude its use in calculating the "pay" to which an employee is entitled under the lump-sum payment.

> FN3. The Secretary has adopted a policy which specifically includes regularly earned types of premium pay. The types of premium pays include: night differential under 5 U.S.C. § 5343(f), stand-by duty pay, overtime pay under title 5 and the FLSA, supervisory differential, cost-of-living allowance and foreign area post allowance in certain circumstances. *See* VA Handbook 5007, Part IV, Chapter 3, Appendix B.

However, the Defendant argues that because the calculation of the lump-sum payment for title 38 and "hybrid" employees is governed by 38 U.S.C. § 7453(i), it is unnecessary to define the meaning of "pay" in 5 U.S.C. § 5551 to make the proper calculation. *D. Br. at 10, 13.* The Defendant asserts that the use of the terms "basic pay" and "additional pay" in title 38 is clear. *Id.* The Defendant alleges that the plain language of the statute limits the lump-sum payout to employees under its authority to their "basic rate of pay without consideration of any 'additional pay.' " *Id. at 12.* Defendant also argues that Congress has on occasion narrowed the definition of "pay" in various pay statutes. *Id. at 15.* In this case, according to Defendant, Congress has clearly limited the pay that title 38 and "hybrid" employees would receive in their lump-sum payment with the inclusion of the adjective "basic" in 38 U.S.C. § 7453(i)--thereby limiting the calculation to an employee's "basic pay." *Id. at 15.* The Defendant relies on *Curry v. United States,* 66 Fed.Cl. 593 (2005) for its proposition that additional pay received by title 38 employees is not calculated as part of the

lump-sum payment. *P. Br. at 14.* Specifically, in *Curry,* this Court stated that "Congress has 'with clarity' determined via section 7453(I) that lump-sum separation pay should not include additional pay." *Id. at 600.*

Plaintiffs also argue that Congress has created a "statutory scheme" that dictates that employees who take annual leave or elect the lump-sum payment of accrued leave are paid according to the amount they regularly earn during their employment. *Pl. B. at 18.* Plaintiffs assert that the courts have interpreted the term "pay" to include premium pay and basic pay in calculating the amount to compensate employees who take leave with pay provided to federal workers under 5 U.S.C. § 6303. *Id. at 18.* The Plaintiffs rely on *Lanehart v. Horner,* 818 F.2d 1574 (Fed.Cir.1987) and *Armitage v. United States,* 991 F.2d 746 (Fed.Cir.1993). *Id. at 20.* In *Lanehart,* the Court "concluded that 'pay' as used in the 'leave with pay' statutes has consistently been construed for more than a century as encompassing the total compensation or remuneration normally and regularly received by an employee." *Lanehart,* 818 F.2d at 1581-1582. The Plaintiffs contend that 5 U.S.C. § 6303 is analogous to 5 U.S.C. § 5551. *P. Br. at 20.* Therefore, the Plaintiffs argue that the term "pay" in the two statutes should be interpreted consistently. *Id. at 19.* The Court finds that the Plaintiffs misinterpret the holdings in *Lanehart* and *Armitage.* In both cases the Federal Circuit found that the Plaintiffs were entitled to premium pay *while on leave.* (Emphasis added.) In arriving at its conclusion, the court turned to the "leave with pay" statutes and concluded that there would be *\*163* no reduction in pay while on leave. Contrary to the case at hand, these employees were still working and it was determined that they were to receive the same pay they would have received had they worked for leave purposes only, not lump-sum payments.

Finally, the Plaintiffs argue that the lump-sum payment is not limited to basic pay based on the legislative history of 5 U.S.C. § § 5551-5552. *Id. at 24.* However, the Court finds that the legislative history of title 38 is consistent with excluding additional pay from the lump-sum payment for employees. *See* H.R.Rep. No. 93-368 at 1708 (1973), *reprinted in* 1973 U.S.C.C.A.N. 1688 (discussing 38 U.S.C. § 7453(i) stating "additional pay under this new subsection will not count as basic compensation for lump-sum leave payments, severance pay, and other benefits relating to basic compensation.").

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

It is clear to the Court that Congress has "with clarity" determined that section 7453(i) lump-sum separation pay should not include additional pay regardless of what title 5 might provide to other civil service employees. Hence, following *Curry,* "the most logical conclusion is that Congress meant what it did and did what it meant-excluding the additional pay only from the lump-sum separation pay calculation...." *Curry,* 66 Fed.Cl. at 600. Therefore, because the Plaintiffs are employees governed by section 7453(i) the Court finds that the statute is clear that additional pay is excluded from the lump-sum calculation.

Even if the terms in Section 7453(i) were ambiguous, the Court must look to the test in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). That test consists of two questions. The first question the Court must address is "whether Congress has directly spoken on the precise question at issue." Id. at 843, 104 S.Ct. 2778. If Congress has directly spoken, the inquiry ends. Id. If, however, the statute is silent or ambiguous, the Court must determine the second question, that question being "whether the agency's answer is based on a permissible construction of the statute." Id. If there is a gap in the statute, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Id. at 843-44, 104 S.Ct. 2778. And unless the interpretation is one that is arbitrary, capricious, or manifestly contrary to the statute, the "court may not substitute its own construction of a statutory provision for a reasonable interpretation made by an administrator." Id. at 844, 104 S.Ct. 2778. Thus, unless the agency's interpretation is unreasonable, the agency's interpretation must prevail. Id. Here, the Court finds that the agency's interpretation is not unreasonable and, therefore, the decision by the VA Secretary that premium pay is not included in the lump-sum payment must be upheld. The Court, therefore, **GRANTS** Defendant's Motion to Dismiss for failure to state a claim upon which relief may be granted.

**C.    Treasury    and    General    Government Appropriations Act of 1997**

Further, the Defendant asserts that plaintiffs' claim for Sunday premium pay is statutorily barred. *D. Br. at 20.* In support, the Defendant cites, Pub.L. No. 105-61 [FN4], the Treasury and General Government Appropriations Act for fiscal year 1998. *D. Br. at 20.* The Defendant argues that the Act

precludes the payment of appropriated funds for Sunday premium pay unless the payee actually worked during the time for which pay is received. *Id.* The specific language in question is § 636 which states:

> FN4. Treasury, Postal Service, and General Government Appropriations, 1998, Pub.L. No. 105-61, § 636, 111 Stat. 1272, 1316 (1997).

Notwithstanding any other provision of law, no part of any appropriation contained in this Act or any other Act for any fiscal year shall be available for paying Sunday premium pay to any employee unless such employee actually performed work during the time corresponding to such premium pay.

111 STAT. 1272, 1316.

The Defendant notes that the effective date of the Act was September 30, 1997. *D. Br. at 20.* Accordingly, the Defendant contends **\*164** the Act bars Plaintiffs' claim to Sunday premium pay if they did not actually perform the work. *Id.* In their Third Amended Complaint Plaintiffs seek payment of leave for Sunday premium pay prior to 1999.

[5] Based on the clear prohibition in the FY 1998 Appropriations Act, the Court finds that the Plaintiffs are, therefore, precluded from seeking relief for the inclusion of Sunday premium pay as part of their accrued annual leave if they did not actually perform the work after October 1, 1997. However, prior to the enactment of the law, Plaintiffs may be entitled to such payment. Therefore, the Defendant's Motion to Dismiss for failure to state a claim on which relief may be granted is **PARTIALLY GRANTED** as to the inclusion of Sunday premium pay in the lump sum payment calculation.

### *CONCLUSION*

For the reasons set forth in this opinion the Court hereby **DENIES** Defendant's Motion to Dismiss for lack of subject matter jurisdiction and **GRANTS** Defendant's Motion to Dismiss for failure to state a claim on which relief may be granted. Therefore, the Court hereby **DISMISSES with prejudice** those claims set forth in Plaintiffs' Third Amended Complaint paragraph 2, subsections (4), (5), (6) and (9) pursuant to RCFC 12(b)(6). The Court further **PARTIALLY GRANTS** Defendant's Motion to Dismiss Plaintiffs' Third Amended Complaint paragraph 2 subsections (2) and (3) in accordance with the opinion. The Court will contact the parties

78 Fed.Cl. 157
78 Fed.Cl. 157
**(Cite as: 78 Fed.Cl. 157)**

to schedule a status conference to discuss the remaining litigation in this matter.

**It is so ORDERED.**

78 Fed.Cl. 157

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw

78 Fed.Cl. 86                                                                 Page 1
78 Fed.Cl. 86
**(Cite as: 78 Fed.Cl. 86)**

**C**

Solow v. U.S.
Fed.Cl.,2007.

United States Court of Federal Claims.
Jean-Robin SOLOW, et al., Plaintiffs,
v.
The UNITED STATES, Defendant.
**No. 06-872C.**

Aug. 21, 2007.

**Background:** Former federal employees brought
suit against the United States claiming that the
government miscalculated the amount of the lump
sum payment due them for accrued annual leave
when they separated from service or entered the
military on active duty by excluding certain forms of
employee compensation from the payout. Defendant
moved to dismiss.

**Holdings:** The United States Court of Federal
Claims, Smith, Senior Judge, held that:

(1) suit was not barred by res judicata arising from
prior class action suit;

(2) prior class action suit equitably tolled statute of
limitations on plaintiffs' claims until settlement with
other members of class severed their claims; and

(3) suit was not barred by laches.

Motion denied.
West Headnotes
**[1] Judgment 228 ☞677**

228 Judgment
    228XIV Conclusiveness of Adjudication
      228XIV(B) Persons Concluded
        228k677 k. Persons Represented by Parties.
Most Cited Cases
Suit by former federal employees claiming that the
government miscalculated the lump sum payment
amount of accrued annual leave owed them when
they separated from service was not barred by res
judicata arising from prior class action suit which
ended in settlement, where plaintiffs were not

included in settlement class, and thus parties in the
two suits were not identical or in privity.

**[2] Federal Courts 170B ☞1106**

170B Federal Courts
    170BXII Claims Court (Formerly Court of
Claims)
      170BXII(B) Procedure
        170Bk1103 Time to Sue and Limitations
          170Bk1106 k. Computation of
Limitations in General. Most Cited Cases
Prior class action against the United States brought
by former federal employees claiming that the
government miscalculated the lump sum payment
amount of accrued annual leave owed them when
they separated from service equitably tolled statute of
limitations on claims of putative class members until
settlement with other members of class severed their
claims. 28 U.S.C.A. § 2501.

**[3] Equity 150 ☞72(1)**

150 Equity
    150II Laches and Stale Demands
      150k68 Grounds and Essentials of Bar
        150k72 Prejudice from Delay in General
          150k72(1) k. In General. Most Cited
Cases
The defense of laches requires a showing of
unreasonable and unexcused delay by the plaintiff in
filing suit that prejudices the defendant.

**[4] United States 393 ☞39(12)**

393 United States
    393I Government in General
      393k39 Compensation of Officers, Agents, and
Employees
        393k39(11) Recovery of Compensation
          393k39(12) k. Time to Sue, Limitations,
and Laches. Most Cited Cases
Suit by former federal employees claiming that the
government miscalculated lump sum payment
amount of accrued annual leave owed them when
they separated from service was not barred by laches,
notwithstanding that plaintiffs waited from seven to
eleven years to file their suit, as they were reasonable
in awaiting settlement in class action raising identical
claims before bringing their own separate claims;
moreover, personnel records were still available and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

government had notice of the claims based on prior class action.


**\*86** Ira M. Lechner, Escondido, California, for Plaintiffs.

**\*87** Hillary A. Stern, Commercial Litigation Branch, Civil Division, Department of Justice with whom were Peter D. Keisler, Assistant Attorney General, Jeanne M. Davidson, Director, for Defendant.

### OPINION and ORDER

SMITH, Senior Judge.

This case involves the calculation of the lump sum payment to civilian federal employees under 5 U.S.C. § § 5551, 5552 when they separated from service or enter the military on active duty. The Plaintiffs are former employees of federal civilian agencies that claim that the government miscalculated the amount of their lump sum payment by excluding certain forms of employee compensation from the payout.

The case is now before this Court on the Government's Motion to Dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1). In support of its motion, the Government contends that the Plaintiffs' claims are precluded under the doctrine of *res judicata,* and/or the statute of limitations, and/or the doctrine of laches. After hearing oral argument [FN1] and careful consideration, and for the reasons set forth in this opinion, the Court **DENIES** the Government's Motion to Dismiss for lack of subject matter jurisdiction.


FN1. This case was heard with *Athey v. United States,* Case No. 99-2051 C, on June 27, 2007.

### FACTS

Federal civilian employees are entitled to a lump sum payment of their accrued annual leave when they separate from government service or enter the military on active duty. 5 U.S.C. § § 5551, 5552. In this case, the Plaintiffs were all previously employed by either the United States Information Agency, the Resolution Trust Corporation, and/or the Nuclear Regulatory Agency. Plaintiffs received a lump sum payment of their accrued leave upon separation from service. *D. Br.* at 3. Plaintiffs claim that the calculation of the payout amount did not include certain forms of premium pay or scheduled pay increases that they would have received if they worked through their period of accrued annual leave.

*Compl.* at ¶ ¶ 2, 3. The Plaintiffs in this suit all left federal service at different times, about the years 1995 through 1999. *D. Br.* at 9.

In 1999, a separate class action suit was brought before this court in *Archuleta v. United States,* Case. No. 99-205C. *Id.* at 3. The *Archuleta* case was filed on behalf of employees of all federal agencies claiming that the government miscalculated the lump sum payment amount of accrued annual leave owed them when they separated from service. *P. Br.* at 6. The parties ultimately agreed to settle the claims in the *Archuleta* suit. *Id.* The settlement order limited the settlement class to employees of 17 named federal agencies. *Id.* Plaintiffs formerly employed by those 17 agencies were to receive payment and the claims of former Department of Veterans Affairs employees were severed according to the agreement. *D. Br.* at 4. In an order approving the settlement, this Court ordered that "all claims that were or could have been made in the litigation by the named plaintiffs, are dismissed with prejudice...."*Order Approving Settlement,* filed June 2006. Plaintiffs, thereafter, filed this suit on December 21, 2006.

The government filed a motion to dismiss the present suit for lack of subject matter jurisdiction under RCFC 12(b)(1). Thereafter, the Plaintiffs answered and oral argument was held. For the reasons set forth below, the Court hereby **DENIES** Defendant's Motion to Dismiss.


### DISCUSSION

A. The Claims are Not Precluded by *Res Judicata*


[1] The doctrine of *res judicata* requires that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). *Res judicata*'s purpose is "an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered**\*88** forever settled as between the parties." *Id. at 401, 101 S.Ct. 2424* (quoting *Baldwin v. Traveling Men's Ass'n,* 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244 (1931)). The burden rests with the party moving for dismissal under *res judicata* to establish "that (1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

based on the same set of transactional facts as the first." *Ammex, Inc. v. United States,* 334 F.3d 1052, 1055 (Fed.Cir.2003).

The Defendant argues that all of the elements to preclude the Plaintiffs claims are met. First, Defendant argues that the parties are identical. *D. Br.* at 5. The United States was the Defendant and the class in *Archuleta* was all civilian government employees who separated from service before April 1993. *Id.* at 6. Second, the Defendant claims that the *Archuleta* settlement was "a final judgment on the merits" which establishes the second element of *res judicata. Id.* at 6. Finally, the Defendant argues that the instant case involves the same transactional facts as in *Archuleta* which was also a dispute over the inclusion of premium pay and pay increases in the lump sum payment of accrued annual leave for federal workers. *Id.* at 7.

On the other hand, the Plaintiffs argue that the elements required to prevail on a claim of *res judicata* are not satisfied and thus the claims are not precluded. *P. Br.* at 9. The Plaintiffs argue that the parties in the present suit are not identical or in privity with the class members in *Archuleta. Id.* at 10. In support of this contention, the Plaintiffs contend that the previous case did not name any plaintiffs that are named in the current case nor was there a contractual or legal basis that joined the parties in privity. *Id.* Further, the Plaintiffs argue that while the complaint in *Archuleta* referenced a broader group of plaintiffs, the final settlement included a narrower settlement class which did not include the Plaintiffs in the present case. *Id.*

The Court finds that the *Archuleta* litigation was resolved by a settlement agreement that defined the settlement class as consisting of employees of specifically named agencies which did not include the current named Plaintiffs. For that reason, the parties in the two suits are not identical. Further, there is no basis to conclude that legal privity existed between the parties in *Archuleta* and those involved in the present litigation. Therefore, the Court **DENIES** the Defendant's Motion to Dismiss based on the doctrine of *res judicata.*

## B. The Claims are not Barred by the Statute of Limitations

[2] All claims filed in this Court must be brought within six years from the time that the claims first accrued. 28 U.S.C. § 2501. "Under the Tucker Act,

a claim accrues 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.' " *MacLean v. United States,* 67 Fed.Cl. 14, 18 (2005). According to the Defendant, the Plaintiffs' claims accrued upon leaving federal employment. *D. Br.* at 9. The Defendant argues that in the case of each named Plaintiff, separation from federal service occurred more than six years before filing their complaint and, therefore, the statute of limitations would bar their claims. *Id.*

The Plaintiffs, however, argue that based on equitable tolling principles the statute of limitations was tolled from the time *Archuleta* was filed on April 7, 1999 until the case settled on June 1, 2006. *P. Br.* at 27.

The Plaintiff contends that the Irwin Doctrine, enunciated in *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), applies equitable tolling to suits against the government in the same way it is applied to disputes involving private litigants unless Congress clearly expresses a contrary intent. *P. Br.* at 16; *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95-96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *Kirkendall v. Dep't of Army,* 479 F.3d 830, 836 (Fed.Cir.2007). Next, the Plaintiffs assert that the courts have not precluded the applicability of equitable tolling on suits brought under the Tucker Act. *Id.* at 18. The Plaintiffs then argue that the statute of limitation in this case should be tolled based on the Supreme Court ruling in *\*89American Pipe v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). The Plaintiffs argue that under that rule, once a class action is filed, the statute of limitations is tolled for all putative class members. *P. Br.* at 21. The Plaintiffs assertion is that the *Archuleta* class action tolls the statute of limitations in the instant suit because they were putative class members of the earlier litigation.

The Court agrees with the Plaintiffs that equitable tolling of the statute of limitation under the Tucker Act is appropriate in this case. As the Plaintiffs noted, the government became aware of the Plaintiffs' claims through the *Archuleta* suit and, therefore, cannot claim any " 'undue' administrative burden" arising from tolling the statute of limitations. *P. Br.* at 19. Further, the Court agrees with the Plaintiffs that equitable tolling in this case will encourage the "aggregation of many small claims." *Id.* Hence, equitable tolling in this case would be consistent with the goals of judicial efficiency promoted by class actions. The Court further concludes that the

78 Fed.Cl. 86
78 Fed.Cl. 86
**(Cite as: 78 Fed.Cl. 86)**

Page 4

*Archuleta* suit tolled the statute of limitations for the Plaintiffs based on the principle announced in *American Pipe.* In that case, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554. Applying *American Pipe,* the *Archuleta* suit would have included the Plaintiffs in this case had the litigation continued. Therefore, the previous suit equitably tolled the statute of limitations for the instant Plaintiffs until the settlement severed their claims.

### C. The Claims are not Barred by Laches

[3] In the alternative, the Defendant raises the affirmative defense of laches to bar the Plaintiffs' claims. *D. Br.* at 9. The doctrine of laches "recognizes the need for the speedy vindication or enforcement of rights." *Henson v. United States,* 27 Fed.Cl. 581, 591 (1993). The defense of laches requires a showing of "unreasonable and unexcused" delay by the plaintiff in filing suit that prejudices the defendant. *Cornetta v. United States,* 851 F.2d 1372, 1377-1378 (Fed.Cir.1988). Prejudice may take the form of an inability to "mount a defense" or economic harm. *Id.*

[4] In support of its laches defense, the Defendant argues that the Plaintiffs waited seven to eleven years to file their suit without offering any reasons for the delay. *D. Br.* at 11. To establish the second element of laches, the Defendant argues that the delay has prejudiced their ability to mount a defense. *Id.* The Defendant alleges that because the events at issue took place so long ago, the government now faces difficulties in locating information they need to mount a defense. *Id.* Specifically, the Defendant points to the difficulty in finding former personnel who would have knowledge of the lump sum payout made to the Plaintiffs and the likelihood that they will no longer recall what happened even if located. *Id.* Further the Defendant argues that there are no assurances that personnel records concerning the lump sum payment to the Plaintiffs are still available. *Id.* Therefore, the Defendant maintains that they have established the elements of laches by showing an unreasonable delay that has resulted in prejudice to their ability to defend the suit.

The Plaintiffs argue that waiting until the class was determined in *Archuleta* before filing suit was "eminently reasonable." *P. Br.* at 28. The Plaintiffs

argue that there is no prejudice made against the Government's ability to mount a defense. *Id.* at 29. In response to Defendant's claim concerning the location of records, the Plaintiffs contend that the relevant personnel information is kept by the government in electronic format which is currently available. *Id.* Further, the Plaintiffs argue that locating former employees involved in the Plaintiffs' lump sum calculation is not essential to the defense because of data retained by the Government. *Id.* In addition, the Plaintiffs argue that the Defendant was aware of the need to preserve evidence that could be used in this case based on the *Archuleta* suit filed in 1999 because it referenced all government employees. *Id.* at 29.

The Court finds that the Plaintiffs were reasonable to await settlement in *Archuleta* before bringing their own separate claims. **\*90** Therefore, there was no unreasonable delay on the part of the Plaintiffs to file their suit. Moreover, personnel records are still available and the Government had notice of the claims based on the *Archuleta* suit. For that reason, the Court **DENIES** Defendant's Motion to Dismiss based on the doctrine of laches.

### *CONCLUSION*

For the reasons set forth in this opinion, the Court hereby **DENIES** Defendant's Motion to Dismiss for lack of subject matter jurisdiction. The Court will contact the parties to schedule a telephone status conference to discuss further litigation in this matter.

**It is so ORDERED.**

Fed.Cl.,2007.
Solow v. U.S.
78 Fed.Cl. 86

END OF DOCUMENT

Westlaw.

76 Fed.Cl. 339                                                                                      Page 1
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

H
GHS Health Maintenance Organization, Inc. v. U.S.
Fed.Cl.,2007.

United States Court of Federal Claims.
GHS HEALTH MAINTENANCE
ORGANIZATION, INC. d/b/a BlueLincs HMO,
Plaintiff,
Texas Health Choice, L.C., Plaintiff,
Scott & White Health Plan, Plaintiff,
v.
UNITED STATES, Defendant.
**Nos. 01-517C, 05-371C, 05-963C.**

April 17, 2007.

**Background:** In consolidated cases, contractors who
provided health care benefits for federal employees
brought suit against the United States alleging breach
of contract. Parties filed cross-motions for summary
judgment.

**Holdings:** The United States Court of Federal
Claims, Horn, J., held that:

(1) Office of Personnel Management (OPM)
regulation precluding reconciliation of the costs of
health care benefits provided by a contractor in the
last year of contractor's participation in the Federal
Employees Health Benefits Program (FEHBP) was
invalid because it conflicted with section of the
Federal Employees Health Benefits Act (FEHBA);

(2) contractors did not waive their rights to object to
mandatory contract clause which incorporated invalid
regulation by not challenging the clause until after
contract award and performance; and

(3) contractors were entitled to reformation of their
contracts to remove offending provision, and to
reconciliation of costs in their final year.

Plaintiffs' motions granted; defendant's cross-motion
denied.
West Headnotes
**[1] Statutes 361 ⚷190**

361 Statutes

361VI Construction and Operation
361VI(A) General Rules of Construction
361k187 Meaning of Language
361k190 k. Existence of Ambiguity.
Most Cited Cases
The first step in statutory construction is to determine
whether the language at issue has a plain and
unambiguous meaning with regard to the particular
dispute in the case.

**[2] Statutes 361 ⚷190**

361 Statutes

361VI Construction and Operation
361VI(A) General Rules of Construction
361k187 Meaning of Language
361k190 k. Existence of Ambiguity.
Most Cited Cases
Statutory construction ceases if the statutory
language is unambiguous and "the statutory scheme
is coherent and consistent."

**[3] Statutes 361 ⚷206**

361 Statutes

361VI Construction and Operation
361VI(A) General Rules of Construction
361k204 Statute as a Whole, and Intrinsic
Aids to Construction
361k206 k. Giving Effect to Entire
Statute. Most Cited Cases
In interpreting the plain meaning of the statute, it is
the court's duty, if possible, to give meaning to every
clause and word of the statute.

**[4] Statutes 361 ⚷206**

361 Statutes

361VI Construction and Operation
361VI(A) General Rules of Construction
361k204 Statute as a Whole, and Intrinsic
Aids to Construction
361k206 k. Giving Effect to Entire
Statute. Most Cited Cases
A court must avoid an interpretation of a statutory
clause or word which renders other provisions of the
statute inconsistent, meaningless, or superfluous.

**[5] Statutes 361 ⚷188**

361 Statutes

76 Fed.Cl. 339
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

Page 2

361VI Construction and Operation
  361VI(A) General Rules of Construction
    361k187 Meaning of Language
      361k188 k. In General. Most Cited Cases

**Statutes 361 ☞214**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k214 k. In General. Most Cited Cases

**Statutes 361 ☞219(4)**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k219 Executive Construction
          361k219(4) k. Erroneous Construction; Conflict with Statute. Most Cited Cases

When a statute's language is plain, the sole function of the courts is to enforce it according to its terms; in such instances, the court should not consider conflicting agency pronouncements or extrinsic evidence of a contrary intent.

**[6] Statutes 361 ☞217.2**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k217.2 k. Legislative History of Act. Most Cited Cases

If a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute.

**[7] Administrative Law and Procedure 15A ☞386**

15A Administrative Law and Procedure
  15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
    15AIV(C) Rules and Regulations
      15Ak385 Power to Make
        15Ak386 k. Statutory Basis. Most Cited Cases

**Administrative Law and Procedure 15A ☞416.1**

15A Administrative Law and Procedure
  15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
    15AIV(C) Rules and Regulations
      15Ak416 Effect
        15Ak416.1 k. In General. Most Cited Cases

If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation; such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

**[8] Administrative Law and Procedure 15A ☞416.1**

15A Administrative Law and Procedure
  15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
    15AIV(C) Rules and Regulations
      15Ak416 Effect
        15Ak416.1 k. In General. Most Cited Cases

Administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.

**[9] Statutes 361 ☞219(2)**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k219 Executive Construction
          361k219(2) k. Existence of Ambiguity. Most Cited Cases

**Statutes 361 ☞219(4)**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k219 Executive Construction
          361k219(4) k. Erroneous Construction; Conflict with Statute. Most Cited Cases

*Chevron* deference requires that a court ask the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

following questions when reviewing an agency's construction of a statute: first, whether Congress has directly spoken to the precise question at issue; and second, if Congress is silent, or if it has left the statute ambiguous with respect to the specific issue, whether the agency's answer is based on a permissible construction of the statute.

**[10] Statutes 361 ☞219(1)**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
       361k219 Executive Construction
        361k219(1) k. In General. Most Cited Cases

**Statutes 361 ☞219(4)**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
       361k219 Executive Construction
        361k219(4) k. Erroneous Construction; Conflict with Statute. Most Cited Cases

Court of Federal Claims should defer to an agency's construction of a statute if it reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent.

**[11] United States 393 ☞39(2)**

393 United States
   393I Government in General
     393k39 Compensation of Officers, Agents, and Employees
      393k39(2) k. Form and Amount in General. Most Cited Cases

Office of Personnel Management (OPM) regulation precluding reconciliation of the costs of health benefits provided by a contractor to federal employees in the last year of contractor's participation in the Federal Employees Health Benefits Program (FEHBP) was invalid because it conflicted with section of the Federal Employees Health Benefits Act (FEHBA) providing that a carrier's rates shall reasonably and equitably reflect the costs of benefits provided. 5 U.S.C.A. § 8902(i); 48 C.F.R. § 1652.216-70(b)(6).

**[12] United States 393 ☞39(2)**

393 United States
   393I Government in General
     393k39 Compensation of Officers, Agents, and Employees
      393k39(2) k. Form and Amount in General. Most Cited Cases

Contractors who provided health care benefits for federal employees in the Federal Employees Health Benefits Program (FEHBP) did not waive their rights to object to mandatory contract clause which incorporated invalid regulation precluding reconciliation of costs in the last year of contractor's participation in the FEHBP by not challenging the clause until after contract award and performance, considering futility of protesting the clause. 5 U.S.C.A. § 8902(i); 48 C.F.R. § 1652.216-70(b)(6).

**[13] Equity 150 ☞72(1)**

150 Equity
   150II Laches and Stale Demands
     150k68 Grounds and Essentials of Bar
      150k72 Prejudice from Delay in General
       150k72(1) k. In General. Most Cited Cases

To prevail on a defense of laches, the defending party must show unreasonable, unexcused delay by the claimant from the time the plaintiff knew or should have known of the claim, and prejudice to the other party.

**[14] Equity 150 ☞84**

150 Equity
   150II Laches and Stale Demands
     150k84 k. Application of Doctrine in General. Most Cited Cases

Doctrine of laches did not bar challenge by contractors to invalid regulation of the Office of Personnel Management (OPM) implementing the Federal Employees Health Benefits Act (FEHBA), absent evidence of unreasonable delay by contractors in asserting their challenge, or prejudice from any delay. 5 U.S.C.A. § 8901 et seq.; 48 C.F.R. § 1652.216-70(b)(6).

**[15] Reformation of Instruments 328 ☞16**

328 Reformation of Instruments
   328I Right of Action and Defenses
     328k15 Grounds for Reformation
      328k16 k. In General. Most Cited Cases

76 Fed.Cl. 339
76 Fed.Cl. 339
(Cite as: 76 Fed.Cl. 339)

Contractors who contracted to provide health care benefits for federal employees in the Federal Employees Health Benefits Program (FEHBP), and who prevailed on challenge to validity of regulation incorporated in mandatory clause of their contracts which precluded reconciliation of costs in final contract year, were entitled to reformation of their contracts to remove offending provision, and to reconciliation of costs in final year.

**\*341** Daniel B. Abrahams, Constance A. Wilkinson, and Michael D. Maloney, Epstein, Becker & Green, P.C., Washington, D.C., for plaintiff GHS Health Maintenance Organization, Inc. d/b/a BlueLincs HMO. Michael S. Nadel, Joel L. Michaels, Maura A. Dalton, and Arthur G. Sapper, McDermott Will & Emery LLP, Washington, D.C., for plaintiffs Texas Health Choice, L.C. and Scott & White Health Plan. Jane W. Vanneman, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With her were Peter D. Keisler, Assistant Attorney General, and Susan Whitman and Jill Gerstenfield, United States Office of Personnel Management, Washington D.C., of counsel.

## OPINION

HORN, Judge.

These cases come before the court upon the parties' cross-motions for summary judgment. Plaintiffs are three health benefits carriers (collectively, the "carriers")–GHS Health Maintenance Organization, Inc., doing business as BlueLincs HMO (BlueLincs), Texas Health Choice, L.C. (Texas Health), and Scott & White Health Plan (Scott & White). These cases involve contracts between the carriers and the United States Office of Personnel Management (OPM) for health care benefits to federal employees. OPM is the federal agency responsible for administering the Federal Employees Health Benefits Act (FEHBA), codified at 5 U.S.C. § § 8901-8914 (2000). The FEHBA governs all health plans servicing federal employees.

These cases focus on each plaintiff's last year of participation in the Federal Employees Health Benefits Program (FEHBP). As discussed more fully below, each year during a carrier's participation in the program, OPM and the carrier engage in a process to reconcile the current year's premium rates with the premium rates the contractor is charging the lower of two similarly sized subscriber groups (SSSGs). This is because the premium rates charged by carriers at the beginning of a contract year are

only estimates of what a carrier's rates are projected to be for that year. The reconciliation results in a finding either that the government paid the carrier too much or too little. If it is determined that the estimated rates were higher than the actual rates the carrier should have been paid, the carrier refunds the government the difference. If it is determined that the estimated rates were lower than the actual rates the carrier should have been paid, the government pays the carrier the difference.

Whether this payment or recoupment as a result of the reconciliation process should occur in a carrier's last year of participation in the program is the issue before the court. Included in all FEHBP contracts is a mandatory clause, titled "Accounting and Price Adjustment (Jan 1998)," which contains a paragraph known as the "Final Year Regulation." The Final Year Regulation states that: "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates." **\*342** 48 C.F.R. § 1652.216-70(b)(6) (Oct. 1, 1998). Accordingly, in the last year of participation in the FEHBP, if the government overpays, the clause contemplates no recoupment for its losses from a carrier through the reconciliation process and, similarly, if the government underpays, the clause anticipates no recoupment to the contractor for its losses through the reconciliation process.

In their complaints before this court, the plaintiffs argue that 48 C.F.R. § 1652.216-70(b)(6), promulgated by OPM, conflicts with the statute, 5 U.S.C. § 8902(i) (2000), which requires that: "Rates charged under health benefits plans described by section 8903 or 8903a of this title shall reasonably and equitably reflect the cost of the benefits provided." The plaintiffs argue that the Final Year Regulation, incorporated into the plaintiffs' contracts, violates the statute and, therefore, results in a breach of the plaintiffs' contracts. Each plaintiff seeks monetary damages for the government's alleged breach of contract. The plaintiffs also seek a declaratory judgment, asking this court to invalidate 48 C.F.R. § 1652.216-70(b)(6) either in whole, or as applied to each plaintiff's contract with OPM. Specifically, plaintiff BlueLincs seeks $369,127.00 for breach of contract, while plaintiff Texas Health seeks $622,246.00, and plaintiff Scott & White seeks $3,625,782.00. For the reasons discussed below, this court finds that 48 C.F.R. § 1652.216-70(b)(6) conflicts with 5 U.S.C. § 8902(i). The court, therefore, grants the plaintiffs' motions for summary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339                                                                                              Page 5
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

judgment and denies the defendant's cross-motion for summary judgment.

## FINDINGS OF FACT

### Procedural History

Only BlueLincs initially filed its case in the United States Court of Federal Claims, which became case no. 01-517C, and the lead case of these consolidated cases. Case no. 01-517C, however, was stayed in this court at the request of the parties, pending resolution of procedural issues in the other two cases, which plaintiffs initially filed in different federal district courts.

Texas Health initially filed its case in January, 2003, in the United States District Court for the Eastern District of Texas. In June, 2003, the government moved to dismiss or transfer the case to the United States Court of Federal Claims, arguing that the District Court lacked jurisdiction to hear the plaintiff's claims. A Magistrate Judge of the District Court recommended that the District Court deny the government's motion. *See Texas Health Choice, L.C. v. U.S. Office of Pers. Mgmt., No. Civ. A. 9:03CV14, 2004 WL 3266033, at \*6-7 (E.D.Tex. Feb.12, 2004).* The District Court adopted the Magistrate Judge's recommendation and denied the government's motion to dismiss or transfer. The government appealed the District Court's decision to the United States Court of Appeals for the Federal Circuit.

Finding that Texas Health's contract was controlled by the Contract Disputes Act, 41 U.S.C. § § 601-613 (2000), the Federal Circuit reversed the Texas District Court in *Texas Health Choice, L.C. v. Office of Personnel Management,* 400 F.3d 895 (Fed.Cir.), *reh'g* and *reh'gen banc denied* (2005). The Federal Circuit found:
We agree with OPM that under the CDA, the Court of Federal Claims has exclusive jurisdiction over Texas Health's suit against OPM relating to the validity of the Final Year Regulation incorporated into the FEHBA contract as Clause 3.2(b)(6). That is because Texas Health's claim is related to the FEHBA contract. "The CDA exclusively governs Government contracts and Government contract disputes." *Cecile Indus., Inc. v. Cheney,* 995 F.2d 1052, 1055 (Fed.Cir.1993).

*Texas Health Choice, L.C. v. Office of Pers. Mgmt.,*

400 F.3d at 898. The Federal Circuit stated: "That Texas Health's complaint, literally read, sought only to invalidate the Final Year Regulation, as opposed to recover the $622,246 reconciliation amount, is of no consequence to the question of jurisdiction because the complaint relates to a dispute implicating a contract with the Government." *Id.* at 900.

Thus, the Federal Circuit referred jurisdiction to the United States Court of Federal Claims to hear the plaintiff's claim, and review the validity of the regulation as it applied to the final year of participation in the **\*343** program by a health benefits carrier. After the Federal Circuit's decision, in March, 2005, the Eastern District of Texas District Court transferred Texas Health's case to this court. Texas Health's case was filed in the United States Court of Federal Claims as case no. 05-371 C.

Scott & White initially filed its case in August, 2001, in the United States District Court for the District of Columbia, which became *Scott & White v. OPM,* No. 01:CV:1824 (JGP). In January, 2003, while its case was pending in District Court, Scott & White filed a complaint in the United States Court of Federal Claims, which became case no. 03-61 C. Another judge of the Court of Federal Claims, however, dismissed that case because Scott & White also had the same case pending in the District Court. *See Scott & White v. United States,* No. 03-61 C (Fed.Cl. Apr. 22, 2003) (order dismissing without prejudice). On March 31, 2005, relying on the Federal Circuit decision in *Texas Health Choice, L.C. v. Office of Personnel Management,* 400 F.3d at 898, the United States District Court for the District of Columbia ordered that Scott & White's case be transferred to the United States Court of Federal Claims. Scott & White appealed the District Court's March 31, 2005 order, but subsequently moved to dismiss its appeal. The United States Court of Appeals for the Federal Circuit dismissed Scott & White's appeal on September 1, 2005. The District Court then transferred Scott & White's case to this court on September 2, 2006. After the two cases initiated in the two different District Courts were transferred to this court, the court consolidated the three cases because they raise the same legal issue involving the validity of 48 C.F.R. § 1652.216-70(b)(6).

### Background of the FEHBP

In 1959, Congress established a subsidized health insurance program which covered federal workers, family members, annuitants, and retired federal

workers.  *See* Federal Employees Health Benefits Act (FEHBA) of 1959, Pub.L. 86-382, H.R.Rep. No. 86-957 (1959), *reprinted* in 1959 U.S.C.C.A.N. 2913, 2914.  The current FEHBA is codified at 5 U.S.C. § § 8901-8914 (2000).  Under the FEHBA, OPM is authorized to contract with qualified carriers offering health benefits plans for a renewable term of at least one year.  *See* 5 U.S.C. § 8902(a).  A contractor under the program provides a health benefits plan to enrolled federal enrollees and their families and is compensated by premium payments comprised of a government contribution and an enrollee contribution.  Therefore, once enrolled in a plan, the employee pays only a portion of the fixed premium.  The government contributes an amount not to exceed 75% of the actual subscription charge for an enrolled individual.  *See* 5 U.S.C. § 8906(b)(1)-(4).  The rest of the premium is withheld from the enrollee's paycheck or annuity.  *See* 5 U.S.C. § 8906(d).

BlueLincs, Texas Health, and Scott & White each entered into a contract with OPM to provide health benefits to eligible federal enrollees and their families through the FEHBP.  As part of the plaintiffs' contracts, OPM annually negotiated with each contractor the benefits and premiums for the next contract year, which began January 1 of the following calendar year.  Premiums were negotiated on the basis of experience rating or community rating.  The process began each May, when contractors proposed to OPM premium rates for the upcoming contract year.  The premium rates proposed represent the contractors' estimates of what the contractors will charge similarly sized subscriber groups (SSSGs) during the upcoming calendar year.  *See* 48 C.F.R. § 1602.170-13.

The Federal Employees Health Benefits Acquisition Regulation (FEHBAR) defines an SSSG as follows:
(a) *Similarly sized subscriber groups* (SSSGs) are a comprehensive medical plan carrier's two employer groups that:
(1) As of the date specified by OPM in the rate instructions, have a subscriber enrollment closest to the FEHBP subscriber enrollment; and,
(2) Use any rating method other than retrospective experience rating; and,
(3) Meet the criteria specified in the rate instructions issued by OPM.
(b) Any group with which an FEHB carrier enters into an agreement to provide **344** health care services is a potential SSSG (including separate lines of business, government entities, groups that have multi-year contracts, and groups having point-of-service products).

48 C.F.R. § 1602.170-13.

In determining the final rates for a plan, the OPM Federal Employees Health Benefits Acquisition Regulation requires that "OPM shall determine the FEHBP rate by selecting the lower of the two rates derived by using rating methods consistent with those used to derive the SSSG rates." 48 C.F.R. § 1602.170-13(d).  Furthermore, the acquisition regulation requires that:  "The subscription rates agreed to in this contract shall be equivalent to the subscription rates given to the carrier's similarly sized subscriber groups (SSSGs)...." 48 C.F.R. § 1652.216-70(b)(2).  Rate negotiations for a given calendar year typically take place in June, July and August so that rates are finalized prior to the open season during which employees select their insurance plans for the following year.  During that year, OPM remits the premium payment at the agreed-upon rates.

Health maintenance organizations are at risk when they determine their rates.  If they charge too much, they are at risk of losing enrollees in the competitive open season process.  If they charge too little, they may not earn enough premium income to meet the covered health services of the group.  It is the carrier's responsibility to project the appropriate amount to charge for covered services in advance of the year in which the services will be provided.

Generally, beginning in April of the contract year, contractors and OPM engage in a process to reconcile the current year's premium rates (which were estimates of what the contractor's SSSG rates would be) with the premium rates the contractor actually is charging an SSSG. OPM does not obtain all detailed records that may be maintained at the carrier's place of business.  Instead, OPM relies on audits to provide an incentive for the carriers to accurately represent the data that drive their rates in the first instance.

To the extent an audit of any plan results in findings regarding the calculations or representations relevant to negotiation or reconciliation figures, those figures are subject to correction, adjustment or claim by OPM under 48 C.F.R. § 1652.215-70, titled "Rate Reduction for Defective Pricing or Defective Cost or Pricing Data," and 48 C.F.R. § 1652.216-70, the "Accounting and Price Adjustment" clause.  In years when the contract is renewed, if it is determined that the rates currently in force were higher than the rates actually charged to the SSSG, the contractor pays the government the difference.  *See* 48 C.F.R. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7

1652.216-70(b)(4-5).    If it is determined that the rates currently in force were lower than the rates actually charged to the SSSG, the government pays the contractor the difference.   *See id.*

With respect to the years at issue when the contracts were not renewed for the three named plaintiffs, the government refused to adjust the differences between the rates that were then currently in force and the rates actually charged to the SSSG. OPM takes the position that this result is mandated by 48 C.F.R. § 1652.216-70(b)(6), which requires that the following language be included in all program contracts: "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates." 48 C.F.R. § 1652.216-70(b)(6).    This paragraph in the Accounting and Price Adjustment clause, known as the Final Year Regulation, appears in the contracts of BlueLincs, Texas Health, and Scott & White.    The clause was not negotiated, but mandatory.

### Scott & White's Final Year Reconciliation Claim

Scott & White provided health care benefits to federal employees in Texas as part of the FEHBP. Section 3.2 of Scott & White's contract with OPM incorporated the Final Year Regulation, quoted immediately above.    Scott & White's final year of participation in the FEHBP was 1999.    In a telefax dated September 22, 1999, Scott & White informed OPM that it intended to withdraw from the *345 FEHBP, effective January 1, 2000.    In the telefax, Scott & White stated:    "As we discussed this afternoon, Scott and White regrets that we have decided to withdraw from participation as an HMO under the FEHBP effective upon the contract anniversary date for 2000 [January 1, 2000]."    On September 23, 1999, OPM responded to Scott & White's notice and informed Scott & White that it was the carrier's responsibility to continue health care benefits to all federal enrollees until coverage under their new health benefits plan begins. Thus, 1999 was Scott & White's final year of participation in the FEHBP, which, according to the defendant, invoked the Final Year Regulation, 48 C.F.R. § 1652.216-70(b)(6), as incorporated in a clause in the contract.

For Scott & White's 1999 contract year, beginning in July, 1999, OPM actually performed a reconciliation calculation on Scott & White's rates.    During the reconciliation, OPM calculated the difference

between Scott & White's estimated 1999 contract rates and the rates that should have been charged based upon Scott & White's actual community rates in effect on January 1, 1999.    By a letter dated July 30, 1999, Nancy Kichak, Director of the Office of Actuaries, Retirement and Insurance Service for OPM, informed Scott & White that:    "We have calculated the difference between the 1999 contract rates and the rates that should be charged based on your plan's actual community rates in effect on January 1, 1999 and the information you provided about the plan's Similar Sized Subscriber Groups (SSSGs).    The parties have stipulated that the 1999 reconciliation resulted in $3,625,782.00 due to Scott & White.    OPM, however, did not refund to Scott & White the amount reconciled for its 1999 contract year."

This amount, $3,625,782.00, represents the amount requested by Scott & White in its October 10, 2000, certified claim to David Lewis, a contracting officer in the Insurance Contracts Division of OPM. In its claim to the contracting officer, Scott & White stated: The claim seeks to recover $3,625,782 (the "Claim Amount") in unpaid premiums for the 1999 contract year.    Specifically, SWHP [Scott & White Health Plan] requests payment for premiums owed by OPM under the Contract for benefits and coverage provided by SWIP to FEHBP members for the 1999 contract which OPM did not pay to SWHP.
OPM did not pay the Claims Amount on the ground that SWHP terminated the Contract at the end of the 1999 contract year and therefore was not entitled to a rate reconciliation adjustment.    It is SWHP's understanding that OPM relied upon 48 C.F.R. § 1652.216-70(b)(6) in denying SWHP payment on the Claim Amount....
SWHP objects to OPM's refusal to pay the Claim Amount....

The $3,625,782.00 amount, plus interest, also is the amount requested by Scott & White in its lawsuit in this court.

### Texas Health's Final Year Reconciliation Claim

Like Scott & White, Texas Health provided health care benefits to federal employees in Texas as part of the FEHBP.    Also similar to Scott & White, section 3.2 of Texas Health's contract with OPM incorporated the Final Year Regulation language. Texas Health's last year of participation in the FEHBP was 2001.    Specifically, on September 27, 2001, David Marlon, President of Texas Health,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339
76 Fed.Cl. 339
(Cite as: 76 Fed.Cl. 339)

wrote to Clifford Moseley, a contracting specialist with OPM, and stated, "please let this serve as formal notification of our decision to not-renew the above-referenced contract with the Office of Personnel Management to participate in the Federal Employee Health Benefits Program (FEHBP) in Texas, effective December 31, 2001."

Before Texas Health had notified OPM of its intention to withdraw from the FEHBP, OPM actually had reconciled Texas Health's rates for 2001. Based upon its reconciliation, OPM concluded that Texas Health was due $622,246.00, and paid that amount to Texas Health. However, after receiving Texas Health's notification that it did not intend to renew its contract, OPM informed Texas Health that the company would need to refund the $622,246.00 to the government. **346 Specifically, in a letter dated October 15, 2001, OPM's Nancy Kichak wrote to Texas Health stating: "We were informed that you [Texas Health] would be withdrawing from the FEHB program at the end of 2001; therefore, we should not have performed a reconciliation of your 2001 contract rates. We need to settle the outstanding amount owed to OPM due to an over payment.... As a result of this overpayment, OPM is due $622,246."

On January 8, 2002, Texas Health filed a certified claim with William T. Stuart, a contracting officer with OPM. In its certified claim, Texas Health stated that it filed the claim, "disputing the action taken by the Office of Personnel Management (OPM) to recoup $622,246.00 paid to TXHC for the 2001 rate reconciliation," and stating that Texas Health believed that "the regulation (48 C.F.R. § 1652.216-70(b)(6)) upon which OPM relied in recouping the $622,246 from TXHC is inconsistent with OPM's statutory obligation to pay a *fair and equitable* rate and a rate that is equivalent to that charged the similarly sized subscriber groups (SSSGs)." (emphasis in original). OPM did not respond to the claim. The $622,246.00 amount, plus interest, is the amount requested by Texas Health in its lawsuit in this court.

### BlueLincs' Final Year Reconciliation Claim

GHS, doing business as BlueLincs, a Health Maintenance Organization (HMO) owned by Blue Cross and Blue Shield of Oklahoma, entered into a contract with OPM to provide health benefits to federal employees, annuitants and their dependents in Oklahoma. Similar to the contracts entered into with

Texas Health and Scott & White, BlueLincs' contract with OPM also incorporated the Final Year Regulation language. BlueLincs' final year of participation in the FEHBP was 2000. By letter dated July 14, 2000, Blue Cross and Blue Shield of Oklahoma informed OPM that it would "no longer be offering BlueLincs HMO to federal employees for 2001."

Before BlueLincs submitted its notice of non-renewal to the OPM, BlueLincs had provided OPM with documentation and a revised proposal for the rate reconciliation process for BlueLincs' contract year 2000. Assuming that the BlueLincs contract would be renewed, OPM actually conducted a reconciliation with respect to BlueLincs' contract, and determined, at that time, that BlueLincs was owed $364,962.00 for the year 2000.

After BlueLincs had submitted its notice to OPM that it did not intend to renew its FEHB contract, OPM issued a contracting officer's final decision on September 7, 2000, claiming entitlement to $312,867.00 for lost investment income under a prior settlement with BlueLincs for contract years 1993, 1994, and 1995, pursuant to section 5.9(e) of BlueLincs' contract with OPM, and 48 C.F.R. § 1652.215-70. Neither party has provided evidence in this case addressing OPM's lost investment income claim that BlueLincs owes the $312,867.00,[FN1] nor has the defendant filed a counterclaim in that amount. The lost investment income issue, therefore, is not before the court. The only issue under review is whether BlueLincs is entitled to a reconciliation for its final contract year, 2000.

> FN1. The record, which is somewhat confusing, reflects that OPM withheld not $312,867.00, but $314,587.00, on the lost investment income issue.

On July 20, 2001, BlueLincs submitted a certified claim to Abby Block, OPM's Assistant Director for Insurance Programs, requesting that BlueLincs be able to offset $314,587.00 OPM claimed was owed by BlueLincs against BlueLincs' contract year 2000 rate reconciliation. On March 7, 2002, BlueLincs submitted a supplemental certified claim in the amount of $54,540.00. OPM did not respond to either claim. The total of these two claims is $369,127.00. In its complaint in this court, BlueLincs requests that the court invalidate OPM's Final Year Regulation, and award BlueLincs the $369,127.00, plus interest, for breach of contract.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339                                                                                                    Page 9
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

**History of the Final Year Regulation, 48 C.F.R. § 1652.216-70(b)(6)**

The Final Year Regulation, as incorporated in the plaintiffs' contracts, was promulgated by OPM through the formal rulemaking process in accordance with the Administrative Procedure Act (APA), **347**5 U.S.C. § 553 (1988). On October 20, 1989, OPM published in the Federal Register a notice of proposed rulemaking addressing multiple regulations pertaining to the FEHBP, including the Final Year Regulation. *See* FEHB Acquisition Regulation; Revision of Contract Clauses and Community Rating Practices, 54 Fed.Reg. 43089-01 (Oct. 20, 1989). The summary of the proposed rulemaking stated:

The Office of Personnel Management (OPM) is issuing proposed regulations which would recognize the increasing diversity in community rating practices within the insurance industry and, specifically, within the Federal Employees Health Benefits Program (FEHBP). The regulations would also expand and clarify OPM's FEHBP price negotiation policy. At the same time, OPM is taking the opportunity to amend some of the required contract clauses found in section 1652 of the Federal Employees Health Benefits Acquisition Regulation (FEHBAR) to better reflect the specific needs of the FEHBP, to add a new Federal Acquisition Regulation (FAR) clause requiring carriers to maintain a drugfree workplace, and to delete unnecessary or inappropriate FAR clauses.

54 Fed.Reg. at 43089.

With reference to the Final Year Regulation, 48 C.F.R. § 1652.216-70(b)(6), OPM indicated in its proposed rulemaking that:

The Accounting and Price Adjustment clause [1652.216-70] used in the community rated contracts has been substantially changed to reflect OPM's treatment of the new HMO amendments contained in Public Law 100-517. The subscription rate now focuses on the basic PMPM [per member per month] capitation or revenue requirement and is considered to be a market price under the FAR. OPM recognizes that the actual market price for the following contract year may not be available at the time of the carrier's rate submission. Proposed rates must be developed by starting from a current market price and adjusting that price to project to January 1. If the projection is later revised downward for the similarly sized subscriber groups, adjustments must be made to the following year's FEHB proposal to reflect the

revision. If the trend adjustment for the similarly sized subscriber groups is increased over the estimate, the carrier may propose an addition to the following year's capitation. This is equivalent to the annual reconciliation currently requested by OPM.

54 Fed.Reg. at 43090 (bracketed material in original).

As part of the proposed change to the Final Year Regulation, OPM proposed to include the section at issue in this case that addresses rate reconciliation during the final year of a carrier's participation in the FEHBP. Specifically, OPM proposed language stating: "As prescribed in 1616.270, the following clause [Accounting and Price Adjustment (Jan 1990) ] shall be inserted in all FEHBP contracts based on established market price ... (6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimated and the actual market price, PMPM capitation or revenue requirement." 54 Fed.Reg. at 43094.

OPM accepted public comment on the Final Year Regulation between October, 1989 and January, 1990, and received comments on OPM's proposed change to the Final Year Regulation, including a comment from OPM's Office of Inspector General. On December 19, 1989, Karen Eaton of the law firm Epstein, Becker & Green, P.C., the law firm representing BlueLincs in this case, also submitted a comment on OPM's proposed changes. In her comment, Ms. Eaton indicated that her firm "represented a number of carriers who participate in the Federal Employees Health Benefits Program as well as the American Managed Care Review Association, an association of managed care plans including carriers which participate in the Federal Employees Health Benefits Program." In response to OPM's proposed rule changes and the Final Year Regulation, Ms. Eaton stated on behalf of her clients that:

We object to 1652.216-70(b)(6) in that it penalizes a carrier in its final year of participation in the FEHBP because it did not accurately anticipate seven months earlier (when the rates were filed with the Office of Personnel Management) what its community**348** rate would be on January 1 of the final contract year. The reconciliation process should be applied to every carrier whether or nor they intend to participate the following contract year.

PARTNERS National Health Plans also commented to OPM on January 4, 1990. In its comment,

PARTNERS stated:

If the contract is not renewed, the proposal states that neither the Government nor the Carrier is entitled to any adjustment (payable or receivable) for the difference between the estimated and actual rates. Why should the fact that the contract is not being renewed impact the rate reconciliation and settlement process?

In addition to receiving these comments from representatives of FEHBP carriers, OPM received input from Patrick J. Conklin, the Inspector General of OPM. In his comments on OPM's proposed rulemaking concerning the Final Year Regulation, Mr. Conklin stated:

*1652.216-70 Accounting and price adjustments*: The clause provides that "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimated and the actual market price, PMPM capitation or revenue requirement." Here too, we do not believe that the Government's interest are adequately protected. The clause does not address the potential for a Plan to intentionally overcharge the Program prior to withdrawing from the program. We believe the clause should only apply when the contract is not renewed "for the convenience of the Government", as defined elsewhere in the FAR.

In a July 3, 1990 response to the Inspector General's concerns, Curtis Smith, the Associate Director for Retirement and Insurance stated that:

The argument for claims or adjustments in price when a contract is not renewed can be made by either party. For example, one respondent to the proposed rule wants to be able to bill the Government in the event of nonrenewal. Nevertheless, our past experience has been that, on termination, the carriers generally do not have adequate data available for us to make price adjustments. Further, in the event a plan goes out of business, there are no rates to reconcile. In our opinion, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination. OPM continues to have recourse to debt collection agencies and the courts if the situation warrants.

On July 2, 1990, after receiving public comments from the three sources above, namely, PARTNERS, Epstein, Becker & Green, PARTNERS National Health Plans and the OPM Inspector General, OPM published its

notice of final rulemaking in the Federal Register. *See* 55 Fed.Reg. 27406-01 (July 2, 1990). With its notice, OPM published its response to the comments received on the Final Year Regulation:

The clause in 1652.216-70 provides that if the FEHBP contract is not renewed, neither the Government nor the carrier is entitled to any adjustment for the difference between the estimated and actual market price. Two commenters did not understand why nonrenewal of the contract impacts the rate reconciliation and settlement process.

OPM's experience has been that it is difficult to get adequate data from plans when they have terminated. Further, in the event a plan goes out of business, there are no rates to reconcile. In the opinion of OPM, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination.

55 Fed.Reg. at 27410.

In its final rulemaking in 1990, OPM adopted the language of the Final Year Regulation as follows: "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimated and actual market price, PMPM capitation or revenue requirement." 55 FR at 27416 (codified at 48 C.F.R. § 1652.216-70(b)(6) (Oct. 1, 1990)). The final rulemaking indicated that the language became effective January 1, 1990, and was to be applied beginning with "the 1990 FEHB Program con**\*349** tracts...." The Final Year Regulation was modified in 1997 to read as follows: "(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates."

### DISCUSSION

The parties have filed cross-motions for summary judgment. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630-31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247-48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,*361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,*361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 52 Fed.Appx. 507 (2002), *published at*317 F.3d 1331 (Fed.Cir.2003); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250-52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment: saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the

motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614-15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,*970 F.2d 890 (Fed.Cir.1992); *see also U.S. Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." **\*350***Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,*534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir.1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587-88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247

Page 12

F.3d 1202, 1207 (Fed.Cir.2001).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied,*532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,*393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. United States Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. United States Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338-39 (Fed.Cir.2001), *cert. denied,*534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002).

**Plaintiffs Seek to Invalidate the Final Year Regulation**

In these cases, the lead motion for summary judgment was filed, jointly, by Scott & White and Texas Health. In its separate motion for summary judgment, BlueLincs adopted its co-plaintiff's motions and incorporated by reference the arguments presented by Scott & White and Texas Health. Therefore, unless otherwise indicated, any argument identified as made by one plaintiff is one adopted by all three plaintiffs.

The plaintiffs argue that the government's reliance on

the Final Year Regulation, as **351** incorporated in clause 3.2(6) of the contracts, to refuse to reconcile and reimburse the carriers during the last year of a carrier's participation in the FEHBP, if the reconciliation so indicates, conflicts with the requirement in the statute, the FEHBA. The statute states that a carrier's rates "shall reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). The current version of the Final Year Regulation and the contract language state: "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates." 48 C.F.R. § 1652.216-70(b)(6).

Plaintiffs argue that Congress charged OPM with promulgating regulations "to ensure that the Act's standard of reasonable and equitable compensation is met." Plaintiffs acknowledge that generally, OPM has done so, but that with respect to the Final Year Regulation, "OPM has deviated from Congress's charge." According to the plaintiffs, the Final Year Regulation is in direct violation of statutory guidance in the FEHBA. The plaintiffs' state:

The Final Year Regulation turns a health plan's last year in the Program into a compulsory game of Russian Roulette for both the government and the health plan, with a guarantee that one party will find the chamber loaded. Either the health plan overcharges the government in the final year, in which case the taxpayers are cheated, or the government underpays, in which case the health plan is denied the compensation to which it is entitled. In either case, the Final Year Regulation violates Congress's directive that rates paid equitably and reasonably reflect the cost of the benefits provided.

The plaintiffs argue, therefore, that the Final Year Regulation guarantees that "whether by underpayment or overpayment, the government will pay an amount different-in some cases, vastly different-from the amount commanded by the Act," which should "reasonably and equitably reflect the cost of the benefits provided,"5 U.S.C. § 8902(i), and "creates an incentive for a health plan to propose overly high estimated rates if it knows it is entering the final year of its participation in the program." According to the plaintiffs, the government's reasons for promulgating the Final Year Regulation "fail as a matter of law."

Plaintiffs also reject the justification for the Final Year Regulation provided by the OPM in the Federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Register in July, 1990, when OPM issued its final rulemaking decision adopting the Final Year Regulation. *See* 55 Fed.Reg. at 27410. That rationale, which is quoted in full above, stated that the reasoning behind the Final Year Regulation was that it was the government's experience that it has been "difficult to get adequate data from plans when they have terminated," and that, "in the event a plan goes out of business, there are no rates to reconcile." The plaintiffs argue that this rationale is merely a claim of "administrative convenience," is inconsistent with the statute, and must fail as a matter of law.

The plaintiffs rely on *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002), in which the United States Supreme Court stated:   "Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.' " *Id.* at 91, 122 S.Ct. 1155 (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 125, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)).   Even if the record in the present case were to support the defendant's notion that the Final Year Regulation serves the interest of administrative convenience, plaintiffs argue that the regulation still would be invalid because it relieves the government of the requirement of ensuring that the plan was paid in a way that "reasonably and equitably" reflects the costs of the benefits provided, as required by 5 U.S.C. § 8902(i).

In *Ragsdale,* the Supreme Court reviewed a federal agency regulation which stated:   "If an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA [Family Medical Leave Act] leave, the leave taken does not count against an **\*352** employee's FMLA entitlement [of 12 weeks]." *Id.* at 88, 122 S.Ct. 1155 (quoting 29 C.F.R. § 825.700(a) (2001)) (bracketed material added).   The plaintiff's employer, Wolverine, had provided plaintiff Ragsdale 30 weeks of leave, but had failed to designate the leave as under the FMLA. Plaintiff sought her FMLA entitlement of 12 more weeks, on top of the 30 weeks already provided, based upon the agency's regulatory language. *Id.* at 84, 122 S.Ct. 1155.   The Supreme Court sided with Wolverine, holding that the agency's regulation was contrary to the statute (the FMLA), in that the regulation effectively provided certain employees the right to more than 12 weeks of FMLA leave in a 1-year period. *Id.* at 84, 94, 96, 122 S.Ct. 1155.   "A regulation cannot stand if it is 'arbitrary, capricious,

or manifestly contrary to the statute.' " *Id.* at 86, 122 S.Ct. 1155 (quoting *United States v. O'Hagan,* 521 U.S. 642, 673, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984))).   The FEHBP plaintiffs in this case rely upon the Supreme Court's findings in *Ragsdale* that the agency's position, reflected in its regulation, was "extreme," *id.* at 90, 122 S.Ct. 1155,"contradicts and undermines the FMLA's pre-existing remedial scheme,"*id.* at 92, 122 S.Ct. 1155, and upsets the careful balance set by Congress, *id.* at 94, 122 S.Ct. 1155.

The plaintiffs in the present case analogize the Supreme Court's reasoning in *Ragsdale* to the Final Year Regulation, and argue that the Final Year Regulation "does not say that payment will not follow reconciliation in the final year of the contract if administrative difficulty prevents the reconciliation's completion, but rather says that payment will *never* follow reconciliation in the final year of the contract."(emphasis in original).   Thus, the plaintiffs argue that OPM's Final Year Regulation "contradicts and undermines" the Act's regulatory scheme, as the Supreme Court found the agency regulation did in *Ragsdale. Id.* at 92, 122 S.Ct. 1155.

Plaintiffs also maintain that OPM's rationale of administrative convenience is entirely unsupported by the record and contradicted by OPM's own regulations.   Plaintiffs state that the defendant "merely assumed that it would be administratively difficult to pay all or a majority of health plans" the amount determined by the reconciliation. Specifically, plaintiffs suggest that OPM provides no explanation as to why OPM could not obtain data from plans that have terminated because OPM's own regulations require carriers to maintain all records for five years, including records for the last year of participation in the FEHBP.   Plaintiffs cite to the clause at 48 C.F.R. § 1652.204-70, titled "Contractor Records Retention (Jan 1998)" (the Retention Regulation), which also was incorporated into each of the carriers' contracts at section 3.4.

The clause, as written in Scott & White's contract, stated:
Notwithstanding the provisions of Section 5.7 (FAR 52.215-2(d)) *Audit and Records-Negotiation,...* the Carrier of a contract of $500,000 [ [FN2] ] or more will retain and make available all records applicable to a contract term that support the annual statement of operations and the rate submission for that contract term for a period of 5 years after the end of the

contract term to which the records relate, except that individual enrollee and/or patient claim records shall be maintained for 3 years after the end of the contract term to which the claim records relate.

> FN2. The clauses as written in BlueLincs' and Texas Health's contract contained similar records retention requirements, however, they did not contain the $500,000.00 standard.

Furthermore, according to the plaintiffs, OPM guidelines make it clear that the Retention Regulation requires plans to retain the very same documents OPM uses in the reconciliation process. Specifically, in an OPM guideline titled "OPM Reconciliation Guidelines-1999," OPM stated:

All rate agreements between OPM and the carrier are subject to audits by the OPM Office of the Inspector General. The results of such audits may require modifications to previous agreements and subsequent rate adjustment. **Pursuant to contract clause 3.4, Contractor Records \*353** Retention (FEHBA 1652.204.70 [the Retention Regulation] ), OPM requires all carriers to maintain documentation to support all calculations and statements pertaining to this reconciliation. This includes documentation to support the SSSG rates.[FN3]

> FN3. *See also* the clause at FAR 52.215-2, "Audit and Records-Negotiation (Jun 1999)," included in the contracts, which provides the contracting officer or authorized representative the right to examine and audit records.

(emphasis in original).

Based upon the above quoted contract requirements, plaintiffs argue that the defendant's rationale that "it is difficult to get adequate data from plans when they have terminated" is negated by OPM's own regulations and guidelines. Plaintiffs argue, therefore, that it is a fair assumption that this difficulty will not occur "in any but the most exceptional of cases," quoting language from *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. at 93, 122 S.Ct. 1155.

The plaintiffs also cite *Bolden v. Blue Cross & Blue Shield Association,* 669 F.Supp. 1096 (D.D.C.1986),

*aff'd,* 848 F.2d 201 (D.C.Cir.1988), in support of their position. In *Bolden,* the court reviewed an OPM decision directing that the Program's surplus reserve money be refunded to certain Blue Cross/Blue Shield enrollees. *Id.* at 1102. Although the court found that OPM's reasoning for its decision was not arbitrary, capricious, or otherwise not in accordance with the law, the District Court rejected OPM's rationale of administrative convenience. Specifically, the *Bolden* court stated:

OPM's reference to administrative concerns raises a factual question. However, OPM merely assumes that a refund to past enrollees would be administratively difficult. There is no concrete evidence that including plaintiffs in the refund would significantly burden OPM. Mere speculation is not enough.... To the extent, therefore, that OPM's decision rests on administrative concerns, it is not supported by the record.

*Bolden v. Blue Cross & Blue Shield Ass'n,* 669 F.Supp. at 1105.

Based upon the holding in *Bolden,* plaintiffs similarly argue that there is no "concrete evidence" of any difficulty in the administrative record. Instead, the plaintiffs argue that the administrative record contains only two instances, out of hundreds of health benefits carriers that contract with OPM, in which OPM believed the documentation of a non-renewing plan to be insufficient. Those two instances are presented in the administrative record and involved the carriers Coordinated Health Care and Maxicare. In both instances, documentation was deemed insufficient to support rate reconciliation. Plaintiffs suggest that it would have been more consistent with the statutory guidance at 5 U.S.C. § 8902(i) for the final regulation to provide for an exception to reconciliation only when insufficient data is available, rather than to establish a "*per se* " prohibition that no carrier is entitled to reconciliation in the final year of participation.

Finally, the plaintiffs argue that the Final Year Regulation is invalid as applied to the plaintiffs in this case. Specifically, plaintiffs argue that they obtained and retained sufficient data to complete a reconciliation in the last year of each plaintiff's participation in the FEHBP. Plaintiffs argue that their contracts should, at a minimum, be reformed to permit reconciliation of each carrier's final year of participation in the FEHBP. Moreover, in spite of defendant's concern that there is insufficient documentation to support reconciliation in the final year, reconciliation activity actually took place for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339
76 Fed.Cl. 339
(Cite as: 76 Fed.Cl. 339)

each of the three plaintiffs.    In July, 1999, OPM completed a reconciliation process on Scott & White's rates with respect to its 1999 contract. During the reconciliation, OPM calculated the difference between Scott & Whites' estimated 1999 contract rates and the rates that should have been charged based upon Scott & White's actual community rates in effect on January 1, 1999.    The parties have stipulated that the 1999 reconciliation resulted in $3,625,782.00 due to Scott & White.

OPM also performed an initial reconciliation of Texas Health's rates for 2001.    Based on its reconciliation, OPM concluded that Texas Health was due $622,246.00, and paid **354** that amount to Texas Health.    However, after receiving Texas Health's notification that it did not intend to renew its contract, OPM informed Texas Health that it would need to refund the $622,246.00.    BlueLincs, similarly, provided OPM with documentation and a revised proposal for the rate reconciliation process for BlueLincs' contract year 2000.    Assuming that the BlueLincs contract would be renewed, OPM also conducted a reconciliation with respect to BlueLincs' contract, although the resulting adjustment appears to be minimally in dispute.    BlueLincs seeks a total of $369,127.00 for a year 2000 reconciliation.

Citing *LaBarge Products, Inc. v. West,* the plaintiffs argue that "[w]here, as here, the government's misconduct results in a violation of law in the writing of the contract, courts will reform the contract to correct the illegal term."    *See LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1552 (Fed.Cir.1995) (holding reformation appropriate despite the contractor's initial adherence to a contract provision that was later shown to be illegal); *see also Am. Tel. & Tel. Co. v. United States,* 177 F.3d 1368, 1376 (Fed.Cir.1999) ("When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory...."). Citing *Barrett Refining Corp. v. United States,* 242 F.3d 1055, 1059 (Fed.Cir.), *reh'g denied* (2001), the plaintiffs further argue that when the offending clause is struck, "the express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value ... under the contract."    In *Barrett,* the court found that because a price escalation clause was unauthorized and unenforceable, "there was no longer any express clause covering price escalation, and thus, nothing to preclude an implied-in-fact agreement on that term." *Id.* at 1060.    Fundamental to the court's decision in

*Barrett* was its factual finding of a promise by the government to pay at least fair market value. Similarly, according to the plaintiffs, the FEBHA requires the government to compensate participating health plans at rates that "reasonably and equitably" reflect the cost of the benefits provided, and for which OPM bargained, before accepting the plans' services.

**Defendant's Support for its Final Year Regulation**

The defendant argues that OPM is entitled to substantial deference in interpreting the FEHBA, which Congress charged it to administer, including promulgation of the Final Year Regulation in implementation of the statute. The defendant argues, therefore, that the regulation is a "valid and proper exercise of OPM's very broad authority to administer the FEHBP in accordance with OPM's statutory mission."    Defendant believes that the Final Year Regulation "is a permissible construction of the FEHBA, [and] promotes efficiency and management of the program."    The defendant also states that the Final Year Regulation properly allocates the risk of incorrectly estimated or negotiated rates in a year in which a carrier chooses to leave the program.

In its motion for summary judgment, the defendant argues that the Final Year Regulation is not arbitrary or capricious;  rather, that it is valid and effective as a matter of law.    The defendant analyzes the Final Year Regulation under the *Chevron* deference standard.    *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984);  *see also United States v. Mead Corp.,* 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).    The defendant argues that OPM's interpretation of the statutory provision requiring reasonable and equitable rates for community rated plans is reasonable under *Chevron* and *Mead.* Citing *Chevron,* the defendant states that: "Where, as here, OPM interprets a statute that it is entrusted with administering, its interpretation is entitled to 'considerable weight.' "    *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 844, 104 S.Ct. 2778.

The defendant argues that OPM's discretion to administer the FEHBP is "very broad."    The defendant cites to court opinions which have reviewed the FEHBP, and concludes that OPM enjoys broad discretion in managing the program. For example, the **355** defendant cites to *Tackitt v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

*Prudential Insurance Company,* 758 F.2d 1572, 1575 (11th Cir.1985),* which stated that the "grant of authority given OPM to approve benefit plans is very broad."   The defendant also cites to *National Federation of Federal Employees v. Devine,* 679 F.2d 907, 912 (D.C.Cir.1981),* in which the Circuit Court of Appeals stated:  "In considering the issues on appeal, we note first that OPM has been granted by statute broad discretionary authority to negotiate and contract for the benefits to be offered by health carriers,"*but see National Treasury Employees Union v. Campbell,* 589 F.2d 669, 678 (D.C.Cir.1978)* ("[T]he [Civil Service] Commission's [OPM's predecessor] discretion under the Health Benefits Act, though broad, is bounded by [5 U.S.C.] Section 8902(i);* and it is to the courts that the task of policing the boundary falls.") (bracketed material added).

Defendant further argues that "OPM's construction of the FEHBA statute, as it implemented section 8902(i)* requiring reasonable rates, is not arbitrary or capricious.   Nor is OPM's regulation clearly wrong, or an impermissible construction of the statute."   Defendant asserts that the court should defer to OPM's expertise because "OPM is in the best position to determine how best to administer the program, to balance statutory requirements against the limited resources OPM possesses, in order to minimize costs to the Government and to FEHBA enrollees."   Additionally, the defendant argues that the Final Year Regulation not only is reasonable and consistent with FEHBA, but also is consistent with the cost and pricing analysis and contractor accountability principles of the Federal Acquisition Regulation, and alleviates the administrative burden and inefficiencies the agency had experienced in attempting to deal with community rated carriers which had terminated contracts with OPM, and for which no rates could be adjusted for the next following insurance year.   Citing *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 525, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978),* the defendant argues that OPM is in a better position to determine the requirements of the agency because:  "Administrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved."   Moreover, the defendant suggests that even if a different or better way than the Final Year Regulation to regulate community rates could be achieved under 5 U.S.C. § 8902(i),* when a carrier exits the program,

that does not mean that the Final Year Regulation as written is arbitrary or capricious.

Addressing the costs to the government in managing the FEHBP, the defendant argues that it is OPM's duty to consider the cost to the government in making determinations relating to the FEHBA.   To support its position, the defendant cites to *National Federation of Federal Employees v. Devine,* 679 F.2d at 912,* in which the court stated:  "The entire legislative scheme is based upon OPM considering cost to the government in contracting for health benefit plans."   Thus, considering the cost to both the government and the carriers, the defendant argues that OPM developed "an indisputably equitable solution," whereby OPM and the carriers would "share" the risk of any upward or downward adjustment in a carrier's final year of participation in the FEHBP.

Defendant argues that the plaintiffs are attempting to advance the notion that there is a precise rate for carriers, and that this is "a distorted characterization of the rating and reconciliation process."   Defendant states that community rates are driven by actuarial science applied to data that is maintained and presented by the carrier to OPM. According to the defendant, there is no requirement that the rates "equal, precisely, the cost of benefits, nor is it required that the SSSG price must equal, in dollar terms, the FEHBP price."   There is language in the Federal Employees Health Benefits Acquisition Regulation (FEHBAR) which states:  "OPM shall determine the FEHBP rate by selecting the lower of the two rates derived by using rating methods consistent with those used to derive the SSSG rates."   48 C.F.R. § 1602.170-13(d).*  Citing 48 C.F.R. § 1602.170-13(d),* the defendant states that **356** all that is required is that the rates for FEHBP enrollees be developed using rating methods consistent with those used to derive the carrier's SSSG rates.   Moreover, the rates are subject to adjustment and reconciliation, as provided by 48 C.F.R. § 1652.216-70.*   Defendant argues that section 8902(i)* only requires a reasonable and equitable reflection of the cost of benefits provided when comparing the federal group to the appropriate SSSG, a standard which is met by initial, unreconciled rates.

In response to the plaintiffs' argument that the regulation should not apply to the plaintiffs individually because they had records available to reconcile in their last year of performance in the FEHBP, the defendant asserts that a regulation applies to all community rated carriers, including

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339                                                      Page 17
76 Fed.Cl. 339
(Cite as: 76 Fed.Cl. 339)

plaintiffs, without regard to whether the underlying rationale of the regulation pertains to their individual cases. The defendant argues that in promulgating general rules, the agency is not required to determine, and take into account, the actual effect of the rule upon each person subject to the rules. The defendant cites to The *Assigned Car Cases,* 274 U.S. 564, 583, 47 S.Ct. 727, 71 L.Ed. 1204 (1927), in which the United States Supreme Court stated: "[I]n establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general." Furthermore, the defendant argues that the Final Year Regulation establishes the rights and responsibilities of all of the contractors in the FEHBA, and that parties subject to the rules may not selectively choose, after the fact, which regulations apply. Thus, the defendant argues that whether any of the above-captioned plaintiffs could provide, or did provide, OPM with adequate data necessary to calculate a reconciliation amount, does not determine the validity of the Final Year Regulation.

### Standard of Review

[1][2][3][4] At the heart of this case is whether the Final Year Regulation, 48 C.F.R. § 1652.216-70(b)(6), conflicts with 5 U.S.C. § 8902(i). Thus, the court reviews the words of the statute at issue and compares those words with the implementing regulation. The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker,* 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251

(2001)); *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker,* 533 U.S. at 174, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000).

[5][6] When the statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. at 450, 122 S.Ct. 941. Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its **\*357** terms.' " *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed.Cir.) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)), *reh'g denied* and en banc *suggestion declined* (1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391 (citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] princip[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States,* 512 U.S. 573, 583-84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Whitfield v. United States,* 543 U.S.

209, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history ...."), *reh'g denied sub nom.* Hall v. United States, 544 U.S. 913, 125 S.Ct. 1606, 161 L.Ed.2d 293 (2005); *but see* Chamberlain Group, Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1196 (Fed.Cir.2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,'*Ratzlaf v. United States,* 510 U.S. 135, 147-48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.' " (quoting *Tidewater Oil Co. v. United States,* 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972))), *cert. denied,*544 U.S. 923, 125 S.Ct. 1669, 161 L.Ed.2d 481 (2005).

[7][8] "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843-44, 104 S.Ct. 2778 (footnote omitted). The Supreme Court also has written that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. at 226-27, 121 S.Ct. 2164; *see also Yanco v. United States,* 258 F.3d 1356, 1362 (Fed.Cir.2001).

Elaborating on the *Chevron* doctrine, the United States Supreme Court in *Mead* stated:
When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,"*Chevron,* 467 U.S., at 843-844[, 104 S.Ct. 2778], and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. See *id., at 844[, 104 S.Ct. 2778]; United States v. Morton,* 467 U.S. 822, 834[, 104 S.Ct. 2769, 81 L.Ed.2d 680] (1984); APA, 5 U.S.C. § § 706(2)(A), (D). But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying

a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions*358 the agencies have already answered. "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,' "*Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting *Skidmore,* 323 U.S., at 139-140[, 65 S.Ct. 161]), and "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...."*Chevron, supra,* at 844[, 104 S.Ct. 2778] (footnote omitted); *see also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565 [, 100 S.Ct. 790, 63 L.Ed.2d 22] (1980); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450[, 98 S.Ct. 2441, 57 L.Ed.2d 337] (1978). The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position, see *Skidmore, supra,* at 139-140 [, 65 S.Ct. 161].

*United States v. Mead Corp.,* 533 U.S. at 227-28, 121 S.Ct. 2164 (omissions in original and footnotes omitted); *see also Household Credit Servs., Inc. v. Pfennig,* 541 U.S. 232, 239, 242, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004); *Lacavera v. Dudas,* 441 F.3d at 1383; *California Indus. Prods, Inc. v. United States,* 436 F.3d at 1352-57; *Rotech Healthcare Inc. v. United States,* 71 Fed.Cl. 393, 421,*appeal dismissed,* 214 Fed.Appx. 973 (Fed.Cir.2006).

[9] *Chevron* deference requires that a court ask the following questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 842-43, 104 S.Ct. 2778. If the congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43, 104 S.Ct. 2778 (footnote omitted). However, if Congress is silent, or if it has left the statute "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnotes omitted).

[10] With respect to an agency's statutory

construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778 (citations omitted). However, "[d]eference does not mean acquiescence." *Presley v. Etowah County Comm'n,* 502 U.S. 491, 508, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 842-43, 104 S.Ct. 2778). The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

[11] Although not in agreement with defendant's conclusions on the merits, the court agrees that the validity of the Final Year Regulation as compared to the FEHBA is analyzed applying *Chevron* deference to determine whether the promulgation and implementation of the regulation were arbitrary, capricious, or contrary to the statute. *See Lacavera v. Dudas,* 441 F.3d 1380, 1383 (Fed.Cir.2006) ("Because the [agency] is specifically**359** charged with administering this statute, we analyze a challenge to the statutory authority of its regulations under the *Chevron* framework.") (citing *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 and *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. at 837, 104 S.Ct. 2778),*cert.denied,*--- U.S. ----, 127 S.Ct. 1246, 167 L.Ed.2d 74 (2007); *see also California Indus. Prods., Inc. v. United States,* 436 F.3d 1341, 1353 (Fed.Cir.2006) ("[W]e must give effect to [an agency's] regulation so long as it represents a reasonable interpretation of the statute.").

The court begins its *Chevron*-style analysis by reviewing the language of the statute in question.

The statutory language at issue in 5 U.S.C. § 8902 reads as follows:

§ 8902. Contracting authority

(a) The Office of Personnel Management may contract with qualified carriers offering plans described by section 8903 or 8903a of this title, without regard to section 5 of title 41 or other statute requiring competitive bidding. Each contract shall be for a uniform term of at least 1 year, but may be made automatically renewable from term to term in the absence of notice of termination by either party.

* * * *

(i) *Rates charged under health benefits plans described by section 8903 or 8903a of this title shall reasonably and equitably reflect the cost of the benefits provided.* Rates under health benefits plans described by section 8903(1) and (2) of this title shall be determined on a basis which, in the judgment of the Office, is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers. The rates determined for the first contract term shall be continued for later contract terms, except that they may be readjusted for any later term, based on past experience and benefit adjustments under the later contract. Any readjustment in rates shall be made in advance of the contract term in which they will apply and on a basis which, in the judgment of the Office, is consistent with the general practice of carriers which issue group health benefit plans to large employers.

5 U.S.C. § 8902(a), (i) (emphasis added). The above-quoted language providing that rates "shall reasonably and equitably reflect the cost of the benefits provided" was contained in the original 1959 FEHBA. *See*Federal Employees Health Benefits Act (FEHBA) of 1959, Pub.L. No. 86-382, § 6(h), 73 Stat. 708, 713 (1959), H.R.Rep. No. 86-957 (1959), *reprinted* in 1959 U.S.C.C.A.N. 2913, 2923.

The plaintiffs argue that the language requiring rates to "reasonably and equitably reflect the cost of the benefits provided," conflicts with the language of the Final Year regulation. The Final Year Regulation at issue in this case, which came into being in 1990, was revised in 1997 to read, as follows:

(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.[FN4]

FN4. The original 1990 language stated: "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimated and actual market price, PMPM capitation or revenue requirement." 55 Fed.Reg. 27406, 27416.

62 Fed.Reg. 47569, 47577 (Sept. 10, 1997) (codified at 48 C.F.R. § 1652.216-70(b)(6)).

The language of the statute is specific regarding the end result, but not specific regarding how to effect that result.    In fact, the FEHBA allows OPM to devise regulations necessary to implement the FEHBA.    Specifically, 5 U.S.C. § 8913(a) states: "The Office of Personnel Management may prescribe regulations necessary to carry out this chapter."    5 U.S.C. § 8913(a); see also Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt., 220 F.3d 427, 429 (5th Cir.2000) ("Under FEHBA, the OPM is delegated the authority to promulgate regulations and to negotiate and contract with qualifying private insurance carriers to offer health benefit plans to federal employees."); *360Goepel v. Nat'l Postal Mail Handlers Union, 36 F.3d 306, 313 n. 8 (3d Cir.1994) ("Congress authorized OPM to 'prescribe regulations necessary to carry out' the provisions of FEHBA. 5 U.S.C. § 8913(a)."), cert. denied,514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 555 (1995); Kobleur v. Group Hospitalization and Med. Servs., Inc., 954 F.2d 705, 709 (11th Cir.1992) ("The FEHBA gives OPM the authority to administer the program by contracting with qualified private carriers to offer a variety of health care plans, 5 U.S.C. § 8902, by distributing information on the available plans to eligible employees, id. § 8907, by promulgating necessary regulations, id.§ 8913...."), reh'g denied,963 F.2d 387 (11th Cir.1992).

The defendant argues that this court should defer to OPM's interpretation of the statute because "OPM possesses expertise to administer and manage the complex, nationwide, FEHBA program, and make policy judgments, as the health care industry evolves over time."    Numerous courts have reviewed various OPM regulations and decisions and have determined that OPM has broad authority to regulate the program as appropriate.    For example, in Bolden v. Blue Cross and Blue Shield Association, the United States District Court for the District of Columbia cited the

statute at issue in this case, 5 U.S.C. § 8902, and stated:

The statute vests the Office of Personnel Management (OPM) with broad authority to administer the FEHB Program.    Pursuant to its contracting authority, OPM annually renegotiates with each carrier the rates and benefits for the next contract year. 5 U.S.C. § 8902.    The FEHBA requires that rates "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i).    In determining the proper rates, OPM considers both prior experience and insurance industry practice. Id. Once set, rates remain in effect throughout the contract term. Id.

Bolden v. Blue Cross and Blue Shield Ass'n, 669 F.Supp. at 1098 (reviewing an OPM decision to refund surplus reserve money to selected Blue Cross/Blue Shield enrollees).

In reviewing OPM actions, other courts have found that the agency has wide discretion in the administration of the FEHBP. See Garvey v. Prudential Ins. Co., 596 F.Supp. 1119, 1122 (E.D.Pa.1984) (in a case involving the termination of nursing benefits, the court stated that the "FEHBA granted the Civil Service Commission, later the OPM, broad discretionary authority to negotiate, contract for and approve the benefits to be offered by health carriers to federal employees.") (citing Nat'l Fed'n of Fed. Employees v. Devine, 679 F.2d at 912); Tackitt v. Prudential Ins. Co., 595 F.Supp. 887, 894 (N.D.Ga.1984) (in a case involving a reduction in home nursing benefit levels, the court stated: "Under the FEHBA, OPM has broad discretionary authority to negotiate and contract for health plan benefits.... Further, OPM has broad discretion to vary the status of the plans.    For example, OPM may adjust rates under 5 U.S.C.A. § 8902(i) (West Supp.1984); it may withdraw approval of a health benefit plan or carrier under 5 C.F.R. § 890.205 (1983); and it may bargain for diverse levels of health benefits under 5 U.S.C.A. § 8902(d) (West Supp.1984)."), aff'd,758 F.2d 1572 (11th Cir.1985).

Although the court agrees with the defendant that Congress has provided OPM with broad authority to administer the FEHBP, as the agency deems necessary, it is not limitless authority.    In National Treasury Employees Union v. Campbell, the United States Court of Appeals for the District of Columbia agreed with the trial court's finding that the Civil Service Commission, a predecessor to OPM, had broad discretion to manage the FEHBP.    However, citing the statute at issue in the case before them, 5

U.S.C. § 8902(i), the Circuit Court reversed in part and remanded in part the District Court's finding, and stated that there were limits to the discretion of the agency when setting rates and rate adjustments under the FEHBA. The Court of Appeals stated:

We have no quarrel with the proposition that the Commission [the Civil Service Commission, a predecessor to the OPM] has wide discretion to study and evaluate the "complex accounting and actuarial methods involved;" but we do not think it follows that the Commission has [c]arte blanche. Congress did set certain limits, and chief among them is the requirement **\*361** of Section 8902(i) that rates "reasonably and equitably reflect the cost of the benefits provided." Plaintiff here asserts that this mandate has not been followed. If so, the Commission has acted contrary to law. Nothing in the statute suggests that Congress intended to foreclose judicial intervention in such a situation.... Rather, the Commission's discretion under the Health Benefits Act, though broad, is bounded by Section 8902(i); and it is to the courts that the task of policing the boundary falls.

Nat'l Treasury Employees Union v. Campbell, 589 F.2d at 678-80; see also Muratore v. OPM, 222 F.3d 918, 923 (11th Cir.2000) (although the court deferred to OPM's expertise in determining the standard of review to apply, the Eleventh Circuit qualified its deference to the agency's expertise, stating that: " 'Deference, of course, does not mean abdication of careful judicial review.' We will defer to OPM's interpretation as long as that interpretation is reasonable and relies on ample factual and legal support.") (quoting Northwest Pipeline Corp. v. Fed. Energy Regulatory Comm'n, 61 F.3d 1479, 1486 (10th Cir.1995)).

Therefore, when reviewing the Final Year Regulation, OPM's expertise is not entirely dispositive. Regardless of OPM's extensive experience in the area of health plan management, this court should not sustain the agency's interpretation of the Final Year Regulation, as applied to the contracts at issue, if it is inconsistent with the statute, the FEHBA. In the case before the court, the meaning of the words of the statute are uncomplicated and clear. Despite having delegated implementation of the program to OPM, Congress gave explicit instructions in the statute that the rates must "reasonably and equitably reflect the cost of benefits provided."

The second step of a Chevron-style analysis is to determine "whether the agency's answer is based on a

permissible construction of the statute." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843, 104 S.Ct. 2778 (footnote omitted). This court recognizes that it need not find that the interpretation promulgated by OPM was the only one OPM permissibly could have adopted to uphold the statute's construction, or even that OPM's interpretation reflects the reading this court would reach upon its own. Id. at 843 n. 11, 104 S.Ct. 2778. All this court need find is that OPM's interpretation "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent." Rust v. Sullivan, 500 U.S. at 184, 111 S.Ct. 1759.

Upon reviewing the defendant's reasoning and basis for promulgating the Final Year Regulation, this court finds that the determination in 48 C.F.R. § 1652.216-70(b)(6) that there will be no reconciliation of the costs of benefits and, therefore, no payment or recoupment provided in a carrier's last year of participation in the FEHBP, conflicts with the intent of the FEHBA that a carrier's rates shall reasonably and equitably reflect the cost of benefits provided. Specifically, the statutory framework of the FEHBA, 5 U.S.C. § 8902(i), states: "Rates under health benefits plans described by section 8903(1) and (2) of this title shall be determined on a basis which, in the judgment of the Office, is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers." To achieve the "lowest schedule of basic rates generally charged," OPM established a regulatory framework that includes numerous assurances to the government and carriers that rates would be equitably established and adjusted. Specifically, when establishing a carrier's FEHBP rates in comparison to SSSG rates, OPM reviews two SSSGs serviced by a carrier to "determine the FEHBP rate by selecting the lower of the two rates derived by using rating methods consistent with those used to derive the SSSG rates." 48 C.F.R. § 1602.170-13(d). Additionally, carriers are required to maintain financial records of their participation in the FEHBP, 48 C.F.R. § § 1604.703, 1604.705, and 1652.204-70 (the "Contractor Records Retention (Jan 1998)" clause); rate reductions are made in the event of a carrier's defective cost or pricing data, 48 C.F.R. § 1652.215-70 (the "Rate Reduction for Defective Pricing or Defective Cost or Pricing Data (Jan 1998)" clause); and a reconciliation process is used to ensure that both the carrier and the government **\*362** are "reasonably and equitably" compensated or charged for the benefits provided, 5 U.S.C. § 8902(i), pursuant to 48 C.F.R. § 1652.216-70(a),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

Page 22

(b)(2)-(4) (the "Accounting and Price Adjustment (Jan 1998)" clause).

Reviewing the statute and the regulations together, OPM's refusal to compensate a carrier or recoup an overpayment by OPM in a carrier's last year of participation in the program, as provided by the Final Year Regulation, ignores, invalidates, and conflicts with the intent of the FEHBA and the other strict financial requirements, also established by OPM to ensure equitable rates. By ignoring these record keeping and auditing requirements, OPM places both the carrier and the government and, therefore, the public fisc, at risk of being inappropriately and potentially grossly under compensated during a carrier's last year of participation in the FEHBA. Moreover, the record keeping requirements, which note no exception for the final year of a carrier's participation, and which require record retention, are inconsistent with the refusal to financially reimburse after a reconciliation in the final year of a carrier's participation in the program. In all the cases currently before the court, a reconciliation of monies owed was performed, based on available records. For these reasons, the court finds that the requirements of 48 C.F.R. § 1652.216-70(b)(6) conflict with the statutory intent of the FEHBA and are inconsistent even with OPM's own implementation of the FEHBP.

OPM's resolve to ensure that the most correct rates are achieved by program participants is indicated in the clause promulgated by the agency at 48 C.F.R. § 1652.215-70, titled "Rate Reduction for Defective Pricing or Defective Cost or Pricing Data (Jan 1998)" (the Rate Reduction Clause). This clause also was included in the FEHBP contracts at section 3.3 of all three contracts at issue in this case. This clause requires:
(a) If any rate established in connection with this contract was increased because (1) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not complete, accurate, or current as certified in the Certificate of Accurate Cost or Pricing Data (FEHBAR 1615.804-70); (2) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not accurate as represented in the rate proposal documents; (3) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups (see FEHBAR 1602.170-13) as certified in the Certificate of Accurate Cost or Pricing Data for Community Rated Carriers; or (4) the Carrier submitted [ ] or

kept in its files in support of the FEHBP rate, data or information of any description that were not complete, accurate, and current-then, the rate shall be reduced in the amount by which the price was increased because of the defective data or information.

48 C.F.R. § 1652.215-70(a).

Through the Rate Reduction Clause, OPM has taken steps to ensure that it receives accurate rates from FEHBP carriers, and requires that, in the event that the carrier charges inaccurate rates, the carrier will pay the difference, plus any interest on that amount. *See* 48 C.F.R. § 1652.215-70(c); *see also PCA Health Plans of Texas, Inc. v. LaChance,* 191 F.3d 1353, 1354 (Fed.Cir.) ("[A] carrier that submits a defective community rate must pay the government the overcharge payment and interest 'from the date the overcharge was paid by the Government to the Carrier.' ") (quoting 48 C.F.R. § 1652.215-70(c) (1998)), *reh'g denied* (1999).

The requirements of 48 C.F.R. § 1652.215-70, with reference to refunding erroneously charged amounts, adheres to the requirements of 5 U.S.C. § 8902(i) that rates "reasonably and equitably reflect the cost of the benefits provided." Therefore, it is contradictory to OPM's own orchestrated goals, as well as the FEHBA, that during the last year of participation in a program, OPM would ignore this requirement and permit carriers to exit the program, without recouping on behalf of the taxpayer any amounts determined to be owed to the government by a reconciliation of the carrier's estimated rates with its reconciled rates. As explained above, the rates offered by carriers to OPM in advance is merely an estimate of each year **\*363** of a carrier's anticipated rates provided to SSSGs. It is acknowledged that this rate may be under or over estimated by a significant margin, up to millions of dollars, as evidenced by the refunds requested by the plaintiffs in this case. By failing to hold a carrier accountable for potential, estimation errors in the last year of a carrier's participation, OPM's regulatory provision in the Final Year Regulation denying recoupment or reimbursement, therefore, is contradictory to the intention of the FEHBA statute that rates "reasonably and equitably reflect the cost of the benefits provided," and conflicts even with OPM's own regulations requiring rate reductions in the event that erroneous estimated or incorrect information causes incorrect rates to be charged to OPM.

Aside from arguing that the court should defer to

76 Fed.Cl. 339
76 Fed.Cl. 339
(Cite as: 76 Fed.Cl. 339)

Page 23

OPM's expertise in the area of health plan management, and that OPM enjoys broad discretion in managing the FEHBP, the defendant argues that the difficulty of acquiring data in the last year of a contractor's participation in the FEHBP rationalizes and validates OPM's Final Year Regulation. Specifically, the defendant states that
the reconciliation process is a complex one, and, in large part, qualitative in nature. OPM is entitled to rely upon its determination that it is difficult to obtain adequate data, based on its experience in reconciling rates in the year of nonrenewal, and to construct a community rating policy that eases the administrative burdens of operating in the face of that difficulty.... It is apparent that OPM made a rational connection between the difficulties in reconciling rates it had experienced and the rule it made, relying upon factors that Congress intended it to consider.

OPM stated in its final rulemaking in defense of promulgating the Final Year Regulation: "OPM's experience has been that it is difficult to get adequate data from plans when they have terminated. Further, in the event a plan goes out of business, there are no rates to reconcile. In the opinion of OPM, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination."

An agency's "[j]udgment about the best regulatory tools to employ in a particular situation is ... entitled to considerable deference from the generalist judiciary." *WorldCom, Inc. v. FCC,* 238 F.3d 449, 458 (D.C.Cir.2001) (quoting *Western Union Int'l, Inc. v. FCC,* 804 F.2d 1280, 1292 (D.C.Cir.1986)). However, an agency's decision to employ a regulatory scheme must have a reasonable basis. The only support produced by the defendant for its argument that it is difficult for OPM to acquire data or information on carriers in their last year of participation in the FEHBP were two letters from OPM to two carriers, in the 1988-1989 time frame, out of the hundreds of carriers enrolled in the FEHBP then and since, and a declaration [FN5] from OPM's Director of the Office of Actuaries, Retirement and Insurance Service, Nancy Kichak, discussing the two carriers cited.

FN5. The plaintiffs filed motions to strike Ms. Kichak's declaration, dated May 6, 2002, essentially as being light on "facts," and heavy on "argument" and, therefore, as not appropriate for the administrative record. The declaration not only post-dates the

traditional administrative record surrounding the final years at issue in this case (for Scott & White, the year 1999; for BlueLincs, 2000; and for Texas Health, 2001), but also post-dates the launching of this litigation by BlueLincs, whose complaint was dated September 7, 2001. Nevertheless, the court finds Ms. Kichak's declaration helpful. *See Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989) (including as potential reasons for supplementing the record: "(1) when agency action is not adequately explained in the record before the court; ... (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly...."). Regardless, the essential information for understanding defendant's argument, even without Ms. Kichak's declaration, is contained in the two letters which are in the administrative record. Given the court's rejection of defendant's position, plaintiffs are in no way harmed by the court's review of Ms. Kichak's declaration. The court also notes that even given the opportunity, Ms. Kichak, in her declaration, was unable to offer more than the two carriers named to try to demonstrate an allegedly pervasive problem of inadequate data for reconciliation in a carrier's Final Year of FEHBP participation.

The two carriers cited by OPM were Coordinated Health Care and Maxicare. OPM's July 20, 1988 letter to Coordinated Health **\*364** Care informing the carrier that no reconciliation would occur, which is in the administrative record, stated, in its entirety:
Coordinated Health Care (M2) has merged with HMO of Minnesota (LP). However, HMO of Minnesota has dropped out of the Federal Employee's Health Benefits Program.
The Office of the Actuaries is also unable to perform a reconciliation of the 1988 rates for Coordinated Health Care because the documentation is insufficient. As a result, we have decided to reinstate the proposed rates and assume no payment is due OPM or the plan.

In her declaration regarding the letter to Coordinated Health Care, Ms. Kichak indicated that:
OPM found that it was unable to obtain adequate data to reconcile rates for a variety of plans. In the case of Coordinated Health Care, which merged with HMO of Minnesota, documentation was insufficient

to enable the Office of the Actuaries to reconcile the 1998 rates for Coordinated Health Care. As a result, OPM decided to reinstate the proposed rates and assumed no payment was due to OPM or the plan.

This 1988 case reflects the obvious. When documentation necessary for reconciliation is insufficient, for whatever reason, reconciliation may not take place. OPM's Final Year Regulation, however, mandates that no reconciliation occur in the final year, even when there is sufficient data for reconciliation, as in all three cases before this court.

In the second instance, OPM sent a July 20, 1989 letter to carrier Maxicare, also in the administrative record, stating:
The Office of Actuaries has recently reviewed the reconciliations of the Maxicare plans. We are concerned about the fact that in several cases, the actual 1990 rates are significantly different from the rates that were originally proposed, and that the documentation provided to support these rate changes is not sufficient.
In view of the fact that Maxicare has filed for bankruptcy, and that Flora Yang, the Office of Actuaries contact at Maxicare for the 1989 rate negotiations, is no longer at Maxicare, we recommend that any amounts due Maxicare as the result of the 1989 reconciliation be held in abeyance until the current audit of Maxicare is completed....
As to Maxicare, Ms. Kichak's declaration states that:
In the case of Maxicare Plans, in fourteen cases, the actual 1990 rates were significantly different from the rates that were originally proposed and the documentation provided to support these rate changes was not sufficient. Maxicare had filed for bankruptcy and its rate negotiation contact employee left the company. OPM's Office of the Actuaries recommended that any amounts due Maxicare as a result of the 1989 reconciliation, as well as amounts due from Maxicare to OPM, be held in abeyance until an audit of Maxicare was completed.

In spite of the letter to Maxicare speaking of insufficient documentation, the OPM letter adds that the "amounts in question" are $2,468,030.00, which OPM owes Maxicare, and $89,935.00, which Maxicare owes OPM. The difference between these two amounts is not insignificant. The record does not reflect whether the current audit OPM mentioned in the Maxicare letter produced information sufficient to accurately determine the net amount OPM owed Maxicare. If, however, the combination of

Maxicare's bankruptcy and the loss of Maxicare's contact person with OPM rendered Maxicare's rates unreconcilable, in spite of an audit, then perhaps no reconciliation could occur. The special situations represented by Maxicare back in 1989 and Coordinated Health Care back in 1988 provide little basis to ignore the final years of other carriers, such as the three plaintiffs before this court, when the data is available for reconciliation. Defendant's offer of two carriers, from the 1988-1989 time frame, does not suggest that insufficient documentation is a pervasive problem to be remedied with the Final Year Regulation; instead, very limited support has been offered by defendant for the court's review as justification and support at the time the regulation was promulgated. Other than an assertion of a desire for administrative convenience, **\*365** the suggestion is that the problem is historical, isolated and apparently nonrecurring. In this regard, *see* Ragsdale v. Wolverine World Wide, Inc., 535 U.S. at 93, 122 S.Ct. 1155 (Categorical rules "reflect broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful. When the generalizations fail to hold in the run of cases ... the justification for the categorical rule disappears.") (citations omitted). Defendant's decision to issue the Final Year Regulation, in light of objections, including those of the agency Inspector General, and without apparent support for the administrative difficulty it asserted, may be considered arbitrary.

The defendant argues that OPM is not required to determine, and take into account, the actual effect of the rule upon each carrier subjected to the rule. *See* The Assigned Car Cases, 274 U.S. at 583, 47 S.Ct. 727 ("[I]n establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the [Interstate Commerce] Commission, like other legislators, may reason from the particular to the general."). However, even though a rule may be promulgated from a handful of experiences, a rule may not be promulgated by an agency based on limited evidence, when it contradicts the statutory scheme intended by Congress. By promulgating the Final Year Regulation, OPM placed the federal government in a situation whereby it does not obtain reasonable or equitable rates, and potentially loses millions of dollars, or unreasonably withholds millions of dollars, based, apparently, on minimal support from the experiences of only two carriers, from years ago. The agency has been unable to provide sufficient documentation to support the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 25

agency's alleged inability to establish reconciliation amounts. Without adequate support in the record at the time the regulation was promulgated and again before this court, defendant's promulgation of the Final Year Regulation, based on claimed administrative difficulty, appears arbitrary in the face of a statute commanding rates to "reasonably and equitably" reflect the cost of benefits provided.

As to the plaintiffs' argument that a carrier could be charged too much or too little, without reconciliation, defendant believes this is "a distorted characterization of the rating and reconciliation process." Defendant argues that it is not required that the rates equal, precisely, the cost of benefits, nor is it required that the SSSG price must equal, in dollar terms, the FEHBP price. Rather, defendant argues, what is required is that the rates for the FEHBA enrollees be developed using rating methods consistent with those used to derive the carrier's SSSG rates. However, because 5 U.S.C. § 8902(i) requires that the rates charged by a carrier under the FEHBP be a reasonable and equitable reflection of the cost of benefits provided when comparing the federal group to the appropriate SSSG, reconciliation, which is mandated by OPM for all years, save the final year of participation, produces a more accurate reflection of what the carrier charged the other comparable groups that it insures. To properly carry out the intent of the statute, reconciliation also must take place in the final year of participation.

The Inspector General of the OPM correctly recognized the potential for a carrier to take advantage of the non-reconciliation process in its last year of participation, and plan for termination. Specifically, the OPM Inspector General stated that the clause "does not address the potential for a Plan to intentionally overcharge the Program prior to withdrawing from the Program." The OPM Inspector General's own words and warning are telling. In the event that a carrier terminates its participation, the auditing functions of OPM as described above are essentially eliminated by the Final Year Regulation and an unscrupulous carrier could take advantage of the rule.

In response to the plaintiffs' argument that OPM regulations require participants in the FEHBP to retain their accounting records, thereby facilitating a final year reconciliation, the defendant argues that although the record retention contract clause, found at 48 C.F.R. § 1652.204-70 ("Contractor Records Retention (Jan 1998))," applies to annual operations**366 and rate reconciliations, the "record

retention provisions do not apply to the **nonreconciliation** of rates ... for the simple reason that there is no 'reconciliation' of rates in the final year of the carrier's participation."(emphasis in original). Apparently, the defendant means that, because there is a Final Year Regulation, providing for "nonreconciliation," the Contractor Records Retention clause, which otherwise would apply and cause records to be maintained for reconciliation purposes, does not apply to this final year. It is, however, the Final Year Regulation which is being challenged, and, absent the Final Year Regulation, the Contractor Records Retention clause would be operative.

Defendant also argues that the court should not set aside the Final Year Regulation because the plaintiffs in this case had the opportunity to challenge promulgation of the Final Year Regulation and failed to do so. Specifically, the defendant states that the plaintiffs failed to provide any comments, or to otherwise challenge the proposed regulation during the comment period, when the three carriers had FEHBP contracts with OPM. In an attempt to support its position, the defendant cites *Michigan v. U.S. Environmental Protection Agency,* 213 F.3d 663 (D.C.Cir.2000), *cert. denied,*532 U.S. 904, 121 S.Ct. 1225, 149 L.Ed.2d 135 (2001), for the proposition that when plaintiffs do not challenge the promulgation of a regulation, the court will not later set aside the regulation. The District of Columbia Circuit Court of Appeals opinion, however, warrants a closer reading. On this point, the Court of Appeals states, verbatim:

Therefore, CIBO [Council of Industrial Boiler Owners] contends, industrial boilers as a group can have no impact on long-range ozone transport. However, this factual claim fails in view of contrary evidence in the record. OTAG's [Ozone Transport Assessment Group] Executive Report states as one of its major conclusions that "[b]oth elevated (from tall stacks) and low-level NOx [nitrogen oxides] reductions are effective." Executive Report at 4. EPA reiterated this finding by OTAG in the NPRM [Notice of Proposed Rulemaking], *see* Proposed Rule, 62 Fed.Reg. at 60,332, it relied on the finding, and it appears that members of CIBO never challenged it during the comment period. Therefore, we cannot say EPA's inclusion of non-EGU's [non-electricity generating units] in the group of significantly contributing sources was arbitrary.

*Michigan v. U.S. Envtl. Prot. Agency,* 213 F.3d at 690.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The District of Columbia Circuit Court opinion in the *Michigan* case merely came to the unremarkable conclusion that it was not arbitrary for the EPA to rely on unchallenged factual findings in its rulemaking, particularly when members of Council of Industrial Boiler Owners (CIBO) did not object during the comment period. CIBO had not challenged factual findings in the *Michigan* case. In contrast, at issue in the present case is the fundamental legality of the regulation, and the defendant is complaining that the plaintiffs failed to point out that the proposed Final Year Regulation is in violation of a statute, and illegal, thereby providing sanctuary to an illegal regulation. Furthermore, unlike the regulations promulgated by the EPA, which apparently were not challenged by members of CIBO, the Final Year Regulation in this case was challenged, but to no avail. Defendant has acknowledged the three challenges to the Final Year Regulation-by the PARTNERS National Health Plan, by OPM's own Inspector General, and by the law firm of Epstein Becker & Green, P.C., the same law firm now representing BlueLincs in this litigation. The Epstein Becker & Green comment on OPM's rulemaking, dated December 19, 1989, objecting to the Final Year Regulation, began: "This firm has represented a number of carriers who participate in the Federal Employees Health Benefits Program as well as the American Managed Care Review Association, an association of managed care plans including carriers which participate in the Federal Employees Health Benefits Program." BlueLincs does not indicate that Epstein Becker & Green was representing BlueLincs, individually, for purposes of the comments on OPM's rulemaking, but notes that the law firm was acting on behalf of an industry trade association, the American Managed Care Review Association. In any event, defendant*367 has cited no authority for the proposition that an absence of objections to the Final Year Regulation inoculates OPM from a later challenge to the legality of the regulation based on a violation of 5 U.S.C. § 8902(i)'s statutory command that FEHBP rates must "reasonably and equitably reflect the cost of the benefits provided." Moreover, in the present case there were objections to the proposed Final Year Regulation, noted above, and OPM's summary rejection of each of those objections, each specifically challenging the absence of a final year reconciliation, is an indication that it would have been futile for any of the plaintiffs in this action or any others also to have objected. Furthermore, this court does not accept the implications of defendant's argument, that an agency can successfully violate a statute and safely insulate an illegal rule from judicial review and redress if the agency is able to proceed through the rulemaking process without drawing an objection. That is certainly not the holding in *Michigan v. U.S. Environmental Protection Agency, 213 F.3d at 690,* and the proposed Final Year Regulation did draw objections, as noted, but to no avail.

Defendant further argues that the Final Year Regulation was incorporated into the plaintiffs' contracts through section 3.2 of each contract, and that, "Therefore, even if this Court were to hold the regulation to be invalid, plaintiffs are bound by the contracts they signed, which included the provision for nonreconciliation of rates in the final year of nonrenewal." The defendant argues that from 1990 forward, for more than ten years, every year, each of the plaintiffs signed a contract with OPM that contained section 3.2, the words of the Final Year Regulation. Defendant concludes, "It is axiomatic that a contractor is held to its voluntary contractual commitment." Defendant cites *Giesler v. United States, 232 F.3d 864, 869 (Fed.Cir.2000)* for this proposition, but *Giesler* is inapposite, and provides no support to defendant. In *Giesler,* the contractor failed to comply with a specification in the solicitation, and was required to pay the additional cost to provide conforming goods. *Id. at 867-68.*[FN6] The United States Court of Appeals for the Federal Circuit stated that "[p]arties to a contract are generally bound by its terms,"*id. at 869,* would not permit rescission of the contract based on the contractor's failure to read and comply with the specifications, and awarded reprocurement costs to the government. *Id. at 877.* The facts and circumstances of *Giesler* are distinct from the facts in the instant case, for the product specifications in *Giesler* did not violate a statutory command, as the Final Year Regulation does in this case.

> FN6. The Department of Defense specification in *Giesler* sought a mixed nut composition of not more than 10% peanuts by weight, while the contractor intended to provide a mixed nuts composition which was 60% peanuts. *Giesler v. United States, 232 F.3d at 867-68.*

Defendant also cites *American Electric Contracting Corporation v. United States,* which similarly is distinguishable from the present case. In *American Electric,* the dispute involved the contractor's proposed electric-power receptacles, which could not meet military specifications. *See Am. Elec.*

*Contracting Corp. v. United States,* 217 Ct.Cl. 338, 344-45, 579 F.2d 602, 605 (1978). Receptacles meeting the military specifications were more costly. The United States Court of Claims denied the contractor's subsequent claim, reasoning that:

To allow plaintiff to bid, obtain the award and the contract as the lowest bidder, and only after beginning performance claim additional compensation on the ground that there was a procedural irregularity by the Navy in following its regulations prior to the award, would tend to undermine the fairness of the competitive bidding process. A contractor who was aware of the procedural irregularity would be able to submit a lower bid than his competitors on the assumption that if he raised the irregularity after he received the award he would receive additional compensation even if the total made his bid higher than those of his competitors. In addition, the procedural omission would permit him to extricate himself from specifications found to be more difficult or costly than originally anticipated. Plaintiff should be held to its voluntary contract commitment.

**\*368** *Am. Elec. Contracting Corp. v. United States,* 217 Ct.Cl. at 359, 579 F.2d at 613. The court in *American Electric,* like *Giesler,* was concerned with a contractor seeking relief from its own failure to comply with specifications; in neither case was there an allegation that the specifications or other contract term violated a statutory command. Also, as noted above in *American Electric,* the United States Court of Claims was concerned that a contractor might be able to submit a lower bid than his competitors, then recoup greater compensation after award, or perhaps extricate itself from onerous specifications after award. Because the Final Year Regulation impacts all FEHBP carriers, not just the plaintiffs in the above-captioned three cases, the stage is not set "to undermine the fairness of the competitive bidding process." *Id.* at 359, 579 F.2d at 613.

Defendant also cites to *Mexican Intermodal Equipment, S.A. de C.V. v. United States,* an opinion written by the undersigned judge, which quoted *American Electric* for the proposition that the "[p]laintiff should be held to its voluntary contract commitment." *Mexican Intermodal Equip., S.A. de C.V. v. United States,* 61 Fed.Cl. 55, 65 (2004) (quoting *Am. Elec. Contracting Corp. v. United States,* 217 Ct.Cl. at 359, 579 F.2d at 613). *Mexican Intermodal,* however, does not assist defendant. In that case, two years after final payment and close out of its contract with the United States Marine Corps, and four and one-half years after its best and final

offer, Mexican Intermodal claimed that the Marine Corps had improperly reopened discussions and engaged in illegal auction techniques. *Mexican Intermodal Equip., S.A. de C.V. v. United States,* 61 Fed.Cl. at 57-58, 65. The opinion concluded that Mexican Intermodal had waited too late to complain: If MIE [Mexican Intermodal Equipment] believed that there was a violation of the FAR by the USMC, the time for protest in order to permit the USMC to take corrective action has long since passed, with the award, full performance and completion of the contract. MIE's timing limits any remedy to paying MIE a higher price for its cargo containers, which the government may not have been willing to pay at the time of negotiation the contract. MIE belatedly seeks the benefit of a bargain it did not make, which, if permitted by this court, would tend to undermine the fairness of the procurement process.

*Mexican Intermodal Equip., S.A. de C.V. v. United States,* 61 Fed.Cl. at 65. In contrast, the Final Year Regulation was a required OPM clause for all FEHBP carriers, thereby leveling the competitive playing field. The issue in the instant case is whether a federal statute invalidates an OPM regulatory provision and mandatory contract clause, an issue not present in either *Giesler, American Electric,* or *Mexican Intermodal.*

[12] Defendant also argues that by failing to challenge the Final Year Regulation, which was expressly incorporated into the FEHBP contracts the plaintiffs signed each year, the plaintiffs waived their rights to object to the clause, even if the court finds, as it has, that OPM's Final Year Regulation is inconsistent with the statute, 5 U.S.C. § 8902(i), and thereby invalid. In support of its waiver argument, defendant relies on the opinion of the United States Court of Appeals for the Federal Circuit in *Whittaker Electronic Systems v. Dalton,* which states that: "The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [Defense Acquisition Regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." *Whittaker Elec. Sys. v. Dalton,* 124 F.3d 1443, 1446 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1997).

In *Whittaker,* Defense Acquisition Regulation (DAR) language provided that option clauses would not be included in contracts, if the contractor would be required to incur "undue risks" as to the cost or availability of labor or materials on the potential option work. *Id.* at 1446. In spite of this regulatory

Page 28

caveat, an option clause was included in the contract at issue in *Whittaker;* the agency ultimately exercised the option; and a combination of delays and excess labor costs increased the contract's costs, leading the contractor to believe that there had been **\*369** undue risk, and that the agency, therefore, never should have inserted an option clause into the contract in the first place. *Id.* at 1445.

The Federal Circuit in *Whittaker* nevertheless found that the contractor had waived its objections to the option clause, having
failed to make a timely objection to the option clause, to any "undue risk" it believed was thereby improperly allocated to it, or assert a violation of the regulation.... The fact that REL [REL, Inc.] failed to complain and WES [Whittaker Electronic Systems, which acquired REL, Inc.] agreed without objection to take over REL's contract, substantially completing it, constituted a waiver of the grounds for rescinding or voiding the contract because of a violation of the regulation, even assuming the option clause indeed violated the regulation.

*Whittaker Elec. Sys. v. Dalton,* 124 F.3d at 1446.

Whittaker had argued that the government violated the Defense Authorization Regulation in the negotiation and drafting of the contract. *Id.* at 1445. After award and performance of the contract, Whittaker complained that even though there had been "undue risks," an option clause nevertheless was included in the contract and ultimately was exercised, in violation of the Defense Acquisition Regulation provision, which provided that options will not be employed when there are undue risks. *Id.* at 1446. Whittaker, therefore, attacked the government's discretionary judgment to include and exercise an option clause, which turned on a decision as to the amount of risk of cost escalation the contractor would face during the option period. In *Whittaker,* the option clause might have been included or might not have been included, depending on the evaluation of risk during a potential option period. Inclusion of a option clause was a discretionary matter, and negotiable, and under these facts and circumstances the Federal Circuit decided that the contractor should have weighed in on the issue before the contract clauses were agreed upon and the contract awarded.

In the present case, the record contains no evidence of protest, as in *Whittaker,* however, there was no discretionary matter to decide, comparable to deciding whether or not there was undue cost risk

during a potential option period. To the contrary, the record reflects that inclusion of the offending clause in FEHBP contracts was not discretionary or negotiable, but mandatory. As discussed earlier, OPM had proposed the Final Year Regulation in 1989, had overridden objections from carriers as well as OPM's own Inspector General in 1989 and 1990 during the rulemaking, and had published the Final Year Regulation as part of a mandatory clause in OPM's Federal Employees Health Benefits Acquisition Regulation, for inclusion in all FEHBP contracts. *See* OPM's Federal Employees Health Benefits Acquisition Regulation (FEHBAR), at section 1616.7001 (requiring the inclusion of the Accounting and Price Adjustment clause at FEHBAR 1652.216-70 and the Final Year Regulation at 1652.216.70(b)(6) of that clause). Given the need to litigate the question of consistency between the statute and the Final Year Regulation, it may not have been clear to the parties whether or not the single clause of numerous mandatory clauses violated the statute. The agency had demonstrated its unwillingness to consider alternate positions on the Final Year Regulation, even in the face of negative comments, including from its own Inspector General; moreover, the clause at issue would only become operative for a final year in which there was no renewal of contract. Under such circumstances, and especially given the futility of protesting the clause, the plaintiffs should not be found to have waived their objection.

Furthermore, *Whittaker* did not address whether or not the Defense Acquisition Regulation rule, which was violated in that case, was for the benefit of the government or the contractor, even though a Defense Acquisition Rule rule which worries about whether or not undue risk of cost escalation will overwhelm a bidder would appear at first glance to be for the benefit of the bidder. This line of inquiry provides another feasible exception to the rule that a contractor's failure to raise a timely objection waives a subsequent challenge. **\*370***Whittaker Elec. Sys. v. Dalton,* 124 F.3d at 1446. For example, in *Applied Devices,* the government insisted on and the contractor acquiesced to an inappropriate cancellation ceiling of 3%, thereby violating Armed Services Procurement Regulation (ASPR) provisions, which required a reasonable and realistic estimate of costs to compute the cancellation ceiling. *Applied Devices Corp. v. United States,* 219 Ct.Cl. 109, 114, 118, 591 F.2d 635, 637, 639 (1979). The United States Court of Claims thought the contractor should have protested the inadequacy of the cancellation ceiling before bid opening, but did not find the omission to

be fatal. *Id.* at 119-20, 591 F.2d at 640. Instead, the Court of Claims found that the Armed Services Procurement Regulation provisions with which the cancellation ceiling did not comply were written for the protection of bidders, distinguishing

between a contract written in violation of a provision of law enacted for the contractor's protection, and violation of a provision of law as to which it can only be said that the contractor derives an incidental benefit from the provision if it is observed. The contractor in the former case can obtain reformation and is not bound by his estoppel, acquiescence, and even failure to protest.

*Applied Devices Corp. v. United States,* 219 Ct.Cl. at 114, 591 F.2d at 640.

Reiterating the same rule, the United States Court of Appeals for the Federal Circuit, in *Cessna Aircraft Company v. Dalton,* considered when a contractor may assert a breach against the government for violation of law:

The primary intent of a statute or regulation must be to protect or benefit a class of persons in order for that class to be able to bring suit against the government for violating the statute or regulation. *See generally Rough Diamond Co. v. United States,* 173 Ct.Cl. 15, 351 F.2d 636, 640, 642 (1965). We have stated that "if government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence, or failure to protest."(quoting *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1552 (Fed.Cir.1995)) (citing *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 426 F.2d 314, 317 (1970) and *Rough Diamond,* 351 F.2d at 639-43); *see Applied Devices Corp. v. United States,* 219 Ct.Cl. 109, 591 F.2d 635, 640-41 (1979). However, if the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about the government's failure to comply with that statute or regulation, even if that party derives some incidental benefit from compliance with it. *See Rough Diamond,* 351 F.2d at 642; *Hartford Accident & Indemnity Co. v. United States,* 130 Ct.Cl. 490, 127 F.Supp. 565, 567 (1955).

*Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442, 1451-52 (Fed.Cir.1997), *cert. denied,*525 U.S. 818, 119 S.Ct. 57, 142 L.Ed.2d 44 (1998); *see also Gould, Inc. v. United States,* 66 Fed.Cl. 253, 265 (2005), and numerous citations therein; *Hermes Consol., Inc. v. United States,* 58 Fed.Cl. 3, 12-20 (2003), and extensive discussion therein of varying precedent. In this regard, plaintiffs argue that "health plans are a

principal beneficiary of the statutory obligation for compensation," and conclude that plaintiffs did not waive their objections to the inclusion of the Final Year Regulation in their contracts. Defendant argues that the statute was intended to benefit the government and federal employees, not the health plans.

The legislative history of the FEHBA indicates that the Act was designed to provide subsidized health care benefits to federal employees and their families, provided by the private health care industry. *See*H.R.Rep. No. 86-957 (Aug. 20, 1959), *reprinted* in 1959 U.S.C.C.A.N. 2913, 2914. The House Report on the FEHBA stated: "The reported bill makes basic and catastrophic health protection available to approximately 2 million Federal employees and their dependents." *Id.* at 2915. The reported bill provided that taxpayers would pay 50% of the cost of the health care premiums,[FN7] with the federal employees' contribution of the other 50% made through payroll deductions. *Id.* at 2915-17, 2923-24. The House Report reflected that **371** the private health industry was given the opportunity for the new health care business, and specifically named the following private health care carriers in the legislative history: Blue Cross-Blue Shield, the health plan of the National Association of Letter Carriers, the health plan of the National Federation of Post Office Clerks, the Kaiser Foundation plan in California, the Group Health Association plan in Washington, D.C., and the Group Health Insurance plan in New York. *Id.* at 2915. The House Report intended that the rates charged by the private carriers should be competitive with rates charged by the health care industry to other large employers. *Id.* at 2916, 2923.There is no language in the legislative history indicating that rates should not be reconciled if a contract is not renewed, or that either the government or the carriers would leave money on the table in the final year. The House Report also stated:

FN7. Currently the taxpayer subsidy is up to 75%. *See*5 U.S.C. § 8906(b)(2) (2000).

The committee points out that the Civil Service Commission, the Bureau of the Budget, major employee organizations, and leading companies and associations which now provide health benefits and will participate in this program, have agreed to the terms of the reported bill, in a spirit of compromise and cooperation, in order that an effective and financially sound Government employees health benefits program may become a reality at the earliest

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339                                                                                                      Page 30
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

possible time. The committee desires to express its appreciation for this cooperation and joint endeavor to bring about a result in the general interest of the Government and all parties concerned. It is believed that the final agreement represented by the reported bill will receive overwhelming approval by Federal employees, full cooperation by the companies and association which expect to participate, and support of the Government departments and agencies concerned.

H.R.Rep. No. 957 (Aug. 20, 1959), *reprinted* in 1959 U.S.C.C.A.N. 2913, 2917.

The legislative history reflected in the Senate Report on the FEHBA indicated that health care was a $4.5 billion industry, and that there were between 1,000 and 1,100 different insurance carriers offering health insurance to the public, including: "(1) 71 Blue Cross plans, 8 Blue Cross-Blue Shield plans, 58 Blue Shield plans, a number of other nonprofit plans similar to these plans ...; (2) between 800 and 900 insurance companies; (3) 8 group practice prepayment plans ...;(4) certain employee organizations with organized health insurance plans for their own members." *See* S.Rep. No. 86-468, at 1, 7-8 (July 2, 1959). The Senate Report further noted that

Testimony before the subcommittee indicated that the Blue Cross-Blue Shield plans were prepared to offer a national service type plan. That the insurance companies were likewise prepared to offer Federal employees a single national plan was indicated in the testimony of the witness for the insurance industry and was also evident from the Civil Service Commission's proposal of April 15, and from its second proposal of May 18.

Witnesses representing prepaid group practice plans impressed the committee with the scope of benefits these plans were able to provide. The value of the preventive and diagnostic services they provide and the reductions in use of hospitals achieved by use of outpatient facilities were noted.

S.Rep. No. 86-468, at 8-9 (July 2, 1959).

A review of this legislative history indicates that the primary beneficiaries of the FEHBA were individual federal employees who took advantage of having one-half of their health care premiums subsidized by taxpayers, and the health industry, which was given the opportunity for extensive additional business. Although it can be said that the direct beneficiaries of the legislation were the federal employees and corporate health care benefits providers, due to the increased business opportunity, the government also

could be considered an incidental beneficiary in that government employment might appear more attractive with available, partially subsidized health care coverage. The health care industry was a primary beneficiary, in that it was handed health care business for **\*372** up to 2 million federal customers,[FN8] assisted by taxpayer subsidies and employee payroll deductions.

> FN8. Potential customers were estimated at 4.5 million individuals, counting both federal employees and their families. *See* 105 Cong. Rec. H17549, H17553 (daily ed. Sept. 1, 1959) (statement of Rep. Rees of Kansas).

OPM should not be permitted to ignore statutory commands (5 U.S.C. § 8902(i)). Nor should OPM be able to promulgate mandatory clauses (the Final Year Regulation) over health care industry objections, leaving the reasonable impression that further objection is futile; and then insist, in this litigation, that private carriers nevertheless must have raised their objection before award of individual contracts to provide health care services, particularly when the objection involves a future contingency that may or may not occur. Given OPM's treatment of objections during rulemaking, the record reflects that objections prior to contract award similarly would have been futile. Nor should plaintiffs under these facts and circumstances be expected to expend attorney fees on an uncertain issue (whether the mandatory clause violates the statute), to litigate a contingency which has not yet arisen (FEHBP nonrenewal), and may or may not arise in any individual case for years to come, if ever.

Furthermore, under the facts and circumstances of this case, the government was not prejudiced by the plaintiffs' failure to object before award, for, even armed with the knowledge of the protest, the government had no other alternatives to consider, adopt or forego. In this instance, there was no option to negotiate an alternative result or price. The clause was considered mandatory, and failure to include the clause not an option. By way of contrast, in *E. Walters & Company,* the United States Court of Claims stated:

[T]he Government had been prejudiced in consideration of other alternatives.... Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision ... or it could have elected instead, to award the non set-aside

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339                                                                    Page 31
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

quantity in the next least expensive manner.... Plaintiff's silence deprived the Government of that relatively painless alternative.

*E. Walters & Co. v. United States,* 217 Ct.Cl. 254, 265, 576 F.2d 362, 368 (1978) (footnote omitted); *see also Am. Tel. & Tel. Co. v. United States,* 307 F.3d 1374, 1381 (Fed.Cir.2002) ("In short, the proper time for AT & T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT & T did not do."), *cert. denied,* 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003); *Hermes Consol., Inc. v. United States,* 58 Fed.Cl. at 14-15 (discussing *E. Walters & Co. v. United States,* 217 Ct.Cl. at 265, 576 F.2d at 368,* and the requirement that the government show prejudice if it is to prevail on an argument that the claimant has waived its objection). In the present cases, the plaintiffs' silence deprived the government of no other alternatives, and defendant has not demonstrated the requisite prejudice to prevail on a waiver argument. The merits issue of whether OPM's Final Year Regulation violates 5 U.S.C. § 8902(i) was addressed above and concluded in favor of plaintiffs. Plaintiffs are entitled to the benefits of the reformation process, and are "not bound by ... estoppel, acquiescence, and even failure to protest." *Applied Devices Corp. v. United States,* 219 Ct.Cl. at 114, 591 F.2d at 640.

[13] Defendant alternatively argues that laches bars the plaintiffs' claims. To prevail on a defense of laches, the defending party must show unreasonable, unexcused delay by the claimant from the time the plaintiff knew or should have known of the claim, and prejudice to the other party. *See Poett v. Merit Sys. Prot. Bd.,* 360 F.3d 1377, 1384 (Fed.Cir.2004); *JANA, Inc. v. United States,* 936 F.2d 1265, 1269 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992); *United Enter. & Assocs. v. United States,* 70 Fed.Cl. 1, 21 (2006); *see also Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961).

[14] A review of actions taken by plaintiffs on their claims does not reflect unreasonable delay. OPM contracts are executed **\*373** on an annual basis. The record contains a "2000 Contract," no. CS 2074, titled "Contract for Federal Employees Health Benefits," signed by BlueLincs' representative on December 20, 1999 and by the OPM contracting officer on May 1, 2000. The effective date of the 2000 Contract was listed as January 1, 2000. By letter dated July 14, 2000, BlueLincs informed OPM that its final FEHBP year would be the year 2000.

BlueLincs submitted a certified claim to the OPM contracting officer dated July 20, 2001. OPM did not respond to the certified claim, and BlueLincs proceeded to file its complaint in this court on September 7, 2001, although the litigation was delayed pending consolidation with the cases brought by the other two plaintiffs listed in the above caption.

Texas Health's final FEHBP year was 2001. By letter dated September 27, 2001, Texas Health provided written notice to OPM of the nonrenewal of its contract after December 31, 2001. By letter dated January 8, 2002, Texas Health filed a certified claim with the OPM contracting officer. OPM did not respond to the certified claim, and Texas Health filed a claim in the United States District Court for the Eastern District of Texas in January, 2003. In June, 2003, the government moved to dismiss or transfer the case to the United States Court of Federal Claims, arguing that the District Court lacked jurisdiction to hear the plaintiff's claims. A Magistrate Judge of the District Court recommended that the court deny the government's motion, and proceed with the case in the District Court. *See Texas Health Choice, L.C. v. U.S. Office of Pers. Mgmt.,* No. Civ. A. 9:03CV14, 2004 WL 3266033, at \*6-7 (E.D.Tex. Feb.12, 2004). The District Court adopted the Magistrate Judge's recommendation and denied the government's motion to dismiss or transfer. The government appealed the District Court's decision to the United States Court of Appeals for the Federal Circuit. Finding that Texas Health's contract was controlled by the Contract Disputes Act, 41 U.S.C. § § 601-613 (2000), on March 3, 2005, the Federal Circuit reversed the District Court in *Texas Health Choice, L.C. v. Office of Personnel Management,* 400 F.3d at 898. After the Federal Circuit's decision, the Eastern District of Texas District Court transferred Texas Health's case to this court, which was filed on March 16, 2005 as case no. 05-371 C.

Scott & White's final FEHBP year was 1999. By telefax dated September 22, 1999, Scott & White informed OPM that it would be withdrawing from the FEHBP at the end of the 1999 contract year. By letter dated October 10, 2000, Scott & White filed a certified claim with the OPM contracting officer. OPM did not respond to the certified claim, and in August, 2001 Scott & White filed a complaint in the United States District Court for the District of Columbia, which became *Scott & White v. Office of Personnel Management,* No. 01:CV:1824 (JGP). On January 10, 2003, while its case was pending in District Court, Scott & White filed a complaint in the United States Court of Federal Claims, which became

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case no. 03-61 C. The case was assigned to another judge of this court, who dismissed the Court of Federal Claims case due to the pending case in District Court. *See Scott & White v. United States,* No. 03-61C (Fed.Cl. Apr. 22, 2003) (order dismissing case, without prejudice). On March 31, 2005, relying on the Federal Circuit's decision in *Texas Health Choice, L.C. v. Office Pers. Mgmt.,* 400 F.3d at 898, the United States District Court for the District of Columbia transferred the *Scott & White* case to the United States Court of Federal Claims. Scott & White appealed the District Court's March 31, 2005 order, but subsequently agreed to dismiss its appeal. The United States Court of Appeals for the Federal Circuit dismissed Scott & White's appeal on September 1, 2005. The District Court then transferred Scott & White's case to this court, which was filed on September 2, 2005. After all of plaintiffs' cases were transferred to this court, the court consolidated the three cases.

The above review of the actions taken by the plaintiffs to prosecute their claims does not reflect unreasonable delay on the part of plaintiffs, which defendant must demonstrate for its laches defense. *See Poett v. Merit Sys. Prot. Bd.,* 360 F.3d at 1384. Defendant, however, argues that the consideration of laches should begin when the plaintiffs failed to challenge the promulgation of the **\*374** Final Year Regulation in 1990, and that some ten or more years elapsed between the promulgation and the submission of the plaintiffs' claims to the OPM contracting officer. As noted above, BlueLincs' claim was filed with the OPM contracting officer in July, 2001; Scott & White's agency claim was filed in October, 2000; and Texas Health's Claim agency claim was filed in January, 2002. Under the facts and circumstances of these consolidated cases, plaintiffs did not act unreasonably. Plaintiffs were faced with a Final Year Regulation, which had been specifically objected to by the PARTNERS National Health Plan, by OPM's own Inspector General, and by the law firm of Epstein Becker & Green, to no avail. In addition to the apparent futility of obtaining favorable action from OPM on its Final Year Regulation, plaintiffs did not suffer financial impact in 1990. Plaintiffs suffered financial impact in 1999 (Scott & White), 2000 (BlueLincs), and 2001 (Texas Health), the final years which OPM refused to reconcile, although challenged to do so by each plaintiff. Under these facts and circumstances, the court does not find the sort of unreasonable delay required for a laches defense.

Moreover, for a laches defense, defendant is required

to demonstrate prejudice from the alleged unreasonable delay, which defendant has been unable to do. Defendant briefly argues prejudice, citing "fading memories." However, defendant does not cite fading memories from the year 1990, but from the year 2000, and as the above chronology demonstrates, the plaintiffs took timely action to prosecute their claims, beginning with their final years under the FEHBP in 1999 (Scott & White), 2000 (BlueLincs), and 2001 (Texas Health). Furthermore, for these three plaintiffs, calculations of the amounts due plaintiffs had actually been made in the time frame of their final years under the FEHBP. Beginning in July, 1999, OPM completed the reconciliation process on Scott & White's rates with respect to its 1999 contract. During the reconciliation, OPM calculated the difference between Scott & Whites' estimated 1999 contract rates and the rates that should have been charged based upon Scott & White's actual community rates in effect on January 1, 1999. By a letter dated July 30, 1999, Nancy Kichak, Director of the Office of Actuaries, Retirement and Insurance Service for OPM, informed Scott & White that: "We have calculated the difference between the 1999 contract rates and the rates that should be charged based on your plan's actual community rates in effect on January 1, 1999 and the information you provided about the plan's Similar Sized Subscriber Groups (SSSGs)." The parties have stipulated that the 1999 reconciliation resulted in $3,625,782.00 due to Scott & White.

This amount, $3,625,782.00, represents the amount requested by Scott & White in its October 10, 2000, certified claim to David Lewis, a contracting officer in the Insurance Contracts Division of OPM. In its claim to the contracting officer, Scott & White stated: The claim seeks to recover $3,625,782 (the "Claim Amount") in unpaid premiums for the 1999 contract year. Specifically, SWHP [Scott & White Health Plan] requests payment for premiums owed by OPM under the Contract for benefits and coverage provided by SWIP to FEHBP members for the 1999 contract but which OPM did not pay to SWHP.
OPM did not pay the Claims Amount on the ground that SWHP terminated the Contract at the end of the 1999 contract year and therefore was not entitled to a rate reconciliation adjustment. It is SWHP's understanding that OPM relied upon 48 C.F.R. § 1652.216-70(b)(6) in denying SWHP payment on the Claim Amount....
SWHP objects to OPM's refusal to pay the Claim Amount....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The $3,625,782.00 amount, plus interest, also is the amount requested by Scott & White in its lawsuit in this court. Therefore, the record reflects that timely reconciliation action actually was taken with respect to plaintiff Scott & White, negating defendant's claim of prejudice based on "fading memories."

As for Texas Health, before that plaintiff had notified OPM, on September 27, 2001, of its intention to withdraw from the FEHBP on December 31, 2001, OPM actually had **375** reconciled Texas Health's rates for 2001. The record reflects that, based on its reconciliation, OPM concluded that Texas Health was due $622,246.00, and paid that amount to Texas Health. However, after receiving Texas Health's notification that it did not intend to renew its contract, OPM informed Texas Health that it would need to refund the $622,246.00. Specifically, in a letter dated October 15, 2001, Ms. Kichak wrote to Texas Health stating: "We were informed that you [Texas Health] would be withdrawing from the FEHB program at the end of 2001; therefore, we should not have performed a reconciliation of your 2001 contract rates. We need to settle the outstanding amount owed to OPM due to an over payment.... As a result of this overpayment, OPM is due $622,246."

On January 8, 2002, Texas Health filed a certified claim with William T. Stuart, a contracting officer with OPM. In its certified claim, Texas Health stated that it filed the claim, "disputing the action taken by the Office of Personnel Management (OPM) to recoup $622,246.00 paid to TXHC for the 2001 rate reconciliation." Therefore, the record reflects that timely reconciliation action actually was taken with respect to Texas Health, again negating defendant's claim of prejudice based on "fading memories."

As for BlueLincs, before that plaintiff submitted its July 14, 2000 notice of non-renewal to OPM, in April and May of 2000, BlueLincs provided OPM with documentation and a revised proposal for the rate reconciliation process for BlueLincs' contract year 2000. Assuming that the BlueLincs contract would be renewed, OPM conducted a reconciliation with respect to BlueLincs' contract, and determined, at that time, that BlueLincs was owed $364,962.00 for the year 2000.

On July 20, 2001, BlueLincs submitted a certified claim to Abby Block, OPM's Assistant Director for Insurance Programs, requesting that BlueLincs be able to offset the $314,587.00 OPM claimed was owed by BlueLincs against BlueLincs' contract year

2000 rate reconciliation. On March 7, 2002, BlueLincs submitted a supplemental certified claim in the amount of $54,540.00. The total of these two BlueLincs claims is $369,127.00, which is the amount BlueLincs claims before this court. Therefore, the record reflects that timely reconciliation action actually was taken with respect to plaintiff BlueLincs, once again negating defendant's claim of prejudice based on "fading memories." The court concludes that defendant has not demonstrated prejudice, which is a required element of laches, nor, as noted above, has defendant demonstrated the unreasonable delay requisite for a defense of laches. *See Poett v. Merit Sys. Prot. Bd., 360 F.3d at 1384.*

[15] OPM's Federal Employees Health Benefits Acquisition Regulation (FEHBAR), at section 1616.7001, requires that the Final Year Regulation "shall be inserted in all FEHB contracts based on a combination of cost and price analysis (community rated)," and was, in fact, inserted in the contracts of all three plaintiffs. For the reasons discussed above, the court finds that this FEHBAR-required Final Year Regulation, 48 C.F.R. § 1652.216-70(b)(6), conflicts with the intent of the FEHBA statute, 5 U.S.C. § 8902(i). As for a remedy, "[w]hen a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory...." *Am. Tel. & Tel. Co. v. United States, 177 F.3d at 1376.* Plaintiffs have requested reformation of the FEHBP contracts to remove the offending provision, and permit reconciliation for the final year of each contract.

In the *LaBarge* case, the United States Court of Appeals for the Federal Circuit stated:
One of our predecessor courts, the United States Court of Claims, has applied the equitable principle of contract reformation when a contract has been written in violation of a law or regulation enacted for the benefit of prospective contractors.... *Applied Devices Corp. v. United States, 591 F.2d 635, 640-41, 219 Ct.Cl. 109, 119-20 (1979)* (holding contractor was entitled to reformation of contract's cancellation charge term because government had violated regulation in calculating charge)....**376** *See also Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed.Cir.1988)* (if government violated applicable regulations in setting economic index incorporated into contract, "the government cannot, by law, benefit from it" and contract must be reformed).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 Fed.Cl. 339
76 Fed.Cl. 339
**(Cite as: 76 Fed.Cl. 339)**

Page 34

*LaBarge Prods., Inc. v. West,* 46 F.3d at 1552; *see also Beta Sys., Inc. v. United States,* 838 F.2d at 1186 (noting the legal presumption that the government did not intend to use a clause which would violate the law); *Northrop Grumman Corp. v. United States,* 47 Fed.Cl. 20, 42 (2000) (inferring that the basis for reformation in *Applied Devices Corporation v. United States,* 219 Ct.Cl. at 118, 591 F.2d at 639, was that the parties would not have entered into a contract with an illegal term, but intended compliance with the law). The court finds that the plaintiffs before this court are entitled to reformation of their health care contracts with OPM. Removing the Final Year Regulation will permit reconciliation in the final year, consistent with the statutory direction in 5 U.S.C. § 8902(i). Plaintiffs, and the government, for that matter, are entitled to the amounts, if any, resulting from a reconciliation performed on each plaintiff's FEHBP account.

### CONCLUSION

For the reasons discussed above, the court finds that OPM's Final Year Regulation, 48 C.F.R. § 1652.216-70(b)(6), is arbitrary, and violates the intent of the statutory language in the FEHBA, 5 U.S.C. § 8902(i), which requires rates charged by FEHBP carriers to "reasonably and equitably reflect the cost of the benefits provided." The court, therefore, **GRANTS** the plaintiffs' motions for summary judgment, and **DENIES** the defendant's cross-motion for summary judgment. The plaintiffs in this case shall confer with the defendant regarding damages, preparatory for discussion at a status conference, which will be scheduled in a separate order.

**IT IS SO ORDERED.**

Fed.Cl.,2007.
GHS Health Maintenance Organization, Inc. v. U.S.
76 Fed.Cl. 339

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.