**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MENOMINEE INDIAN TRIBE OF WISCONSIN,** ) ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | **Case Number 07-cv-0812 (RMC)** |
| **UNITED STATES OF AMERICA, et al.** ) ) | |
| **Defendant** ) ) ) | |

**MEMORANDUM OPINION**

The Menominee Indian Tribe of Wisconsin (the "Tribe" or "Menominee") returns to this Court upon remand from the D.C. Circuit, continuing to seek monies from the Department of Health and Human Services, Indian Health Service ("IHS") for contract support costs the Tribe incurred in providing health care services to its members in 1995-2000.  In reversing this Court, the Circuit found that the six-year limitation period for presenting administrative claims, as allowed by the Contract Disputes Act, 41 U.S.C. § 401, *et seq*, can be equitably tolled. *Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 529 (D.C. Cir. 2010) ("*Menominee II* ") ("We agree that the statute is subject to tolling and remand for the district court to consider whether tolling is appropriate in this case.").  The Tribe argues that it is entitled to equitable tolling because: 1) it reasonably relied on a potential class action brought by other tribes complaining of the same insufficient payments; 2) it reasonably believed it was a member of the putative class and thereby was pursuing its claims for contract support costs; and 3) it reasonably believed that, as a member

of the proposed class, it was entitled to suspension of the limitations period during the class certification period.

The United States moves to dismiss, or alternatively for summary judgment, arguing that no equitable tolling is appropriate and that, on the merits, Menominee received all the monies to which it was entitled or that it waived its rights to seek more. The United States also argues that the Tribe cannot recover on its 1999 and 2000 stable-funding claim because even if it were not barred by the statute of limitations, nearly all of the appropriated money was spent. The Tribe opposes each of these arguments and also moves for summary judgment. The Court will grant summary judgment to the United States with respect to the 1996-1998 shortfall claims and the 1999 and 2000 stable-funding claim. The Court will deny both parties' motions with respect to the 1995 shortfall claim.

## I. FACTS

The Menominee Indian Tribe of Wisconsin is a federally recognized Indian tribe and is eligible to enter into contracts with the United States under the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. § 450. The ISDA authorizes tribes to execute "self-determination" contracts with the IHS in order to provide health care programs and other services to their members that the United States has historically provided. The United States pays tribes the amounts the federal government would otherwise spend for such health-related programs and services as well as various administrative costs incurred by the tribes (contract support costs or "CSC").

Each year from 1995 to 2000, Menominee provided health care services to eligible members pursuant to its self-determination contracts. From 1996 to 2000, the Tribe also signed

"Rate Agreements" and "Annual Funding Agreements."[1]  The Rate Agreements were negotiated with the Department of Interior and, according to the Tribe, were used to calculate accurate CSC for the programs and services the Tribe administered.  The Annual Funding Agreements were negotiated with the IHS and, according to the United States, included all CSC owed to the Tribe.[2]  For each year, IHS paid the Tribe the amount of CSC enumerated in the Annual Funding Agreements, but did not pay the amount of CSC the Tribe says is owed pursuant to the Rate Agreements.  Menominee seeks damages for the unpaid CSC for 1995-2000.

## II.  LAW

### A.  Indian Self-Determination and Education Assistance Act

Congress enacted the ISDA in 1975 to allow American Indians and Alaska Natives to contract with the federal government to operate a variety of programs, functions, services, and activities previously provided by the federal government.  *See* 25 U.S.C. § 450.  For instance, the Secretary of Health and Human Services, through IHS, has provided health care programs to American Indians.  Under the ISDA, an Indian tribe can contract with IHS and administer its own health care programs and the Secretary pays the tribe both the costs IHS would have expended for the programs (the "base" or "Secretarial" costs) and CSC.

---

[1] In 1995, the Tribe had a Rate Agreement but no Annual Funding Agreement.  For that year, the lump-sum CSC was listed in the self-determination contract and not in a separate agreement.

[2] The Tribe contends that there was no negotiation with respect to the Annual Funding Agreements and that IHS knew that there were insufficient appropriations to pay full CSC for every eligible tribe and therefore offered a lesser amount on a "take it or leave it" basis.  If additional funds came in, IHS would unilaterally modify the funding agreements and pay the Tribe more; however, there was never sufficient money to fully pay the CSC as calculated using the rates in the Rate Agreements.

CSC include both direct costs (such as workers' compensation insurance) and indirect costs (such as rent, utilities, and payroll for management and administration) that a tribe incurs in administering its programs. *See Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 634 (2005). Most CSC are indirect and they are "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe." *Id.* at 625 (quoting Br. for Federal Parties at 7).

### B.  Contract Disputes Act

In 1978, Congress enacted the Contract Disputes Act ("CDA") which "establishe[s] a comprehensive framework for resolving contract disputes between executive branch agencies and government contractors." *Menominee II*, 614 F.3d at 521.  As originally enacted, there was no statutory time limit to bring a contract dispute claim under the CDA.  In 1994, Congress amended the CDA to require that contract disputes be submitted to the contracting officer of the relevant agency "within six years after the accrual of the claim."[3]  *See* 41 U.S.C. § 605(a).  The submitted claim "need not be elaborate" and can be reflected in letters alone.  *Arctic Slope Native Association, Ltd. v. Sebelius*, 583 F.3d 785, 797 (Fed. Cir. 2009).

Once a claim has been submitted, the contracting officer generally has 60 days to issue a decision.  *See* 41 U.S.C. § 605(c).[4]  If the decision is unfavorable or not timely issued, the contractor can appeal the decision to the board of contract appeals within the relevant agency or, within 12 months, file suit in the United States Court of Federal Claims.  *Menominee II*, 614 F.3d

---

[3] The only exception is for a government claim against a contractor involving fraud.  *See* 41 U.S.C. § 605(a).

[4] If the claim is for more than $100,000, the contracting officer must issue a decision within 60 days, or notify the contractor of when the decision will be issued.  41 U.S.C. § 605(c)(2).  In the latter case, the decision should be issued "within a reasonable time."  *Id.* at § 605(c)(3).

at 521.  The present case was brought in the District Court for the District of Columbia instead of

the Court of Federal Claims because the ISDA allows a tribe to bring a contract claim in a federal

district court.  *Id.* at 522 (citing 25 U.S.C. § 450m-1(a)).

### C.  Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6).  A

complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds

upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations

omitted).  In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters

about which the court may take judicial notice.  *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059

(D.C. Cir. 2007).  If, in considering a Rule 12(b)(6) motion, "matters outside the pleading are

presented to and not excluded by the court, the motion shall be treated as one for summary judgment

under Rule 56."  Fed. R. Civ. P. 12(d); *see Holy Land Found. for Relief and Dev. v. Ashcroft*, 333

F.3d 156, 165 (D.C. Cir. 2003).  Because the Court has considered matters outside of the pleadings,

it will treat the United States' motion as one for summary judgment.

### D.  Motion for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party

who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.  ANALYSIS

On March 14, 2008, this Court granted in part and denied in part the United States' motion to dismiss. *Menominee Indian Tribe of Wisconsin v. United States*, 539 F.Supp.2d 152 (D.D.C. 2008) ("*Menominee I*").  The Court held that the statute of limitations for filing claims under the CDA barred the 1996-1998 CSC funding claims and that the statute is jurisdictional in nature and therefore not subject to tolling. *Id.* at 153-54.  The Court also held that the 1995 CSC funding claim was barred by laches. *Id.* at 154-55.  The Court denied the motion to dismiss with respect to the 1999-2004 claims because the "ISDA mandates the payment of *full* indirect CSC. . . " *Id.* at 155 (emphasis in original).

On November 18, 2011, the parties stipulated to the dismissal of the 1999-2004 shortfall claims and Menominee then appealed this Court's decision.  The D.C. Circuit reversed this

Court and held that the CDA statute of limitations for filing administrative claims in federal court is not jurisdictional and is thus subject to equitable tolling. *Menominee II*, 614 F.3d at 523-25. The Circuit also held that class action tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), is inappropriate here because Menominee did not timely file an administrative claim and therefore would not have been part of the class in *Cherokee Nation* even had one been certified. *Id.* at 526-529. While the Circuit held that the CDA may be equitably tolled, it could not determine whether it should be tolled in this case because the parties disputed relevant facts.[5] *Id.* at 531. The Circuit remanded the case to determine whether equitable tolling is appropriate. *Id.*

With respect to laches, the Circuit held that the district court: 1) miscalculated the length of the Tribe's delay in submitting a claim; 2) failed to consider the Tribe's argument that the delay was reasonable; and 3) relied on insufficient reasons to hold that the government was prejudiced by the delay. *Id.* at 531-32. The Circuit remanded for the Court to determine if the 1995 claim is barred by laches. *Id.* at 531.

The United States has abandoned it laches argument and instead contends that equitable tolling is inappropriate; that the Tribe released its 1996, 1997, and 1998 claims; that there was no breach of contract because the United States paid the full amounts listed in the Annual Funding Agreements; and that even if there were a breach, Menominee could not recover because there are no longer appropriated funds for the years at issue. Menominee disagrees, asserting that equitable tolling is appropriate; that the alleged releases are invalid; that the United States has not

---

[5] Although the United States argued that there were disputed facts, it now agrees that "[i]t is the significance of these facts, and not the facts themselves, that remain in dispute." Def.'s Supp. Brief [Dkt. # 48] at 2. The Tribe concurs that there are no material facts in dispute that are relevant to the question of equitable tolling. Pl.'s Supp. Brief [Dkt. # 47].

paid the amount of CSC calculated under the Rate Agreements; and that there were sufficient funds during the contract years to pay its CSC claims fully so that it is irrelevant if there are not funds available now.

### A. Equitable Tolling (1996-1998 CSC Claims)

In litigation between private parties, "[f]ederal courts have typically extended equitable relief only sparingly." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). A party seeking equitable tolling has a "high" hurdle to clear. *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998). "Statutes of limitations are not arbitrary obstacles to the vindication of just claims . . . . They protect important social interests in certainty, accuracy, and repose." *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 452-53 (7th Cir. 1990). As such, "[t]he court's equitable power to toll the statute of limitations will be exercised only in extraordinary and carefully circumscribed instances." *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988).

The Supreme Court recently reaffirmed that a litigant must establish two things for equitable tolling to apply: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The Tribe argues that it need not meet this two-prong test because immediately after setting forth this test, the Supreme Court "stressed the flexible nature of tolling as an equitable doctrine" and that "[e]quitable powers are to be exercised 'on a case-by-case' basis rather than according to 'mechanical rules.'" Pl.'s Opp'n at 17 (quoting *Holland*, 130 S.Ct. at 2563).

The flexibility emphasized by the Supreme Court, however, dealt with how courts analyze cases under (not instead of) the two-part rule. Specifically, the Supreme Court rejected the

Eleventh Circuit's mechanical rule that attorney misconduct can never be an "extraordinary circumstance" justifying equitable tolling absent "bad faith, dishonesty, divided loyalty, mental impairment or so forth . . . ." *Holland*, 130 S.Ct. at 2562-63. The Supreme Court's rejection of a hard and fast rule to identify "extraordinary circumstances" does not give this Court license to ignore the necessity for an "extraordinary circumstance." "[C]ourts of equity 'must be governed by rules and precedents no less than the courts of law.'" *Id.* at 2562 (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)). In other words, the Court should "flexibly" consider: 1) whether the Tribe diligently pursued its rights, and 2) whether an extraordinary circumstance prevented it from failing to file a timely claim. The Court has no leeway in the name of "equity" to ignore either factor.

The Tribe relies on the long history of tribal litigation with respect to CSC to support its claim for equitable tolling:

> Despite the clear language of the ISDA, both IHS and the Bureau of Indian Affairs ("BIA") have resisted paying full CSC for at least twenty years, leading to extensive litigation. In 1991, the Ramah Navajo chapter filed a class-action suit against the Secretary of the Interior alleging that BIA systematically underpaid indirect costs by using a flawed indirect cost rate calculation methodology. *Ramah Navajo Chapter v. Lujan*, No. 90-0957 (D.N.M.) ("*Ramah*"). The case later came to include "shortfall claims" of the kind Menominee raises in this case . . . .
>
> In 1993, Ramah moved for certification of a nationwide class of all tribal contractors who had contracted with BIA under the ISDA, and Judge Hansen certified the class. . . . [Despite the Government's argument] Judge Hansen held, however, that exhaustion would be futile, so "it is not necessary that each member of the proposed class exhaust its administrative remedies under the Contract Disputes Act." *Id.* at 4. The fact that Ramah had timely presented its claims satisfied the CDA requirement, and other tribal contractors could participate in and benefit from the class action even if they had not separately presented their own claims.

> In 1997, The Tenth Circuit ruled in favor of Ramah on liability. *Ramah Navah Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997). Settlement discussions ensued [and a partial settlement of $76M was approved]. *Ramah Navajo Chapter v. Babbitt*, 50 Supp. 2d 1091 (D.N.M. 1999). [Menominee shared in this and a subsequent distribution.] . . .
>
> The Cherokee Nation filed a separate class action against IHS on March 5, 1999.  Both the class and the claims were nearly identical to those in the *Ramah* case.  The Cherokee Nation, like Ramah before it, challenged a uniform agency CSC policy . . . .  The proposed class was defined as "[a]ll Indian tribes and tribal organizations operating Indian Health Service programs . . . ."  *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. at
> 360 . . . . Given the [Menominee] experience with the *Ramah* class, it relied on the *Cherokee* class action to represent its claims and it did not file its own lawsuit.

Pl.'s Opp'n at 20-21.

Class certification was denied in *Cherokee Nation* on February 9, 2001. *Cherokee Nation of Okla. v. United States*, 199 F.R.D. 357, 363 (E.D. Okla. 2001).  The Oklahoma District Court later ruled that there was no statutory duty to fund contract support costs fully when there were insufficient appropriations. *Cherokee Nation of Okla. v. United States*, 190 F. Supp. 2d 1248, 1260-61 (E.D. Okla. 2001). Cherokee Nation appealed the latter decision but did not appeal the denial of class certification.  The Tenth Circuit affirmed the district court on appeal. *Cherokee Nation of Okla. v. United States*, 311 F.3d 1054 (10th Cir. 2002).  That same year, the Ninth Circuit, in *Shoshone-Bannock Tribes v. Secretary, Dep't of Health and Human Servs.*, 279 F.3d 660 (9th Cir. 2002), also ruled that tribes are not statutorily entitled to recover full CSC if Congress has not appropriated sufficient funds.

The Federal Circuit disagreed with the Ninth and Tenth Circuits, *Thompson v. Cherokee Nation*, 334 F.3d 1075 (Fed. Cir. 2003), and the Supreme Court granted certiorari to

resolve this split.  *Cherokee Nation of Okla. v. Thompson*, 541 U.S. 934 (2004).  Given the circuit

conflict and imminent review by the Supreme Court, Menominee decided to wait for the Supreme

Court ruling before filing a claim.  Although the Tribe was aware of the six year statute of

limitations, it believed the statute was tolled (as in *Ramah*) by the *Cherokee Nation* suit.  Thus, with

its limited resources, the Tribe opted not to pursue a claim until the Supreme Court decided whether

the government has a statutory obligation to fund fully the CSC contractually agreed to.

The Supreme Court affirmed the Federal Circuit on March 1, 2005.  *Cherokee Nation*

*of Okla. v. Leavitt*, 543 U.S. 631 (2005).  In so doing, the Court rejected the government's argument

that it was not required to pay the full CSC enumerated in Annual Funding Agreements.  *Id.*  638-

40.[6]  Six months later, Menominee filed its administrative claims.

Menominee argues that given its prior success in *Ramah,* it was reasonable to wait

for the resolution of the *Cherokee Nation* case before filing its administrative claim.  As part of this

argument, Menominee states that the United States discouraged the filing of claims prior to the

*Cherokee Nation* decision by the Supreme Court by arguing that tribes who filed claims could not

be part of the *Cherokee Nation* class.  Finally, Menominee  argues that the class pleading in

*Cherokee Nation* was "defective" and thus equitable tolling is appropriate under *Irwin v. Dep't of*

*Veteran Affairs*, 498 U.S. 89 (1990) and *American Pipe & Construction Co. v. Utah*, 414 U.S. 538

(1974).  *Id.* at 18-19.  The Court will address each of these arguments, applying the *Holland*

framework.

---

[6] One notable difference between the agreements in the *Cherokee Nation* case and those here is that the CSC listed in Cherokee Nation's Annual Funding Agreement was unpaid. *Cherokee Nation*, 543 U.S. at 635.  Here, IHS paid the CSC amount listed in Menominee's AFA but did not pay CSC calculated using the rates in the Rate Agreements.

### i. Reasonable to wait

Having previously benefitted from the *Ramah* case (without filing a claim or suit), Menominee likewise believed that it would benefit from *Cherokee Nation* (without filing a claim or suit).  Menominee was aware that it only had six years to file a claim, but assumed that the deadline would be tolled based upon *Cherokee Nation*.  *See* Pl.'s Opp'n, Ex. L (Wakau Decl.) ¶ 8.  Menominee points out that it was not until 2005 that it knew that it could get recompensed for CSC shortfalls, and that it was not until 2010 after *Menominee II* that it knew it needed to have filed a claim to benefit from the *Cherokee Nation* class action.  Given this changing legal landscape and its prior success with *Ramah*, Menominee argues that it was reasonable to wait for resolution of *Cherokee Nation* before filing its administrative claim.  Although the Court is sympathetic, the complete historical facts do not demonstrate that Menominee was diligent in pursuing its claims or that the lack of clarity in the law was an "extraordinary circumstance" to justify equitable tolling.

First, Menominee's focus on the *reasonableness* of its decision to wait is misplaced.  Although it may have been reasonable, given the circumstances, for Menominee to expect to benefit from the *Cherokee Nation* class without filing an administrative claim or attempting to join the action (a point the Court does not reach), the reasonableness of that decision does not necessarily mean that Menominee "pursu[ed] [its] rights diligently."  *Holland*, 130 S. Ct. 2562.  Litigants routinely abandon claims given the costs of litigation, limited financial resources, and/or the uncertainty of the outcome.  If a court equated *reasonableness* in waiting with *diligence* in pursuing, a statute of limitations could be tolled indefinitely, even for litigants who reasonably decide to abandon their claims.  At most, Menominee has demonstrated reasonable inaction, not reasonable diligence, but the latter is required for equitable tolling.

Second, the factors Menominee has identified (prior class action, uncertain legal standard, limited resources, etc.) do not, individually or collectively, amount to "an extraordinary circumstance." Again, it is common for a litigant to be confronted with significant costs to litigation, limited financial resources, an uncertain outcome based upon an uncertain legal landscape, and impending deadlines. These circumstances are not "extraordinary" and are therefore insufficient to support Menominee's claim for equitable tolling.

### ii. Government's alleged switch of position

As part of its argument that it was reasonable to wait for the Supreme Court ruling in *Cherokee Nation*, Menominee alleges that "[d]uring the *Cherokee* case, the Government argued that contractors who presented their own claims should be *excluded* from the class." Pl.'s Opp'n at 21 (emphasis in original). Later, Menominee argues that "it was not until after the Supreme Court's decision [in *Cherokee Nation*] that the government argued, for the first time[,] that asserted class members must first have presented claims to the contracting officer in order to participate in the class." *Id.* at 23. Even looking at the facts in a light most favorable to Menominee, these assertions are in error.

First, Menominee's latter statement is directly contradicted by its own brief. Menominee admits that when Ramah moved for class certification in 1993, "[t]he Government argued that the class could not be certified unless each class member had first exhausted its administrative remedies by filing claims with the agency contracting officer as required by the Contract Disputes Act." *Id.* at 20. Thus, the Government could not have been arguing "for the first time [after the *Cherokee Nation* decision in 2005] that asserted class members must first have presented claims to the contracting officer." *Id.* at 23.

-13-

Second, the Government did not, in fact, argue "[d]uring the *Cherokee* case . . . that contractors who presented their claims should be *excluded* from the class." *Id.* at 21.  Instead, the United States argued that: 1) "[c]ertification of the proposed class would improperly interfere with the litigation of cases raising similar or related issues in other judicial districts,"[7] and 2) "[t]ribes that have received previous judicial decisions on their claims cannot be included in the class because their claims would be barred by the principles of *res judicata*." *Id.* at 13 (citing *Robertson v. Isomedix, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994)).  Thus, the United States was arguing that no class should be certified, not that tribes, by merely filing an administrative claim, would not be allowed to be part of the class if one were certified.

Third, and most importantly, the United States' litigation position throughout these disputes — even if its position had changed or were inaccurate — does not excuse Menominee's failure to file a timely claim.  *See Moreno v. United States*, 82 Fed. Cl. 387, 403 (2008) ("If the fact that the agency expresses a position which turns out to be incorrect is a warrant for tolling, the limitations period would be suspended indefinitely.")

### iii.  Defective pleading

Menominee claims that equitable tolling is appropriate in this case because of a "defective pleading" filed in *Cherokee Nation.*  Menominee argues that because the class as pled was defective under Rule 23, Cherokee Nation filed a "defective pleading" which warrants equitable tolling here.  Pl.'s Reply at 16 [Dkt. # 41]; Pl.'s Opp'n at 19 (the lack of commonality, typicality, and adequate representation in *Cherokee Nation* "is a classic defective pleading scenario.")

---

[7] Def.'s Opp'n to Plaintiffs' Mot. for Class Certification [Dkt. # 88] at 12-13, *Cherokee Nation of Okla. v. United States*, No. 99-092 (E.D. Okla. 2000) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Menominee's argument ignores the distinction between a defective *class* and a defective *pleading* (such as a complaint in the wrong forum, *see, e.g., Burnett v. New York Central R.R. Co.*, 380 U.S. 424 (1965)). The former supports class action tolling; the latter supports equitable tolling. Because there was no defective pleading, *Burnett* is inapposite and Menominee cannot rely on it to support equitable tolling. Moreover, *Burnett* is distinguishable because the plaintiff in that case pursued its claim by filing a complaint (albeit in the wrong court). In this case, the Tribe did not file a complaint anywhere within the limitations period. Accordingly, Menominee's reliance on *Burnett* is further misplaced, and the Tribe's statement that "it had, in effect, filed a defective pleading in the wrong court" is incorrect. Pl.'s Reply at 18.

Menominee's reliance on *American Pipe & Contruction Co.* is also misplaced. *American Pipe* dealt with class action tolling, not equitable tolling. *See Menominee*, 614 F.3d at 526-29.[8] The Circuit has already made it clear that class action tolling under *American Pipe* is inappropriate in this case. *See id.* Thus, Menominee's reliance on *American Pipe* to support equitable tolling is unavailing.

### iv.  Equitable Tolling Conclusion

Menominee is correct that equitable tolling is more than just a mechanical application of the two *Holland* factors. However, 1) Menominee cannot point to any affirmative act it took in

---

[8] Although in passing the Supreme Court suggested that *American Pipe* dealt with equitable tolling, *Irwin,* 498 U.S. at 457-58, *Irwin* did not address the distinction between class action tolling and equitable tolling. *American Pipe* actually dealt with class action, not equitable tolling. *See generally American Pipe*, 414 U.S. 538. *See also Menominee II*, 614 F.3d at 526-529; *Irwin*, 498 U.S. at 457 n.3 (citing *American Pipe* and parenthetically stating "plaintiff's timely filing of a defective class action tolled the limitations period as to the individual claims of purported class members."); *cf. Bright v. United States*, 603 F.3d 1273, 1287-88 (Fed. Cir. 2010) (class action tolling and equitable tolling require different analysis).

over six years to pursue its claim diligently; 2) filing an administrative claim is a relatively simple process; 4) there was no affirmative misconduct on the part of the government; and 5) Menominee does not present any additional facts from which the Court could find equitable tolling aside from those found insufficient to support class action tolling. Thus, equitable tolling is inappropriate and the Court will enter summary judgment will on behalf of the United States.

### B. 1995 Claim

The 1995 claim is not subject to the statute of limitations because the self-determination contract was executed before there was a statute of limitations in the Contract Disputes Act. 48 C.F.R § 33.206. Thus, equitable tolling is not applicable to this claim. There are, however, genuine issues of material fact preventing the Court from granting summary judgment to either party on this claim.

First, the cost rate for 1995 is unclear; it is either 13.80% or 12.73%. *See, e.g.,* Def.'s Reply [Dkt # 38]. Second, Menominee's damage figures set forth in its reply brief do not match those in its Complaint. Third, although the parties agree that $827,534 in CSC was carried over from 1995 to 1996, they disagree as to whether this impacts the amount of CSC due in 1995. The effect of the carry over from 1995 will have to be further briefed before the Court can conclude whether Menominee is entitled to damages on its 1995 claim.

### C. 1996 Claim

Because the Court has determined that equitable tolling is unavailable, there is no need to address each of the government's alternative arguments for judgment for the 1996-1998 years. The Court notes, however, that Menominee's 1996 CSC claim would be time barred even if equitable tolling were appropriate.

Menominee argues that the statute of limitations on its claim for 1996 did not begin to run until January 1, 1999. It relies on the "common formulation," Pl.'s Opp'n at 27, that "[a] claim accrues when damages are ascertainable." *Id.* (quoting *Patton v. United States*, 64 Fed. Cl. 768, 774 (2005) (citations and internal quotations omitted)). Since the 1996 contract did not close until 1998, Menominee argues that its damages were not ascertainable until then. "Until then, IHS could have, and did, supplement CSC for prior years in which the contract was in effect." Pl.'s Opp'n at 27. The argument is without merit. When the 1996 Annual Funding Agreement ended, Menominee knew that the government had not paid it full CSC. Once Menominee knew or should have known that it had a claim for additional contract support costs, the statute of limitations began to run, even if the precise amount of the underpayment had to be further calculated. *See Kinsey v. United States*, 852 F.2d 556 (Fed. Cir. 1988) ("where a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongfully withheld in breach of the contract")*; Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995) (claims for breach of contract generally accrue at the time of the breach).

Moreover, adopting Menominee's argument — that a claim for failing to pay under the *Annual Funding Agreement* does not accrue until the expiration of the *self-determination contract* — could extend the statute of limitations indefinitely. An initial self-determination contract may last for up to three years. 25 U.S.C. § 450j(c)(1)(A). After the contract has "matured," (*i.e.,* been in force for three or more years without significant, material audit exceptions), a tribe can choose a longer contract term, including an indefinite term. 25 U.S.C. § 450b(h) and 450j(c)(1)(B). Thus, if the statute of limitations did not begin to run until after a self-determination contract

expired, the limitations period would remain open indefinitely for tribes with an indefinite contract term.   Such a result would eviscerate the statute of limitations without any equitable basis. Accordingly, the Court finds that the statute of limitations began to run when Menominee's Annual Funding Agreements each expired and not when the underlying self-determination contract expired.

### D.   1999 and 2000 Stable-Funding Claim

Menominee claims that it was underpaid in 1999 and 2000 because the CSC paid to it were less than the amount it was owed in 1998 (the "stable-funding claim").[9]   Menominee's stable-funding claim fails, however based upon the law of the case.   In *Menominee I,* this Court dismissed all of Menominee's CSC claims prior to 1999 based upon the statute of limitations.   *See Menominee I,* 539 F.Supp.2d at 153-54; March 14, 2008 Order [Dkt. #15].   The Court did not dismiss Menominee's claims from 1999 to 2004.   *See id.*   The Court's opinion and order did not distinguish between Menominee's *shortfall* claims for 1999 to 2004 and its *stable-funding* claim for 1999 and 2000.   *See id.*   The order merely dismissed *all* claims for contract years before 1999 and left in tact *all* claims for years after 1999.   *See* March 14, 2008 Order.

After the decision issued and the order was entered, Menominee could have continued to litigate its 1999-2004 claims.   Instead, it agreed to voluntarily dismiss these claims in order to appeal the Court's dismissal of its 1995-1998 claims.   Before doing so, however, the Tribe tried to preserve its stable-funding claim for appeal.   The Tribe stipulated that "[its] third Claim for Relief, entitled Stable Funding, is premised on alleged wrongs that occurred in 1997" and asked that "the

---

[9] Menominee originally based its stable-funding claim on 1997, not 1998.   In its current briefing, however, the Tribe admits that its CSC needs dropped from $404,938 in 1997 to $383,176 in 1998.   *See* Pl.'s Opp'n at 36-37.   Thus, its stable-funding claim is now based upon what it was owed in 1998 and not 1997.   This difference is not material, however, because the statute of limitation expired for both the 1997 and 1998 claims.

Court issue a final order explicitly stating that the Tribe's [stable-funding claim] is barred by the Statute of Limitations." Joint Stipulation [Dkt. # 26] ¶ 2. As requested, the Court entered an order, stating that "[b]ecause the Tribe's [stable-funding claim] is premised on alleged wrongs that occurred in 1997, the claim is time-barred for the reasons explained in the Court's March 14, 2008 Memorandum Opinion." March 27, 2008 Order [Dkt. # 27]. Thus, going up on appeal, the law of the case was that Menominee's stable-funding claim was dependant on whether its claim for 1997 could be tolled.

On appeal, the Tribe did not challenge the Court's order that the Tribe's stable-funding claim was subject to the statute of limitations for 1997. *See* Opening Brief of Appellant, *Menominee II*. Indeed, it would have been difficult for it to do so given its stipulation that its stable-funding claim was "premised on alleged wrongs that occurred in 1997." Joint Stipulation ¶ 2. Having failed to raise the argument on appeal, Menominee's stable-funding claim continued, on remand, to rise and fall on whether or not the Court would toll the statue of limitations for either 1997 or 1998.

In its Motion for Summary Judgment, the United States points out that the Court need not reach the Tribe's stable-funding claim if it does not find that equitable tolling is warranted. The Tribe does not address this argument in its opposition. Instead, it includes a single, conclusory footnote which states, "[t]he 1999 and 2000 stable-funding claim[] [is] not subject to the statute of limitations defense." Pl.'s Opp'n at 33 n.15. The Tribe does not explain why this claim is not subject to the statute of limitations, nor does it explain how this footnote is consistent with either its prior stipulation or the Court's prior order which held otherwise. In any event, whatever merit may lie with the argument that the 1999 and 2000 stable-funding claim is not barred by the statute of

limitations that ran with the Tribe's 1997 or 1998 shortfall claim, that argument is foreclosed by the law of the case and has been waived by the Tribe.

        The law of the case simply holds that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *see also LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (*en banc*) ("the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*.") (emphasis in original).  The Court has previously held (at both parties' request) that the Tribe's stable-funding claim was subject to the statute of limitations based upon actions in years prior to 1999 and that is the law of the case.  This should not be disturbed especially when, as here, the Tribe had the opportunity to appeal this decision and failed to do so. *See, e.g., Williamsburg Wax Museum v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987) ("Under the law of the case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.") Accordingly, the Court will grant summary judgment in favor of the United States on the Tribe's stable-funding claim.[10]

---

[10]  Additionally, the Court finds that the Tribe also waived its argument that its stable-funding claim for 1999 and 2000 is not time-barred by failing to respond to the government's argument. *See, e.g., Hopkins v. Women's Div., Bd. of Global Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.")

**IV.  CONCLUSION**

Because Menoniminee cannot demonstrate that it is entitled to equitable tolling, the Court will grant summary judgment to the United States with respect to Menominee's shortfall claims for 1996 to 1998 and its stable-funding claim for 1999 and 2000.  The Court will deny without prejudice both parties' motions for summary judgment with respect to the Tribe's 1995 claim.  A memoralizing Order accompanies this Memorandum Opinion.


Date:   January 24, 2012                        _____/s/_____
                                                ROSEMARY M. COLLYER
                                                United States District Judge